**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
      pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

| | |
|---|---|
| JOSEPH SALKOWITZ, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br><br>    vs.<br><br>HENRY SCHEIN, INC., STANLEY M. BERGMAN, and STEVEN PALADINO,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

-------------------------------------------------------X

Plaintiff Joseph Salkowitz ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Henry Schein, Inc. ("Henry Schein" or the "Company"), as well as media and analyst reports about the

Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded Henry Schein securities from March 7, 2013 through February 12, 2018, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company conducts business in and has principal executive offices in this Judicial District.

5.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying PSLRA Certification, acquired Henry Schein securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.    Defendant Henry Schein provides health care products and services to dental practitioners and laboratories, animal health clinics, physician practices, government, institutional health care clinics, and other alternate care clinics worldwide. The Company is a Delaware corporation with its principle executive offices located at 135 Duryea Road, Melville, New York 11747. Henry Schein securities trade on the NASDAQ Global Select ("NASDAQ") market under the symbol "HSIC."

8.    Defendant Stanley M. Bergman ("Bergman") has been the Company's Chairman and Chief Executive Officer ("CEO") since 1989 and a director since 1982. Bergman was President from 1989 to 2005, Executive Vice President from 1985 to 1989 and Vice President of Finance and Administration from 1980 to 1985.

9.    Defendant Steven Paladino ("Paladino") has been the Company's Executive Vice President and Chief Financial Officer ("CFO") since 2000. Paladino was Senior Vice President and CFO from 1993 to 2000 and has been a director since 1992. From 1990 to 1992, Paladino served as Vice President and Treasurer and Corporate Controller from 1987 to 1990.

10.    Defendants Bergman and Paladino are herein referred to as "Individual Defendants."

11.    Collectively, Defendant Henry Schein and Individual Defendants are herein referred to as "Defendants."

12.    Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.      approved or ratified these statements in violation of the federal securities laws.

13.     Henry Schein is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

14.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Henry Schein under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

15.     On February 13, 2013, Henry Schein filed an annual report on Form 10-K for the fiscal year ended December 29, 2012 (the "2012 10-K") with the SEC, which provided the Company's annual financial results and position. The 2012 10-K was signed by Defendants Bergman and Paladino. The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

16.     The 2012 10-K discussed the competition, stating in relevant part:

**Competition**

The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products. Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

*In North America, we compete with other distributors, as well as several manufacturers, of dental, medical and animal health products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the sale of our dental products, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company*. . . .

(emphasis added).

### Defendants' False and Misleading Class Period Statements

17.     On March 7, 2013, the Company issued a press released entitled "Henry Schein Recognized By Ethisphere As One Of The World's Most Ethical Companies For Second Year In A Row." The press release stated in relevant part:

MELVILLE, N.Y., March 7, 2013 /PRNewswire/ -- Henry Schein, Inc. (NASDAQ: HSIC), the world's largest provider of health care products and services to office-based dental, medical and animal health practitioners, announced today that it was again named to Ethisphere® Institute's 2013 World's Most Ethical Companies Ranking™ for exemplary ethical leadership, worldwide business standards and commitment to corporate social responsibility.

Honored by Ethisphere in 2012 and 2013, Henry Schein continues to be recognized for being a health care industry leader in upholding the highest ethical standards and business practices. This year, Henry Schein was among 138 companies recognized by Ethisphere, a leading international think tank dedicated to the creation, advancement and sharing of best practices in business ethics, corporate social responsibility, anti-corruption and sustainability. This is the seventh year that Ethisphere Institute has published the World's Most Ethical Companies Ranking.

"Since our founding eighty years ago, a deep commitment to the highest ethical standards has always been a central part of the character of Henry Schein, and this commitment forms the very foundation of our business model," said Stanley M. Bergman, Chairman of the Board and Chief Executive Officer of Henry Schein, Inc. "We are very proud to again be honored by Ethisphere Institute in recognition of our success in implementing exceptional worldwide business standards as well as our enduring dedication to enhancing access to health care for the underserved through our global corporate social responsibility program, Henry Schein Cares."

Henry Schein Cares stands on four pillars: engaging Team Schein Members to reach their potential, ensuring accountability by extending ethical business practices to all levels within Henry Schein, promoting environmental sustainability, and expanding access to health care for underserved and at-risk communities around the world.

