**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE HENRY SCHEIN, INC. SECURITIES LITIGATION | Master File No.<br>1:18-cv-01428-MKB-VMS<br><br>CLASS ACTION |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................ 2

II.    PARTIES ............................................................................................ 7

     A.     Lead Plaintiff ............................................................................ 7

     B.     Defendants ............................................................................. 8

         1.     Henry Schein, Inc. ...................................................... 8

         2.     Individual Defendants ................................................. 9

III.   JURISDICTION AND VENUE ........................................................ 10

IV.   BACKGROUND OF THE FRAUD ................................................... 10

     A.     Schein's Dental Business ....................................................... 10

     B.     Defendants Knew That Investors Were Concerned About Margin Compression and Repeatedly Sought to Reassure Them That Schein Would Compete on Price While Preserving Market Share Through Service and Offerings ....................................................................... 13

     C.     After Accusations Concerning Anti-Competitive Practices, Defendants Repeatedly Assured Investors That Schein's Business Operated in a "Highly Competitive Environment" ................................................... 15

V.    DEFENDANTS' FRAUDULENT SCHEME ................................... 19

     A.     Defendants Conspired With Benco and Patterson to Fix Margins and to Exclude Lower-Priced Competitors From the Market .......................... 20

         1.     Schein Conspired With Benco and Patterson to Block Buying Groups ................................................................. 22

         2.     Schein, Benco, and Patterson Colluded to Boycott State Dental Association Buying Groups and to Quash Competition From a new Online Dental Supplier ....................................... 29

         3.     The Allegations Against Schein Are Further Corroborated by a Knowledgeable Former Employee ............................. 37

         4.     Schein Colludes With Benco, Patterson, and Dentsply to Cut out Dental Brands for Less's Low-Margin Sales of Dentsply Products ........ 38

5.      Schein Colludes to Block Competition from Archer & White and
        Dynamic in Oklahoma and Arkansas ...................................................... 40

6.      Schein Works to Control Archer & White's Distribution of
        Instrumentarium Products ........................................................................ 46

VI.     LOSS CAUSATION – THE TRUTH ABOUT DEFENDANTS' COLLUSIVE
        CONDUCT IS REVEALED TO INVESTORS ................................................ 48

        A.      Revelations Affecting Trading on August 8, 2017 ............................... 48

        B.      Revelations Affecting Trading on November 6, 2017 .......................... 50

        C.      Revelations Affecting Trading on February 13, 2018 .......................... 52

        D.      Post-Class Period Developments .......................................................... 55

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER ............................................ 56

VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 59

        A.      Defendants' Materially False and Misleading Statements and Omissions in
                Schein's SEC Filings ............................................................................ 59

        B.      Defendants' Materially False and Misleading Statements and Omissions in
                Conference Calls and Investor Presentations ....................................... 65

IX.     PRESUMPTION OF RELIANCE ................................................................. 73

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................... 74

XI.     CLASS ACTION ALLEGATIONS .............................................................. 74

XII.    COUNTS .................................................................................................... 76

        Count I  Violations of Section 10(b) of the Exchange Act and Rule 10b-5
        Promulgated Thereunder  (Against the Speaking Defendants) ........................... 76

        Count II  Violations of Section 20(a) of the Exchange Act  (Against the Individual
        Defendants) .................................................................................................. 78

XIII.   PRAYER FOR RELIEF ............................................................................. 80

XIV.    JURY DEMAND ........................................................................................ 81

1.      Lead Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami Retirement Trust" or "Lead Plaintiff") brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of itself and all other similarly situated purchasers of the securities of Henry Schein, Inc. ("Schein" or the "Company") from March 7, 2013 through February 12, 2018, inclusive (the "Class Period").

2.      Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on, among other things, the independent investigation of Court-appointed Lead Counsel Bernstein Litowitz Berger & Grossmann LLP. This investigation included, among other things, a review and analysis of: (i) Schein's public filings with the United States Securities Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) transcripts of Schein's investor calls and of conferences at which Defendants (defined below) spoke; (v) analyses of securities movement and pricing data; (vi) complaints, other publicly-filed court documents, and documents filed in connection with governmental investigations; (vii) interviews with and review of materials provided by persons with first-hand knowledge of the facts alleged herein; and (viii) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.   PRELIMINARY STATEMENT[1]

3.    This case is about Defendants' false and misleading statements made to portray their dental distribution business as successfully producing excellent profits while operating in a highly competitive environment. Defendants repeatedly and misleadingly attributed the strength of their dental distribution business to the quality of their value-added business model. These false and misleading statements caused Schein's share price to trade at artificially inflated prices during the Class Period. However, Defendants misrepresented and failed to disclose that, in reality, they had engaged for years in collusive and anticompetitive practices in order to maintain Schein's margins, profits, and market share. Throughout the Class Period, and even before it, Defendants engaged in extensive efforts to collude with their so-called competitors – other distributors of dental products, including two behemoths who, together with Schein, controlled the vast majority of the dental market – to fix gross profit margins and illicitly frustrate attempts by state dental associations and smaller dental practices to join together in buying groups to achieve economies of scale and lower prices. Defendants' collusive practices are detailed in this complaint, as are their materially false and misleading statements. When the market learned the truth – that Schein's purported profit margins and market share were unsustainable and had been inflated by collusive conduct – over $2.75 billion in shareholder value was lost.

4.    The market for dental products in the United States generates approximately $10 billion in annual sales. Defendant Schein is the largest distributor of dental supplies and equipment, with a market share representing approximately 37.5% of U.S. sales. Schein's chief competitors are Patterson Dental ("Patterson") (a division of Patterson Companies, Inc.), which has approximately 33% market share, and Benco Dental Supply Company ("Benco"), which has

---

[1] Unless otherwise noted, any emphasis in quotations contained in this Complaint is added.

approximately 12% market share. Collectively, these three firms control approximately 85% of the market for dental goods in the United States.

5.     Throughout the Class Period, Defendants went out of their way to address investor concerns about how the Company was maintaining such healthy profit margins and fighting off the risk of lower-priced competition – including by denying that it had any exposure to or liability for collusive or anti-competitive conduct. Schein dismissed all of these concerns and repeatedly rejected the possibility that the health of its dental business was attributable to anything beyond its ability to compete with rivals based on the merit of its value-added offerings. In fact, Defendants Schein, Bergman (the CEO) and Paladino (the CFO), with information furnished by Defendant Sullivan (the President of Schein's North American dental business), consistently and repeatedly reassured investors that Schein operated in an extremely competitive environment. For example, Schein's Class Period SEC filings stated that: "[o]ur distribution business is characterized by . . . *intense competition*"; "we *compete with other distributors* . . . *primarily on the basis of price*"; and "[i]n the sale of our dental products, our primary competitors are [Patterson] and [Benco]." Similarly, during conference calls and investor conferences, Defendant Bergman claimed that "[o]ur prices are competitive," "I am a big fan of the free market," and "*[w]e have been competing strongly with our major competitors and the smaller competitors for decades*," while Defendant Paladino asserted that "we're very competitive in pricing." Defendants explained the Company's high margins in such a competitive environment by claiming that Schein offered a suite of value-added services that were very desirable to the Company's customers. For example, during one Class Period earnings call, Defendant Bergman stated: "The proposition we offer is based on a value, a *margin generation* value that enables us to fund the value-added services, which we believe are unique in the market."

- 3 -

6.     These statements were intended to, and did, soothe and comfort investors about any concerns arising from possible competition from other distributors or from the impact of alleged collusive conduct. Prior to the end of the Class Period, securities analysts covering Schein made no inquiries about collusion and never attributed any risk (or even discussion of possible risks) to any alleged collusive conduct. Unfortunately for investors, Defendants' statements  on those subjects were also materially false and highly misleading given the anti-competitive and collusive practices that Defendants were engaging in throughout the Class Period. Instead of competing fiercely with other distributors in a free market system, Schein was actually colluding with them – using several different, coordinated means to work with Benco, Patterson, and others to protect pricing, margins and market share.

7.     Due in part to the small number of firms that control an outsize percentage of overall sales, the market for dental products, including consumable supplies, e.g., exam gloves, is prone to collusive conduct. Many of these products are commoditized and undifferentiated. Under normal circumstances it would be expected that purchasers (dental practices) would largely make purchasing decisions based on price – thereby eroding margins for companies participating in the supply chain (i.e., manufacturers and distributors like Schein). Investors were aware of this risk and frequently inquired about it – only to be met with Defendants' false and misleading assurances mentioned above. But Schein and the small number of other distributors, who collectively exerted significant control over almost the entire market, used their power to maintain inflated profit margins by squeezing out lower cost competitors and stifling attempts by customers to themselves exert more market power. These efforts also included cooperation – often under duress – from certain suppliers and manufacturers of dental products, too.

8.      In fact, emails and other statements by Schein executives reflect Defendants' participation in industry-wide efforts to collusively fix gross profit margins at 32% to 34%. Schein and other market participants aggressively sought to preserve those margins, and explicitly told competitors who were seeking to undercut them by competing on price, and thus by selling at lower margins, not to do so. Schein both threatened to and did retaliate against competitors, purchasers or sellers who sought to undercut their inflated prices.

9.      Thus, despite their statements to the contrary, Defendants actively engaged in multiple forms of undisclosed collusive conduct, designed either to protect profit margins or crowd out potential competition. These efforts, described in detail below, are evidenced by first-hand accounts of Schein executives' own statements, as well as emails, text messages, and other communications. For example, beginning by July 2012, Schein, along with its competitors, in particular, Patterson and Benco, engaged in a coordinated effort to block sales to "group purchasing organizations" or "buying groups," which sought to collect individual and smaller practices' orders to purchase dental products in bulk at lower prices than were otherwise available to them. Schein participated for years in efforts to force manufacturers and other distributors not to sell to these buying groups, and to boycott state dental associations in Texas, Arizona, and elsewhere that were taking steps to organize buying groups. Schein and the other distributors similarly engaged in efforts to block competition through sales of products by Smile Source and SourceOne Dental, Inc. ("SourceOne"), each of which was engaged in efforts to partner with buying groups to provide online sales of discounted medical products.

10.      Schein also colluded with other distributors to maintain gross margins and used manufacturers to punish competitors who tried to sell at prices that could threaten the industry-wide margin-fixing scheme. For example, when Archer & White Sales, Inc. ("AW") and Dynamic

Dental Solutions ("Dynamic") attempted to take share in dental markets by offering lower prices, Schein and other participants in the cartel used their influence, as major distribution partners to the manufacturers Danaher Corporation ("Danaher") and Instrumentarium Dental Inc. ("Instrumentarium"), to force Danaher and Instrumentarium to cut off AW from selling their products. These efforts are reflected in detailed accounts attributed to Schein's senior salespeople. Similar efforts were made by Schein to cut off sales of products made by Dentsply International Inc. ("Dentsply") through online distributors selling at discount prices.

11.     The collective effect of these actions stands in sharp contract with the Defendants' repeated statements that they invited and encouraged competition, including based on price, all while attributing the strength of their dental distribution business to their value-added model. Those statements were patently untrue and incredibly misleading.

12.     Defendants' knowledge or recklessness in making their repeated representations about "competitiveness" is also clear. The details of these schemes reveal Defendant Sullivan's extensive personal involvement in the collusive activities, as well as the participation of several of Sullivan's direct reports, including David Steck, Director of Sales for the dental division. For their part, Defendants Paladino and Bergman signed the Company's Class Period SEC filings, which disclosed the existence of numerous lawsuits, filed before and during the Class Period by competitors and purchasers alleging the same or similar collusion. While Schein repeatedly denied any liability for claims that it had colluded with Benco, Patterson, and others, Schein's disclosures about those suits undeniably put Paladino and Bergman on notice that Schein may have been engaged in collusive activities. Either Paladino and Bergman investigated those claims, and thus had knowledge of the collusive practices that contradicted their Class Period statements, or they failed to investigate and made their statements concerning competition and margins with reckless

disregard for the truth. Defendants' scienter is also supported by, among other things, the importance of the dental business to Schein's overall operations and results and by Bergman and Paladino's massive sales of over $53 million in Schein common stock at artificially inflated prices during the Class Period.

13.     The truth was revealed to investors in a series of partial disclosures beginning in August 2017, when, as result of its inability to continue or expand its collusive conduct, Schein was forced to report weakness specifically in its North American dental consumables business for second-quarter 2017. That same day, Schein's stock price fell by over 5% as a result. On November 6, 2017, the Company made similar revelations while reporting on the very next quarter: it announced margin compression in the dental business and an associated guidance cut for full fiscal year 2017, as well as disclosing for the first time two of the collusion-related lawsuits against the Company. These revelations caused a further 10% decline in Schein's stock price. Finally, on February 12, 2018, investors were shocked to learn that the U.S. Federal Trade Commission ("FTC") had filed an action against Schein, Patterson and Benco alleging in detail illegal collusion in the dental distribution business based on a lengthy and thorough investigation.[2] As a result of the revelation, and the assumption that any collusive practices would now be forced to end, Schein's share price declined by nearly 7%. All told, when the truth concerning Defendants' fraud was revealed to investors, ***it wiped out over $2.75 billion in Schein's market capitalization***.

## II.     PARTIES

### A.     Lead Plaintiff

14.     Lead Plaintiff Miami Retirement Trust is a defined benefit pension fund for the benefit of certain public employees of the City of Miami, Florida. As of its audit for fiscal year

---

[2] *In the Matter of Benco Dental Supply Co., et al.*, Docket No. 9379 (Fed. Trade Com.) (the "FTC Action").

2016, Lead Plaintiff had approximately $617 million in assets held for the benefit of its members. As set forth in the certification previously filed with this Court (ECF No. 16-2), Miami Retirement Trust purchased Schein common stock during the Class Period and were damaged by Defendants' conduct as alleged herein.

### B.   Defendants

#### 1.   Henry Schein, Inc.

15.   Defendant Henry Schein, Inc. is a Delaware corporation headquartered in Melville, New York. Schein's common stock is listed on NASDAQ and actively traded under the symbol HSIC. As of February 15, 2018 Schein had 153,694,200 shares of common stock outstanding.[3]

16.   Schein is purportedly the world's largest distributor of healthcare products and services, and reported worldwide net sales of approximately $12.5 billion and U.S. net sales of approximately $7.9 billion in 2017. The Company's health care distribution business is its largest by far, comprising approximately $12 billion of Schein's $12.5 billion 2017 net sales.

17.   Schein's health care distribution business consists of three primary segments:

- ***Dental***: Schein's dental distribution business consists of more than 49,000 stock-keeping units ("SKUs") and includes products and services such as infection-control products, handpieces, preventatives, impression materials, composites, anesthetics, teeth, dental implants, gypsum, acrylics, articulators, abrasives, dental chairs, delivery units and lights, X-ray supplies and equipment, equipment repair and high-tech and digital restoration equipment. The dental segment, including sales in both the U.S. and internationally, accounted for approximately $6 billion in net sales, or nearly 50% of net sales at the Company, in fiscal-year 2017.

- ***Animal Health***: Schein's animal health distribution segment consists of more than 14,000 SKUs and includes products and services such as branded and generic pharmaceuticals, surgical and consumable products and services, and equipment. Schein's animal health segment accounted for approximately $3.5 billion in net sales in fiscal-year 2017.

---

[3] On September 14, 2017, Schein's common shares split on a 2:1 basis; unless otherwise noted, all share price and daily volume amounts noted in this Complaint have been adjusted to account for the split.

- *Medical*: Schein's medical distribution segment consists of more than 48,000 SKUs and includes products and services such as branded and generic pharmaceuticals, vaccines, surgical products, diagnostic tests, infection-control products, X-ray products, equipment and vitamins. The medical segment accounted for approximately $2.5 billion in net sales in fiscal-year 2017.

### 2.    Individual Defendants

18.    Defendant Stanley M. Bergman ("Bergman") is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Schein. Bergman has served in those roles since 1989 and has served as an executive of the Company since at least 1980.

