**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**IN RE HENRY SCHEIN, INC.**
**SECURITIES LITIGATION**

No. 1:18-cv-01428-MKB-VMS

**ECF-Filed**
**Oral Argument Requested**

---

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**
**LEAD PLAINTIFF'S CONSOLIDATED COMPLAINT**

Ralph C. Ferrara (admitted *pro hac vice*)
Ann M. Ashton (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, DC  20004
(202) 416-6800
rferrara@proskauer.com
aashton@proskauer.com

Jonathan E. Richman
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY  10036-8299
(212) 969-3000
jerichman@proskauer.com

*Counsel for Defendants*

December 10, 2018

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

ARGUMENT .......................................................................................................................... 6

I.      PLAINTIFF HAS NOT PLED A VIOLATION OF § 10(b). ................................... 6

    A.      Plaintiff Has Not Pled a Material Misstatement or Omission ............................... 6

        1.      No Misstatements About Market Competition ............................................ 7

        2.      No Misstatements About Cost-Containment and Pricing Issues ................ 9

        3.      No Misstatements About Value-Added Services ...................................... 10

        4.      No Misstatements About Financial Results and Margins ......................... 11

        5.      No Misstatements About Future Competition .......................................... 11

        6.      No Particularized Pleading of Anticompetitive Conduct ........................ 12

    B.      Plaintiff Has Not Pled a Strong Inference of Scienter ....................................... 16

        1.      No Inference of Scienter as to Messrs. Bergman and Paladino ............... 17

        2.      The Insiders' Stock Sales Do Not Show Scienter ................................... 17

            a.      The Stock Sales Were Not Unusual ............................................. 18

            b.      The Stock Sales Were Not Otherwise Suspicious ........................ 19

        3.      No Inference of Scienter as to Mr. Sullivan ............................................ 22

        4.      The "Core Operations" Doctrine Does Not Support Scienter ................. 24

        5.      Other Lawsuits and Investigations Do Not Show Scienter ...................... 26

        6.      Statements About Competition Do Not Show Scienter ............................ 26

    C.      The Complaint Does Not Adequately Plead Loss Causation ............................... 27

        1.      The Loss-Causation Theory Is Not Linked to the Challenged Conduct .................................................................................................. 27

i

2.      The Post-August 2017 Disclosures Did Not Reveal Anything New .........28

D.      The Publicly Available Facts Showing a Lack of Loss Causation Also
        Defeat Plaintiff's Allegations of Reliance and Misrepresentations.......................33

II.     PLAINTIFF HAS NOT PLED A CLAIM FOR CONTROL-PERSON
        LIABILITY.............................................................................................................34

A.      Plaintiff Has Not Established Mr. Sullivan's Control Over Schein ......................35

B.      Plaintiff Has Not Shown Any Individual Defendant's Culpable
        Participation.........................................................................................................35

CONCLUSION..................................................................................................................36

# TABLE OF AUTHORITIES

*Page(s)*

CASES:

*Acito v. IMCERA Grp, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................................18

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  899 F.3d 87 (2d Cir. 2018) ............................................................................13, 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...............................................................................34

*Barrett v. PJT Partners Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ................................................22, 23

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ..............................................................................15

*City of Brockton Ret. Sys. v. Shaw Grp., Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) ...............................................................21

*City of Omaha v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012) ................................................................................33

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ...........................................................................7, 8

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) ..............................................................27

*Cutsforth v. Renschler*,
  235 F. Supp. 2d 1216 (M.D. Fla. 2002) ...........................................................10

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014) ..............................................................................29

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................................6

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..........................................................................6, 16

*Emps. Ret. Sys. of Providence v. Embraer S.A.*,
  2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ..............................................11, 15

iii

*Friedman v. JP Morgan Chase & Co.*,
   2016 WL 2903273 (S.D.N.Y. May 8, 2016),
   *aff'd*, 689 F. App'x 39 (2d Cir. 2017) ............................................................................ 34, 35

*Hogan v. Pilgrim's Pride Corp.*,
   2018 WL 1316979 (D. Colo. Mar. 14, 2018) ............................................................... 12

*In re Advanced Battery Techs., Inc.*,
   781 F.3d 638 (2d Cir. 2015) ......................................................................................... 16

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ......................................................................................... 19

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) .......................................................................... 20

*In re Boston Tech., Inc. Sec. Litig.*,
   8 F. Supp. 2d 43 (D. Mass. 1998) ................................................................................ 10

*In re Dental Supplies Antitrust Litig.*,
   2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ........................................................ 12, 30

*In re Ferrellgas Partners, L.P. Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ......................................................... 24, 25

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................... 26

*In re Glenayre Techs., Inc. Sec. Litig.*,
   1998 WL 915907 (S.D.N.Y. Dec. 30, 1998),
   *aff'd sub nom. Kwalbrun v. Glenayre Techs., Inc.*,
   201 F.3d 431 (2d Cir.1999) .......................................................................................... 20

*In re Hertz Global Holdings Inc.*,
   905 F.3d 106 (3d Cir. 2018) ......................................................................................... 18

*In re Iconix Brand Grp., Inc.*,
   2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ............................................................... 18

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................... 18, 20, 21, 22, 27

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ........................................................................... 19

*In re New Energy Sys. Sec. Litig.*,
   66 F. Supp. 3d 401 (S.D.N.Y. 2014) ........................................................................... 29

*In re Nice Sys., Ltd. Sec. Litig.*,
 135 F. Supp. 2d 551 (D.N.J. 2001) .................................................................8

*In re Nimble Storage, Inc. Sec. Litig.*,
 252 F. Supp. 3d 848 (N.D. Cal. 2017) ...........................................................15

*In re Pfizer Sec. Litig.*,
 538 F. Supp. 2d 621 (S.D.N.Y. 2008) ............................................................34

*In re Prestige Brands Holding, Inc.*,
 2006 WL 2147719 (S.D.N.Y. July 10, 2006) .................................................22

*In re Rockwell Med., Inc. Sec. Litig.*,
 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...........................................24, 26

*In re Sanofi Sec. Litig.*,
 155 F. Supp. 3d 386 (S.D.N.Y. 2016) ............................................................11

*In re Supercom Inc. Sec. Litig.*,
 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) .................................................12

*In re Syntex Corp. Sec. Litig.*,
 1993 WL 476646 (N.D. Cal. Sept. 1, 1993) ..................................................34

*In re Text Messaging Antitrust. Litig.*,
 782 F.3d 867 (7th Cir. 2015) ....................................................................13, 15

*In re Tyson Foods, Inc. Sec. Litig.*,
 275 F. Supp. 3d 970 (W.D. Ark. 2017) ..........................................................12

*In re Veon Ltd. Sec. Litig.*,
 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ................................................35

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ..................................................9

*In re Yukos Oil Co. Sec. Litig.*,
 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .................................................34

*In re Zyprexa Prods. Liab. Litig.*,
 549 F. Supp. 2d 496 (E.D.N.Y. 2008) .............................................................4

*Janbay v. Canadian Solar, Inc.*,
 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ................................................13

*Kramer v. Time Warner Inc.*,
 937 F.2d 767 (2d Cir. 1991) ...........................................................................4

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ......................................................................27, 29

*Levy v. Maggiore*,
   48 F. Supp. 3d 428 (E.D.N.Y. 2014) ...............................................................4

*Livingston v. Cablevision Sys. Corp.*,
   966 F. Supp. 2d 208 (E.D.N.Y. 2013) ...........................................................18

*Low v. Robb*,
   2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) ...................................................13

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .....................................................................29

*Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
   22 F. Supp. 3d 669 (E.D. Ky. 2014) ................................................................8

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016) ..........................................................................11

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018) ..............................................................8

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
   774 F.3d 598 (9th Cir. 2014) .........................................................................27

*Plumbers Local No. 200 Pension Fund v. Wash. Post Co.*,
   831 F. Supp. 2d 291 (D.D.C. 2011)................................................................25

*Reilly v. U.S. Physical Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. July 23, 2018) ...........................................18, 20, 21

*Ressler v. Liz Claiborne, Inc.*,
   75 F. Supp. 2d 43 (E.D.N.Y. 1998),
   *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*,
   189 F.3d 460 (2d Cir. 1999) .......................................................17, 18, 20

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anonima*,
   2018 WL 4308546 (S.D.N.Y. Sept. 10, 2018) ................................................24

*SEC v. First Jersey Sec.*,
   101 F.3d 1450 (2d Cir. 1996) ........................................................................35

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
   248 F. Supp. 3d 428 (S.D.N.Y. 2017) ............................................................22

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
  2010 WL 2473595 (S.D.N.Y. June 17, 2010),
  *aff'd*, 448 F. App'x 116 (2d Cir. 2011)..................................................................34

*Steinberg v. Ericsson LM Tel. Co.*,
  2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ........................................................15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) .................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................16

*Thomas v. Shiloh Indus., Inc.*,
  2017 WL 2937620 (S.D.N.Y. July 7, 2017) ..........................................................22

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) .........................................................................9, 10, 11

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011) ....................................................................24

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
  2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013) ........................................................26

*Utesch v. Lannett Co.*,
  316 F. Supp. 3d 895 (E.D. Pa. 2018) ........................................................12, 17, 26

*White v. H&R Block, Inc.*,
  2004 WL 1698628 (S.D.N.Y. July 28, 2004) ...................................................33, 34

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) .................................................................................18

**STATUTES:**

Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b).................................................*passim*

Securities Exchange Act § 20(a), 15 U.S.C. § 78t(a) .........................................1, 34, 35

15 U.S.C. § 78u-4(b)..................................................................................................6, 16

15 U.S.C. § 78u-5(c)...............................................................................................11, 12

**OTHER AUTHORITIES:**

Fed. R. Civ. P. 8(a) ........................................................................................................12

Fed. R. Civ. P. 9(b).................................................................................................*passim*

SEC Rule 10b-5, 17 C.F.R. 240.10b-5 ..................................................................................*passim*

## PRELIMINARY STATEMENT

This case is a putative securities class action about alleged violations of the antitrust laws by Henry Schein, Inc. ("Schein"), the country's largest distributor of dental supplies and equipment. Lead plaintiff alleges that Schein "engaged for years in collusive and anticompetitive practices" with its primary competitors "in order to maintain Schein's margins, profits, and market share," but defrauded investors by "misleadingly attribut[ing] the strength of [its] dental distribution business to the quality of [its] value-added business model." [Consolidated Complaint (the "Complaint" or "Compl.") ¶ 3] Schein's stock price allegedly fell "[w]hen the market learned the truth – that Schein's purported profit margins and market share were unsustainable and had been inflated by collusive conduct . . . ." [*Id.*] Plaintiff now asserts a securities-fraud claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5, as well as a control-person liability claim against the individual defendants under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiff's Complaint fails to state a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b).