The evaluation criteria for the World's Most Ethical Companies Ranking includes an in-depth assessment of Corporate Citizenship and Responsibility; Ethics and Compliance Program; Culture of Ethics; Corporate Governance; and Reputation, Leadership and Innovation. Based on the "Ethics Quotient" score derived from this evaluation, the top percentile performers in each industry are further evaluated through a stringent due diligence process.

Selected from thousands of nominated companies, Henry Schein was honored this week at Ethisphere's Dinner Awards Ceremony at the Grand Hyatt Hotel in New York City during the 5th annual Global Ethics Summit. For more information on Ethisphere's World's Most Ethical Companies rankings, please visit http://ethisphere.com/worlds-most-ethical-companies-rankings.

18.     On May 7, 2013, the Company filed a Form 10-Q for the quarter ended March 30, 2013 (the "1Q 2013 10-Q") with the SEC, which provided the Company's first quarter 2013 financial results and position. The 1Q 2013 10-Q stated the Company's disclosure controls were effective as of March 30, 2013. The 1Q 2013 10-Q was signed by Defendant Paladino.

19.     The 1Q 2013 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.     The 1Q 2013 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

\*     \*     \*

*Industry Consolidation*

\*     \*     \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

21.     On August 6, 2013, the Company filed a Form 10-Q for the quarter ended June 29, 2013 (the "2Q 2013 10-Q") with the SEC, which provided the Company's second quarter 2013 financial results and position. The 2Q 2013 10-Q stated the Company's disclosure controls were effective as of June 29, 2013 and that "there have been no changes in our internal control over financial reporting that occurred during the quarter ended June 29, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The 2Q 2013 10-Q was signed by Defendant Paladino.

22.     The 2Q 2013 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23.     The 2Q 2013 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

\*     \*     \*

*Industry Consolidation*

\*     \*     \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

24.     On November 5, 2013, the Company filed a Form 10-Q for the quarter ended September 28, 2013 (the "3Q 2013 10-Q") with the SEC, which provided the Company's third quarter 2013 financial results and position. The 3Q 2013 10-Q stated the Company's disclosure controls were effective as of September 28, 2013. The 3Q 2013 10-Q was signed by Defendant Paladino.

25.     The 3Q 2013 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.     The 3Q 2013 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the

potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

*      *      *

*Industry Consolidation*

*      *      *

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

27.    On February 11, 2014, Henry Schein filed an annual report on Form 10-K for the

fiscal year ended December 28, 2013 (the "2013 10-K") with the SEC, which provided the

Company's annual financial results and position. The 2013 10-K was signed by Defendants

11

Bergman and Paladino. The 2013 10-K contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

28.     The 2013 10-K discussed the competition, stating in relevant part:

**Competition**

The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products. Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

*In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the sale of our dental products, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company*. . . .

(emphasis added.)

29.     On May 6, 2014, the Company filed a Form 10-Q for the quarter ended March 29, 2014 (the "1Q 2014 10-Q") with the SEC, which provided the Company's first quarter 2014 financial results and position. The 1Q 2014 10-Q stated the Company's disclosure controls were effective as of March 29, 2014 and that "there have been no changes in our internal control over financial reporting that occurred during the quarter ended March 29, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" The 1Q 2014 10-Q was signed by Defendant Paladino.

30.     The 1Q 2014 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

31.     The 1Q 2014 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices.  It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.  We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

\*       \*       \*

*Industry Consolidation*

\*       \*       \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

32.     On August 4, 2014, the Company filed a Form 10-Q for the quarter ended June 28, 2014 (the "2Q 2014 10-Q") with the SEC, which provided the Company's second quarter 2014 financial results and position. The 2Q 2014 10-Q stated the Company's disclosure controls were effective as of June 29, 2014 and that "there have been no changes in our internal control over financial reporting that occurred during the quarter ended June 28, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The 2Q 2014 10-Q was signed by Defendant Paladino.

33.     The 2Q 2014 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

34.     The 2Q 2014 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of

HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

*　　*　　*

*Industry Consolidation*

*　　*　　*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

35.     On November 6, 2014, the Company filed a Form 10-Q for the quarter ended September 27, 2014 (the "3Q 2014 10-Q") with the SEC, which provided the Company's third quarter 2014 financial results and position. The 3Q 2014 10-Q stated the Company's disclosure controls were effective as of September 27, 2014. The 3Q 2014 10-Q was signed by Defendant Paladino.