19.    Defendant Steven Paladino ("Paladino") is the Chief Financial Officer ("CFO") and an Executive Vice President of Schein. Paladino has served in these roles since 2000, and has been with Schein since 1987.

20.    Defendant Timothy J. Sullivan ("Sullivan") is the President of Schein's North American Dental Group, and has overseen Schein's U.S. dental operations since at least 2006. In 1997, Schein acquired Sullivan Dental Products, Inc. ("Sullivan Dental"), which had been led by Defendant Sullivan's father, Robert Sullivan. At the time, Defendant Sullivan served as the President, CFO, and as a Director of Sullivan Dental. In 2001, Defendant Sullivan entered into a consent order with the SEC in connection with allegations that he had engaged in insider trading in 1997 by tipping off three individuals about Sullivan Dental's impending acquisition by Schein. Sullivan was required to pay disgorgement, interest, and civil penalties and was, in addition, permanently enjoined from committing future violations of Section 10(b) and Rule 10b-5.

21.    Defendants Schein, Bergman, and Paladino are sometimes collectively referred to herein as the "Speaking Defendants." Defendants Bergman, Paladino, and Sullivan are sometimes collectively referred to herein as the "Individual Defendants," and, together with Schein, the "Defendants."

III.    JURISDICTION AND VENUE

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Schein's principal executive office is located within this District at 135 Duryea Road, Melville, New York, 11747, and many of the acts and practices complained of herein occurred in substantial part in this District.

24.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

IV.    BACKGROUND OF THE FRAUD

A.    Schein's Dental Business

25.    Schein is a dominant player in the $10 billion annual U.S. dental market. Schein has approximately 37.5% share, while its largest two competitors, Patterson and Benco, have shares of approximately 33% and 12% respectively – meaning that Schein, Patterson, and Benco collectively control nearly 85% of the market. Small discount distributors account for a further 12%.

26.    Schein's dental products distribution business represents the lion's share of its health care distribution business, which in turn constitutes well over 90% of the Company's entire portfolio. For Fiscal Year 2017 ("FY 2017"), dental products distribution accounted for 48.5% of Schein's total net sales, amounting to more than $6 billion in net sales. Schein's gross profit from its health care distribution segment was more than $3 billion in FY 2017; although Schein does

not break out its profit for the dental products distribution sub-segment, it has explained that margins in dental products are higher than in the Company's medical and animal health businesses, and so it is likely that dental products distribution represents 50% or more of the Company's gross profits.

27. Over the past two decades, the U.S. dental market has undergone dramatic changes which presented serious threats to distributors' margins and motivated attempts to collude to preserve them. Among other things, Schein noted in each of its Forms 10-K and 10-Q filed during the Class Period that in "recent years" its customers in the health care distribution segment, which includes the dental products distribution business, have "increasingly focused on cost containment." Schein further noted that the importance of cost containment to health care "accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which . . . emphasi[ze] . . . obtaining products at competitive prices."

28. Consistent with Schein's analysis, a 2017 report by the Center for Workforce Studies at the State University of New York at Albany's School of Public Health noted a clear trend towards consolidation in the dental market: for example, while the total number of dental practice firms increased by 11.1% from 2002 to 2012, over the same period the total number of firms with fewer than 5 employees grew only by 4.8%, while the total number of firms with 1,000 or more employees grew by 267%. The same study noted that the growth in dental support organizations ("DSOs") – organizations that "provide practice management services such as employment and human resources, billing, accounting, regulatory compliance, lease arrangements, [and] purchasing services" could also be explained in part by attempts at reigning in costs in the dental industry: it noted that "the number of DSOs has grown substantially across the US" and

attributed that growth in part to "[e]conomic . . . influences, including costs associated with delivering oral health services."

29.     One key cost containment mechanism that has grown in popularity in recent years is the use of buying groups or group purchasing organizations ("GPOs"). These entities help healthcare providers realize savings and efficiencies by aggregating purchasing volume and using the resulting leverage to negotiate discounts with manufacturers, distributors, and other vendors. Buying groups have been popular in the medical supply industry for many years, and have proven to be effective at reducing costs: for example, a June 2017 study commissioned by the Healthcare Supply Chain Association found that, in the medical field, "providers realize savings of 10-18% by using GPOs, measured relative to the costs providers would have incurred if they negotiated prices on their own." The study further found that the savings generated by GPOs "are likely to be especially valuable to smaller, rural hospitals, which may benefit relatively more than larger hospitals from GPO services" and that "[p]roviders pass [GPO-related] savings on to patients."

30.     In fact, Schein had direct experience with margin compression in the medical segment due to the operation of GPOs, and it specifically warned investors about it. The Company's Form 10-K filed February 23, 2010 included among its discussion of risk factors with respect to Schein's medical products distribution: "Expansion of group purchasing organizations ('GPO') or provider networks and the multi-tiered costing structure may place us at a competitive disadvantage," noting further that "GPOs[] demand more favorable pricing terms." This warning was substantially repeated among the risk factors discussed in each of the Company's Forms 10-K filed during the Class Period.

31.     Schein and its purported "competitors" were well aware that GPOs and other cost containment measures placed the Company's substantial dental segment profits and margins at

risk. Indeed, with respect to its health care distribution segment – of which dental distribution was by far the largest component – Schein disclosed in each of its Class Period Forms 10-K and 10-Q (and in SEC filings prior to the Class Period) that, "[w]ith respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies."

32.     Internal conversations about this issue were even more pointed. Paul Lettieri ("Lettieri"), who worked as a Regional General Manager at the Company from January 2014 through March 2018, and previously in other roles at Schein from 2008, explained that the Company had experience dealing with buying groups on the medical side. The profit margins on the medical side of the Company were much lower because of that different atmosphere. Lettieri further explained that it was well understood at the Company that dental is about 10 years behind medical, but that buying groups were a threat on the dental side that would eventually push down margins.

**B.     Defendants Knew That Investors Were Concerned About Margin Compression and Repeatedly Sought to Reassure Them That Schein Would Compete on Price While Preserving Market Share Through Service and Offerings**

33.     Given the material threat posed to Schein's financial results by a trend towards cost containment in the dental market, investors frequently asked about the Company's margins and competitive environment. Indeed, during Schein's fourth quarter 2016 earnings call on February 21, 2017 (the "Q4 2016 Earnings Call"), Defendant Bergman noted that questions about the competitive environment facing the Company were "probably the most asked question[s] from analysts, other than, how's the market doing."

- 13 -

34.     In response to these questions, the Speaking Defendants regularly made several representations. First, they repeatedly stated that the dental market was extremely competitive. For example, each Schein Form 10-K and Form 10-Q filed during the Class Period stated that the distribution business was marked by "intense competition," and each Form 10-K filed during the Class Period stated that "[t]he distribution . . . of health care supplies and equipment is highly competitive."

35.     Moreover, Defendant Bergman regularly spoke on earnings calls and at investor conferences about the competitive environment facing the Company. For example, during the Company's second-quarter 2016 earnings call on August 4, 2016, Bergman stated with respect to the dental market that "[t]here is no shortage of competitors. Everybody is fighting for that last dollar, so it is a competitive market." Similarly, during Schein's third-quarter 2016 earnings call (the "Q3 2016 Earnings Call"), Bergman similarly assured investors that Schein had "been competing with [its] major competitors and the smaller competitors for decades," while during the Q4 2016 Earnings Call, Bergman stated: "The competition wants our business and we want our competitors' business. It's a fiercely competitive market."

36.     Second, throughout the Class Period, the Speaking Defendants repeatedly stated that, although there was heavy competition in the market, Schein was able to maintain higher prices and margins because it provided a suite of value-added services for which its customers were ready and willing to pay. For example, during the Q3 2016 Earnings Call, Defendant Bergman stated:

> At the end of the day, we believe we have a very strong proposition to offer to our large customers, our mid size customers and our smaller customers. The proposition we offer is based on a value, a margin generation value that enables us to fund the value-added services, which we believe are unique in the market.

Similarly, during the Q4 2016 Earnings Call, Defendant Bergman stated:

> We have, we believe, the most outstanding offering, with tremendous experience in that area. And yes, every now and again, a competitor will go in with a price

that's below ours, and we will not match those prices. Because we believe our offering is of higher value, and we cannot and will not dilute the value that is ascribed to our offering. So I would be understanding that Henry Schein is competitive in the space, highly competitive in the space, has always been competitive.

37.    At the Goldman Sachs Global Healthcare Conference on June 13, 2017, Defendant

Paladino claimed that, in fact, market reaction bore out Schein's hypothesis that its value-added

products and services sustained higher pricing in the dental market. Paladino stated:

[E]ven today, without some of these new entrants, we're not the lowest in the market on every single price, on every single product. But what we do is we have unbelievably good service levels and a really strong offering of value-added products and services. And what we found is the market really wants more than just the lowest price. They want that combination of very competitive pricing as well as all the other services. . . . I think people are voting with their wallet or their checkbook by really saying we really want all of these other services as well as competitive pricing.

**C.    After Accusations Concerning Anti-Competitive Practices, Defendants Repeatedly Assured Investors That Schein's Business Operated in a "Highly Competitive Environment"**

38.    Tellingly, the Speaking Defendants' claims that the market was competitive and

that Schein's service offerings were valued by the market and supported the Company's high

margins were made at the same time as the Company was being named as a defendant in a raft of

lawsuits, filed by customers and smaller competitors, alleging that the Company was engaged in

anticompetitive, protectionist behavior to prevent margins from eroding. In response to these suits,

Schein defended itself vigorously, and routinely denied any wrongdoing.

39.    On August 31, 2012, AW filed a complaint against Schein and certain medical

equipment manufacturers (the "AW Complaint" or "AWC") alleging that Schein had conspired

with Danaher and an unnamed company to force manufacturers to refuse to deal with AW and its

partner Dynamic in order to prevent competition from AW and DDS and thereby to maintain

inflated margins.[4] On August 1, 2017, AW filed an amended complaint under seal, adding Benco and Patterson as defendants and alleging that Schein, Benco, Patterson, and Burkhart Dental Supply ("Burkhart") conspired to fix prices and to refuse to compete with one another, and enlisted Danaher and Instrumentarium (which had subsequently been acquired by Danaher) to discipline AW by throttling its sales of Danaher and Instrumentarium products. AW filed a second amended complaint under seal, adding additional allegations, on October 30, 2017. Defendants first disclosed AW's suit in the Company's Form 10-Q filed November 6, 2017, and did not admit AW's allegations, instead claiming that they "intend[ed] to vigorously defend [them]selves against [AW's] action."

40.     On September 21, 2015, SourceOne filed a complaint against Schein, Benco, and Patterson (the "SourceOne Complaint" or "SC") alleging that the three conspired to pressure state dental associations and manufacturers to prevent the formation of GPOs using SourceOne's online platform.[5] Among other things, the SourceOne Complaint alleged that Schein and its co-conspirators coordinated to block the Texas Dental Association ("TDA") from using SourceOne's platform to form a GPO for TDA members called "TDA Perks Supplies." On June 27, 2017, Schein announced that it would settle the SourceOne Action for approximately $5.3 million. Schein further stated that it denied "any wrongdoing related to the SourceOne litigation and chose to pursue a settlement solely to avoid further distraction and cost resulting from this matter."

41.     On November 6, 2015, Dentsply filed suit against Dental Brands for Less LLC dba Dental Wholesale Direct ("Dental Brands") alleging violations of, among other things, various state and federal unfair competition and trademark-related laws in connection with Dental Brands'

---

[4] *Archer and White Sales, Inc. v. Henry Schein, Inc. et al.*, No. 2:12-cv-00572-JRG (E.D. Tex.) (the "AW Action").

[5] *SourceOne Dental, Inc. v. Patterson Companies, Inc. et al.*, No. 2:15-cv-05440-BMC-GRB (E.D.N.Y.) (the "SourceOne Action").

grey-market sales of Dentsply equipment.[6] On June 7, 2016 Dental Brands answered Dentsply's complaint and filed counterclaims, including allegations that Schein, Benco, and Patterson were engaged in a horizontal price-fixing scheme and conspired to pressure Dentsply and other manufacturers to force out Dental Brands, which offered many identical products as Schein and its co-conspirators at steep discounts. Dental Brands' counterclaims were dismissed in part on October 27, 2016, and Dental Brands filed an amended answer with counterclaim on August 8, 2018 (the "Dental Brands' Second Counterclaim" or "DBSC"). Despite appearing in the Dentsply Action as an interested party on December 30, 2016, Schein never disclosed the Dentsply Action to Schein's investors.

42.   On February 26, 2016, a class of purchasers of dental supplies and equipment filed suit against Schein, Benco, and Patterson alleging that the three conspired to inflate margins by, among other things, agreeing to fix profit margins in the dental market and working to block the entry of lower-priced competitors like AW and SourceOne.[7] A Second Consolidated Amended Complaint in the matter was filed on October 22, 2016 (the "Dentists' Complaint" or "DC"). On August 30, 2018, Schein filed with the SEC a press release announcing that it would pay approximately $38.5 million to settle the case. The press release quoted Defendant Bergman as stating:

> We categorically and emphatically deny any wrongdoing, and we have made a business decision in the best interests of the Company to engage in settlement discussions to avoid long, distracting litigation and the additional use of resources. We have a long history of serving customers with integrity and honesty, and we have earned our reputation for doing business ethically in a competitive business environment.

---

[6] *Dentsply International, Inc. v. Dental Brands for Less LLC*, No. 1:15-cv-08775-LGS-GWG (S.D.N.Y.) (the "Dentsply Action").

[7] *In re Dental Supplies Antitrust Litigation*, No. 1:16-cv-00696-BMC-GRB (E.D.N.Y.) (the "Dentists' Action").

43.     On August 3, 2017, the Attorney General of the State of Texas filed a lawsuit against Schein alleging that it had coordinated with two unnamed co-conspirators to boycott the TDA's annual meeting in May 2014, to pressure manufacturers to join the co-conspirators' boycott, and to pressure manufacturers and distributors not to supply TDA Perks Supplies.[8] That same day, Schein agreed to stipulate to an injunction prohibiting anticompetitive activity, but stated that it "continues to deny [the Texas Attorney General's] allegations as well as any liability or wrongdoing," but agreed to resolve the matter "to avoid the time, uncertainty, and expense of protracted litigation."

44.     On August 17, 2017, IQ Dental Supply, Inc. ("IQ Dental"), a seller of dental supplies who operated through the SourceOne website that had been the subject of the then-recently settled SourceOne lawsuit, filed a complaint against Schein, Benco, and Patterson concerning Schein and its co-conspirators' alleged boycott of the SourceOne website (the "IQ Dental Complaint").[9] In the Company's Form 10-Q filed November 6, 2017 (the "Q3 2017 Form 10-Q"), Schein refused to admit any of IQ Dental's allegations, stating instead that it "intend[ed] to vigorously defend [itself] against [IQ Dental's] action." IQ Dental's case was dismissed on December 22, 2017 on antitrust standing grounds, including because IQ Dental had alleged that it was only able to sign a contract with SourceOne after Schein, Benco, and Patterson had allegedly forced other distributors not to work with SourceOne, and, as a competitor, IQ Dental lacked standing to assert price-fixing claims.

45.     When confronted by each of these claims, Defendants refused to admit any wrongdoing or associated liability. Instead, Defendants regularly and emphatically issued denials

---

[8] *State of Texas v. Henry Schein, Inc.*, No. D-1-GN-17-003749 (Travis Cnty., Tx.) (the "Texas AG Action")..

[9] *IQ Dental Supply, Inc. v. Henry Schein, Inc. et al.*, No. 2:17-cv-4834 (E.D.N.Y.) (the "IQ Dental Action").

stating that they had not engaged in wrongful anticompetitive conduct, thereby reassuring the market that the allegations against the Company lacked merit. Investors' comfort with these denials is reflected by the reality that, until disclosure of the complaint filed by the FTC at the end of the Class Period (the "FTC Complaint" or "FTCC"), Defendants did not address any of the anticompetitive allegations during their quarterly conference calls, analysts did not ask questions about the allegations during those conference calls, and analyst reports did not discuss or focus on Defendants' alleged anticompetitive practices.