First, plaintiff has not pled a material misrepresentation or omission. The Complaint does not allege any facts showing that the overall dental distribution business was *not* competitive even if collusive conduct purportedly existed in some unquantified portion of it. Defendants' statements about competition in the market were also inactionable puffery and expressions of opinion, and plaintiff has not pled particularized facts showing that they were false. Similarly, defendants' comments ascribing Schein's success to the company's "value-added" services were inactionable expressions of opinion and puffery, and plaintiff has not pled any facts showing that customers did *not* deal with Schein because of its value-added services.

Second, plaintiff has not pled a strong inference of scienter – knowing or reckless misconduct – as required by the PSLRA.  To create an inference of scienter as to Schein itself, plaintiff must establish that Schein's management knew of or recklessly disregarded violations of the antitrust laws and thus knew or recklessly disregarded that their statements about Schein's business performance were false.  The Complaint has virtually no allegations that defendants Stanley Bergman and Steven Paladino (Schein's CEO and Chief Financial Officer, respectively) knew of purportedly collusive, anticompetitive conduct.  Nor do those officers' sales of Schein stock create an inference of scienter, because, when examined in context, the sales were not suspicious or unusual.  The alleged knowledge of defendant Timothy Sullivan (president of Schein's North American dental division) cannot be attributed to Schein, because he was not a management-level employee, and the Complaint does not create a strong inference of his scienter in any event.  And plaintiff cannot rely on the "core operations" doctrine to establish scienter, because the North American dental business was not a core operation.

Third, the Complaint does not adequately plead loss causation – that the supposedly "corrective disclosures" revealed *new* information to the market.  As an initial matter, plaintiff's loss-causation theory does not make sense:  it depends on the allegation that Schein's reported financial performance began to suffer after Schein abandoned its supposedly anticompetitive conduct, but the Complaint never alleges that Schein did in fact abandon such conduct, or when it did so.  But in any event, allegations about that conduct – lawsuits, news articles, governmental investigations, etc. – had been in the public domain since 2012, long before the supposed "truth" was revealed starting on August 8, 2017.  Even if plaintiff could allege loss causation for losses incurred on or before that date, the subsequent disclosures did not reveal anything new.

Fourth, the information available in the market by the time trading began on August 8, 2017 also precludes plaintiff from pleading reliance.  Plaintiff has invoked the fraud-on-the-market presumption of reliance, which depends on the proposition that the market for Schein stock was efficient and promptly incorporated all publicly available information.  Under that assumption, the stock price on and after August 8, 2017 necessarily reflected the public information about the antitrust allegations and Schein's "poor" financial results.  The stock price thus could not have been inflated on or after that date, and purchasers could not have relied on an inflated price.  Moreover, the public information precludes plaintiff from pleading any actionable misrepresentation or omission on or after that date under the "truth on the market" doctrine.

Finally, the Complaint does not adequately plead control-person liability as to the three individual defendants – not only because it fails to plead an actionable primary violation of the Exchange Act, but also because it does not establish Mr. Sullivan's control over Schein or any individual's culpable participation in alleged misconduct relating to financial reporting.

## FACTUAL BACKGROUND

### A.    Schein's Dental Distribution Business

Schein is a global healthcare distribution business with three primary segments:  dental, animal health, and medical.  [Compl. ¶ 17]  Mr. Bergman is Schein's CEO and Chairman [*id.* ¶ 18]; Mr. Paladino is its Chief Financial Officer [*id.* ¶ 19]; and Mr. Sullivan is President of the North American portion of Schein's Global Dental Group [*id.* ¶ 20].  This case concerns only the U.S. dental distribution business, which provides dental products and services to a wide variety of healthcare providers [*id.* ¶ 17].

The U.S. dental distribution market has several principal competitors, with Schein, Patterson Dental ("Patterson"), and Benco Dental Supply Company ("Benco") being the three largest.  [Compl. ¶¶ 4, 25]  Other competitors include smaller distributors that operate on

regional and local levels.  [*E.g.*, 2013 Form 10-K at 4 (Ex. B)][1]  Manufacturers of dental

products can also sell directly to healthcare providers, thereby reducing or eliminating the role of

distributors such as Schein.  [*Id.*]  In light of these various types of competition, Schein stated in

SEC disclosures, earnings calls, and investor conferences that the dental market was highly

competitive.  [*E.g.*, Compl. ¶¶ 34-35; *see, e.g.*, 2013 Form 10-K at 4-5 (Ex. B)]

Many dental products are commoditized and do not vary widely among competitors.

[Compl. ¶ 7]  Schein therefore warned that a significant price reduction by a competitor could

lead to a similar reduction in Schein's prices.  [*Id.*; *e.g.*, 2013 Form 10-K at 5 (Ex. B)]

Some providers of dental services have organized into collectives known as buying

groups or group purchasing organizations ("GPOs"), which consist of smaller providers that join

together to try to obtain better pricing terms for products and services from manufacturers and

distributors.  [Compl. ¶ 29]  Schein's SEC filings discussed GPOs and warned investors that

"'[e]xpansion of [GPOs] . . . may place us at a competitive disadvantage'" because "'GPOs[]

demand more favorable pricing terms.'"  [*Id.* ¶ 30 (quoting 2013 Form 10-K)]

Schein repeatedly expressed its belief that it could maintain its position in a competitive

market because of the value it provided to its customers.  [Compl. ¶¶ 36-37]  Schein marketed

itself as a one-stop shop for dental needs, providing an array of supplemental services such as

practice-management software systems, financial services, e-services, practice technology,

---

[1]     "Ex." refers to the exhibits (designated by letter) to the accompanying Declaration of
Rachel O. Wolkinson.  Exhibits to the Appendix ("App.") to this brief (which is also Ex. MM to
the Declaration) are cited by number.  The Appendix exhibits show the intensity and credibility
of information embedded in the market relating to the misrepresentations and omissions alleged
in the Complaint.  In ruling on a motion to dismiss, the Court may consider documents
incorporated in the Complaint by reference, documents deemed integral to the Complaint, and
public records, including SEC filings.  *Levy v. Maggiore*, 48 F. Supp. 3d 428, 438 (E.D.N.Y.
2014).  The Court may also consider news articles, documents filed in other courts, analyst
reports, and other publicly available materials.  *E.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767,
774 (2d Cir. 1991); *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008).

network and hardware services, and continuing education for practitioners. [*E.g.*, 2013 Form 10-K at 3, 5 (Ex. B)]  Schein also hoped to use its position in the dental market to cross-sell products from its animal-health and medical sectors. [*Id.* at 8]  Schein made clear that, because of the value it provided, it would "'not match [a competitor's] prices'" in some circumstances to avoid "'dilut[ing] the value that is ascribed to our offering.'" [Compl. ¶ 36]

**B.      Plaintiffs' Allegations About Schein's North American Dental Business**

The Complaint alleges that Schein's stock price was artificially inflated from March 7, 2013 through February 12, 2018 (the "Class Period") because Schein had misleadingly portrayed its dental distribution business "as successfully producing excellent profits while operating in a highly competitive environment" even though, "in reality, [Schein] had engaged for years in collusive and anticompetitive practices in order to maintain Schein's margins, profits, and market share." [*Id.* ¶ 3]  Plaintiff bases that assertion on allegations recycled from antitrust lawsuits that were matters of public record and had been known in the market for years. [*E.g.*, *id.* ¶¶ 38-45]

The Complaint alleges that Schein, Patterson, and Benco engaged in a coordinated effort to squeeze out lower-cost competitors and block sales of dental products to GPOs.  That effort purportedly enabled Schein to inflate profit margins by eliminating competitors that would have driven down prices. [*Id.* ¶ 9]  And because Schein was purportedly engaging in profitable anti-competitive conduct, statements in its SEC filings highlighting the competitive nature of the industry and the reasons for Schein's financial performance were false and misleading. [*Id.* ¶ 5]

The Complaint contends that Schein's stock price fell starting in August 2017 when Schein announced below-expected financial performance that allegedly "revealed that Schein's poor results were a product of abandoning prior attempts to inflate sales volumes and margins through anticompetitive collusion." [*Id.* ¶ 109]  The full "truth" supposedly was revealed with

the news that the Federal Trade Commission (the "FTC") had filed an enforcement action against

Schein, Benco, and Patterson on February 12, 2018.  [*Id.* ¶¶ 115, 117, 119]

## ARGUMENT

The Court should dismiss the Complaint in its entirety because plaintiff has failed to

plead with particularity the existence of any material misrepresentations or omissions, scienter,

loss causation, or reliance.  Nor does the Complaint establish control-person liability.