36.     The 3Q 2014 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

37.     The 3Q 2014 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*        \*        \*

*Industry Consolidation*

\*        \*        \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

38.     On February 11, 2015, Henry Schein filed an annual report on Form 10-K for the fiscal year ended December 27, 2014 (the "2014 10-K") with the SEC, which provided the Company's annual financial results and position. The 2014 10-K was signed by Defendants Bergman and Paladino. The 2014 10-K contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

39.     The 2014 10-K discussed the competition, stating in relevant part:

**Competition**

The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products.  Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

*In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the dental market, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company*. . . .

(emphasis added).

40.     On May 4, 2015, the Company filed a Form 10-Q for the quarter ended March 28, 2015 (the "1Q 2015 10-Q") with the SEC, which provided the Company's first quarter 2015 financial results and position. The 1Q 2015 10-Q stated the Company's disclosure controls were effective as of March 28, 2015. The 1Q 2015 10-Q was signed by Defendant Paladino.

41.     The 1Q 2015 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

42.     The 1Q 2015 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad

array of products and services at low prices.  It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.  We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

*       *       *

*Industry Consolidation*

*       *       *

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our

sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

43.     On July 29, 2015, the Company filed a Form 10-Q for the quarter ended June 27, 2015 (the "2Q 2015 10-Q") with the SEC, which provided the Company's second quarter 2015 financial results and position. The 2Q 2015 10-Q stated the Company's disclosure controls were effective as of June 27, 2015. The 2Q 2015 10-Q was signed by Defendant Paladino.

44.     The 2Q 2015 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

45.     The 2Q 2015 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*        \*        \*

*Industry Consolidation*

\*        \*        \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

46.     On November 4, 2015, the Company filed a Form 10-Q for the quarter ended September 26, 2015 (the "3Q 2015 10-Q") with the SEC, which provided the Company's third quarter 2015 financial results and position. The 3Q 2015 10-Q stated the Company's disclosure controls were effective as of September 26, 2015. The 3Q 2015 10-Q was signed by Defendant Paladino.

47.     The 3Q 2015 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

48.    The 3Q 2015 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices.  It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.  We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*        \*        \*

*Industry Consolidation*

\*        \*        \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and

marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

49.     On February 10, 2016, Henry Schein filed an annual report on Form 10-K for the fiscal year ended December 26, 2015 (the "2015 10-K") with the SEC, which provided the Company's annual financial results and position. The 2015 10-K was signed by Defendants Bergman and Paladino. The 2015 10-K contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

50.     The 2015 10-K discussed the competition, stating in relevant part:

**Competition**

The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products. Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

*In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the dental market, our primary competitors are the*

*Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company.*

(emphasis added).

51.     On May 3, 2016, the Company filed a Form 10-Q for the quarter ended March 26, 2016 (the "1Q 2016 10-Q") with the SEC, which provided the Company's first quarter 2016 financial results and position. The 1Q 2016 10-Q stated the Company's disclosure controls were effective as of March 26, 2016 and that "there have been no changes in our internal control over financial reporting that occurred during the quarter ended March 26, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The 1Q 2016 10-Q was signed by Defendant Paladino.

52.     The 1Q 2016 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

53.     The 1Q 2016 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

    In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*   \*   \*

*Industry Consolidation*

\*   \*   \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

54.     On August 4, 2016, the Company filed a Form 10-Q for the quarter ended June 25, 2016 (the "2Q 2016 10-Q") with the SEC, which provided the Company's second quarter 2014 financial results and position. The 2Q 2016 10-Q stated the Company's disclosure controls

were effective as of June 25, 2016 and that "there have been no changes in our internal control over financial reporting that occurred during the quarter ended June 25, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" The 2Q 2016 10-Q was signed by Defendant Paladino.

55.     The 2Q 2016 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

56.     The 2Q 2016 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.
                            *        *        *
*Industry Consolidation*

26

*     *     *

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

57.    On November 2, 2016, the Company filed a Form 10-Q for the quarter ended September 24, 2016 (the "3Q 2016 10-Q") with the SEC, which provided the Company's third quarter 2016 financial results and position. The 3Q 2016 10-Q stated the Company's disclosure controls were effective as of September 24, 2016 and that "there have been no changes in our internal control over financial reporting that occurred during the quarter ended September 24, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The 3Q 2016 10-Q was signed by Defendant Paladino.