## V.    DEFENDANTS' FRAUDULENT SCHEME

46.    As noted above, the market for dental supplies and equipment distribution services in the United States has several characteristics that make it particularly susceptible to anticompetitive conduct. The market is highly concentrated: Schein, Benco, and Patterson collectively constitute between 80% and 90% of the market. This level of market concentration made it easier for Schein, in conjunction with other market participants, to effectuate an anticompetitive scheme, as there were fewer parties whose activities need to be coordinated in order to effect control over the vast majority of the market. In turn, because Schein and a handful of other companies control the vast majority of the market faced by the manufacturers who sell to them, they have the power to dictate terms to those manufacturers.

47.    In addition, the market for dental product and equipment distribution is characterized by relatively elastic demand for many products which are undifferentiated or commoditized (e.g., consumable dental products such as hygienic supplies, gloves and sterilization supplies) and for those products that are offered by multiple competitors. Faced with the reality that a competitor could obtain a competitive advantage by achieving sales at a lower margin, and passing on those margin decreases to customers, distribution firms should attempt to undercut one another's prices to steal market share from one another. However, recognition of this very reality

– that incentives exist to undercut prices, which would in turn yield lower prices and lower profit margins for distributors – creates a greater incentive to engage in collusive anticompetitive conduct to preserve corporate profits. That Schein, Benco, and Patterson (and their other co-conspirators) had the opportunity to raise their distribution prices suggests that the market had been distorted by anticompetitive conduct.

48.     Within this industry context, from at least 2008, Defendants conspired with Schein's horizontal competitors Benco and Patterson (and others) to engage in a variety of anticompetitive conduct, including fixing margins and organizing boycotts (including by manufacturers under their control) of certain competitors and consumers in order to maintain and inflate the Company's profit margins in the face of significant threats.

49.     Knowing that factors allowing for collusive activity were present in the market for dental products, throughout the Class Period, Defendants repeatedly touted that the market was "competitive," that Schein always sought to compete on "price," and that Schein was concerned about losing market share and profit margins. As described below, the last of these representations turned out to be true, but the others were not: rather than compete on price, Schein and the other major distributors of dental products instead engaged in undisclosed efforts to collude in an effort to protect pricing, market share, and profit margins.

A.     **Defendants Conspired With Benco and Patterson to Fix Margins and to Exclude Lower-Priced Competitors From the Market**

50.     From 2005 or earlier, Schein, Benco, Patterson, and others agreed to fix margins for distribution of dental supplies and equipment at 26-28%, and these margins increased over time, reaching 35% by 2016. DC ¶46. Defendants maintained these inflated margins through direct agreement with Benco and Patterson. As discussed further below, during a June 2008 meeting with Skip Pettus, then of Dynamic, Schein Regional Manager Mark Lowery explicitly stated that Schein

- 20 -

and its co-conspirators worked together to ensure that dentists purchased products "for the same price no matter who they buy it from" so that each distributor would "get paid," and further that the margin-fixing scheme had run "unanimously across the industry [for] as long as [Lowery had] been in the dental business." *Id.* ¶¶53, 63, 65.[10]

51.     The high margins Schein, Benco, and Patterson were able to maintain enticed new entrants into the market who sought to take share by offering lower prices or by grouping customers together to exert market power (and for the new competitors, to create economies of scale). However, rather than lower their prices to match the new competitors, which would have reduced the margins Schein, Patterson, and Benco enjoyed, the companies instead illegally conspired to prevent these new entrants from successfully operating in the marketplace. Specifically, Schein, Benco, and Patterson responded to the threat of these new entrants by applying pressure on manufacturers, distributors, and state dental associations to (i) exclude "buying groups" and certain lower-priced competitors, and (ii) attempt to pressure other lower-priced competitors into joining Schein's conspiracy and raising prices. Schein and its co-conspirators effected their conspiracy by communicating through a variety of means, including in private meetings, text messages, phone calls, emails, and intermediaries including personnel of dental supply and equipment manufacturers. *Id.* ¶47.

52.     The conspiracy described herein severely restricted he ability of buying groups and Schein, Benco, and Patterson's aspiring competitors to survive, which in turn preserved market share and allowed the co-conspirators to maintain their margin agreement. Schein denied, and continues to deny, that it had engaged in any of these schemes and has instead repeatedly touted

---

[10] Tellingly, Schein's answer to the Dentists' Complaint concedes that Lowery met with Pettus and that quotes attributed to Lowery were accurate, claiming only that plaintiffs in that case "mischaracterize or take out of context the cited quotations." *See* Answer of Defendant Henry Schein, Inc., *In re Dental Supplies Antitrust Litigation*, 16 Civ. 696 (BMC) (E.D.N.Y.), ECF No. 122 ("Dentists' Answer") ¶¶53, 63, 65.

its efforts to grow and/or maintain its business in the highly competitive dental products business by providing value-added services.

### 1.   Schein Conspired With Benco and Patterson to Block Buying Groups

53.   Schein worked with its peers to quash threats from customers' attempted changes in buying strategies. Specifically, as was revealed by the details set forth in the FTC Complaint against Schein, Benco, and Patterson, Schein illegally conspired with Benco and Patterson (and others) to boycott buying groups in order to prevent such arrangements from reducing the conspirators' profit margins. The roles of Defendant Sullivan, and his chief lieutenant, David Steck, in Schein's efforts to block buying groups are set forth in detail.

54.   As noted above, dental buying groups, which are also known as "group purchasing organizations," "GPOs," "buying clubs," "study clubs," and "buying cooperatives," are groups of independent solo or small group practices that attempt to join together in order to exert market power in buying dental supplies and equipment while still remaining separately owned and operated. By coming together into a buying group, independent dentists can form a larger, more sophisticated single purchaser who is more capable of exerting market power and forcing down margins on dental supplies. Buying groups offer independent dentists the opportunity to enjoy the benefits of purchasing at scale without having to yield operational control over their practices by becoming part of a larger dental practice, corporate dental provider, or other entity.

55.   While buying groups offered the potential for savings on the purchase of dental products, their members, individual dentists, were also generally dependent on the service offerings, inventory and delivery logistics provided by the large distributors of dental products – namely, Schein, Patterson and Benco. Since small dental practices generally do not have the physical capacities to store large volumes of supplies and do not wish to tie up significant amounts of working capital by holding significant inventory of consumable supplies, they rely upon the

service of large distributors to provide such services. Similarly, to avoid interruption in patient care (and revenue), small dental practices require rapid service and repair or replacement of dental equipment. Small dental practices typically rely upon the large dental distributors to provide these services. Given these constraints, Schein, Benco and Patterson's agreement to block sales to buying groups significantly impacted the viability of their very model. This factor also ensured that efforts to block buying groups by Schein and its co-conspirators would be effective.

56.     Schein, Benco, and Patterson feared that buying groups would drive down prices and threaten their profit margins in dental equipment and supplies. For this reason, Schein, Benco, and Patterson feared the expansion of the group purchasing model into the dental industry.

57.     However, each nonetheless had a unilateral incentive to contract with buying groups, which provided the opportunity to reach new customers and increase revenues. If one or two of these major distributors refused to work with buying groups, the other(s) would only be more incentivized to do so – as the reduction in competition would increase the bargaining power of those who remained present in the market. Indeed, absent coordinated action amongst the three, there would be no economic incentive for any of Schein, Benco, and Patterson to unilaterally refuse to deal with buying groups.

58.     Lettieri, Schein's former Regional General Manager, confirmed that Schein sought to collusively block any increase in purchasing power that may have been exercised by buying groups to protect against margin erosion. He also noted that Schein, Benco, and Patterson did not want to support buying groups.

59.     Schein's opposition to buying groups is further reflected in internal Schein emails. For example, in a July 11, 2015 email from Narpat Jain, of EM Dental in New Jersey, to Schein salesperson Matt O'Malley, Jain inquired whether Schein would be interested in providing a

discount for group purchases by members of a New Jersey professional association. O'Malley forwarded that inquiry to his supervisor, Lettieri, asking: "How should I handle this situation??" On July 13, 2015, Lettieri responded and told him, in regard to Jain's question about group purchasing discounts, that "[i]t never really works out[]." Similarly, in an October 26, 2015 email, Lettieri provided salesperson Kimberly Sbarra with a "spreadsheet we are using to help combat buying groups."

60.     As detailed in the FTC Complaint, historically, Schein had worked with some buying groups while Benco had categorically refused to engage them. FTCC ¶33. By July 2012, however, Schein had agreed with Benco to refuse to deal with them going forward. *Id.* ¶32. The agreement between Schein and Benco is evidenced by frequent emails between Defendant Sullivan and Benco Managing Director Chuck Cohen, which confirm that the two companies were working together to fight buying groups. *Id.* ¶33. As a result of the deal struck with Benco as of July 2012, Defendant Sullivan and other Schein executives instructed the Company's sales personnel to avoid sales to buying groups and the Company's policy was not to provide discounts or compete for their business. *Id.* ¶34.

61.     The results of the deal soon began to manifest. Specifically, in July 2012, a buying group named Smile Source contacted Benco to seek to establish a dental supply agreement, and noted that it had worked with Defendant Sullivan and purchased products from Schein in the past. *Id.* ¶35. Patrick Ryan, a Benco sales director, forwarded Smile Source's email inquiry to Chuck Cohen, a Benco managing director, and told Cohen to "tell your buddy Tim [Sullivan] to knock this sh[*]t off." *Id.*[11] Cohen asked Ryan to resend the Smile Source inquiry without Ryan's

---

[11] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations." *See* Answer of Respondent Henry Schein, Inc., *In the Matter of Benco et al.*, FTC Docket No. 9379 (filed: March 6, 2018) ("FTC Answer") ¶35.

comment "so that I can print & send to Tim [Sullivan] with a note. The good news is: perhaps they're looking to us because Schein told them NO. That works for me." *Id.*[12] Benco rejected Smile Source shortly thereafter. *Id.*

62.     Patterson joined Schein and Benco's collusive agreement to refuse to provide discounts to or otherwise compete for buying groups by February 2013, when Cohen of Benco emailed Paul Guggenhim, Patterson's President, after having heard that Patterson was offering discounts to a New Mexico buying group. *Id.* ¶¶36-37. Cohen's February 8, 2013 email to Guggenheim stated:

> Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups (though we do work with corporate accounts) and our team understands that policy.

63.     Although Patterson historically did not share Schein and Benco's approach of refusing to engage buying groups, it shifted policies after Guggenheim (of Patterson) received Cohen's message. Guggenheim responded to Cohen, saying "[t]hanks for the heads up. I'll investigate the situation. We feel the same way about these." *Id.* ¶39. Guggenheim also forwarded Cohen's email to David Misiak and Tim Rogan, Patterson's Vice-President of Sales and Vice President for Marketing, respectively, and soon after, Patterson adopted a policy of refusing to do business with buying groups. *Id.* ¶40. Indeed, when a Benco regional manager inquired about the New Mexico buying group on February 26, 2013, Benco's Cohen stated that he had "sent [Guggenheim] a note about it. Don't want to call because it might be construed as price fixing." *Id.* ¶41.

---

[12] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations." *See* FTC Answer ¶35.

64.     The agreement between Schein, Benco, and Patterson was soon put into effect in the context of a customer called Atlantic Dental Care ("ADC"), which each believed was a buying group. *Id.* ¶42. Just weeks after Schein, Benco, and Patterson communicated about their common policy of rejecting buying groups, each refused to bid for ADC's business. *Id.* Indeed, in an email dated February 27, 2013 Misiak of Patterson pointed to the shared policy in instructing Patterson's sales team to reject ADC, stating: "Confidential and not for discussion [...] ***our 2 largest competitors stay out of these as well***. If you hear differently and have specific proof please send that to me." *Id.* ¶43 (emphasis added).[13]

65.     Over the next weeks and months, executives from Schein and Benco discussed whether ADC was or was not a buying group. *Id.* ¶44. On March 25, 2013, Defendant Sullivan called Benco's Cohen and they spoke for nearly ten minutes, during which conversation the two discussed ADC and Cohen told Sullivan that Benco would not bid for ADC's business. *Id.* ¶45.[14] The two continued discussing whether ADC was a buying group via text message with the aim of seeking clarity on whether ADC was or was not a buying group and whether the firms could do business with ADC and still honor their collusive agreement. *Id.* On March 27, Cohen sent a text message to Sullivan stating that Benco would seek to work with ADC because it had determined that ADC was actually a centrally-owned corporate dental practice and not a buying group comprised of independent dentists: "Tim: Did some additional research on the Atlantic Care deal, seems like they have actually merged ownership of all the practices. So it's not a buying group, it's a big group. We're going to bid. Thanks." *Id.*[15] Cohen and Sullivan continued to communicate,

---

[13] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." *See* FTC Answer ¶43.

[14] Schein admitted that this phone call occurred, but denied that Sullivan discussed ADC. *See* FTC Answer ¶45.

[15] Schein admitted that a Benco senior executive sent this text message. *See* FTC Answer ¶45.

with Cohen sending a text message to Sullivan on March 26, 2013 reaffirming Benco's commitment not to work with a buying group (*id.* at ¶46) and culminating in an April 3, 2013 phone call. *Id.* ¶47.[16] Both Schein and Benco ended up bidding for the ADC contract, which Benco won around May 2013. *Id.* The degree of coordination among these would-be competitors, led by Defendant Sullivan, is clear evidence of their efforts to collude to block buying groups.

66.     Patterson's response to Benco's successful bid for ADC's business further demonstrates the existence of the conspiracy. After Benco won ADC's business, on June 6, 2013, Patterson's Guggenheim replied to the email thread containing Cohen's February 8, 2013 email. *Id*. ¶48. Guggenheim asked Cohen to explain Benco's agreement with ADC in light of Cohen's earlier statement that Benco did not do business with buying groups:

> Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with Atlantic Dental Care? . . . I'm wondering if your position on buying groups is still as you articulated back in February? . . . Sometimes these things grow legs without our awareness!

Cohen responded to Guggenheim two days later, explaining that ADC was a corporate dental practice and not a buying group, that bidding for ADC's business was consistent with Schein, Benco, and Patterson's collusive agreement, and that Benco's position on buying groups was unchanged. *Id.* ¶49. On June 10, Guggenheim replied, "[s]ounds good Chuck. Just want to clarify where you guys stand." *Id.* Patterson soon chose to follow Schein and Benco in competing for ADC's business. *Id.* ¶50.

67.     Schein, Benco, and Patterson continued to receive requests from buying groups in the months and years to come – and to reject them, citing the agreement between the three companies. In August 2013, a new Patterson executive asked his colleagues Misiak and Rogan

---

[16] Schein admitted that several communications and the April 3, 2013 phone call occurred, but denied that they were related to ADC or any other buying group. *See* FTC Answer ¶47.

whether it was "worth it to explore GPO?," to which Rogan responded: "We don't need GPO's in the dental business. ***Schein, Benco, and Patterson have always said no***. I believe it is our duty to uphold this and protect this great industry." *Id.* ¶51 (emphasis added).[17] In or around September 2013, Benco learned that a smaller distributor, Burkhart, was working with a buying group, and moved to stop them. *Id.* ¶53. When Burkhart failed to fall in line, Benco's Ryan asked Cohen to reach out to Schein and Patterson, stating, "maybe what you should do is make sure you tell Tim [Sullivan] and Paul [Guggenheim] to hold their positions as we are." *Id.* ¶56.[18] A few weeks later, on October 1, 2013, Ryan called Schein's Vice-President of Sales Randy Foley, reaffirmed Benco's commitment not to work with buying groups, and told Foley that Benco would not work with Smile Source, the buying group Schein and Benco had colluded to reject in 2012. *Id.* ¶57. On October 9, 2013, Foley told his superior at Schein that he had spoken with Ryan, noting that Smile Source had reached out to Benco and that Benco was "anti Buying Group." *Id.* ¶58.[19] Similarly, in January 2014, Benco's Ryan and Cohen internally discussed Smile Source, with Ryan writing that "Randy [Foley] at Schein and I talked specifically about them. Buh-bye." *Id.* ¶60.[20] True to the agreement between them, neither Schein nor Benco bid on Smile Source's business in 2013. *Id.* ¶57.