## I.    PLAINTIFF HAS NOT PLED A VIOLATION OF § 10(b).

To plead a claim under § 10(b) of the Exchange Act, a plaintiff must establish a material

misrepresentation or omission, scienter, reliance, economic loss, and loss causation.  *Dura*

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  "Any complaint alleging securities fraud

must [also] satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b)

by stating with particularity the circumstances constituting fraud."  *ECA & Local 134 IBEW*

*Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  "Under the

PSLRA, the complaint must 'specify each statement alleged to have been misleading, [and] the

reason or reasons why the statement is misleading,' and 'state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind.'"  *Id.* (quoting

15 U.S.C. §§ 78u-4(b)(1), (2)).

The Complaint fails to allege any material misstatements or omissions – whether about

competition in the dental market, cost containment, the growth of GPOs, value-added services,

or gross profit margins.  Nor does the Complaint create a strong inference of scienter or

adequately plead loss causation or reliance.

### A.    Plaintiff Has Not Pled a Material Misstatement or Omission.

The crux of the Complaint is Schein's purported failure disclose that it "had engaged for

years in collusive and anticompetitive practices in order to maintain [its] margins, profits, and

market share." [Compl. ¶ 3; *accord id.* ¶ 135]  But "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing . . . ." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotations omitted).  If a company "disclos[es] its involvement in multiple legal proceedings" and notes the potential risks involved, it "complie[s] with its disclosure obligations under our case law." *Id.*

Plaintiff does not allege that any court has ever held that Schein actually engaged in the anticompetitive conduct pled in the Complaint.  This case involves only unadjudicated alleged wrongdoing.  Schein promptly disclosed the principal lawsuits cited in the Complaint.[2]  And Schein warned that the proceedings could expose it to liability and defense costs.  [*E.g.*, 2016 Form 10-K at 35 (Ex. F) (warning that lawsuits seek "equitable relief, compensatory and treble damages, jointly and severally, punitive damages, interest, and reasonable costs and expenses, including attorneys' fees and expert fees"); *id.* at 27 (warning that failure to comply with antitrust laws "could have a material adverse effect on our business").]  Schein thus complied with its disclosure obligations.

But in any event, even on their own terms, the various types of allegedly misleading statements pled in the Complaint do not constitute material misrepresentations or omissions.

## 1.    No Misstatements About Market Competition

The Complaint focuses primarily on Schein's statements relating to "intense competition" in the dental distribution market and competition based on price.  [Compl. ¶¶ 134-37, 142-45, 148-65]  Plaintiff contends that those statements were false or misleading because Schein was

---

[2]    The *SourceOne* case was filed on September 21, 2015 [Compl. ¶ 40], and Schein disclosed it on November 4, 2015 [Ex. C at 44].  The first of the class actions was filed on January 20, 2016 [Ex. R], and Schein disclosed it on February 10, 2016 [Ex. D at 31].  The *IQ Dental* case was filed on August 17, 2017 [Compl. ¶ 44], and Schein disclosed it on November 6, 2017 [Ex. I at 50-51].  The FTC action was filed on February 12, 2018 [Compl. ¶ 115], and Schein disclosed it the very next day [*id.* ¶ 117].

actually engaged in anticompetitive, collusive conduct with Benco and Patterson.  The challenged statements are not actionable for a number of reasons.

First, the Complaint does not plead any particularized facts showing that the overall dental distribution business was *not* competitive.  Plaintiff alleges collusive conduct only as to buying groups or other GPOs, but it does *not* assert that Schein's dealings with such purchasers constituted all, most, or even a significant part of Schein's dental distribution business – or that anticompetitive conduct existed in any other area of that business.  To the contrary, the Complaint alleges that Schein competed (unsuccessfully) with Benco after a particular customer was determined *not* to be a buying group.  [*Id.* ¶ 65]  Thus, nothing in the Complaint shows that statements about the competitiveness of Schein's overall dental distribution business were false even if anticompetitive conduct allegedly existed in some unspecified fraction of that business.

Second, statements about "competition" in the market and Schein's "competitive prices" are "inactionable puffery" – "too general to cause a reasonable investor to rely upon them."  *City of Pontiac*, 752 F.3d at 183.  *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (statements about company's "competitive advantage" are puffery) (internal quotations omitted); *Norfolk Cty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014) ("'strengthened our competiveness'" is "too squishy, too untethered to anything measurable," to be actionable) (internal quotations omitted); *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 579-80 (D.N.J. 2001) ("'strong competitive position'" is puffery).  These holdings are hardly surprising.  Virtually *every* business faces some type of competitive pressure and presumably hopes to withstand it.

Third, the statements about the competitiveness of the market were also expressions of opinion, which are not actionable unless either (*i*) "the speaker did not hold the belief she

professed or the supporting fact[s] she supplied were untrue" or (*ii*) "the speaker omits information whose omission makes the statement misleading to a reasonable investor" because "the omitted facts would *conflict* with what a reasonable investor would take from the statement itself." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (emphasis added; internal quotations omitted). *See, e.g.*, *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *4-6 (S.D.N.Y. May 11, 2016) (statement about competitive pressure was opinion).

The Complaint does not plead any facts suggesting either that defendants did *not* believe that Schein was operating in a competitive market or that any embedded facts supporting that opinion were untrue.  And to the extent plaintiff contends that defendants failed to mention the unadjudicated allegations of anticompetitive conduct in some fraction of the business, those allegations had been known to the market for years, as discussed more fully below [*e.g.*, Compl. ¶¶ 38-43], and – being mere unadjudicated charges – they did not actually "conflict" with what a reasonable investor would have taken from defendants' statements.  *Tongue*, 816 F.3d at 211.

Fourth, some of the challenged statements were not assertions of fact or opinion, but were risk warnings.  For example, Schein warned that "'price reductions by our competitors could result in a similar reduction in our prices'" and that "'[a]ny of these competitive pressures may materially affect our operating results.'"  [Compl. ¶¶ 144-45]  The Complaint does not explain why those warnings were inaccurate.  Every company faces some kind of competition, and competitive pressures can affect a company's financial results.

## 2.   No Misstatements About Cost-Containment and Pricing Issues

The Complaint faults Schein's statement that, "'[i]n recent years, the health care industry has increasingly focused on cost containment . . . [and] has accelerated the growth of . . . collective buying groups'" [*Id.* ¶¶ 132-33].  But plaintiff does not explain why this statement was

false.  Plaintiff's thesis is that Schein and others engaged in anticompetitive conduct because the industry *was* focusing on cost containment.

A similar problem afflicts plaintiff's attack on Schein's statements about lower margins from large-group customers and higher prices from office-based customers.  [*Id.* ¶¶ 140-41] According to the Complaint, the receipt of lower margins from large-group customers was why Schein and others allegedly colluded against GPOs.  The statements thus were not false.

### 3.   No Misstatements About Value-Added Services

Nor can plaintiff allege a material misrepresentation based on statements that Schein could maintain higher prices and margins despite heavy competition because of the suite of value-added services that it provided to customers.  [*Id.* ¶¶ 154-55, 166-67]

First, those statements were protected expressions of opinion about customers' perceptions of the value of Schein's services.  [*E.g.*, *id.* ¶ 154 ("'*we believe* we have a very strong proposition to offer our . . . customers . . . based on a value'") (emphasis added); ¶ 166 ("'*[W]e believe* that the Value-Added service part of [Schein's] offering continues to grow in importance'") (emphasis added)]  *See Tongue*, 816 F.3d at 210.  The Complaint does not allege that defendants did *not* believe that Schein's success was due to the value-added services that the company provided.  And plaintiff does not plead any facts suggesting that defendants' beliefs were false – that customers were *not* attracted to Schein's value-added services.

Second, the statements about "value-added" services were inactionable puffery.  *See, e.g.*, *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1238-39 (M.D. Fla. 2002) (statements about "'add[ing] enhanced value' or 'add[ing] value' are non-actionable puffery" because they "are simply devoid of any substantive content"); *see also, e.g.*, *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 71 (D. Mass. 1998) (statement that objective is to provide customers with "'the

most advanced and complete solution for creating and delivering value-added services'" is

puffery). Such statements are generic enough to apply to virtually any business.

### 4.   No Misstatements About Financial Results and Margins

Plaintiff alleges that Schein's reported gross margins were false and misleading because

they had been inflated by illegal conduct. [Compl. ¶¶ 138-39] But "a violation of federal

securities laws cannot be premised upon a company's disclosure of accurate historical data."

*Emps. Ret. Sys. of Providence v. Embraer S.A.*, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30,

2018) (internal quotations omitted). Because plaintiff "does not dispute that [Schein's] financial

statements were (literally) accurate, the statements or omissions concerning [Schein's] financial

statements are not actionable." *Id.*; *accord, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386,

404 (S.D.N.Y. 2016).

### 5.   No Misstatements About Future Competition

Plaintiff alleges that Schein made false or misleading statements about the future impact

of price competition and digital platforms. [Compl. ¶¶ 162-63, 166-67] These statements are

not actionable because they are expressions of opinion and fall within the PSLRA's safe harbor.