58.    The 3Q 2016 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

59.     The 3Q 2016 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*          \*          \*

*Industry Consolidation*

\*          \*          \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and

marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure, although there can be no assurances that we will be able to successfully accomplish this. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

60.    On February 21, 2017, Henry Schein filed an annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Bergman and Paladino. The 2016 10-K contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

61.    The 2016 10-K discussed the competition, stating in relevant part:

**Competition**

The distribution and manufacture of health care supplies and equipment is highly competitive.  Many of the health care distribution products we sell are available to our customers from a number of suppliers.  In addition, our competitors could obtain exclusive rights from manufacturers to market particular products.  Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

*In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on*

*the basis of price, breadth of product line, customer service and value-added products and services. In the dental market, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company*. . . .

(emphasis added).

62.     On May 9, 2017, the Company filed a Form 10-Q for the quarter ended April 1, 2017 (the "1Q 2017 10-Q") with the SEC, which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q stated the Company's disclosure controls were effective as of April 1, 2017. The 1Q 2017 10-Q was signed by Defendant Paladino.

63.     The 1Q 2017 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

64.     The 1Q 2017 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution

companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*       \*       \*

*Industry Consolidation*

\*       \*       \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure, although there can be no assurances that we will be able to successfully accomplish this. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

65.     On August 8, 2017, the Company filed a Form 10-Q for the quarter ended July 1, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q stated the Company's disclosure controls were effective as of July 1, 2017 and that "[t]here have been no changes in our internal control over

financial reporting that occurred during the quarter ended July 1, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." The 2Q 2017 10-Q was signed by Defendant Paladino.

66.     The 2Q 2017 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

67.     The 2Q 2017 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support. We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*       \*       \*

*Industry Consolidation*

\*       \*       \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations. In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure, although there can be no assurances that we will be able to successfully accomplish this. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

68.     On November 6, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q stated the Company's disclosure controls were effective as of September 30, 2017. The 3Q 2017 10-Q was signed by Defendant Paladino.

69.     The 3Q 2017 10-Q contained signed SOX certifications by Defendants Bergman and Paladino attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

70.     The 3Q 2017 10-Q stated how the growth of collective buying groups would impact the Company and how it was positioned to capitalize on a trend of consolidation in the health care industry:

*Industry Overview*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices.  It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.  We believe that the trend towards cost containment has the potential to favorably affect demand for technology solutions, including software, which can enhance the efficiency and facilitation of practice management.

Our operating results in recent years have been significantly affected by strategies and transactions that we undertook to expand our business, domestically and internationally, in part to address significant changes in the health care industry, including consolidation of health care distribution companies, health care reform, trends toward managed care, cuts in Medicare and collective purchasing arrangements.

Our current and future results have been and could be impacted by the current economic environment and uncertainty, particularly impacting overall demand for our products and services.

\*       \*       \*

*Industry Consolidation*

\*       \*       \*

The trend of consolidation extends to our customer base. Health care practitioners are increasingly seeking to partner, affiliate or combine with larger entities such as hospitals, health systems, group practices or physician hospital organizations.  In many cases, purchasing decisions for consolidated groups are made at a centralized or professional staff level; however, orders are delivered to the practitioners' offices.

We believe that consolidation within the industry will continue to result in a number of distributors, particularly those with limited financial, operating and marketing resources, seeking to combine with larger companies that can provide growth opportunities. This consolidation also may continue to result in distributors seeking to acquire companies that can enhance their current product and service offerings or provide opportunities to serve a broader customer base.

Our trend with regard to acquisitions and joint ventures has been to expand our role as a provider of products and services to the health care industry. This trend has resulted in our expansion into service areas that complement our existing operations and provide opportunities for us to develop synergies with, and thus strengthen, the acquired businesses.

As industry consolidation continues, we believe that we are positioned to capitalize on this trend, as we believe we have the ability to support increased sales through our existing infrastructure, although there can be no assurances that we will be able to successfully accomplish this. We also have invested in expanding our sales/marketing infrastructure to include a focus on building relationships with decision makers who do not reside in the office-based practitioner setting.