68.   The conspiracy to reject buying groups is further evidenced by documents from 2014 and 2015. In May 2015, Patrick Ryan of Benco rejected a buying group, commenting in an

---

[17] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." *See* FTC Answer ¶51.

[18] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." *See* FTC Answer ¶56.

[19] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." *See* FTC Answer ¶58.

[20] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." *See* FTC Answer ¶60.

internal email that "[t]he best part about calling these [buying groups] is I already KNOW that Patterson and Schein have said NO." *Id.* ¶63.[21] In June 2015, Ryan informed a Benco sales representative: "We don't allow [volume discount] pricing unless there is common ownership. Neither Schein nor Patterson do either." *Id.* ¶64.[22]

### 2. Schein, Benco, and Patterson Colluded to Boycott State Dental Association Buying Groups and to Quash Competition From a new Online Dental Supplier

69.    Schein and its co-conspirators' refusal to deal with buying groups and attempts to squeeze out lower-priced competitors came together in Schein, Benco, and Patterson's campaigns to enforce a boycott of online competitor SourceOne and to prevent several state dental associations from launching buying groups for their members with SourceOne's assistance.

70.    SourceOne operated an online marketplace for dental supplies, which was set up to make more than 50,000 distinct types of dental supplies and equipment available directly to dentists, thereby offering dentists a single point of purchase and reduced prices while cutting out wholesale-level distributors like Schein, Benco, and Patterson. SC ¶25. SourceOne planned to aggressively take share from Schein, Benco, and Patterson by partnering with state dental associations to develop GPOs and associated ecommerce websites for their members, which SourceOne would own and operate. *Id.* ¶26. By operating as a GPO (thereby exerting market power with respect to manufacturers) and cutting out traditional distributors, SourceOne was able to offer dental supplies at prices more than 30% lower than those offered by Schein, Benco, and Patterson. *Id.* ¶27.

---

[21] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." *See* FTC Answer ¶63.

[22] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." See FTC Answer ¶64.

71.    The Texas Dental Association ("TDA") and Arizona Dental Association ("AZDA") are state dental associations comprised of dental practices and associated businesses across the states of Texas and Arizona, respectively, and were two significant partners for SourceOne. In October 2013, TDA and SourceOne launched a buying group and associated online sales platform for TDA members called "TDA Perks Supplies." *Id.* ¶28. TDA Perks Supplies was an immediate success, and many other state dental associations planned to emulate TDA in partnering with SourceOne to create GPOs for their members. *Id.*

72.    Schein, Benco, and Patterson viewed SourceOne and TDA Perks Supplies as a significant threat, as it could cause customers to leave them for SourceOne or force them to bring down their margins. *Id.* ¶29. The three companies developed at least two anticompetitive strategies to attempt to quash the threat from SourceOne and related state dental association GPOs.

73.    First, Schein, Benco, and Patterson contacted other distributors who supplied SourceOne in order to pressure them to stop doing so. *Id.* ¶33. Schein and its co-conspirators effected this pressure by threatening to reduce or stop purchasing from distributors who continued to do business with SourceOne. *Id.* At the time, SourceOne sold dental supplies primarily sourced either directly from manufacturers or from two distributors, Arnold Dental Supply ("Arnold") and DDS Dental Supplies ("DDS"). *Id.* ¶34. The manufacturers who sold directly through SourceOne were generally immune to pressure from Schein and its co-conspirators, as those manufacturers did little business with the three companies; those who sold through Arnold and DDS also sold substantial amounts through Schein, Benco, and Patterson, however, and were therefore vulnerable to the three companies' pressure. *Id.*

74.    Indeed, from October 2013 through April 2014, several manufacturers who supplied SourceOne through Arnold and DDS pulled dozens of product lines from SourceOne –

including several of the most popular products on SourceOne's platform. *Id.* ¶35. Arnold and DDS informed SourceOne that these manufacturers' decisions to no longer work with SourceOne were made in response to pressure applied by Schein and/or its co-conspirators. *Id.* By April 2014, SourceOne was no longer able to sell thousands of dental supplies, which included at least 75% of the top-selling products on the SourceOne and TDA Perks Supplies websites. *Id.* In addition, that same month, Arnold and DDS both stopped working with SourceOne, with DDS stating that its decision was the result of Schein, Benco, and Patterson's pressure on manufacturers who worked with Arnold and DDS. *Id.* The nearly simultaneous decisions made by several manufacturers operating through Arnold and DDS to pull products from SourceOne stood in stark contrast to those made by manufacturers who sold directly to dentists through SourceOne, who were immune to pressure from Schein, Benco, and Patterson and who generally did not pull their products. *Id.* ¶¶36-37. Schein and its co-conspirators' attempts to thwart SourceOne did not end there: when SourceOne sought to replace Arnold and DDS with alternative distributors, those distributors were deterred from engaging with SourceOne by the boycott Schein, Benco, and Patterson had effected, and one specifically told SourceOne as much. *Id.* ¶39.

75.     Second, Schein and its co-conspirators worked to attack state dental associations who were considering forming GPOs by directly applying pressure to those dental associations themselves, including through boycotts of their trade shows. Boycotting the trade shows applied pressure to state dental associations because those associations derive substantial revenues from the participation of large players like Schein and its co-conspirators. Indeed, Lettieri, the former Schein Regional General Manager, explained that the booths companies like Schein purchased cost anywhere from $10,000 to $40,000, depending on the event and location, and confirmed that Schein was a major donor to such events and that it would matter if Schein threatened not to attend.

Schein and its co-conspirators threatened or implemented boycotts of at least three trade shows – those run by the TDA, the AZDA, and the Louisiana Dental Association ("LDA").

76.     As was set forth in both the FTC and SourceOne Complaints, Schein and its co-conspirators' plans to boycott the TDA's 2014 annual trade show (the "TDA Trade Show") began to form in 2013. In October 2013, at Benco managing director Cohen's direction, a Benco Texas regional manager reached out to his counterpart at Schein to let him know that Benco was thinking about withdrawing from the TDA Trade Show. FTCC ¶71. A summary of the call stated that "Chuck Cohen will be reaching out to . . . Tim Sullivan to see if [Schein] would do the same thing." *Id.*[23] The same Benco employee also reached out to Patterson to discuss pulling out of the TDA Trade Show. *Id.*

77.     Two months later, on December 11, 2013, Benco's Texas regional manager stated that he had " been talking to the directors of Schein and Patterson" and that the ***three companies would*** "***tak[e] a stand together against***" TDA Perks Supplies. *Id.* Also in December 2013, a Schein regional manager in Texas learned from a Patterson branch manager that Patterson was pulling out of the TDA Trade Show, and a Schein zone manager wrote in an email that s/he "firmly believe[d] [Patterson] made the move expecting us to follow suit." *Id.*[24] On January 6, 2014, Schein's Vice President of Sales, David Steck (who reports directly to Defendant Sullivan), and Misiak, his

---

[23] Schein does not deny the accuracy of this quotation, stating instead that "the Commission mischaracterizes or takes out of context the cited quotations from non-Schein employees." Moreover, Schein admits that, in October 2013, a Benco manager called a Schein manager and informed him that Benco was considering pulling out of the TDA trade show. *See* FTC Answer ¶43.

[24] Schein responded to this allegation in the FTC Complaint by (i) admitting that a Schein regional manager in Texas visited a Patterson branch manager, who confirmed that Patterson would not be attending the TDA trade show; (ii) stating that any document referred to in this allegation is the best evidence of its contents, and (iii) denying any remaining allegations not because quotations were inaccurate, but "because the selective quotation of written material, offered without dates and context, is misleading as framed." *See* FTC Answer ¶71.

counterpart at Patterson, spoke for 14 minutes by phone about the TDA. *Id.*[25] Two weeks later, on January 21, 2014, Steck emailed Misiak with the subject line "Texas," stating, "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days." *Id.*[26]

78.     In March 2014, Patterson and TDA representatives met privately, and Patterson threatened to withdraw from the TDA Trade Show and cease advertising in TDA publications if the TDA did not end its relationship with SourceOne. SC ¶43. Schein representatives made identical threats and demands in a meeting in April 2014. *Id.*

79.     The TDA Trade Show was held between April 30 and May 3, 2014. *Id.* ¶44. In an unprecedented move, Schein and its co-conspirators all boycotted the event, canceling their reserved spaces shortly before the trade show was set to begin. FTCC ¶72. Dozens of manufacturers also pulled out of the show without warning, many of whom explained that the decision to withdraw was made in response to pressure from Schein and Patterson. *Id.*

80.     Schein and its co-conspirators also pressured other state dental associations not to do business with SourceOne. When the AZDA considered forming a buying group in 2014, Schein and its co-conspirators discussed withdrawing from the AZDA annual trade show (the "AZDA Trade Show") in response. On July 21, 2014, Benco's Arizona regional manager emailed a Patterson branch manager in Arizona about the AZDA buying group, stating: "I know that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in [Arizona]."

---

[25] Schein admitted that Patterson's senior manager called Schein's senior manager on January 6, 2014, and the phone call lasted for approximately 14 minutes. *See* FTC Answer ¶71.

[26] Schein responded to this allegation by noting "that the Commission mischaracterizes or takes out of context the cited quotation." *See* FTC Answer ¶71.

FTCC ¶73.[27] The AZDA attempted to appease Schein and the other companies by distancing itself from the marketing of SourceOne's platform, but, following inter-firm communications in the summer of 2014, all three distributors withdrew from the AZDA's Western Regional Conference. *Id.*; SC ¶48. Following the boycott and presumably out of fear of additional repercussions, AZDA did not actively promote SourceOne's platform to its members. SC ¶48. Similarly, when the LDA considered creating a GPO using SourceOne's platform in 2015, Schein and its co-conspirators threatened to boycott LDA's annual meeting and trade show. *Id.* ¶49. Subsequently, LDA abandoned plans to endorse SourceOne's platform. *Id.*

81.    Evidence cited in a recent decision in the SourceOne Action confirms many of the facts surrounding Schein's conspiracy with Benco and Patterson to boycott the TDA and AZDA annual meetings in 2014 and 2015, respectively, and to attempt to squeeze out SourceOne, which the three companies viewed as a competitor. *See generally SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 310 F. Supp. 3d 346 (E.D.N.Y. 2018). In that case, in which Schein was initially named but which it settled in 2017, Judge Cogan denied defendants Benco and Patterson's motions for summary judgment on, among other things, state and federal antitrust claims, holding:

> Based on the evidence presented, a jury could reasonably find that at some point between October 2013 and January 2014, defendants agreed with each other or with Schein to exclude SourceOne from the market, including by agreeing to boycott the conventions hosted by the Texas Dental Association and the Arizona Dental Association if those associations did not discontinue their relationship with SourceOne, and by pressuring individual manufacturers and at least one prominent dentist to also discontinue their relationship with SourceOne in furtherance of this conspiracy.

---

[27] Schein responded to this allegation not by denying that the quoted language was accurate, but rather by claiming that "the Commission mischaracterizes or takes out of context the cited quotation from a non-Schein employee." *See* FTC Answer ¶73.

*Id.* at 358. In addition, Judge Cogan noted that, in the absence of collusion amongst one another "defendants' actions in deciding not to attend the TDA and AZDA annual meetings were not clearly in their own individual economic self-interest." *Id.* at 360.

82.     In reviewing the evidence produced in the course of discovery, Judge Cogan found, among other things, that:

- Glenn Showgren, a manager at Schein, reported internally as early as October 31, 2013 that Patterson, Benco, and another distributor, Burkhart, were considering pulling out of the 2014 TDA meeting. *Id.* at 353.

- Before November 20, 2013, Randall McLemore, Schein's Dallas branch manager, visited his Patterson counterpart, Bob Ingersoll, to discuss the TDA annual convention. *Id.*

- On December 11, 2013, Ron Fernandez, Benco's regional manager for San Antonio, Austin, and Houston, told a Benco salesperson: "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against" the TDA. *Id.*

- Immediately after Patterson's December 13, 2013 announcement that it would not attend the TDA Trade Show, a regional manager at Schein informed his supervisor that Patterson had dropped out and stated: "I firmly believe they made the move expecting us to follow suit." *Id.*

- In late December 2013 or early January 2014, Dave Misiak, then-Vice President of Sales at Patterson, called Schein's David Steck to inform him that Patterson would not attend the TDA Trade Show and to see whether Schein would attend. Steck told Misiak that Schein had not yet decided, but that Steck would let Misiak know once it had. Steck testified that it was "unusual" for Misiak to contact him, that he felt an obligation to tell Misiak Schein's final decision because Misiak had told him of Patterson's plans, and that he informed his boss, Defendant Sullivan, of the call because he thought it was important for Sullivan to know of Patterson's plans for the TDA Trade Show. *Id.* at 353-54.

- A few weeks later, on January 21, 2014, Steck told his employees that he needed to inform Patterson about whether Schein was attending the 2014 meeting, stating: "Guys, I have to get back to PDCO on whether or not we are attending the TDA." That same day, Steck emailed Misiak to say that he would call Misiak "to let you know about our decision on the matter we recently discussed in the next couple of days." Misiak expressed outrage to his colleague Tim Rogan because Steck "already told me that they were out. Full blown!" Rogan immediately replied: "That sucks. You should call him. 'Thought I could trust you' type of conversation." *Id.* at 354.

- 35 -

- Schein announced on April 9, 2014 that it would not attend the TDA Trade Show, and Fernandez of Benco told Steck later that same day that Benco had officially decided to pull out too, even before Fernandez had informed his own reports. That same day, Fernandez also called Kevin Upchurch, a Schein manager in Arizona. *Id.* at 354.

- As early as June 18, 2014, Mike Wade, a Benco Arizona regional manager and who was responsible for deciding whether to attend the AZDA convention, told a salesperson, in connection with Benco's decision whether or not to attend the AZDA's convention, that he would "pull some local pressure" and was "[p]laying phone tag with Upchurch at Schein and will get PDCO Manager involved." *Id.* at 355.

- In response to a July 11, 2014 email from Mark Rowe, Benco's Texas decision-maker, asking for updates on TDA Perks Supplies program, Benco's Ron Fernandez stated that there was extremely low turnout at the TDA Trade Show and further that "the doctors know they need us and aren't willing to risk our support by gambling on a poorly planned and run program." With respect to one prominent dentist who had been "openly bashing dental distributors," Fernandez stated that "Schein, Patterson and Benco have all told him he can have the Perks program handle his service needs as well. Really interested to see how that turns out to him." *Id.* at 356.

- On July 30, 2014, Wade sent an email to a representative of Dentsply, a dental manufacturer, asking whether SourceOne was authorized to sell Dentsply products and stating: "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's meeting next year." *Id.* at 355.

- "Randall McLemore of Schein testified that he asked Bob Ingersoll [of Patterson] whether Patterson was planning to attend" the TDA Trade Show "because he 'thought it would be advantageous for my organization if they weren't there and we were.'" *Id.* at 361.

83.     Judge Cogan further found that the co-conspirators' personnel had conceded in depositions that the extensive communications between Schein personnel and their counterparts at Benco and Patterson did not have any legitimate business purposes. For example:

Joe Cavaretta, a member of Schein's Texas decision-making team, admitted at his deposition that Schein did not have a legitimate business reason to share with Patterson the information [Patterson's] Ingersoll provided during his in-person meeting with [Schein's] McLemore. Patterson salesperson Christopher Cobb agreed that there was no legitimate business reason for the text messages that he exchanged with Schein salesperson Tony Starnes about whether their respective companies were attending the [TDA Trade Show]. Schein's Dave Steck testified at

- 36 -

his deposition that he believed making a call like the one [Patterson's] David Misiak had made to him in late December 2013 or early January 2014 would have violated Schein's antitrust policy.