As shown above, an opinion cannot be actionable unless the speaker either did not

actually hold the belief expressed or omitted information whose omission made the statement

misleading to a reasonable investor. *Tongue*, 816 F.3d at 210. The Complaint does not allege

that defendants did *not* believe the opinions they expressed; nor does it allege any omitted facts

that conflicted with the opinions.

The opinions about future market activity are also forward-looking statements protected

by the PSLRA's safe harbor. 15 U.S.C. § 78u-5(c). Such statements are not actionable unless

(*i*) the speaker *actually* knew they were false *and* (*ii*) the statements were not accompanied by

appropriate cautionary language. *E.g.*, *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481,

11

491, 502 (3d Cir. 2016); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *18 (S.D.N.Y.

Oct. 10, 2018).  The Complaint does not allege that Messrs. Bergman and Paladino actually

knew that their forecasts about the future were false.  And the oral statements at issue contained

risk warnings and referred to Schein's published risk warnings, as the PSLRA allows, *see*

15 U.S.C. § 78u-5(c)(2).  [Exs. JJ at 3; KK at 10]

### 6.  No Particularized Pleading of Anticompetitive Conduct

The points discussed above should suffice to show that plaintiff has not pled an

actionable misrepresentation or omission, and the Court may stop its analysis here.  But in any

event, plaintiff also has not pled with the particularity required by the PSLRA and Rule 9(b) that

defendants' statements about competition were actually false.  *See, e.g.*, *Hogan v. Pilgrim's*

*Pride Corp.*, 2018 WL 1316979, at *5-7 (D. Colo. Mar. 14, 2018) ("where plaintiff's central

allegation is that defendants' statements and omissions during the Class Period were misleading

because . . . they failed to disclose an underlying antitrust conspiracy, plaintiff must plead *with*

*particularity* the facts that establish the existence of the antitrust conspiracy"; dismissing

securities case even though antitrust case had survived motion to dismiss) (emphasis added);

*accord, e.g., Utesch v. Lannett Co.*, 316 F. Supp. 3d 895, 902 (E.D. Pa. 2018).[3]

---

[3]     The denial of motions to dismiss the antitrust class actions is thus irrelevant here, because
those motions were decided under Rule 8(a)'s looser pleading standards, rather than under the
PSLRA's and Rule 9(b)'s heightened particularity requirements. *See In re Dental Supplies*
*Antitrust Litig.*, 2016 WL 5415681, at *3 (E.D.N.Y. Sept. 28, 2016).  Courts adjudicating other
securities cases based on antitrust allegations have not hesitated to dismiss the securities actions
even though the antitrust cases survived, or might have survived, motions to dismiss. *See, e.g.*,
*Hogan*, 2018 WL 1316979, at *5-7 & n.4 (plaintiff "must do more than piggyback on *allegations*
in the antitrust case if he wishes to prosecute a securities suit"); *see also In re Tyson Foods, Inc.*
*Sec. Litig.*, 275 F. Supp. 3d 970, 996 (W.D. Ark. 2017) (dismissing securities case for lack of
false statements, but noting that "these findings incorporate the PSLRA's heightened pleading
standard for falsity, and are not necessarily indicative of how [the court] would have decided the
case were it presented as a regular Sherman Act claim").

Plaintiff contends that the statements about competition were false or misleading because Schein was actually engaged in collusive, anticompetitive conduct with Benco and Patterson. Plaintiff thus must plead *with particularity* the existence of such a conspiracy, not just parallel – or even consciously parallel – behavior, which is not unlawful, *e.g.*, *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 97, 105-06 (2d Cir. 2018); *accord In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015) ("Express collusion violates antitrust law; tacit collusion does not."). The Complaint fails to plead particularized evidence that Schein actually *agreed* to anticompetitive conduct with other actors.

As an initial matter, except where the Complaint quotes or cites actual documents or a single witness (Paul Lettieri), it relies entirely on allegations from unadjudicated complaints in various antitrust proceedings. But allegations cribbed from unadjudicated complaints in other actions "cannot establish the particularized facts necessary to support [a] securities fraud claim." *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *5 (S.D.N.Y. Mar. 30, 2012); *accord, e.g.*, *Low v. Robb*, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012). That principle is particularly true where (as here) the other complaints were not subject to the PSLRA's and Rule 9(b)'s heightened pleading rules. But even apart from this fundamental pleading deficiency, the Complaint does not meet the applicable pleading requirements.

For example, many paragraphs allege conduct and communications by only Benco or Patterson, but not any response or action by Schein suggesting an anticompetitive *agreement*:

- The Complaint claims that Benco, Patterson, and Schein discussed whether Atlantic Dental Care ("ADC") was a buying group, but does not allege any affirmative statement *by Schein* showing collusion with Benco and Patterson on a potential bid for ADC. [Compl. ¶¶ 64-66] The only particularized statements come from Benco [*id.* ¶ 65] and Patterson [*id.* ¶¶ 64, 66]. Moreover, Schein ended up bidding *against Benco* for the ADC contract, thereby showing competition. [*Id.* ¶ 65]

- The same is true of the allegations about other buying groups.  [*Id.* ¶¶ 67-68]  Those allegations show only Benco's and Patterson's speculations about Schein's reactions or their statements *to* Schein, but nothing about any statements or agreements *by* Schein.

- The allegations about the Texas and Arizona dental trade shows cite statements by Benco and Patterson employees *to* Schein, but do not plead any responses *from* Schein.  [*Id.* ¶¶ 76-80]  The allegations show that Benco and Patterson were deciding not to attend the trade shows several months *before* Schein made its own decision.  And when Patterson heard that Schein was taking time to make its own decision about attending the trade show, Patterson was upset.  [*Id.* ¶ 82]  Parallel conduct, even consciously parallel conduct, does not violate the antitrust laws.  In fact, a Schein employee "testified that it was 'unusual' for [a Patterson employee] to contact him . . . ."  [*Id.*]

- The Complaint reprints excerpts from a 2018 opinion from the *SourceOne* case (in which Schein was no longer a party [*id.* ¶¶ 40, 81]) listing actions and statements by Benco and Patterson, but does not plead any statement by a *Schein* employee suggesting that Schein had agreed to engage in collusive behavior with Benco or Patterson.  [*Id.* ¶¶ 81-83]

Other paragraphs allege only *unilateral* actions by Schein, without any particularized allegations that Schein based its own decisions on *collusive* arrangements with competitors.  But *unilateral* conduct is not improper under the antitrust laws.  *E.g.*, *Anderson News*, 899 F.3d at 103 ("a business entity has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently") (internal quotations omitted).

- The Complaint alleges that, in response to an email from buying group EM Dental, Schein expressed its opposition to buying groups, but it offers no particularized evidence that Schein was colluding with Benco or Patterson in opposing those groups.  [*Id.* ¶ 59]

- The Complaint alleges that a former Schein employee confirmed that boycotting trade shows of state dental associations that were considering forming buying groups would place pressure on the associations, but does not allege that Schein conveyed its thinking to Benco or Patterson as part of a collusive agreement.  [*Id.* ¶ 75]

Former employee Lettieri's so-called corroboration of collusive agreements [*id.* ¶ 84] also offers no particularized allegation that Schein agreed to anything with Benco or Patterson.

- Even if Lettieri was told not to attend a meeting of the Maryland State Dental Association (a potential buying group) because Patterson had "'pulled out'" of the meeting, Lettieri offers nothing except his unsupported "sense" to suggest that Schein had *previously* agreed with Patterson not to support that association.  [*Id.* ¶¶ 84-85]

14

- Lettieri's statement that a Schein employee "would meet with Benco people 'all the time'" does not say anything about what those meetings involved – whether business or social – and does not plead any facts suggesting agreements with Benco. [*Id.* ¶ 86] *See, e.g., In re Text Messaging*, 782 F.3d at 878 ("as there is no evidence of what information was exchanged at these meetings, there is no basis for an inference that they were using the meetings to plot [anticompetitive conduct]").

In addition, Lettieri's allegations about Schein's overall conduct are not entitled to any weight, because plaintiff has not pled particularized facts "to support the *probability* that [Lettieri] would possess the information alleged." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004) (emphasis added; internal quotations omitted). Lettieri was only a Regional General Manager [Compl. ¶¶ 32, 84], not a corporate-level employee. The Complaint does not plead facts showing either that the matters that Lettieri addressed happened within his region or that he probably knew what was happening in other regions, much less across the entire North American dental business. *See, e.g., Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 155 (improper attribution of "specific nationwide information" to "former employees who worked in local branch offices"); *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 851 n.3 (N.D. Cal. 2017) (no indication that two regional employees "either had responsibility over, let alone knowledge of, the status of commercial sales for the entire company"); *see also Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008).

Finally, Schein's alleged involvement with Archer & White and Dynamic occurred in 2007 and 2008, well before the start of the Class Period in March 2013. [Compl. ¶¶ 50, 92-101, 102-05] Allegations of pre-Class Period misconduct do not show that Schein's Class Period statements five to ten years later were false or misleading. *Embraer*, 2018 WL 1725574, at *4.

The Complaint thus does not plead particularized allegations sufficient under the PSLRA and Rule 9(b) to establish that Schein actually colluded in anticompetitive conduct.