71.     The statements referenced in ¶¶17-70 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Henry Schein was engaging in unethical, anti-competitive behavior through agreements with Benco Dental Supply Company and Patterson Companies, Inc., in violation of United States antitrust laws; (2) Henry Schein engaged in such behavior, in part, to help maintain profitability in a consolidating health care industry; (3) these violations of U.S. antitrust laws would result in heightened scrutiny by the federal government and a lawsuit filed by the Federal Trade Commission ("FTC"); (4) Henry Schein failed to maintain adequate internal controls; and (5) as a result, Defendants' statements about Henry Schein's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

72.     On February 12, 2018, the FTC issued a press release entitled, "FTC Sues Dental Products Distributors for Alleged Conspiracy Not to Provide Discounts to a Customer

Segment," announcing it filed a complaint against Henry Schein, among others, alleging violations of U.S. antitrust laws. The press release states, in relevant part:

> **The Federal Trade Commission filed a complaint against the nation's three largest dental supply companies, a public version of which will be linked to this news release shortly, alleging that they violated U.S. antitrust laws by conspiring to refuse to provide discounts to or otherwise serve buying groups representing dental practitioners. These buying groups sought lower prices for dental supplies and equipment on behalf of solo and small-group dental practices seeking to gain discounts by aggregating and leveraging the collective purchasing power and bargaining skills of the individual practices.** The complaint also alleges an FTC Act Section 5 violation against Benco for inviting a fourth competing distributor to join the conspiracy.

> **The alleged agreement among Benco, Henry Schein and Patterson deprived independent dentists of the benefits of participating in buying groups that purchase dental supplies from national, full-service distributors. As full-service dental distributors, Benco, Henry Schein and Patterson offer gloves, cements, sterilization products and a range of other consumable supplies, as well as equipment, such as dental chairs and lights.** Collectively, the big three control more than 85 percent of all distributor sales of dental products and services nationwide. The U.S. market for dental products is valued at approximately $10 billion. The dental practices that would have benefited from the discounts achieved by these buying groups were small businesses comprised of solo or small groups of dentists.

> **Benco and Henry Schein allegedly entered into an agreement refusing to provide discounts to or compete for the business of buying groups. The complaint details communications between executives of the two companies evidencing the agreement, as well as attempts to monitor and ensure compliance with the agreement. The complaint also asserts that Patterson joined the agreement.** The complaint charges Benco, Henry Schein and Patterson of conspiring in violation of Section 5 of the FTC Act.

> The complaint also alleges that on multiple occasions, Benco invited Burkhart Dental Supply – a regional distributor and the fourth largest full-service distributor in the United States – to refuse to provide discounts to buying groups. As a result of this conduct, the complaint separately charges Benco with a Section 5 invitation to collude count.

> **Based on the agreement among the distributors, the complaint contends that Benco, Henry Schein and Patterson unreasonably restrained price competition for dental products in the United States; distorted prices and undermined the ability of independent dentists to obtain lower prices and discounts for dental products; deprived independent dentists of the benefits of vigorous price and**

*service competition among full-service, national dental distributors; unreasonably reduced output of dental products to dental buying groups; and eliminated or reduced the competitive bidding process for sales to these buying groups. This case reflects the Commission's ongoing efforts to ensure competition in the healthcare industry.*

The Commission vote to issue the administrative complaint was 2-0. The administrative trial is scheduled to begin on Oct. 16, 2018.

(emphasis added).

73.      On this news, shares of Henry Schein fell $4.79 per share or over 6.64% to close at $67.39 per share on February 13, 2018, damaging investors.

74.      On February 15, 2018, the FTC published its redacted complaint against Henry Schein. The Complaint provides evidence of Henry Schein's agreement with Benco and Patterson to refuse to provide discounts to or compete for the business of buying groups from "no later than July 2012" to "at least into 2015." The FTC complaint provides, in relevant part:

*A. Evidence of the Distributors' Agreement and Benco's Invitation to Burkhart*

32. Benco and Schein entered into an agreement to refuse to provide discounts to or compete for Buying Groups no later than July 2012.

33. Historically, Benco had a policy of refusing to sell or provide discounts to Buying Groups. Schein had historically worked with some Buying Groups, but began pursuing an anti-Buying Group strategy. This change followed frequent inter-firm communications between Benco's XXXX and Schein's XXXX prior to July 2012.