*Id.* at 361.

### 3. The Allegations Against Schein Are Further Corroborated by a Knowledgeable Former Employee

84. Lettieri, the former Schein Regional General Manager, has corroborated these allegations, indicating that Schein and its competitors were attempting to thwart state dental associations from forming buying groups. Lettieri noted that a lot of the state organizations and different types of large dental groups were starting to form their own buying groups. Henry Schein was pulling out a lot of support for them, along with their competitors.

85. Lettieri confirmed that Jake Meadows, Schein's Vice President of Sales (who reported directly to Steck), told Lettieri to not attend a meeting of the Maryland State Dental Association in September 2016 because Patterson had pulled out. Lettieri was already on his way to the meeting when Meadows called him about something else. When Lettieri told Meadows he was headed to the meeting, Meadows was surprised that the meeting was still going on and said to Lettieri, "Patterson pulled out, why are we still going?" Lettieri's sense was that Henry Schein agreed with Patterson not to support the Maryland State Dental Association and that there was talk about the Maryland State Dental Association forming their own buying group, similar to the TDA. As Judge Cogan's findings in the SouceOne Action suggest, Meadows' direction to pull out of the Maryland State Dental Association's meeting ran counter to Schein's self-interest – absent collusion with Patterson.

86. Lettieri also recalled that Jake Meadows would meet with Benco people "all the time." Lettieri personally saw Meadows go off to meet with Benco people during the Greater NY meetings in November 2014 and 2015, and in Chicago in February 2010 and 2013. As noted above,

Judge Cogan's summary judgment opinion in the SourceOne Action explicitly noted that there was no legitimate business purpose for similar communications between purported competitors.

### 4. Schein Colludes With Benco, Patterson, and Dentsply to Cut out Dental Brands for Less's Low-Margin Sales of Dentsply Products

87.     A further example of Schein, Benco, and Patterson's attempts to force out lower-price competitors was discussed in the DB Second Counterclaim, filed by Dental Brands in connection with the Dentsply Action. Dental Brands is a discount distributor of dental products that purchases Dentsply (and other products) outside the U.S., primarily in Europe, where product prices (and profit margins) are much lower. Dental Brands then sells those products through its website at prices that are 20% to 65% lower than the prices at which such products are sold by authorized dealers like Schein, Patterson and Benco. DBSC ¶27. This was in stark contrast to the prices of Dentsply products sold by Schein, Benco, and Patterson, which were frequently virtually identical. *Id.* ¶85. In the DB Second Counterclaim, Dental Brands alleges that Schein, Benco, and Patterson were engaged in a horizontal price-fixing scheme and conspired to pressure Dentsply and other manufacturers to force out Dental Brands, which offered many of the same Dentsply products as Schein. *See id.* ¶¶26-27.

88.     Dentsply participated in this scheme on behalf of the "cartel" – consisting principally of Schein, Patterson, and Benco – because Dentsply directly benefitted from the cartel members' sale of Dentsply products at supracompetitive prices. *Id.* ¶31. Dentsply was able to sell products to the cartel members at inflated prices and high gross margins because the operation of the cartel – to eliminate competition from low-priced discount competitors like Dental Brands – allowed those distributors to re-sell the Dentsply products at concomitantly inflated prices and margins. If discount competitors like Dental Brands were allowed to operate they would directly threaten the inflated prices and margins enjoyed by Dentsply and Schein.

89. Both reflecting their power in the market, and further corroborating their efforts to collude to suppress competition, Schein and its co-conspirators forced Dentsply to engage in this conspiracy because they account for the overwhelming majority of Dentsply's business. The DB Counterclaim notes that Schein accounts for approximately 41% of Dentsply's U.S. retail sales, and Schein, Benco, and Patterson collectively for 85% of Dentsply's U.S. sales. *Id.* ¶50. Indeed, Schein was "such a significant force in Dentsply's business that Dentsply [was] compelled to disclose in its filings with the U.S. Securities and Exchange Commission that [Schein] account[ed] for 11% of the company's overall worldwide consolidated net sales – the equivalent of more than $294,000,000." *Id.* ¶51.

90. Dental Brands further alleged that, in forums including the Dental Trade Alliance Grey Market Task Force and Dental Industry Association of Canada Gray Market Summits, which were held since 2008, Schein, Benco and Patterson met with Dentsply and other manufacturers "and agree[d] to eliminate dealers discounting the dental manufacturers' consumable dental supply products which interfere[d] with horizontal price fixing agreements of Schein, Patterson, Benco and other authorized dental dealers of the manufacturers." *Id.* ¶¶54-55.

91. Among the strategies employed by Schein, Benco, and Patterson were disinformation campaigns through which they, along with manufacturers, "misrepresent[ed] the nature, quality, characteristics and fitness of their dental products being sold at discount prices by dealers of which they have not approved" by claiming wrongly that the products, which were functionally identical to those sold by Dentsply into the U.S. retail market, were different, of questionable origin, or mishandled products, or that they posed a risk to patients or a liability risk to dentists. *Id.* ¶¶56, 114-118. Dentsply also filed lawsuits against unauthorized dealers in an attempt to force them to stop selling Dentsply products that Dentsply claimed were, among other

things, risky to patients. *See generally id.* ¶¶126-146. However, Dentsply revealed the falsity of its purported concerns about the safety of its grey market products by frequently permitting unauthorized dealers to liquidate their remaining stock of grey market Dentsply supplies upon resolving those suits. *See id.* Tellingly, Dentsply regularly reported back to its authorized distributors about its successes in quashing unauthorized distributors. *See id.* ¶¶129-30, 135; DBSC Ex. 9.

### 5.     Schein Colludes to Block Competition from Archer & White and Dynamic in Oklahoma and Arkansas

92.     A further example of Schein, Benco, Burkhart, and Patterson's attempts to force out lower-price competitors was discussed in the Dentists' Complaint and in a complaint filed against Schein and others by Archer & White, a competitor who was allegedly harmed by Schein's anticompetitive conspiracy. In July 2004, AW agreed with Dynamic, an Oklahoma-based dental distributor, that Dynamic would act as a sales representative for several equipment lines AW was selling. AWC ¶¶24-25. As a result of the agreement with AW, Dynamic's sales grew significantly, and it soon became a target for Schein and its co-conspirators as AW and Dynamic's success threatened to compress Schein, Benco, and Patterson's margins. *Id.* ¶26.

93.     In September 2007, Dynamic applied to partner with the American Dental Cooperative, Inc. ("ADC"), a cooperative organization created to assist smaller, independent companies compete against large, national suppliers. ADC (known now as "NDC") helped independent distributors expand their product offerings, buy at better prices, and execute on the logistical challenges of product distribution – and so was a key to Dynamic's attempt to compete with companies like Schein. In December 2007, ADC verbally confirmed acceptance of Dynamic's membership application and, at the same time, ADC provided Dynamic with a complete set of price sheets for items available to ADC members. *Id.* ¶27. Just months later,

however, in early 2008, ADC revoked Dynamic's membership on the basis of unspecified "input received" – and AW later learned that ADC revoked Dynamic's membership under pressure from Burkhart personnel on account of Dynamic's low prices. *Id.* ¶28. As discussed in detail below, Schein participated in and was closely tied to Burkhart's efforts to stifle any possible competition from Dynamic, including through collusion with both other distributors and manufacturers and suppliers of dental products.

94.     Around the same time that ADC revoked Dynamic's membership, in January 2008, Mark Lowery of Schein threatened Danaher subsidiary Pelton & Crane, an equipment manufacturer for which Schein was the largest distributor, that Schein would stop selling Pelton & Crane equipment if Pelton & Crane continued to work with AW and Dynamic. *Id.* ¶30. At the same time, Burkhart made similar threats to Pelton & Crane and Belmont, another equipment manufacturer that was also doing business with AW and Dynamic. *Id.* In response to these threats, Danaher personnel met with Schein and Burkhart, and they collectively agreed that Danaher would cut off AW and Dynamic from selling certain lines of dental equipment in Oklahoma and Northwest Arkansas. *Id.* ¶32. Further, even though AW independently had been selling into Oklahoma and Arkansas for years, Danaher agreed to completely ban AW from selling into those states and to restrict it to selling only in Texas. *Id.* To compensate Danaher for lost business from excluding Dynamic and restricting AW, Schein and Burkhart promised to continue to distribute Danaher products and to make up volume Danaher lost by cutting out AW and Dynamic. *Id.* Further confirming its role in blocking competition from AW and Dynamic, on February 25, 2008, Schein announced to its employees that Dynamic would no longer be able to sell Pelton & Crane equipment, and that AW was being restricted – but AW and Dynamic were only informed a week later. *Id*. ¶33.

95.     On May 17, 2008, at a meeting of the Oklahoma Dental Association, Skip Pettus

of Dynamic ran into Ron Fernandez from Schein and a general manager from Burkhart who were

in conversation. The Burkhart general manager suggested to Pettus that Schein, Burkhart, and

Dynamic should talk, and then told Pettus, "You have got to raise your prices!" *Id.* ¶34. Mark

Lowery of Schein then joined the conversation, and Lowery and the Burkhart general manager

explained Schein and Burkhart's collusive agreement and invited AW and Dynamic to join. *Id.*

AW grew concerned, and, on May 27, 2008, at AW's request, Pettus met with the same Burkhart

employee to investigate whether anticompetitive conduct was occurring. *Id.* ¶¶35-36. During the

meeting, the Burkhart employee revealed that, if Schein had already been talking to a potential

customer about the sale of dental equipment, Burkhart would refuse to compete – instead

encouraging the customer to buy from Schein. *Id.* ¶37. The Burkhart employee explained that he

wanted to be "on the same playing field" with Schein, and, offered to contact personnel at Schein

to encourage a meeting with Pettus in order to bring AW into the conspiracy. *Id.* ¶38.

96.     Soon thereafter, in June 2008, Pettus met with Lowery, Schein's regional general

manager, and Jack Powers of Burkhart. *Id.* ¶39.[28] ***Lowery directly stated that Schein and Burkhart***

***agreed not to compete on price.*** For example, he explained that, if a prospective Schein customer

called Burkhart to check prices, Burkhart would "step[] out of it" and refuse to "bid it," because

Burkhart wanted to maintain a certain level of gross profits. *Id.* ¶40. Similarly, if a customer tried

to request prices from Schein, Schein refused to "talk about price" because – in the interest of

"keeping the integrity of margins" – Schein did not want to compete on margins *Id.* Lowery

---

[28] In connection with the Dentists' Action, Schein admitted that Lowery met with Pettus in June 2008. *See, e.g.*,
Dentists' Answer ¶50.

explained that, under the agreement, "*the doctor gets it for the same price no matter who they buy it from*." *Id.*[29]

97.     Pettus asked what he had to do to "get along" with Schein and Burkhart, to "get to a professional level" or be "accepted into the market" "just like a [Burkhart] or a Patterson is." *Id.* ¶53.[30] In response, Lowery explained that, while new entrants like AW and Dynamic typically tried to take market share by lowering prices, Schein and Burkhart wanted AW and Dynamic not to compete on price: "We all want to make a living. We want to—we all—all are going to sell it at a—at a good price where we all get paid." *Id.*[31]

98.     Pettus asked, "What I'm hearing you say from a company standpoint . . . [our] margins [have] got to be better [higher], especially on equipment," to which Lowery responded, "Yeah. . . . That seems to be the Achilles heel." *Id.* ¶55.[32] Pettus confirmed: "[Our] [l]ow margins on [dental] equipment?", and Lowery responded, "Yeah." *Id.*[33] Pettus then asked:

> Let me just cut right to the— to the chase. . . . We've got some you know, there's indicators by—by manufacturers that there's—there's been direct talk from you and others of: Hey, we just don't want him in existence. Don't open him. Don't do whatever. If we raise our prices, can we get relief from that? . . . *If I raise my margins on equipment to an acceptable level . . . can there be relief?*"

---

[29] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶63.

[30] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶53.

[31] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶53.

[32] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶55.

[33] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶55.

*Id.* ¶57.[34] Lowery responded, "[w]hat—what we don't want to do is come across [as] dictating the price to the end user. That will get us in a lawsuit. Guarantee it. But you know, a couple things. One is I think when everyone plays on the same field, it makes things a lot easier." *Id.*[35] ***Lowery reinforced both that he would pressure manufacturers to enforce the collusive practices by squeezing out AW and Dynamic, and that he was doing so with the full knowledge and blessing of the senior-most "corporate" executives at Schein***, explaining how he had told a manufacturer who was supplying AW and Dynamic, "whatever you're doing [for AW and Dynamic], make sure you're doing the same thing here. Because if you're going to be off, I'm going to know about it and you know, that's not going to fly. ***And that's when I'll shoot that up to corporate***. But if we're all on the same playing field, I said, we're cool." *Id.* ¶59.[36]

99.    Lowery further explained that Schein and Burkhart wanted AW and Dynamic to fall in line with the established companies' higher prices, explaining:

> If we're both quoting a deal, let's make sure that we're both getting the same thing. . . . And you're selling it, if you're not going to be selling it, [Burkhart] is going to be selling it, [or] Patterson's going to be selling it. . . . but I just want to make sure we're all on the same page. . . . Will my reps continue to call on your accounts? Absolutely. Will you continue to call on mine? Absolutely. ***But we know that the customer is making a decision based upon who they want to do business with— not because we're slugging it out and killing each other on margins***.

*Id.* ¶60.[37] Pettus asked whether "if I focus on that, if I maintain margins high, can I—I mean, can I rest assured that I—that we're," and Lowery interjected, "[l]et's all just, you know, have the same

---

[34] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶57.

[35] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶57.

[36] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶59.

[37] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶60.

goal in mind . . . . So that way it takes us out of the loop as far as slugging it out [on margins], and the doctor gets it for the same price no matter who they buy it from." *Id.* ¶63.[38]

100.    Schein and Burkhart even went so far as to give specific directions to AW and Dynamic about the margin they should charge their customers. Concerning margins, Pettus asked, "I don't know what's good and what's bad," and Lowery responded that AW and Dynamic should seek margins, on a percentage basis, that were "[n]orth of 32." *Id.* ¶64.[39] Pettus responded, "Really?", and Lowery confirmed. *Id.*[40] Pettus asked again, "[i]f I'm buying at the same as you're buying and we're going up competitively against people not against price, I need to be north of 32 every time?" *Id.* ¶65.[41] Lowery responded:

> You know, unanimously across the industry, as long as I've been in the dental business—32—and I know guys that actually get 34 on stuff . . . but you know, generally speaking, you know, 32 is always good . . . If you get 32 . . . everyone is going to get paid on it. . . . I think if you get down [to] 28, we all don't make a lot.

*Id.*[42] Lowery reiterated that the major distributors all participated in the agreement to fix margins, explaining: "that's where we play ball at," and further explained that, when competitors offered lower prices, a customer's attempt to check prices "gets your head handed to you [and] you look like an idiot." *Id.* ¶¶65-66.[43] Lowery further explained, "25 [percent margins]? I won't even

---

[38] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶63.

[39] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶64.

[40] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶64.

[41] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶65.

[42] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶65.

[43] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶¶65-66.

freaking touch it." *Id.* ¶66.[44] AW refused to enter into the collusive relationship with Schein, and instead opted to sue the Company for damages, as detailed below.

101.    Schein's compensation of sales representatives was consistent with allegations that Schein was attempting to keep margins well above 25%. Lettieri, Schein's former Regional General Manager, noted that, in 2015, there was a major shift to the way sales representatives were compensated. If a sales representative selling to single practices sold above a 26% margin, that representative would get full commission, which was 23% to 24% of Schein's gross profit on the sale. If the margin was below 26%, the representative's commissions would be cut to only 10% of the gross profit on the sale – more than a 50% reduction. This direction came from corporate. David Steck, Schein's Vice President and General Manager who reported to Defendant Sullivan, was always the one who presented changes in compensation to the managers. Lettieri also stated that he was "sure" Defendant Sullivan had a say in the compensation change as well.