**B.**   **Plaintiff Has Not Pled a Strong Inference of Scienter.**

Plaintiff not only has failed to plead an actionable misrepresentation or omission, it also has failed to show that any such alleged misstatement or omission was made with scienter – "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  While recklessness can meet that standard, "recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, . . . not merely a heightened form of negligence." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotations omitted).

To satisfy the PSLRA's scienter requirement, "a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)).  A "strong inference" must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  Courts thus "must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA*, 553 F.3d at 198.

Where a plaintiff seeks to impose liability on a corporation such as Schein, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiff here focuses on the alleged knowledge of Schein's CEO (Mr. Bergman), its CFO (Mr. Paladino), and its head of the North American Dental Group (Mr. Sullivan).  [*E.g.*, Compl. ¶¶ 125-30]  But the Complaint's allegations, whether viewed separately or collectively, do not establish the requisite strong inference of scienter as to any of those individuals.

16

1.     __No Inference of Scienter as to Messrs. Bergman and Paladino__

To establish scienter, plaintiff must plead facts creating a strong inference that

Mr. Bergman or Mr. Paladino "knew or recklessly disregarded that [Schein] was committing

antitrust violations" and that Schein's statements about competition were therefore false or

misleading. *Utesch*, 316 F. Supp. 3d at 902. The sole allegation pled to support the contention

that Mr. Bergman "was likely directly informed" of Schein's purported collusion with Benco and

Patterson comes from a former Schein employee who supposedly stated that "Bergman was in

the room when strategies to deal with buying groups, including directives not to engage with

them, were discussed internally at the Company during sales meetings" [Compl. ¶ 126].

Even if those discussions occurred, and even if Mr. Bergman was paying attention to

them, nothing in this allegation shows Mr. Bergman's knowledge of *collusion* with other

companies; it suggests, at most, his knowledge of only *unilateral* conduct – how Schein itself

intended to deal (or not deal) with buying groups. But as shown above, a *unilateral* decision not

to engage with third parties is not anticompetitive; only a *collusive* decision is, and the allegation

says nothing whatsoever about collusion with other companies. *See Utesch*, 316 F. Supp. 3d at

902 (no strong inference that defendants "acted with fraudulent intent . . . in representing that the

market for [company's products] was price competitive").

If the allegations concerning Mr. Bergman's scienter are feeble, those concerning

Mr. Paladino's are nonexistent. The Complaint does not even attempt to plead a single fact

showing Mr. Paladino's purported knowledge of anticompetitive activity.

2.     __The Insiders' Stock Sales Do Not Show Scienter.__

Plaintiff tries to establish Messrs. Bergman's and Paladino's scienter by citing their stock

sales during the Class Period. [Compl. ¶ 129] But the mere fact that they sold stock does not

suggest scienter. *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58 (E.D.N.Y. 1998), *aff'd sub*

*nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999); *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *15 (S.D.N.Y. Oct. 25, 2017). To create an inference of scienter, a plaintiff must show that the stock sales were "unusual" or "suspicious." *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *Ressler*, 75 F. Supp. 2d at 58. Plaintiff has not done so here.

Mere recitation of seemingly large sales proceeds, without further context, does not make the sales unusual or suspicious. *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) ("raw sales numbers" alone insufficient to establish scienter).

Moreover, the dollar amounts earned during the Class Period must be discounted because of the unusually long duration of that period: nearly five years (59 months). An inference of scienter from even large stock sales "is lessened when . . . the class period is well over a year." *In re Hertz Global Holdings Inc.*, 905 F.3d 106, 121 (3d Cir. 2018) (29-month period); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) ("inordinately long" 44-month period); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) (plaintiffs "obvious[ly] . . . chose[] an unusually long class period of sixty-three weeks [16 months] . . . because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period") (internal quotations omitted).

Especially in light of the 59-month Class Period, Messrs. Bergman's and Paladino's stock sales were not unusual in relation to their pre-period trading or suspicious in any other way.

### a.       The Stock Sales Were Not Unusual.

Messrs. Bergman's and Paladino's Class Period sales were consistent with their prior trading patterns and thus were not unusual. *Ressler*, 75 F. Supp. 2d at 58; *see also Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 221 (E.D.N.Y. 2013) (for stock sale to be unusual, it must be "dramatically out of line" with prior trading practices) (internal quotations omitted).

18

First, Messrs. Bergman and Paladino regularly sold Schein stock in almost every year during the approximately five years before the Class Period (the "Prior Period") and during the five-year Class Period.[4]  They even sold consistently in the same quarter during both the Prior Period and the Class Period.  Mr. Bergman tended to sell stock in the fourth quarter and did so in every year from 2012 through 2016.  [Exs. L at 6-7, 9-10, 12-13, 15-16, 20; M at 2]  Mr. Paladino generally sold in the first quarter and did so in every year from 2010 through 2017 (except 2015).  [Exs. L at 24, 27, 29, 32, 36-38; M at 2-3]

Second, in every year from 2008 through 2014 (except 2009), Mr. Paladino regularly exercised his stock options and sold the resulting shares.  [Exs. L at 24-36; M at 2-3]  Adherence to "an established practice of exercising stock options" suggests that stock sales were not unusual.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 586 (S.D.N.Y. 2014); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) (stock sales from exercises of options were not suspicious because "[a] large number of today's corporate executives are compensated in terms of stock and stock options") (internal quotations omitted).

### b.    The Stock Sales Were Not Otherwise Suspicious.

Nor was anything suspicious about the stock sales during the Class Period.

First, Messrs. Bergman and Paladino sold more shares during the Prior Period than during the Class Period.  (For Mr. Bergman, 706,648 versus 547,400; for Mr. Paladino, 508,000 versus 280,416.)  [Exs. L; M at 1]  Their largest *annual* sales also occurred during the Prior Period, not during the Class Period.  (Mr. Bergman's highest annual sales were in 2012 (506,648 shares); Mr. Paladino's were in 2010 (204,000 shares).  [*Id.*]  Mr. Bergman's greatest annual net receipts from stock sales occurred during the Prior Period ($13,636,255 in 2012); Mr. Paladino's

---

[4]    The Class Period is 1,803 days long.  The Prior Period (March 29, 2008, which was a Saturday, through March 6, 2013) is also 1,803 days long.

were in the first year of the Class Period ($4,948,277 in 2013).  [*Id.*]  And Mr. Paladino's total

net trading receipts during the Prior Period ($11,659,508) were greater than his net receipts

during the Class Period ($10,723,590).[5]  [*Id.*]  These large Prior Period sales and profits

undermine any inference of scienter from the Class Period sales.  *Ressler*, 75 F. Supp. 2d at 58;

*In re Glenayre Techs., Inc. Sec. Litig.*, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998), *aff'd*

*sub nom. Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999).

Second, the timing of Messrs. Bergman's and Paladino's Class Period sales was not

suspicious because the sales took place long before the alleged "truth" was disclosed.

Mr. Bergman's last sale was in November 2016; Mr. Paladino's was in February 2017.  [Exs. L

at 20, 38; M at 2-3]  Those dates were, respectively, nine and six months before the allegedly

"corrective" disclosures began in August 2017.  [Compl. ¶¶ 106-10]  Stock sales that occur many

months before the revelation of alleged misconduct do not suggest scienter.  *Reilly*, 2018 WL

3559089, at *14; *In re Keyspan Corp.*, 383 F. Supp. 2d at 385 (sales two months before

disclosure not suspicious); *see also, e.g.*, *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456

F. Supp. 2d 576, 595-96 (S.D.N.Y. 2006) (sales six months before disclosure not suspicious);

*Ressler*, 75 F. Supp. 2d at 60 (same).

Third, Messrs. Bergman and Paladino did not sell their stock at or near the peak price.

As noted above, both the majority of sales and the largest number of sales in a single year

occurred during the Prior Period, when the price never rose above $45.19 – far below the $93.29

peak price reached during the Class Period, on June 2, 2017.  [Ex. LL at 1-36, 67]  And even for

the Class Period sales, all of the transactions occurred below the peak price of $93.29.

---

[5]     The Complaint's assertion [¶ 129] that Mr. Paladino "sold more than $16 million worth
of stock during the Class Period" fails to subtract the cost of the options that Mr. Paladino
exercised to obtain some of the shares he sold.  The *net* receipts were $10,723,590.  [Ex. M at 1]

Messrs. Bergman's and Paladino's total Class Period sales were done at weighted average prices of only $67.88 and $58.26, respectively. [Ex. M] Even if those sales are examined individually, Mr. Bergman did not sell any stock at all in 2017, when the stock price reached its highest levels; his last sales were on November 11, 2016, at a weighted average price of $78.12. [Exs. L, M] And Mr. Paladino sold relatively few shares in 2017 (26,144 on February 22, 2017, at a weighted average price of $86.70); all of his previous Class Period sales were at a weighted average price of $78.61 or less. [*Id.*] These sales *below* the allegedly inflated peak price thus rebut any inference of scienter. *City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 476 (S.D.N.Y. 2008); *see also Reilly*, 2018 WL 3559089, at *14 (stock sales not "calculated to maximize the personal benefit from undisclosed inside information" are not suspicious).