34. XXXX and other top Schein executives began instructing its sales force to avoid selling to Buying Groups. As a result, Schein refused to provide discounts to or compete for the business of new Buying Groups.

35. In July 2012, Benco suspected that Schein was offering discounts to a Buying Group named XXXX. On July 25, 2012, XXXX contacted Benco for a dental supply agreement and informed Benco that it had purchased products from Schein and worked directly with XXXX. XXXX, a Benco executive who oversaw its Buying Group policy, forwarded XXXX's email inquiry to XXXX, stating: "Better tell your buddy XXXX [XXXX] to knock this shit off." XXXX responded: "Please resend this e-mail without your comment on top so that I can print & send to XXXX [XXXX] with a note. The good news is: perhaps they're

looking to us because Schein told them NO. That works for me." A few days after this exchange, XXXX rejected XXXX.

36. Patterson joined the agreement to refuse to provide discounts to or otherwise compete for Buying Groups no later than February 2013.

37. In February 2013, Benco suspected that Patterson was offering discounts to a Buying Group in New Mexico. On February 8, 2013, XXXX emailed Patterson's XXXX, XXXX:

> "Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups (though we do work with corporate accounts) and our team understands that policy."

38. Historically, Patterson did not have the same policy as Benco, and Patterson executives had not instructed its sales force to refuse to recognize, work with, or offer discounts to Buying Groups.

39. On February 8, 2013, upon receiving XXXX's email, XXXX forwarded XXXX's email to two other Patterson executives: then- XXXX, XXXX, and XXXX, XXXX. XXXX responded to XXXX's email later that day: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these."

40. Like Benco and Schein, top Patterson executives began instructing its sales force to avoid selling to Buying Groups no later than February 2013. As a result, Patterson refused to provide discounts to or compete for the business of new Buying Groups.

41. On February 26, 2013, in response to an inquiry from a Benco regional manager about the XXXX Buying Group, XXXX stated: "I just sent [XXXX] a note about it. Don't want to call because it might be construed as price fixing."

42. In late February 2013, pursuant to the agreement, each of the Respondents refused to submit a bid for a customer called XXXX ("XXXX"), as each of the Distributors believed it to be a Buying Group.

43. In a February 27, 2013 e-mail, Patterson's XXXX instructed his sales team to reject XXXX, stating that both Benco and Schein were also rejecting Buying Groups: "Confidential and not for discussion..our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me." XXXX also stated in an email to XXXX on February 27, 2013: "I'm concerned that Schein and Benco sneak into these co-op bids and deny it."

44. Benco, Schein, and Patterson executives then began communicating about whether XXXX was, in fact, a Buying Group.

45. First, on March 25, 2013, XXXX called XXXX, at XXXX's request. During the call, which lasted approximately 8.5 minutes, the executives discussed XXXX, and XXXX informed XXXX that Benco would not bid on XXXX. Following the call, XXXX and XXXX continued exchanging text messages about XXXX and whether it qualified as a Buying Group. On March 27, 2013, XXXX informed XXXX by text message that Benco had determined XXXX was not a Buying Group, but a corporate dental practice, and that Benco would bid for XXXX's business:

> "XXXX: Did some additional research on the XXXX deal, seems like they have actually merged ownership of all the practices. So it's not a buying group, it's a big group. We're going to bid. Thanks."

46. The following day, on March 26, 2013, XXXX contacted a Benco sales representative to seek information about a Buying Group called XXXX, to which Benco suspected Schein was offering discounts. The Benco sales representative provided details about the purported relationship between Schein and XXXX. Later that day, XXXX copied this information into a text message to XXXX, and commented: "As per my guy in Raleigh: . . . Could be a rumor, sometimes stories go around. Thanks." In the same text message, XXXX also reaffirmed Benco's commitment that it would not work with this Buying Group.

47. XXXX and XXXX exchanged additional text messages and phone calls, culminating in a 5.5 minute phone call on April 3, 2013. Following these communications, both Schein and Benco changed course and submitted a bid for XXXX. Benco won the XXXX contract around May 2013.