### 6.    Schein Works to Control Archer & White's Distribution of Instrumentarium Products

102.    Schein coordinated with its co-conspirators to thwart competition from AW in areas beyond Oklahoma as well. During the American Dental Association meeting in September 2007, AW agreed to serve as the first national hybrid dealer – a dealer who sells to the full national market, with no geographic restrictions, despite operating out of a single location – for Instrumentarium, a manufacturer of dental imaging equipment. AWC ¶46. Being permitted to sell Instrumentarium's highly technical equipment on a national scale was a significant achievement for AW given AW's small size and independent ownership. *Id.* AW quickly rose to the challenge,

---

[44] Rather than deny the accuracy of the quoted language, Schein instead "note[d] that Plaintiffs mischaracterize or take out of context the cited quotations." Dentists' Answer ¶66.

achieving 90% sales growth each year it served as a national dealer of Instrumentarium products. *Id.* ¶47.

103.    Schein and Burkhart soon realized that they were losing share to AW, and that AW's competitive pricing of Instrumentarium equipment threatened their price-fixing agreement. *Id.* ¶48. Accordingly, the two companies worked together to broaden their campaign against AW in order to keep prices high. Schein and Burkhart began by complaining to Instrumentarium about AW's pricing, but their tactics soon escalated: they eventually threatened to stop selling Instrumentarium products unless Instrumentarium agreed to restrict AW's sales. *Id.* ¶49. Under duress, Instrumentarium gave Schein and Burkhart control over AW's Instrumentarium sales. For example, in October 2008, Instrumentarium told AW to "back off" a sale to a dentist in Washington because Burkhart had already been working with the dentist. *Id.* ¶50. Similarly, in March of 2009, Instrumentarium prohibited AW from selling equipment to a California dentist at Schein's direction. *Id.* Instrumentarium's Director of Sales, Mike Null, revealed that Schein was applying pressure to Instrumentarium over these sales. Null told AW that "[t]his is Schein's backyard and Schein is raising hell about your current pricing . . . ," and further explained, "You can't believe what an issue you've become at Schein corporate." *Id.*

104.    Ultimately, Schein and Burkhart forced Instrumentarium to severely restrict AW's sales territory. On April 2, 2009, Instrumentarium told AW that it was scaling back AW's distribution territory from national distribution to the State of Texas in part because of "the integrity of its end-user pricing." *Id.* ¶51. AW's sales of Instrumentarium equipment plummeted almost immediately: it sold $100,000 worth in 2011, as compared to $1.2 million in 2009. *Id.*

105.    As discussed above, as a result of Defendants' efforts, including in collusion and concert with Burkhart, to constrain AW's ability to compete, AW filed claims against Schein

Danaher. Those claims remain pending. At all times relevant hereto, including in its SEC filings, Schein has explicitly denied that it engaged in improper or illegal conduct as asserted by AW.

## VI. LOSS CAUSATION – THE TRUTH ABOUT DEFENDANTS' COLLUSIVE CONDUCT IS REVEALED TO INVESTORS

106.   Defendants' materially false and misleading statements, and failure to disclose material facts necessary to make their statements not misleading, caused the prices of Schein's securities to be artificially inflated during the Class Period. The truth about Schein's collusive, anticompetitive activities were revealed to investors through a series of partially corrective disclosures beginning on August 8, 2017, each of which partially removed artificial inflation in the price of Schein's securities. As such, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiff and the Class.

### A.   Revelations Affecting Trading on August 8, 2017

107.   Before the opening of trading on August 8, 2017, Schein issued a press release reporting its second-quarter 2017 financial results. This was the first disclosure of financial results following Schein's settlement in the SourceOne Action and resolution of the action brought by the Texas Attorney General. Although the Company's results included higher-than-expected earnings-per-share ("EPS"), they also included weak North American dental consumables growth of only 0.8% compared to the prior year's quarter. During the Company's earnings call at 10 a.m. on August 8, 2017, Defendants Bergman and Paladino attempted to assuage concerns about the slow growth. For example, in response to an analyst question from Nathan Rich of Goldman Sachs asking Defendants to explain the Company's slow consumables growth – particularly in light of a poor result in the segment the year prior that made the year-over-year comparison easier – Defendant Bergman blamed the result on a number of factors, including an extra holiday in the quarter and the loss of a customer, as well as "some movement towards lower-priced products."

Defendant Paladino also blamed the result on the holiday issue, while claiming that "sales growth strengthened during the quarter" and stating: "I don't think we think there's any market changes that are important to note. I think we believe that there's a little bit of ebbs and flows and calendar issues that are contributing to it. But we still feel like the market is pretty consistent."

108.   The market immediately reacted negatively to the news. Analysts from Jefferies noted that "[c]ore growth of +4.4% lagged our view (+5.2%) on surprisingly weaker dental trends [including] in . . . US consumables" and stated that "[w]e expect the stock to trade lower on disappointing dental experience & lack of upside to its '17 EPS outlook." Northcoast Research observed that Schein's "0.8% North America dental consumable internal growth [was] below our estimate for the quarter" and explained that "***[w]e could . . . be seeing modest pricing pressure in dental consumable products which is compressing overall internal growth rates***." And analysts from UBS stated that "[w]e believe HSIC's stock weakness post-2Q results is largely being driven by the soft [North America] Dental consumables results, particularly given what appeared to be an easier [year-over-year] comp."

109.   The results disclosed on August 8, 2017, partially corrected Defendants' prior misrepresentations and omissions concerning Schein's outsized margins and market share as being driven by the market's preference for the Company's value-added services (and not by anticompetitive activity). The August 8, 2017 announcement, and the information publicly reported by other sources, including those referenced above, partially revealed the truth concealed by Defendants' misstatements, as it revealed that Schein's poor results were a product of abandoning prior attempts to inflate sales volume and margins through anticompetitive collusion. This was particularly true with respect to dental consumables – the area of Schein's business that was most likely to be affected first by the cessation of its collusive conduct. In response to

disclosure of Schein's weak result in North American consumables and the pricing pressure the company was facing in that core business line, shares of Schein common stock plummeted. On August 8, 2017, Schein shares declined by 5.3%, closing at $87.01 per share, a drop of $4.88 per share from their August 7, 2017 closing price of $91.89, on very high trading volume of 2.5 million shares. The August 8, 2017 decline reflected a loss of approximately $772 million in Schein's market capitalization.

110.     However, the August 8, 2017 disclosure did not reveal the full truth to investors. While Defendants made statements meant to reassure the market of transient causes of the company's soft North America dental consumables numbers, investors were left in the dark as to the true reason for the poor result – the Company's undisclosed shift away from collusive anticompetitive activity and the attendant drop in margins. Still, Defendants made every effort to quell fears regarding the collusive conduct by attributing the poor results to benign causes including holiday timing and the loss of a customer.

### B.     Revelations Affecting Trading on November 6, 2017

111.     On November 6, 2017, before the opening of trading, Schein issued a press release reporting on the Company's third-quarter 2017 financial results. Schein's results were disappointing: the Company reported EPS below estimates and trimmed the upper end of its full-year 2017 EPS guidance range. During the Company's 11 a.m. earnings call, Defendant Paladino explained that Schein's operating margin had contracted by 0.25% as compared to the prior year's third quarter, and attempted to explain the change in terms of faster growth in lower-margin lines of business, renewal of several key DSO contracts (presumably at lower margins), and challenges in the European dental business. In response to an analyst question seeking more detail on the gross margin issue, Defendant Paladino stated that the European dental business issue was the largest single driver, which he suggested was at least partially the result of the "Value-Added

services in Europe" not being "as advanced as [Schein has] in the U.S." Further, in the Company's Form 10-Q field that same day well before the close of trading, Schein for the first time disclosed the AW Action – which had been filed years earlier, in 2012 – as well as the IQ Dental Action.

112.   Analysts reacted strongly and adversely to the news. In a "first look" report published November 6, 2017, Piper Jaffray noted that "Schein's 3Q17 [results] and . . . guidance were disappointing, but we continue to recommend HSIC" for reasons including a belief that "we will see margin lift as product mix improves in 2018 and beyond." The report went on to note the earnings miss and that North American dental consumables growth continued to be lackluster, with reported growth at 1.3% against Piper Jaffray's 2% estimate. In a second report published on the same day, Piper Jaffray again noted that "HSIC reported disappointing 3Q17 results driven by margin pressure and soft dental consumables growth," but that "we believe dental consumables growth can rebound in 2018." The report further noted that "[w]e do not believe collusion lawsuits will significantly impact HSIC's operations following recent settlement with SourceOne," and further that "we do not believe the overall impact will alter [Schein]'s way of business."

113.   The November 6, 2017 disclosures, partially revealed the truth concealed by Defendants' misstatements, as they revealed that Schein's poor results were a product of Defendants' need to abandon prior attempts to inflate margins, increase sales and maintain market share through anticompetitive collusion; they also revealed additional litigation asserting that Schein had been engaged in collusive and anti-competitive conduct. These revelations partially corrected Defendants' prior misrepresentations and omissions concerning Schein's outsized margins being driven by the market's preference for the Company's value-added services (and not by anticompetitive activity). In addition, the November 6, 2017 disclosures revealed the pendency of two new suits – one of which dated back to 2012 – that also alleged that Schein engaged in

egregious anticompetitive conduct. Accordingly, Schein's stock price declined materially in response to these revelations, thereby causing damage to Lead Plaintiff and other members of the Class as a portion of the artificial inflation in the Company's stock price was removed. In response to disclosure of Schein's continued weak results, including reductions in margins, shares of Schein common stock dropped precipitously. On November 6, 2017, Schein shares declined by 9.8%, closing at $70.04 per share, a drop of $7.60 per share from their November 3, 2017 closing price of $77.64, on extremely high trading volume of 7.70 million shares. The November 6, 2017 decline reflected a loss of approximately $1.2 billion in Schein's market capitalization.

114.    However, the November 6, 2017 disclosure did not reveal the full truth to investors. While Defendants made statements meant to reassure the market of transient and nonculpable causes of the Company's poor dental consumables, EPS, and margin results, investors were not informed as to the true reason for the poor result – the Company's undisclosed shift away from collusive anticompetitive activity and the attendant drop in margins, earnings, and consumables revenue.

**C.    Revelations Affecting Trading on February 13, 2018**

115.    Finally, after the close of trading on February 12, 2018, the FTC issued a press release announcing that it had filed suit against Schein, Benco, and Patterson alleging collusion in violation of the antitrust laws. The FTC's announcement, coming after a lengthy and undisclosed investigation, revealed that Schein had engaged in an illegal conspiracy to inflate margins with its two largest competitors, which further called into question the Company's reported financial results and future prospects. The press release noted that "[t]he alleged agreement among Benco, Henry Schein and Patterson deprived independent dentists of the benefits of participating in buying groups that purchase dental supplies from national, full-service distributors" and further explained that "[t]he [FTC] complaint details communications between executives of [Schein and Benco]

evidencing the agreement, as well as attempts to monitor and ensure compliance with the agreement" and that "[t]he complaint also asserts that Patterson joined the agreement." Further, the press release explained:

> [T]he complaint contends that Benco, Henry Schein and Patterson unreasonably restrained price competition for dental products in the United States; distorted prices and undermined the ability of independent dentists to obtain lower prices and discounts for dental products; deprived independent dentists of the benefits of vigorous price and service competition among full-service, national dental distributors; unreasonably reduced output of dental products to dental buying groups; and eliminated or reduced the competitive bidding process for sales to these buying groups.

116.    As set forth above, the FTC Complaint provides significant details concerning Schein's role in the alleged anticompetitive conduct, including the details concerning the critical role that Defendant Sullivan (among other Schein executives) personally played in the alleged scheme.

117.    On February 13, 2018, Schein issued a press release disclosing the lawsuit while denying the allegations.

118.    Combined with the detailed account of Schein's, and in particular, Sullivan's role in the alleged illegal conduct, investors considered the FTC Complaint, which was filed after an extensive factual investigation by an independent government agency that had no business or financial incentive to bring such claims, as an admission concerning the factual allegations therein. Analysts and the news media reacted strongly to the news. In a report published well after the close of trading on February 12, 2018, analysts from Leerink discussed the lawsuit, stating that "[w]e view this ***news as being very serious, and could result in longer-term margin headwinds and multiple compression for HSIC.***" A February 13, 2018 research note from CFRA reported the allegations and Schein's denial, but concluded that "***this case could have a material financial impact on [Schein]***." On information and belief, these were the first instances of securities analysts

- 53 -

who cover Schein reacting adversely to or crediting any allegations concerning collusive or anticompetitive conduct by Defendants, or indicating that the implications of such allegations would have a material effect on the Company's business or financial results.

119.    Disclosure of the FTC complaint, and the information contained therein and publicly reported by other sources, including those referenced above, partially revealed the truth concealed by Defendants' misstatements, as they revealed the existence of Defendants' scheme to conspire with Schein's purported competitors in order to illegally restrain trade and quash competitive threats. These revelations corrected Defendants' prior misrepresentations and omissions concerning the competitive environment Schein faced, the reasons for Schein's financial success, and the Company's prospects going forward. In response to the disclosure of the filing of the FTC's lawsuit against the Company, shares of Schein common stock dropped dramatically. On February 13, 2018, Schein shares declined by 6.64%, closing at $67.39 per share, a drop of $4.79 per share from their February 12, 2018 closing price of $72.18, on extraordinarily high trading volume of 12.35 million shares. The February 13, 2018 decline reflected a loss of approximately $785 million in Schein's market capitalization.

*     *     *

120.    None of these revelations was sufficient on its own to fully remove the inflation from Schein's stock price because each only partially revealed the risks and conditions that were concealed from or misrepresented to investors. Moreover, as explained above, the corrective impact of certain of the disclosures alleged herein was tempered by Defendants' continued reassuring statements and failure to fully disclose the facts.

121.    The decline in Schein's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of

Schein's stock price declines negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Schein-specific facts unrelated to the Schein Defendants' fraudulent conduct.

### D.       Post-Class Period Developments

122.      On February 20, 2018, Schein released its annual results for fiscal 2017 and held a conference call with analysts. On February 23, 2018, Ankur Banerjee of *Reuters* published an article entitled "Legal hurdles, not Amazon, key concern for U.S. dental supply firms." The article explained that "investors and analysts told Reuters that the larger overhang on the two dental suppliers, and privately held Benco Dental Supply, is a recent complaint filed against them by the U.S. Federal Trade Commission," on grounds that "even a quick settlement could force the companies to ramp up discounts to customers and in turn pressure their margins." The article further explained that "[a]ntitrust lawyers, however, said the FTC's complaint against the dental suppliers was more serious than usual and did not rely on just circumstantial evidence," and quoted antitrust attorney Nicholas Gravante of Boies Schiller Flexner as saying that "[i]t appears the FTC has evidence of an explicit agreement between at least two of these so-called competitors and that is a stronger case than what you often typically see."

123.      As noted above in Section V, on April 10, 2018, Judge Cogan of the Eastern District of New York denied Benco and Patterson's motions for summary judgment on Sherman Act, state statutory antitrust law, damages, common-law tortious interference, and civil-conspiracy claims in the SourceOne Action.[45] In so deciding, Judge Cogan held among other things that a jury could find that parallel conduct was the result of illegal collusion and not purely independent on grounds

---

[45] *See generally SourceOne*, 310 F. Supp. 3d 346.

that Benco, Patterson, and Schein had engaged in a high level of suspiciously-timed inter-firm communications and taken actions contrary to their unilateral self-interest, and because the market structure gave them a common motive to conspire.[46]

124.    On August 30, 2018, Schein announced that it expects to incur a $38.5 million charge in connection with attempts to settle the Dentists' Action, and that Benco and Patterson anticipated settling the matter as well. That same day, Patterson announced that it had booked a pre-tax reserve of $28.3 million in connection with settlement of the same action. Analysts from Evercore ISI noted that the settlement "sets up a scenario where pricing is likely to remain under pressure" and that "[t]his is obviously not good for margins nor stocks." In a report discussing Patterson's results and settlement announcement, analysts from Evercore ISI noted: "Deterioration was mainly seen in the Dental business, where management did call out pricing pressure. This is the second mention in as many distributor conference calls. We would call it now a trend and it isn't a positive one." They further explained that the settlement was like to lead to "a hit to environment pricing, which we suspect has already started to adjust. This is likely to be a negative for the industry as a whole."