Fourth, Messrs. Bergman and Paladino still held significant amounts of stock *after* the alleged "truth" was revealed between August 8, 2017 and February 12, 2018. Schein's 2018 Proxy Statement shows that Mr. Bergman still held 1,045,526 shares worth $70,457,997 [Ex. K at 13] (based on the February 13, 2018 post-corrective-disclosure price of $67.39 [Ex. LL at 72]) – nearly double the $37 million he sold during the Class Period [Compl. ¶ 129]. And Mr. Paladino still held 119,675 shares worth $8,064,898 (based on the February 13, 2018 price). [Ex. K at 13] The value of those retained shares was relatively similar to the net value of the shares he sold during the Class Period ($10,723,590). [Exs. L; M at 1] Where, as here, defendants do not "rush[] to cash out" their shares toward the end of a class period, their sales are not suspicious. *City of Brockton Ret. Sys.*, 540 F. Supp. 2d at 475.

Fifth, Mr. Bergman's stock holdings did not decrease significantly during the Class Period. According to the 2013 Proxy Statement, he held 1,317,910 post-split shares (658,955 pre-split) as of March 15, 2013 (eight days after the Class Period began). [Ex. A at 12] By

April 2, 2018, he still held 1,045,526 shares.  [Ex. K at 13]  A decline of only 20.1% of holdings

over five years is not suspicious.  *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *5

(S.D.N.Y. July 10, 2006); *In re Keyspan Corp.*, 383 F. Supp. 2d at 382-83.  For all these reasons,

Messrs. Bergman's and Paladino's stock sales do not create – or even contribute to – a strong

inference of scienter.

### 3.   No Inference of Scienter as to Mr. Sullivan

Plaintiff appears to stake its scienter theory on Mr. Sullivan's alleged knowledge of and

participation in purportedly anticompetitive conduct.  But the allegations fail for many reasons.

First, the Complaint does not assert that Mr. Sullivan made any misstatements or

omissions, or knew of or had anything to do with those allegedly made by Messrs. Bergman and

Paladino or anyone else.  Thus, even if Mr. Sullivan was purportedly involved in anticompetitive

business practices, the Complaint does not allege his knowledge of the subject of this securities

case: Schein's financial reporting and public disclosures.  *See, e.g.*, *Silvercreek Mgmt., Inc. v.

Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) ("it is not enough to *separately* allege

misstatements by some individuals and knowledge belonging to some others where there is no

strong inference that, in fact, there was a connection between the two").

Second, even if Mr. Sullivan could be deemed to have had the requisite scienter as to

Schein's financial reporting and disclosures, he himself is not a defendant in the § 10(b) claim,

and his alleged knowledge cannot be attributed to the company.  Only "'management level'

employees can serve as proxies for the corporation" for purposes of scienter attribution.  *Thomas

v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017); *accord, e.g.*, *Barrett v.

PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017).  Mr. Sullivan, however,

was not a management-level employee.

Schein's SEC filings repeatedly listed the company's top managers. For example, the 2017 Proxy Statement listed Schein's 16 executive officers. [Ex. G at 29] Mr. Sullivan was not in that group. He was only the president of Schein's North American Dental Group, which is a subdivision of one of Schein's three business divisions. [Compl. ¶¶ 20, 17] Mr. Sullivan thus was not a "management level" employee for purposes of scienter attribution.

Third, even if Mr. Sullivan had been a management-level employee, he is not alleged to have been "involved in crafting [Schein's] internal controls or its public disclosures." *Barrett*, 2017 WL 3995606, at *8. "The determinative question" for scienter-attribution purposes is whether the employee "was involved in [the company's public statements], not whether he was involved in [the underlying conduct that allegedly made those statements false]." *Id.*

Moreover, the Complaint does not plead particularized facts creating a strong inference that Mr. Sullivan actually knew about anticompetitive activity. As explained above, virtually all of the allegations come from other, unadjudicated complaints and thus do not satisfy the applicable heightened pleading standards, and some of the allegations [Compl. ¶ 60] concern purported misconduct that took place before the Class Period began. In addition:

- Most of the allegations relating to Mr. Sullivan involve a Benco or Schein employee's stating that he would contact Mr. Sullivan to discuss buying groups [*id.* ¶¶ 61, 67, 76, 77], but the Complaint does not allege that those contacts actually took place and thus does not plead anything about Mr. Sullivan's knowledge or involvement.

- One allegation (from the *SourceOne* summary judgment decision, to which Schein was not a party) asserts that a Schein employee told Mr. Sullivan about Patterson's decision not to attend the Texas trade show [*Id.* ¶ 82] But this alleged after-the-fact knowledge of Patterson's decision does not show that Mr. Sullivan knew of or was involved in it *before* it was made, or that it had been made because of any collusive agreement with Schein.

- The allegation that Mr. Lettieri was "'sure'" that Mr. Sullivan "had a say" in Schein's compensation scheme [*id.* ¶ 101] does not explain why Mr. Lettieri was so "sure." But in any event, the Complaint alleges that Mr. Steck, not Mr. Sullivan, directed the compensation change at issue. [*Id.*] Moreover, knowledge of a compensation scheme is a far cry from knowledge of allegedly anticompetitive agreements.

23

Schein therefore cannot be held liable under § 10(b) based on Mr. Sullivan's alleged scienter.

### 4.   The "Core Operations" Doctrine Does Not Support Scienter.

Plaintiff also tries to establish scienter by alleging that "Schein's dental distribution business was the single most important line of business" during the Class Period, accounting for "nearly 50% of the Company's revenues and likely more than 50% of the Company's profits." [Compl. ¶ 128]  This effort to invoke the so-called "core operations" doctrine – a pre-PSLRA theory allowing a plaintiff to "allege scienter as to individual defendants and a company if the misleading statements and/or omissions related to a core operation of the company," *Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anonima*, 2018 WL 4308546, at *9 (S.D.N.Y. Sept. 10, 2018) – is as misplaced as are plaintiff's other arguments.

As an initial matter, the Second Circuit and the District Courts within this Circuit have expressed skepticism about the doctrine's continued viability under the PSLRA's heightened pleading requirements. *Id.*; *see also, e.g.*, *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 342-43 (S.D.N.Y. 2011).  But to the extent the doctrine has any remaining vitality at all, courts in this Circuit have agreed that it cannot *independently* establish scienter; the most it can do is provide only *supplemental* support to bolster other allegations of scienter.  *Sachsenberg*, 2018 WL 4308546, at *9.  Because all other allegations of scienter in the Complaint are insufficient, the core-operations allegation fails to contribute to a strong inference of scienter.

Not only does the core-operations doctrine fail to advance plaintiff's claim, but plaintiff has not even alleged a core operation sufficient to invoke that doctrine.  Courts applying the doctrine require that the operation constitute "nearly all of a company's business."  *In re Ferrellgas Partners, L.P. Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018); *accord, e.g.*, *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018).  Plaintiff's allegations do not even remotely meet that standard.

24

The most that plaintiff alleges is that Schein's "dental products distribution business" accounted for "48.5% of Schein's total net sales" and "likely . . . represents 50% or more of the Company's gross profits." [Compl. ¶ 26][6]  The Complaint thus does not come close to alleging misconduct in an operation constituting "nearly all" of Schein's business. *In re Ferrellgas*, 2018 WL 2081859, at \*19; *see also, e.g.*, *Plumbers Local No. 200 Pension Fund v. Wash. Post Co.*, 831 F. Supp. 2d 291, 301-02 (D.D.C. 2011) (applying S.D.N.Y.'s "nearly all" standard to hold that business segment representing 57.3%-62.2% of revenue was not a core operation).

Plaintiff's 50% metric not only is insufficient on its own, but also is the wrong metric. Plaintiff's numbers relate to Schein's *global* dental business, not its *North American* dental business.  But the only allegedly illegal activity cited in the Complaint involves the *North American* dental business, not the dental business throughout the entire world.  [Compl. ¶¶ 87-91; *see also id.* ¶¶ 13, 107, 153 (alleging that disclosure of "truth" revealed weakness in North American market).  Plaintiff does not plead the revenues and profits contributed by the *North American* dental business (which are obviously less than 50%) and thus has not established a factual predicate for its core-operations argument.[7]

Nor can plaintiff resort to generalized allegations that the dental distribution segment is "central[] . . . to Schein's overall success" and is Schein's "single most important line of business" [Compl. ¶ 128].  Mere statements of importance to a company's profitability, without

---

[6]     Plaintiff cites the *global* dental segment's percentage of Schein's total sales. *See, e.g.*, 2017 Form 10-K at 56 (using 48.5% figure) [Ex. J].  Plaintiff admits that Schein "does not break out its profit for the dental products distribution sub-segment." [Compl. ¶ 26.]  Plaintiff's allegations as to the dental segment's profits are therefore mere guesswork.

[7]     Plaintiff's pre-motion opposition letter contends that the North American dental business produced "more than 25% of Schein's total revenue." [ECF No. 38, at 2-3]  This allegation is not in the Complaint and thus cannot be used to oppose a motion to dismiss.  But in any event, a business segment that contributes only 25% of a company's revenue is not a core operation. *See, e.g.*, *In re Ferrellgas*, 2018 WL 2081859, at \*19 (30% of business is not a core operation).

further particularized allegations, fail to satisfy the core-operations doctrine. *In re Rockwell*, 2018 WL 1725553, at *14, *17-18 (generalized allegations about "lead branded drug['s]" importance to profitability were insufficient to meet core-operations standard).