48. XXXX and XXXX also communicated about whether XXXX was a Buying Group. On June 6, 2013, after learning that Benco won XXXX's business, XXXX emailed XXXX, replying to the email thread in which XXXX previously invited Patterson to join the agreement in February 2013. XXXX asked XXXX for more information about Benco's agreement with XXXX:

"Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with XXXX? . . . I'm wondering if your position on buying groups is still as you articulated back in February? . . . Sometimes these things grow legs without our awareness!"

49. On June 8, 2013, XXXX responded to XXXX that XXXX was a corporate dental practice, not a Buying Group, and that Benco's position on Buying Groups had not changed. XXXX assured XXXX that Benco's bid was consistent with the agreement. XXXX promised XXXX that Benco will "continue monitoring the process to ensure that XXXX delivers on their commitment to us." XXXX offered

to discuss the issue further. XXXX replied to XXXX on June 10, 2013: "Sounds good XXXX. Just want to clarify where you guys stand."

50. Following this exchange, XXXX informed Patterson's sales team to change course and pursue XXXX's business. Patterson ultimately competed for XXXX's business despite previously notifying XXXX that it would not submit a bid.

51. Throughout 2013, Buying Groups continued to seek supply contracts with Patterson. On August 2, 2013, a new Patterson executive asked XXXX (Patterson XXXX ) and XXXX (Patterson XXXX): "Is it worth it to explore GPO??????? . . . I used to get 1 [request] per month . . . " XXXX responded: "We don't need GPO's in the dental business. Schein, Benco, and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry."

52. On September 4, 2013, when Patterson announced the creation of its Special Markets Division—a division devoted to handling large accounts—it announced internally in a memorandum to regional and branch managers that it would exclude Buying Groups as a potential customer opportunity.

53. In or around September 2013, Benco learned that Burkhart had entered into a supply agreement with a Buying Group. Upon learning this news, Benco attempted to persuade Burkhart to stop discounting to Buying Groups.

54. On September 13, 2013, Benco's XXXX, XXXX, called Burkhart's Vice President of Sales, Jeff Reece. During this phone call, XXXX expressed Benco's concerns about Burkhart's decision to sell to Buying Groups. XXXX told Reece that Buying Groups were a threat to the dental industry.

55. On September 16, 2013, XXXX reported his conversation with Reece to XXXX and XXXX: "I spoke with Jeff Reece at length late Friday about buying groups. JEFF DOES NOT GET IT!!!! . . . I will be meeting with Jeff at the ADA [American Dental Association] meeting to continue the discussion."

56. In response to XXXX's email on September 16, 2013, XXXX asked XXXX to reach out to Schein and Patterson: "XXXX - - maybe what you should do is make sure you tell XXXX [XXXX] and XXXX [XXXX] to hold their positions as we are."

57. On October 1, 2013, Benco's XXXX called his counterpart at Schein, XXXX. During this call, XXXX reaffirmed Benco's commitment against Buying Groups and informed XXXX that Benco would not bid on the Buying Group XXXX. Neither distributor bid on XXXX in 2013.

58. On October 9, 2013, XXXX informed his superior of this communication with Benco:

"Next time we talk remind me to tell you about my conversation with XXXX at SM Benco. They're anti Buying Group and XXXX recently reached out to them. I'm being careful not to cross any boundaries, like collusion."

59. At the Dental Trade Alliance ("DTA") annual meeting in Ponte Vedra Beach, Florida in October 2013, Benco again attempted to persuade Burkhart to stop discounting to Buying Groups. XXXX told Reece that Burkhart's decision to sell to Buying Groups was not acceptable, and expressed concern and disappointment at Burkhart's Buying Group strategy. XXXX attempted to convince Reece that Burkhart should stop selling to Buying Groups. Burkhart continued to sell to Buying Groups after these communications.

60. In January 2014, Benco's XXXX and XXXX discussed the Buying Group XXXX. XXXX wrote: "Very familiar [with XXXX]. Talked to them three times. Nothing is different. XXXX [XXXX] at Schein and I talked specifically about them. Buh-bye."

61. In 2014 and 2015, contemporaneous documents from the Distributors' executives continued to confirm the existence of a conscious commitment to a common scheme.

62. For example, in June 2014, a Patterson executive wrote in a text message: "[W]e've signed an agreement that we won't work with GPO's.**"

63. In May 2015, Benco's XXXX rejected a Buying Group and commented in an internal email: "The best part about calling these [buying groups] is I already KNOW that Patterson and Schein have said NO."