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

125.    Numerous allegations set forth above and summarized below give rise to the strong inference that Defendants knowingly or recklessly misled investors about Schein's anticompetitive schemes and the reasons for and sustainability of its profits and margins.

126.    *First*, as detailed above, Defendant Sullivan was deeply and directly involved in the Company's scheme to collude with Benco and Patterson to exclude buying groups, and that Defendant Bergman was likely directly informed of it. As the FTC Complaint sets forth, text

---

[46] *Id.* at 359.

messages, emails, and phone calls reflect that Defendant Sullivan directly discussed with senior Benco personnel the boycott of the buying groups Smile Source and ADC, as well as the boycott of the TDA Trade Show in response to the TDA's formation of TDA Perks Supplies. Critically, Defendants have not challenged that these conversations occurred. With respect to Defendant Bergman, Lettieri stated that Bergman was in the room when strategies to deal with buying groups, including directives not to engage with them, were discussed internally at the Company during sales meetings dating back to prior to the beginning of the Class Period. Defendants' direct knowledge of the underlying misconduct at issue compels a strong inference of scienter.

127.   ***Second,*** as set forth in Section IV(C) above, Defendants had notice of the allegations of collusive conduct as a result of numerous prior lawsuits alleging similar conduct and related investigations, in which Defendants denied liability and refuted the allegations. Beginning in 2012 and continuing to the end of the Class Period, Schein and its top competitors Benco and Patterson were named in several lawsuits alleging illegal and anticompetitive collusion in the dental market, including attempts to force out lower-priced competitors such as AW and DDS and attempts to fight the formation of buying groups by refusing to deal with them and applying pressure to manufacturers, distributors, and state dental associations to prevent those buying groups from succeeding. Indeed, Schein first disclosed the pendency of the SourceOne Action in its Form 10-Q filed November 4, 2015, and made disclosures about that action, and others described above, in the Forms 10-Q and 10-K the Company subsequently filed during the Class Period, all of which were signed by Defendants Bergman and/or Paladino. In light of their awareness of lawsuits filed against the Company, Defendants' were on notice of many of the facts alleged herein, which facts made their alleged false and misleading statements at least severely reckless, if not intentional.

128.     **_Third_**, the fact that Schein's dental distribution business was the single most important line of business for the Company during the Class Period yields a strong inference of scienter with respect to Defendants' false and misleading statements concerning it. As is set forth above, Schein's dental distribution business accounted for nearly 50% of the Company's revenues and likely more than 50% of the Company's profits. The dental business was a key focus of analysts' and investors' attention during the Class Period. The centrality of the dental distribution business to Schein's overall success and Defendants' repeated assertions concerning the critical nature of competition in that business, yield an inference that Defendants' false and misleading statements were at least severely recklessly made.

129.     **_Fourth_**, suspicious stock sales by Defendants Bergman and Paladino at artificially inflated prices during the Class Period further support an inference of scienter. During the Class Period, Defendant Bergman sold more than **_$37 million_** in Schein stock, as compared to less than $26 million in the equivalent-length period immediately prior (the "Prior Period"). For his part, Defendant Paladino sold more than **_$16 million_** worth of stock during the Class Period. These suspicious stock sales bolster an inference of scienter.

130.     **_Fifth_**, the Speaking Defendants repeatedly made detailed statements based on purported personal knowledge about competition in the Company's dental distribution business, about margins and profits and about specific threats of competition. Indeed, Defendants repeatedly discussed the high level of competition in the dental distribution business in Schein's SEC filings during the Class Period and on the Company's earnings calls, often in direct response to pointed questions from analysts on the subject, and, as set forth below, Defendant Bergman himself stated that questions about competition were "**_probably the most asked question[s] from analysts_**, other than, how's the market doing." Moreover, Defendants regularly held out Benco and Patterson as

the Company's two largest competitors in the dental distribution space. These types of repeated, detailed public comments – through which Defendants Bergman and Paladino held themselves out as knowledgeable on these subjects – further support a strong inference of scienter.

## VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

131.    During the Class Period, Defendants made a host of materially false and misleading statements and omissions, which were disseminated to investors in the Company's SEC filings and press releases, and during conference calls and investor presentations.

### A.    Defendants' Materially False and Misleading Statements and Omissions in Schein's SEC Filings

132.    Defendants Schein, Bergman, and Paladino made materially false and misleading statements concerning buying groups in the Company's Forms 10-K filed February 11, 2014 (the "2013 Form 10-K"), February 11, 2015 (the "2014 Form 10-K"), February 10, 2016 (the "2015 Form 10-K"), and February 21, 2017 (the "2016 Form 10-K), as well as in the Company's Forms 10-Q filed May 7, 2013 (the "Q1 2013 Form 10-Q"), August 6, 2013 (the "Q2 2013 Form 10-Q"), November 5, 2013 (the Q3 2013 Form 10-Q"), May 6, 2014 (the "Q1 2014 Form 10-Q"), August 4, 2014 (the "Q2 2014 Form 10-Q"), November 6, 2014 (the "Q3 2014 Form 10-Q"), May 4, 2015 (the "Q1 2015 Form 10-Q"), July 29, 2015 (the "Q2 2015 Form 10-Q"), November 4, 2015 (the "Q3 2015 Form 10-Q"), May 3, 2016 (the "Q1 2016 Form 10-Q"), August 4, 2016 (the "Q2 2016 Form 10-Q"), November 2, 2016 (the "Q3 2016 Form 10-Q"), May 9, 2017 (the "Q1 2017 Form 10-Q"), August 8, 2017 (the "Q2 2017 Form 10-Q"), and November 6, 2017 (the "Q3 2017 Form 10-Q"). In each of the Forms 10-K listed above, which were signed by Defendants Bergman and Paladino, and in each of the Forms 10-Q listed above, which were signed by Defendant Paladino, Schein stated:

> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad

array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

133.    The statements in the preceding paragraph were materially misleading when made. It was misleading for Schein, Bergman and Paladino to state that the healthcare industry (including the dental supplies and products industries) "has increasingly focused on cost containment" and that that trend "has accelerated the growth of . . . collective buying groups" which "emphasi[ze] . . . obtaining products at competitive prices" when, in truth, and as alleged in detail above, Defendants were engaged in multiple illicit, anti-competitive, and collusive activities in an attempt to fight dental consumers' attempts at "cost containment," including illicitly applying leverage to (1) choke off competition from low-cost distributors of dental supplies and equipment, and (2) prevent the formation of buying groups and associated online dental sales activity.

134.    In each of the SEC filings listed in paragraph 132, Defendants Schein, Bergman and Paladino also stated: "Our distribution business is characterized by . . . intense competition."

135.    The statement in the preceding paragraph was materially false and misleading when made. It was false and misleading for Defendants Schein, Bergman and Paladino to state that its distribution business was characterized by "intense competition" when, in truth, as alleged in detail above, Schein actively colluded with its purported competitors in a common scheme, refused to compete with them on price, and colluded with them to illegally block other companies, including low-cost distributors and platforms supporting lower-cost distribution, from competing in the market.

136.    In the Q1 2013 Form 10-Q, Schein stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with **broad product and service offerings at competitive prices**, and a

> strong commitment to customer service, enables us to be a single source of supply
> for our customers' needs.

This statement was substantially repeated in each of the other SEC filings listed in paragraph 132.

137.   The statements referenced in the preceding paragraph were materially false and misleading. It was materially false and misleading to tout the Company's "broad product . . . offerings at competitive prices," when in fact, and as alleged in detail above, Defendants were engaged in an anticompetitive, collusive conspiracy to maintain inflated prices for products by (1) choking off competition from low-cost distributors of dental supplies and equipment, and (2) preventing the formation of buying groups and associated online dental sales activity.

138.   In each of the SEC filings listed in paragraph 132, Defendants Schein, Bergman and Paladino also reported the Company's "gross margin %" numbers for Schein's "Health care distribution" segment for each respective reporting period.

139.   These reported gross margin percentages referred to in the preceding paragraph were materially false and misleading when made. The gross margin percentages reported by Defendants Schein, Bergman and Paladino were false and misleading because they were inflated due to Schein's illegal, anti-competitive collusion with its purported competitors to thwart (1) the entry of lower-priced competitors and (2) the creation of buying groups, both of which would have had the effect of materially reducing gross profit margin in the Company's healthcare distribution segment had Schein and its co-conspirators not prevented them from happening through illegal, collusive means. The details of these collusive activities are set forth herein.

140.   In each of the SEC filings listed in paragraph 132, Defendants Schein, Bergman and Paladino stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. . . . With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin

on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

141.   The statements in the preceding paragraph were materially misleading when made. It was misleading for Defendants Schein, Bergman and Paladino to state that "sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies" when Schein was colluding with its two biggest competitors to prevent the formation of buying groups that would allow its customers who were office-based practitioners to take advantage of pricing arrangements identical or at least more similar to those enjoyed by large-group customers.

142.   In Schein's Form 10-K filed February 13, 2013, the Company identified the following risk factor: "The health care products distribution industry is highly competitive and we may not be able to compete successfully." This risk factor was substantially repeated in each of Schein's Forms 10-K filed during the Class Period. In addition, this or a substantially equivalent risk factor was incorporated by reference into each of Schein's Forms 10-Q filed during the Class Period.

143.   The statements referred to in the preceding paragraph were materially false and misleading when made. It was false and misleading for Defendants Schein, Bergman and Paladino to state that "[t]he health care products distribution industry [was] highly competitive" when, in truth, Schein actively colluded with its purported competitors in a common scheme, refused to compete with them on price, and colluded with them to illegally block other companies, including low-cost distributors and platforms supporting lower-cost distribution, from competing in the market.

144.   In the 2013 Form 10-K, Defendants Schein, Bergman and Paladino stated:

The distribution and manufacture of health care supplies and equipment is highly competitive. . . . In North America, *we compete with other distributors, as well as several manufacturers, of dental*, medical and animal health products, primarily *on the basis of price*, breadth of product line, customer service and value-added products and services. In the sale of our dental products, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company. In addition, we compete against a number of other distributors that operate on a national, regional and local level. . . . Significant price reductions by our competitors could result in a similar reduction in our prices. Any of these competitive pressures may materially adversely affect our operating results.

These statements were substantially repeated in each of the Forms 10-K filed during the Class Period.

145. The statements referred to in the previous paragraph were materially false and misleading when made. It was materially false and misleading to state that "[t]he distribution . . . of health care supplies and equipment [was] highly competitive" when, in fact, Schein was engaged in egregious anticompetitive conduct with its two largest purported competitors. It was further materially false and misleading to state that Schein "compete[d] with other distributors . . . of dental . . . products, primarily on the basis of price" when Schein was engaged in an anticompetitive conspiracy with its two largest competitors precisely to avoid competing on the basis of price. It was also materially misleading to state that "[i]n the sale of [Schein's] dental products, [Schein's] primary competitors [were] the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company," when in fact Schein was actively colluding with Benco and Patterson to maintain inflated prices and margins in the market for dental products. It was further materially false and misleading to state that Schein "compete[d] against a number of other distributors that operate on a national, regional and local level" when in fact Schein was engaged in an anticompetitive conspiracy with certain of its purported competitors including Benco and Patterson to choke off competition from smaller, lower priced entrants to the dental supplies and equipment market. It was also materially false and misleading to state that

- 63 -

"[s]ignificant price reductions by our competitors could result in a similar reduction in our prices" when, in fact, Schein was colluding with its two largest dental competitors, Benco and Patterson, in order to fix margins, eliminate low-priced competitors, and prevent customers from joining buying groups to reduce prices.

146.    Further, Schein's SEC filings, including the filings listed in paragraph 132, failed to disclose material information required to be disclosed by Item 303 of Regulation S-K (17 C.F.R. §229.303), which requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's liquidity as one of the key items requiring comprehensive disclosure. Specifically, Item 303 requires the disclosure of: "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and . . . the extent to which income was so affected"; and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

147.    Item 303's obligations required Schein to disclose that its profits, margins, and revenues were at risk due to the pressure to allow additional competition, which would decrease margins, allow for additional competition that would reduce revenue, and reduce its market share if and when the Company was forced to, or chose to, cease engaging in the collusive and anticompetitive conduct (as alleged above) that was inflating its Class Period results.

**B.      Defendants' Materially False and Misleading Statements and Omissions in Conference Calls and Investor Presentations**

148.     On June 5, 2013, Defendants Bergman and Paladino presented at the Jefferies Global Healthcare Conference. In the course of the presentation, Defendant Bergman stated:

> ***Our prices are competitive.*** They're not the lowest in the marketplace, but what we do is we supplement our branded offering with our private brand offering. . . . However, if price becomes an issue, we certainly can compete in a way that no one else can.

149.     The statement in the preceding paragraph was materially false and misleading. It was false and misleading to state that Schein's prices were "competitive," when in fact those prices were inflated by the anticompetitive, collusive scheme Schein had entered into with its purported competitors. It was also misleading to state that, "if price becomes an issue, [Schein] certainly can compete in a way that no one else can," when Schein was doing the opposite of competing on price by conspiring to fix margins, prevent lower-priced competition from entering the market, and block price-reducing buying groups from coming into existence.

150.     On August 4, 2014, Defendants Bergman and Paladino hosted Schein's second-quarter 2014 earnings call. During the call, Defendant Bergman stated:

> ***Any time you have competition, it is better. I am a big fan of the free market and this restriction business in the end doesn't pay off.*** I think Henry Schein has a long tradition -- there are examples where it works better because you may need more resources in one way or another to advance the product, but I think Henry Schein's history as an outstanding value-added distributor has shown that we have always been able to find the right balance of products.

151.     The statement in the preceding paragraph was materially misleading. It was misleading for Defendant Bergman to state that "[a]ny time you have competition, it is better" and "I am a big fan of the free market" when, in truth, Schein actively impeded competition and the operation of the free market by entering into a common, anticompetitive scheme with its purported competitors, refusing to compete with them on price, and colluding with them to illegally block

other companies, including low-cost distributors and platforms supporting lower-cost distribution, from competing freely in the market.

152.     On August 4, 2016, Defendants Bergman and Paladino hosted Schein's second-quarter 2016 earnings call. During the call, Robert Jones of Goldman Sachs asked Defendant Bergman a question about the competitive environment Schein was facing in the North American dental market:

> I hate to go back to this, but just on the North American dental market, I wanted to hone in a little bit on the merchandise side. It obviously must've really fallen off in June, based on your commentary.
>
> I'm curious. Is there anything you could elaborate on or share with us relative to the competitive environment? Did you see any changes in behavior from your traditional competitors and the way that they are approaching their go-to-market strategy? Did you see any increased pressure from alternative distribution channels, like online pure-play competitors? Just anything that might help us get our heads around what seemingly was a pretty consistent growth until May, and then obviously what -- based on the numbers you have shared seems like a fairly dramatic pullback in June, would be helpful.

In response, Defendant Bergman stated, among other things, "I don't think there is any major change in dynamics on the competitive side. ***It is a competitive market, to be sure***. There is no shortage of competitors. Everybody is fighting for that last dollar, so it is a competitive market."

153.     Defendant Bergman's statement in the preceding paragraph was materially false and misleading. It was false and misleading to state that the North American dental market was "a competitive market," and there was "no shortage of competitors," and that "[e]verybody [was] fighting for that last dollar" when, in truth, Schein actively colluded with its largest purported dental market competitors in a common scheme, refused to compete with them on price, and colluded with them to illegally block other companies, including low-cost distributors and platforms supporting lower-cost distribution, from competing in the market.