### 5. Other Lawsuits and Investigations Do Not Show Scienter.

The Complaint also tries to create an inference of scienter based on defendants' "notice of the allegations of collusive conduct as a result of numerous prior lawsuits alleging similar conduct and related investigations" [Compl. ¶ 127]. But this allegation assumes the conclusion. As the Complaint notes, defendants "denied liability and refuted the allegations" in those other matters. [*Id.*] Those "denied" allegations thus do not suggest that defendants knew or recklessly disregarded that Schein had engaged in the "refuted" conduct. The Complaint even alleges that Schein had "'antitrust policies'" *against* the conduct alleged here. [*Id.* ¶ 83]

Moreover, even those courts that have considered other lawsuits or investigations as part of the scienter analysis have held that "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter . . . ." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013); *see, e.g.*, *Utesch*, 316 F. Supp. 3d at 903 ("governmental inquiries into [defendant's] purported antitrust violations are unpersuasive in raising the inference that [CEO and CFO] knew about the potential price-fixing"); *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154220, at *2 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations involving the . . . [d]efendants also provides no evidence of scienter.").

### 6. Statements About Competition Do Not Show Scienter.

Finally, plaintiff contends that Messrs. Bergman's and Paladino's "detailed statements based on purported personal knowledge about competition in the Company's dental distribution business" somehow show that those speakers knew that the statements were incorrect. [Compl.

¶ 130]  But again, the Complaint assumes the conclusion.  That Messrs. Bergman and Paladino made statements about competition in the dental business does not suggest they knew that Schein was allegedly *thwarting* that competition.  *Cf., e.g.*, *In re Keyspan*, 383 F. Supp. 2d at 388 (fact that executive "made public statements extolling [company's] positive outlook . . . says nothing about his state of mind in making such statements, and thus allows for no inference of fraud").

For all the above reasons, the Complaint fails to plead a strong inference of scienter as to Schein or any individual defendant.

## C.     The Complaint Does Not Adequately Plead Loss Causation.

The Complaint also fails to plead loss causation.  "[T]o establish loss causation, a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, . . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotations omitted).  Loss causation must be pled with the particularity required by Rule 9(b).  *E.g.*, *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 432 n.9 (S.D.N.Y. 2010).

The Complaint's allegations of loss causation fail because plaintiff's loss-causation theory is not connected to the allegations of anticompetitive conduct, and, at a minimum, the disclosures after August 8, 2017 did not reveal anything new to the market.

### 1.     The Loss-Causation Theory Is Not Linked to the Challenged Conduct.

A fundamental disconnect exists between plaintiff's loss-causation theory and the allegations about Schein's anticompetitive conduct.  Plaintiff contends that Schein's stock price started falling after Schein's August 8, 2017 disclosures because the market realized that Schein had "*abandon[ed]* prior attempts to inflate sales volume through anticompetitive collusion" and

had made an "undisclosed *shift away* from collusive anticompetitive activity."  [Compl. ¶¶ 109, 110 (emphasis added); *accord id.* ¶¶ 113-14, 118]  But the Complaint does not plead any facts alleging how and when that "shift" began, or even that it occurred at all.  Nowhere does the Complaint allege that Schein *stopped* engaging in, or shifted away from, the allegedly anticompetitive behavior, so the Complaint does not tie the stock-price drop to the alleged reason for the weakening financial performance.  If plaintiff does not allege facts showing that Schein stopped or shifted away from anticompetitive conduct by the second or third quarter of 2017, the quarterly announcements could not have revealed the "true reason" for the "poor" financial results in those quarters [*id.* ¶ 109].

Moreover, plaintiff's theory of loss causation for the price drops in August and November 2017 is inconsistent with its theory of loss causation for the February 2018 disclosure. The February disclosure supposedly revealed that "any collusive practices would *now* be forced to end" [Compl. ¶ 13 (emphasis added)].  But the loss-causation theory for the August and November 2017 disclosures depends on the claim that Schein had "abandoned" or "shifted away from" allegedly anticompetitive conduct before June 30, 2017 – long before February 2018.

Accordingly, if plaintiff can plead loss causation at all based on this illogical set of allegations, it must choose between two irreconcilable positions.  If the August 2017 revealed Schein's alleged "abandonment" of anticompetitive conduct, then no loss causation can exist for the November 2017 and February 2018 disclosures.  Alternatively, if the February 2018 disclosure revealed that Schein would "*now* be forced" to end its alleged misconduct, then no loss causation can exist for the August and November 2017 disclosures.

### 2.    The Post-August 2017 Disclosures Did Not Reveal Anything New.

Even if plaintiff had pled a coherent link between the "abandonment" of alleged misconduct and the drop in Schein's stock price, and even if we assume for purposes of this

motion that the Complaint adequately pleads loss causation for the period before the first allegedly corrective disclosure on August 8, 2017, the Complaint does not sufficiently plead loss causation for the rest of the putative class period, because the other two disclosures (on November 6, 2017 and February 12, 2018) did not reveal anything new.  Thus, regardless of how the Court rules on other issues raised in this motion, it should dismiss claims relating to losses allegedly incurred after August 8, 2017.

To establish loss causation, a plaintiff must plead with particularity "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173.  Accordingly, "when elements of the alleged concealed risk were exposed to the market" *before* the stock-price drop, those disclosed elements could not have caused the claimed loss. *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 405 (S.D.N.Y. 2014) (internal quotations omitted); *accord, e.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) (corollary of efficient-market hypothesis is that "information already known by the market" cannot establish loss causation); *see also Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) (no loss causation where market was aware of allegedly withheld information before corrective disclosures).

As explained above, plaintiff's loss-causation theory is that Schein's financial performance had been inflated by allegedly anticompetitive conduct.  According to plaintiff, the market did not realize that alleged fact until August 8, 2017, when Schein disclosed "poor [financial] results [that] were a product of abandoning prior attempts to inflate sales volume and margins through anticompetitive collusion."  [Compl. ¶ 109]

Even if we accept the allegation that the market did not learn this purported news until August 8, 2017, the remaining two disclosures did not add anything new to the market's knowledge. By the time trading began on August 8, 2017, the market knew the following:

- The *Archer & White* case – alleging that Schein had conspired with a manufacturer and another company to refuse to deal with the plaintiff – had been filed on August 31, 2012. [Compl. ¶ 39] The complaint and other court filings were publicly available and were reported in numerous news services between 2012 and 2017. [Exs. O, W; App., Exs. 1-8, 119, 125, 148, 150, 153-56, 159, 160-61, 164, 169-71, 189, 212, 217, 233, 245, 248-49, 251-53, 256-57, 261-70] The case had also been discussed in the September 28, 2016 decision on the motions to dismiss the consolidated antitrust class actions. *In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681, at *2.

- The *SourceOne* case – alleging that Schein, Benco, and Patterson had conspired to pressure state dental associations and manufacturers to prevent the formation of GPOs – had been filed on September 21, 2015. [Compl. ¶ 40] The court filings were available to the public, and the lawsuit was reported in many sources, including mainstream publications such as *Newsday*. [Exs. C at 44; P; X-Z; App., Exs. 10-18, 21, 92, 115, 118, 138, 143-44, 157-58, 176-84, 187-88, 192, 220, 228, 230, 232, 234-40]

- The investigations by the Texas and Arizona Attorneys General (the "AGs") and by the FTC had been disclosed to the public no later than September 21, 2015, because the *SourceOne* complaint had discussed them [Ex. P, ¶¶ 5, 55-58], as had related news articles [Exs. X-Y; App., Exs. 14, 16, 34, 38, 41, 91-94, 97-100, 103, 127, 136-37, 174, 188, 192-203, 206-08, 211]. (The Complaint's allegation that the FTC investigation was "undisclosed" until February 2018 [Compl. ¶ 115] is therefore incorrect.)

- The antitrust class actions – alleging that Schein, Benco, and Patterson had "conspired to inflate margins by, among other things, agreeing to fix profit margins in the dental market and working to block the entry of lower-priced competitors like [Archer & White] and SourceOne" – had been filed starting on January 20, 2016. [Compl. ¶ 42; Exs. E at 39; R] Like the *SourceOne* complaint, the class complaints discussed the pending AG and FTC investigations. [*E.g.*, Ex. R, ¶¶ 8, 83; App., Ex. 23] The Consolidated Complaint in the class actions, filed on March 11, 2016, did so as well. [Ex. S, ¶¶ 8, 170-75; App., Ex. 108] The court papers in those cases were available to the public and were reported in various news articles. [Exs. AA-BB; App., Exs. 109, 118-31, 135-37, 139, 146, 151-52, 162-63, 166-67, 175, 209-10, 221-24, 229, 241-43, 246-47, 260]

- A second amended complaint had been filed in the antitrust class actions on October 22, 2016. [Compl. ¶ 42; Ex. T] This pleading had again discussed the pending AG and FTC investigations. [Ex. T, ¶¶ 8, 171-76; App., Ex. 139]

- Schein had appeared as an interested party (although never as a defendant) on December 30, 2016 in litigation between Dentsply and Dental Brands for Less, in which Dental Brands had alleged that "Schein, Benco, and Patterson were engaged in a

horizontal price-fixing scheme and conspired to pressure Dentsply and other manufacturers to force out Dental Brands" [Compl. ¶ 41].  The *Dentsply* litigation was public and was reported in the press.  [Exs. Q, CC; App., Exs. 20, 140-41]

- Schein had announced on June 27, 2017 that it would settle the *SourceOne* lawsuit for approximately $5.3 million.  [Compl. ¶ 40]  The settlement had been promptly reported in the press.  [Exs. DD, EE; App., Exs. 176-85, 187-88]