64. In June 2015, Benco's XXXX informed a Benco sales representative: "We don't allow [volume discount] pricing unless there is common ownership. Neither Schein nor Patterson do either."

65. Through these and other inter-firm and intra-firm communications, the Distributors exchanged mutual assurances, reached a meeting of the minds, ensured compliance with, and monitored the agreement that no Distributor would provide discounts to or compete for the business of Buying Groups.

66. As a result of the agreement, Benco, Schein, and Patterson lost customers and sales to small, fringe distributors that did offer discounts to Buying Groups.

*B. The Distributors Communicated about State Dental Association Buying Groups*

67. The Distributors continued their pattern of private, inter-firm communications about Buying Groups when they learned that the Texas and Arizona Dental Associations were creating statewide Buying Groups.

68. The Texas Dental Association ("TDA") and Arizona Dental Association ("AZDA") are state dental associations with member dentists across the states of Texas and Arizona, respectively.

69. In October 2013, TDA launched a buying program for its members called "TDA Perks Supplies" (the "TDA Buying Group"), supplied by SourceOne Dental, an online dental distributor. The TDA Buying Group offered discounted supplies to its members.

70. The Distributors viewed the TDA Buying Group as another threat from a Buying Group.

71. Shortly after TDA announced the TDA Buying Group, employees at Benco, Schein, and Patterson engaged in repeated inter-firm communications to apprise each other of their intended response to this new Buying Group. The Distributors discussed collectively withdrawing from the TDA's 2014 annual trade show ("TDA Trade Show"). These communications spanned several months, including, but not limited to, the following:

> a. In October 2013, at XXXX's direction, Benco's Texas regional manager called a Schein Texas regional manager to inform him that Benco was considering pulling out of the TDA Trade Show. According to a summary of the call, the Benco regional manager stated: "XXXX will be reaching out to . . . XXXX to see if [Schein] would do the same thing." Benco's regional manager, at XXXX's direction, also communicated with Patterson's regional manager to discuss withdrawing from the TDA Trade Show.

> b. On December 11, 2013, Benco's Texas regional manager stated the following in regards to the TDA Buying Group: "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against them." Also in December 2013, a Schein regional manager in Texas visited a Patterson branch manager, who informed him that Patterson would not be attending the TDA Trade Show. Schein's zone manager passed this information along to his boss, stating: "FYI Patterson pulled out of [the TDA] Convention. I firmly believe they made the move expecting us to follow suit."

> c. On January 6, 2014, Schein's XXXX, XXXX, and Patterson's XXXX (XXXX), communicated by phone regarding TDA. XXXX and XXXX spoke for 14 minutes. On January 21, 2014, XXXX

sent a XXXX follow-up email with the subject, "Texas," and stated, "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days."

d. On April 16, 2014, Benco's XXXX emailed Schein's XXXX and Patterson's XXXX about the TDA Buying Group. XXXX forwarded an article about the Buying Group, and stated: "Thought you'd be interested in this 'essay' from our friends at the TDA."

72. Benco, Schein, and Patterson each informed the TDA that they would not attend the 2014 TDA Trade Show. Benco, Schein, and Patterson did not attend the 2014 TDA Trade Show.

73. Benco, Schein, and Patterson similarly discussed withdrawing from the AZDA annual trade show in response to AZDA's creation of a Buying Group in July 2014. On July 21, 2014, Benco's Arizona regional manager emailed a Patterson branch manager in Arizona about the AZDA Buying Group, and stated: "I know that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in [Arizona]."

Following inter-firm communications in the summer of 2014, all three distributors withdrew from the AZDA Western Regional Conference ("AZDA Trade Show").

74. The Distributors' inter-firm communications and subsequent withdrawal from the TDA and AZDA Trade Shows are evidence of their conscious commitment to coordinate their response to the threat of Buying Groups.

75.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Henry Schein during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)      the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

83.      Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84.      Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

85.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

89.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the

Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

91.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

92.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

93.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

94.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

98.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the

unlawful conduct alleged which artificially inflated the market price of the Company's securities.

99.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

100.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: March 7, 2018                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:<u>/s/Phillip Kim</u>
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
         pkim@rosenlegal.com

Counsel for Plaintiff