154.    On November 2, 2016, Defendants Bergman and Paladino hosted Schein's third-quarter 2016 earnings call. During the call, Elizabeth Anderson of Evercore ISI asked about the competitive environment in the dental segment: "[I]n terms of the competitive environment you're seeing in dental in terms of large group or smaller spaces, do you have any additional comments on that area, any changes you've been seeing?" Defendant Bergman responded:

> **Well the dental market has always been a very competitive market. We have been competing strongly with our major competitors and the smaller competitors for decades.** I'm not sure the competition has increased substantially. At the end of the day, we believe we have a very strong proposition to offer to our large customers, our mid size customers and our smaller customers. The proposition we offer is based on a value, a margin generation value that enables us to fund the value-added services, which we believe are unique in the market.

155.    Defendant Bergman's statement in the preceding paragraph was materially false and misleading. It was false and misleading to state that "the dental market has always been a very competitive market" and that Schein had "been competing strongly with [its] major competitors and the smaller competitors for decades" when, in fact, Schein was engaged in anticompetitive collusion with its major competitors in the dental space, Benco and Patterson, including by attempting to freeze out the Company's smaller, low-margin competitors. It was also false and misleading to state that Schein's value proposition to its customers was "based on . . . a margin generation value," when in fact Schein was colluding with its primary competitors in the dental market to fix margins and prevent customers from entering into buying groups that would force Schein's margins to compress.

156.    During the same call, Michael Cherney of UBS asked a question about the relationship between pricing and competition in Schein's healthcare businesses:

> I wanted ask a different type of competition question. I know this has been the theme but it seems like the theme across healthcare. I know you guys have been very much focusing on the value-added services you provide, the strong partnerships. Have you seen a trend of people working or are you trying to use price specifically? It seems like it's coming up in other different healthcare sub sectors

whether it's in the dental market or even animal health and medical where people are trying to use price specifically as a weapon, trying to come in and take share.

Defendant Bergman responded:

> Well of course **prices has always played a role, a key role**. You've got to be competitive. Price has been an issue in our markets for the 36 years that I've been in the business. So, yes, price is important. But you have to balance price with value-added services. It costs money to develop value-added services. . . . [T]he combination of investment in the value-added services and price is what drives competition and the bottom line. We obviously have to sharpen that as we have done every single year for decades. We have to sharpen, at the end of the day, the price we charge for the value-added service and the products. Competition has always been there. So I'm not sure if there's anything new in the market other than we have to just continue with what we've done for decades, which is to provide a better proposition to our customers.

157.     Defendant Bergman's statement in the preceding paragraph was materially misleading. It was misleading to state that "prices [had] always played . . . a key role," to imply that Schein's prices were "competitive," and to state that "[w]e have to sharpen the price we charge for the value-added service and the products" and "[c]ompetition [had] always been there" when in fact Schein engaged in several anticompetitive agreements with its largest purported competitors precisely in order to avoid competing on price, including by forcing lower-priced competition out of the market and by preventing customers from organizing into buying groups that could force prices downwards. It was also false and misleading to state that, "for decades," Schein had "provide[d] a better proposition to [its] customers" when, in fact, Schein was engaged in an anticompetitive conspiracy to force out competitors and buying groups who offered customers a better value proposition than Schein, Benco, and Patterson did.

158.     On February 21, 2017, Defendants Bergman and Paladino hosted Schein's fourth-quarter 2016 earnings call. During the call, Mike Minchak of JPMorgan asked about "the competitive landscape in dental, especially as it relates to large versus smaller customers" and

whether Schein had "seen any changes in the competitive dynamics in either of those segments recently." In response, Defendant Bergman stated:

> You know, ***this is probably the most asked question from analysts***, other than, how's the market doing. And I just want to reemphasize ***what we've been saying for years. The dental market is competitive.*** It's a market that is driven by a combination of price and service offered -- in other words, value. I don't think anything has changed. We have a good market share in the large practices. We have, we believe, the most outstanding offering, with tremendous experience in that area. And yes, every now and again, a competitor will go in with a price that's below ours, and we will not match those prices. Because we believe our offering is of higher value, and we cannot and will not dilute the value that is ascribed to our offering. So I would be understanding that Henry Schein is competitive in the space, highly competitive in the space, has always been competitive. There has always been competition. The competition hasn't increased at all. It's the same competition we've had for decades. . . . Our job is to provide value to our customers. I believe we continue to do a good job in that area. And there is no more competition today than there was 10 years ago. ***The competition wants our business and we want our competitions' business. It's a fiercely competitive market.***

159. Defendant Bergman's statements in the preceding paragraph were materially false and misleading. It was false and misleading to state that "[t]he dental market [was] competitive," "[t]here has always been competition," "[t]he competition wants our business and we want our competitions' business," and "[i]t's a fiercely competitive market" when, in fact, Schein engaged in anticompetitive collusion with its largest purported competitors precisely in order to remove competition from the dental market by declining to compete on price and by forcing out new market entrants who otherwise would have competed with Schein, Benco, and Patterson. It was also false and misleading to state that "every now and again, a competitor will go in with a price that's below ours, and we will not match those prices [] [b]ecause we believe our offering is of higher value, and we cannot and will not dilute the value that is ascribed to our offering" when, in fact, Schein was maintaining its high prices by engaging in an anticompetitive conspiracy with its largest purported competitors, Benco and Patterson, in order to force out lower-priced market entrants and buying groups who could cause a reduction in prices.

160.   On May 16, 2017, Defendants Bergman and Paladino presented at the Bank of America Merrill Lynch Healthcare Conference. Defendant Bergman stated:

> ***Dentistry has always been highly competitive on the distribution side.*** We expect it to continue to be highly competitive. . . . [T]he goal is to continue to provide value-added services. We provide very good value-added services in that area, but there's a price below which we will not go. And it is important for us to price our value-added services at a level that we can provide good returns to our investors.

161.   Defendant Bergman's statement in the preceding paragraph was materially false and misleading. It was false and misleading to state that "[d]entistry has always been highly competitive on the distribution side" when, in fact, Schein engaged in anticompetitive collusion with its largest purported competitors precisely in order to remove competition from the dental market by declining to compete on price and by forcing out new market entrants who otherwise would have competed with Schein, Benco, and Patterson. It was also false and misleading to state that "there's a price below which we will not go [] [a]nd it is important for us to price our value-added services at a level that we can provide good returns to our investors" when, in fact, Schein was maintaining its high prices by engaging in an anticompetitive conspiracy with its largest purported competitors, Benco and Patterson, in order to force out lower-priced market entrants and buying groups who could cause a reduction in prices.

162.   On June 13, 2017, Defendant Paladino presented at the Goldman Sachs Global Healthcare Conference. In response to a question from Robert Jones of Goldman Sachs concerning the "potential future threat" of online competition, Defendant Paladino stated:

> It's a really good question because everything is going digital. Technology is in every aspect of everyone's lives today. It's an area, though, that we feel that if we keep doing what our strength has been, which is to have a moat around our business, and ***that moat is really we're very competitive in pricing***. But even today, without some of these new entrants, we're not the lowest in the market on every single price, on every single product. But what we do is we have unbelievably good service levels and a really strong offering of value-added products and services. And what we found is the market really wants more than just the lowest price. They want that combination of very competitive pricing as well as all the other services. So as long

as we keep doing that, I think that we won't have to worry about that pure online discount player. And they're already in the market. Don't worry about new people getting in. It already represents 10% to 15% of the market today, and it really hasn't been growing at much faster rate than the overall market. So again, I think people are voting with their wallet or their checkbook by really saying we really want all of these other services as well as competitive pricing.

163. Defendant Paladino's statement in the preceding paragraph was materially false and misleading. It was false and misleading to state that Schein was "very competitive in pricing" when, in fact, Schein engaged in anticompetitive collusion with its largest purported competitors precisely in order to remove competition from the dental market by declining to compete on price and by forcing out new market entrants who otherwise would have competed with Schein, Benco, and Patterson by offering lower prices. It was also false and misleading to state that the market "want[ed] th[e] combination of very competitive pricing as well as all the other services" that Schein provided, and that "people [were] voting with their wallet or their checkbook by really saying we really want all of these other services [that Schein provided] as well as competitive pricing" when, in fact, Schein's prices remained high not because the market wanted the additional services Schein claimed to offer, but rather because Schein engaging in an anticompetitve conspiracy with its purported competitors in order to maintain high prices by excluding lower-priced entrants to the market and preventing consumers from forming buying groups. It was further false and misleading to state that Schein would not "have to worry about that pure online discount player" and that pure online options were "already in the market" and had not "been growing at much faster rate than the overall market" when Schein engaged in collusion with its largest purported competitors to illegally thwart the SourceOne's attempts to operate an online discount dental supply platform that would have posed a substantial threat to Schein, Benco, and Patterson.

164. On August 8, 2017, Defendants Bergman and Paladino hosted Schein's second-quarter 2017 earnings call. During the call, Defendant Bergman stated:

> [W]e remain comfortable that although *this is a highly competitive market* and every dollar of business that we get, we have to fight for, we believe that we are well positioned to gain market share in the digital technology space and in fact, overall in the dental space, whether it's in consumables for dentists or equipment for dentists[.]

165. Defendant Bergman's statement in the preceding paragraph was materially false and misleading. It was false and misleading to state that the dental market was "a highly competitive market and every dollar of business that we get, we have to fight for" when, in fact, Schein engaged in anticompetitive collusion with its largest purported competitors precisely in order to remove competition from the dental market by declining to compete on price and by forcing out new market entrants who otherwise would have competed with Schein, Benco, and Patterson.

166. On November 6, 2017, Defendants Bergman and Paladino hosted Schein's third-quarter 2017 earnings call. During the call, Defendant Bergman stated:

> [W]e believe that the Value-Added service part of [Schein's] offering continues to grow in importance and we're investing heavily in that area. So the digital platform is an ordering platform, sometimes offered by standalone companies that only offer consumable products and there's a part of the market that goes there. And if it becomes really a price issue, well, Henry Schein has the largest variety of private brand, control brand products in the industry. We have practically everything a practitioner may need at very good prices. And if it becomes a price situation, we can win on that only if that's the only issue. So there are a lot of challenges that we have to face in our business like every other business. But to me, this is not on the top of the list. . . . I think [digital] will remain a size of the market of somewhere between 10%, 15% that'll be price only. And in that market, Henry Schein will continue to compete and compete very well[.]

167. Defendant Bergman's statement in the preceding paragraph was materially misleading. It was misleading to state that Schein had "very good prices" and that "if it becomes really a price issue," Schein could "win on that . . . if that's the only issue" when, in fact, Schein engaged in anticompetitive collusion with its largest purported competitors precisely in order to remove price competition from the dental market by declining to compete on price, by forcing out

new market entrants who otherwise would have competed with Schein, and by conspiring with Benco and Patterson to eliminate downwards price pressure from buying groups. It was also misleading to state that digital ordering would "remain a size of market of somewhere between 10%, 15% that'll be price only [] [a]nd in that market, Henry Schein will continue to compete and compete very well" when, in fact, Schein had illegally conspired with Benco and Patterson to eliminate digital competition from SourceOne.

## IX.    PRESUMPTION OF RELIANCE

168.    At all relevant times, the market for Schein's securities was efficient for the following reasons, among others:

(a)    Schein's stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient market;

(b)    As a regulated issuer, Schein filed periodic reports with the SEC and NASDAQ;

(c)    Schein shares traded regularly and with significant volume, with an average daily volume of 1,031,790 shares traded on the NASDAQ during the Class Period;

(d)    Schein regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, through the Company's website, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)    Schein was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

169.    As a result of the foregoing, the market for Schein stock promptly digested current information regarding Schein from all publicly available sources and reflected such information in Schein's stock price. Under these circumstances, all purchasers of Schein securities during the Class Period suffered similar injury through their purchase of Schein securities at artificially inflated prices, and a presumption of reliance applies.

## X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

170.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Schein who knew that those statements were false or misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

171.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Schein securities between March 7, 2013 through February 12, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Schein at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any affiliates or other entities in which Defendants have or had a controlling interest.

172.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Schein common shares were actively traded on the NASDAQ. As of October 31, 2017, Schein had approximately 156 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this

time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members of the proposed Class. Class members who purchased Schein common shares may be identified from records maintained by Schein or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

173.     Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174.     Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

175.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about Schein's participation in an anticompetitive conspiracy and the sources of the Company's margins;

(c)     Whether Defendants acted with scienter; and

(d)     To what extent the members of the Class have suffered damages, as well as the proper measure of damages.

176.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

- 75 -

## XII.    COUNTS

<u>COUNT I</u>

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
PROMULGATED THEREUNDER
(Against the Speaking Defendants)**

177.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

178.    This Count is asserted on behalf of all members of the Class against Defendants Schein, Bergman, and Paladino for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

179.    During the Class Period, Defendants Schein, Bergman, and Paladino carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding Schein's business, operations, management and the intrinsic value of Schein securities; (ii) enabled Defendants to artificially inflate the price of Schein securities; and (iii) caused Lead Plaintiff and other members of the Class to purchase Schein securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually took the actions set forth herein.

180.    The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Schein securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Defendants named in this count are sued as primary

participants in the wrongful and illegal conduct charged herein. Defendants Bergman and Paladino are also sued as controlling persons as alleged below.

181.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations and financial results of Schein as specified herein.

182.    These Defendants employed devices, schemes and artifices to defraud, while in possession of, or recklessly ignoring, material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Schein's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Schein securities during the Class Period.

183.    Defendants are liable for the materially false and misleading statements and omissions they made during the Class Period as alleged in detail above in Section V.

184.    Defendants Bergman and Paladino, as the most senior officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of the Company, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by Schein. Defendants Bergman and Paladino had direct involvement in the daily business of the Company and either made personally or participated in the preparation and dissemination of the materially false and misleading statements set forth above.

185.    The allegations in this Complaint establish a strong inference that Defendants Schein, Bergman, and Paladino acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts or make their statements not misleading. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them.

186.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

187.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Schein securities during the Class Period.

## COUNT II

### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
(Against the Individual Defendants)

188.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

189.    This Count is asserted on behalf of all members of the Class against Defendants Bergman, Paladino, and Sullivan, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

190.    By reason of their high-level positions of control and authority as the Company's most senior officers and, in the case of Defendant Bergman as Schein's Chairman, the Individual

Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Individual Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Schein during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein. The Individual Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

191.     In their capacities as Schein's most senior corporate officers, and as more fully described above, Defendants Bergman, Paladino and Sullivan had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular decisions, acts, or practices giving rise to the securities law violations as alleged herein. Defendants Bergman and Paladino signed Schein's SEC filings and Sarbanes-Oxley certifications, and Bergman, Paladino and Sullivan were directly involved in providing false information and certifying and/or approving the false statements disseminated by Schein during the Class Period.

192.     Each of the Defendants culpably participated in the fraud alleged herein. Defendants Bergman, Paladino and Sullivan each acted with scienter, as set forth more fully in Section V.

193.     By virtue of their positions as controlling persons of Schein and as a result of their own aforementioned conduct, Defendants Bergman, Paladino and Sullivan, together and

individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff respectfully prays for judgment as follows:

(a)    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representatives, and appointing Bernstein Litowitz Berger & Grossmann LLP as class counsel pursuant to Rule 23(g);

(b)    Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)    Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

(d)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

(e)    Granting such other and further relief as the Court deems just and proper.

## XIV.   JURY DEMAND

194.    Lead Plaintiff demands a trial by jury of all issues so triable.

DATED: September 14, 2018                    Respectfully submitted,

*/s/* James A. Harrod

James A. Harrod
Michael M. Mathai
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jim.harrod@blbglaw.com
michael.mathai@blbglaw.com

*Counsel for Lead Plaintiff Miami Retirement Trust*
*and Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN &**
  **LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Counsel for Lead Plaintiff Miami Retirement Trust*