- The Texas AG had filed a lawsuit against Schein on August 3, 2017, alleging that Schein had coordinated with two co-conspirators "to boycott the [Texas Dental Association's] annual meeting in May 2014, to pressure manufacturers to join the co-conspirators' boycott, and to pressure manufacturers and distributors not to supply [a GPO]."  [Compl. ¶ 43]  That same day, Schein had entered into a stipulated injunction.  [*Id.*]  The lawsuit and the injunction were publicly available and had been discussed in news reports by no later than August 7, 2017.  [Exs. U-V, FF-GG; App., Exs. 190-91, 193-203, 206-08, 211]

- On August 8, 2017, before trading began, Schein had reported its second-quarter 2017 results and disclosed "weak North American dental consumables growth of only 0.8% compared to the prior year's quarter." [Compl. ¶ 107]  "The market immediately reacted negatively to the news." [*Id.* ¶ 108]  According to plaintiff, this announcement "revealed that Schein's poor results were a product of abandoning prior attempts to inflate sales volume and margins through anticompetitive collusion.  This was particularly true with respect to dental consumables – the area of Schein's business that was most likely to be affected first by the cessation of its collusive conduct." [*Id.* ¶ 109]

Thus, by the opening of trading on August 8, 2017, the market was aware that Schein had been accused of antitrust violations by the FTC, state AGs, and private plaintiffs, that Schein had settled the *SourceOne* case and the Texas AG's action, and that Schein's alleged "abandon[ment]" of "prior attempts to inflate sales volume and margins through anticompetitive collusion" had led to "poor" financial results.  [*Id.*]  Even if one accepts that the disclosures available to the market by August 8, 2017 caused the stock drop *on that date*, neither of the two subsequent corrective disclosures added anything significant to the market's knowledge of Schein's alleged behavior and the purported reasons for its "poor" financial performance.

Schein's November 6, 2017 financial report "revealed that Schein's poor results were a product of Defendants' need to abandon prior attempts to inflate margins, increase sales and maintain market share through anticompetitive collusion" [Compl. ¶ 113] – exactly the same

thing that the Complaint alleges about the August 8 financial report [*id.* ¶ 109].  The November 6 report also disclosed the *Archer & White* litigation, which had been a matter of public record since 2012, and the *IQ Dental* case, which had been filed on August 17, 2017.  [*Id.* ¶¶ 44, 111]  But the Complaint does not allege that either of those cases was substantively different from the *SourceOne* case or the antitrust class actions, which had been known for years.  To the contrary, the Complaint contends that all of those cases arose from the same course of alleged misconduct.  [*Id.* ¶¶ 38-45]  The November disclosure thus did not reveal anything new to the market.

The only news revealed on February 12 and 13, 2018 was that the FTC had brought an enforcement action against Schein.  [Compl. ¶¶ 115-17]  But the FTC's investigation had been disclosed in court filings and the press since at least September 21, 2015.  [Exs. P, ¶¶ 5, 55-58; X-Y; App., Ex. 10, 14, 16, 34, 38, 41, 92-94, 97-100, 103, 136, 138, 144, 157, 240]  The market thus had long known of the possibility that the FTC might sue.

The Complaint's assertion that securities analysts covering Schein "never attributed any risk (or even discussion of possible risks) to any alleged collusive conduct" until February 2018, when plaintiff says the full "truth" was revealed [Compl. ¶¶ 6, 45], is demonstrably incorrect.  An August 22, 2017 report by Jefferies noted that "[w]e continue to field questions on longer-term threats [to Schein] from . . . price-fixing litigation."  [Ex. HH at 1; App., Ex. 216]  A September 18, 2017 report by Bank of America Merrill Lynch devoted a full page to *SourceOne* and the antitrust class actions and observed that "some of the information provided in the publicly available court documents . . . lead[s] us to believe that the current margin trends in the US dental distribution industry may [be] more susceptible to new competitive forces than we previously thought."  [Ex. II at 1, 33-34; App., Ex. 221]  And the Complaint itself [¶ 112] cites a November 6, 2017 Piper Jaffray report discussing the antitrust cases against Schein.

The post-August 8, 2017 disclosures thus did not reveal new information, and the Complaint cannot establish loss causation based on any "corrective" disclosures after that date.

### D.   The Publicly Available Facts Showing a Lack of Loss Causation Also Defeat Plaintiff's Allegations of Reliance and Misrepresentations.

In addition to precluding loss causation based on any post-August 8, 2017 disclosures, the information available in the market on and after that date also prevents post-August 7, 2017 purchasers from pleading reliance – or even actionable misstatements or omissions.

First, the publicly available information described above defeats post-August 7, 2017 purchasers' pleading of reliance – a separate element of a § 10(b) claim.  Plaintiff invokes the "fraud on the market" presumption of reliance based on the assertion that "the market for Schein stock promptly digested current information regarding Schein from *all* publicly available sources and reflected such information in Schein's stock price."  [Compl. ¶ 169 (emphasis added)]  Because no *new* information entered the allegedly omniscient market after the August 8, 2017 disclosure (which occurred before the opening of trading [*id.* ¶ 107]), plaintiff's invocation of the efficient-market presumption of reliance necessarily concedes that Schein's stock price on and after that date reflected the alleged misstatements and omissions about which plaintiff complains.  *See, e.g.*, *City of Omaha v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012) (reliance on inflated price not pled where subject of alleged fraud had entered market).

Second, the information available in the market by the time trading began on August 8, 2017 renders immaterial any alleged misrepresentations or omissions about which plaintiff complains.  The Second Circuit "has recognized a corollary to the fraud-on-the-market theory called the 'truth-on-the-market' defense," under which "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *White v. H&R Block, Inc.*, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).

33

Where, as here, all allegedly misrepresented or omitted information was publicly available by August 8, 2017, and nothing new entered the market after that date, no alleged misstatements or omissions on or after that date could have been material. *See, e.g.*, *id.* (granting motion to dismiss because "all the information plaintiffs claim was concealed by defendants was publicly available, . . . and on these facts the law renders defendants' purported misstatements immaterial"); *In re Syntex Corp. Sec. Litig.*, 1993 WL 476646, at *4-6 (N.D. Cal. Sept. 1, 1993) (dismissing case because allegedly withheld information was available in market).[8]

## II.   PLAINTIFF HAS NOT PLED A CLAIM FOR CONTROL-PERSON LIABILITY.

To establish control-person liability under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  To withstand a motion to dismiss, "a plaintiff must allege some level of culpable participation at least approximating reckless in the section 10(b) context" and must satisfy "the heightened pleading standards of Rule 9(b) and the PSLRA . . . ." *Friedman v. JP Morgan Chase & Co.*, 2016 WL 2903273, at *10 (S.D.N.Y. May 8, 2016), *aff'd*, 689 F. App'x 39 (2d Cir. 2017).

For the reasons explained above, plaintiff has not established the first requirement – a primary violation by Schein – so the Court may stop here.  But in any event, the Complaint does not adequately plead the remaining elements of a § 20(a) claim.

---

[8]   *See also, e.g.*, *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 2010 WL 2473595, at *9-10 (S.D.N.Y. June 17, 2010), *aff'd*, 448 F. App'x 116 (2d Cir. 2011); *In re Pfizer Sec. Litig.*, 538 F. Supp. 2d 621, 632-33 (S.D.N.Y. 2008); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *21 (S.D.N.Y. Oct. 25, 2006).

### A.    Plaintiff Has Not Established Mr. Sullivan's Control Over Schein.

To establish a defendant's control over the alleged primary violator, a plaintiff must show that "'the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Friedman*, 2016 WL 2903273, at *11 (quoting *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).  Even if, for pleading purposes, plaintiff has established Messrs. Bergman's and Paladino's control over Schein, it has not alleged any facts showing that Mr. Sullivan – who was president of only the North American Dental Group and was not among the company's top executive officers – somehow had any control over Schein.

Moreover, under § 20(a), "actual control is essential, namely actual control *over the transactions in question*." *Friedman*, 2016 WL 2903273, at *11 (emphasis added); *accord, e.g.*, *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *20 (S.D.N.Y. Aug. 30, 2018).  Nothing in the Complaint suggests that Mr. Sullivan had control over – or even any involvement with – the "transaction" at issue here:  Schein's financial reporting and public disclosures.  Plaintiff charges Mr. Sullivan only with participating in allegedly anticompetitive conduct, not with controlling Schein's public statements.  *Friedman*, 2016 WL 2903273, at *12 (control requirement not met where "the complaint does not plausibly allege any facts showing that [defendant] had specific control over the actions that are the basis of the securities violations by [the primary violators]").

### B.    Plaintiff Has Not Shown Any Individual Defendant's Culpable Participation.

As explained above, plaintiff has not pled a strong inference of scienter as to Messrs. Bergman or Paladino.  Nor has plaintiff done so as to Mr. Sullivan.  The Complaint does not plead any factual allegations suggesting that Mr. Sullivan participated in any way in Schein's financial reporting and disclosures or was even aware of what Schein was telling the market, much less that he knew those statements were allegedly false or misleading.  Nor, as explained

above, does the Complaint plead particularized allegations creating a strong inference that any of

Mr. Sullivan's actions were culpable.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case in its entirety, with

prejudice.

Dated: December 10, 2018

Jonathan E. Richman
Proskauer Rose LLP
Eleven Times Square
New York, New York  10036
(212) 969-3448
jerichman@proskauer.com

Ralph C. Ferrara
Ann M. Ashton
Proskauer Rose LLP
1001 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, D.C.  20004
(202) 416-6800
rferrara@proskauer.com
aashton@proskauer.com

Counsel for Defendants

36