UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

IN RE HENRY SCHEIN, INC. SECURITIES LITIGATION

**MEMORANDUM & ORDER**
18-CV-01428 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Joseph Salkowitz, individually and on behalf of all others similarly situated, commenced the above-captioned action on March 7, 2018 against Defendants Henry Schein, Inc. ("Schein"), Stanley M. Bergman, Steven Paladino, and Timothy J. Sullivan, alleging claims of fraud pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t. (Compl., Docket Entry No. 1.) On September 14, 2018, after Magistrate Judge Vera Scanlon appointed it lead Plaintiff, the City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Plaintiff") filed a Consolidated Class Action Complaint ("CAC"), alleging claims of fraud pursuant to sections 10(b) and 20(a) of the Exchange Act. (CAC, Docket Entry No. 28.) Plaintiff alleges that Defendants made material misstatements and omissions about Schein's distribution business by failing to disclose Schein's anticompetitive actions, including conspiring with its competitors to fix gross profit margins and block new distributors and consumer groups from entering the market, which resulted in losses of "over $2.75 billion in shareholder value" when the market learned the truth. (*Id.* ¶ 3.)

Currently before the Court is Defendants' motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (Defs. Mot. to Dismiss ("Defs. Mot."), Docket Entry No. 45; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 45-1.) Plaintiff opposes the motion. (Pl. Opp'n to Defs. Mot. ("Pl. Opp'n"), Docket Entry No. 46.) For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

## I. Background

The Court assumes the truth of the factual allegations in the CAC for the purposes of this Memorandum and Order.

### a. The parties

Plaintiff is a benefit pension fund for certain public employees of the City of Miami, Florida. (CAC ¶ 14.) Plaintiff purchased Schein common stock from March 7, 2013 to February 12, 2018 (the "Class Period"). (*Id.* ¶¶ 1, 14.)

Schein is the largest distributor of healthcare products and services in the world. (*Id.* ¶ 16.) In 2017, Schein reported net sales of approximately $12.5 billion worldwide and approximately $7.9 billion in the United States. (*Id.*) Schein's healthcare distribution business consists of three primary segments, dental, animal health, and medical. (*Id.* ¶ 17.) The dental segment includes the sale of infection-control products, preventatives, anesthetics, dental implants, dental chairs, delivery units and lights, and X-ray supplies and equipment. (*Id.*) In 2017, the dental segment accounted for approximately $6 billion or fifty percent of Schein's total net sales. (*Id.*)

Schein holds a market share representing approximately forty percent of the United States dental supplies and equipment market. (*Id.* ¶ 25.) Its main competitors are Patterson Dental ("Patterson"), which holds approximately thirty-three percent market share, and Benco Dental Supply Company ("Benco"), which holds approximately twelve percent market share. (*Id.*) Together, Schein, Benco, and Patterson control approximately eighty-five percent of the market for dental supplies and equipment in the United States. (*Id.*)

Bergman is the Chief Executive Officer and Chairman of the Board of Directors of Schein, (*id.* ¶ 18); Paladino is the Chief Financial Officer and an Executive Vice President of Schein, (*id.* ¶ 19); and Sullivan is the President of Schein's North American Dental Group, (*id.*). Sullivan has "overseen" Schein's United States dental operations since at least 2006. (*Id.*)

**b. The alleged fraudulent scheme**

Plaintiff alleges that, by 2005, Schein, Benco, and Patterson reached an agreement to fix margins for the distribution of dental supplies and equipment at twenty-six to twenty-eight percent, and, by 2016, had agreed to set margins at thirty-five percent. (*Id.* ¶ 50.) Plaintiff alleges that to protect these margins, Schein and its competitors "illegally conspired to prevent . . . new entrants from successfully operating in the marketplace." (*Id.* ¶ 51.) According to Plaintiff, the dental supplies and equipment distribution services market is "particularly susceptible to anticompetitive conduct" because Schein and its two largest competitors control eighty-five percent of the market and dental products and equipment are "undifferentiated or commoditized." (*Id.* ¶¶ 46–47.)

**i. Allegations regarding new market entrants**

Plaintiff alleges that Schein conspired with its competitors to set margins, fix prices, and squeeze out new market entrants that threatened those margins and prices. (*Id.* ¶¶ 50–51.) For example, in January of 2008, Schein and another distributor, Burkhart Dental Supply ("Burkhart"), met with a manufacturer to discuss the manufacturer's business arrangement with a smaller distributor, Dynamic Dental Solutions ("Dynamic"). (*Id.* ¶ 94.) During that meeting, Schein, Burkhart, and the manufacturer agreed that if the manufacturer refused to sell its products to Dynamic, which offered the manufacturer's products at a lower price, Schein and Burkhart would compensate the manufacturer by buying more of its products. (*Id.*) A Dynamic employee subsequently met with a Burkhart employee "to investigate whether anticompetitive conduct was occurring." (*Id.* ¶ 95.) During that meeting, the Burkhart employee stated that if Schein was in the process of negotiating with a potential customer about the sale of dental equipment, Burkhart would "refuse to compete" and instead "encourage" the customer to buy from Schein. (*Id.*) The Dynamic employee then met with Schein's regional general manager, who stated that Schein and Burkhart

"agreed not to compete on price." (*Id.* ¶ 96.) The employee asked whether Dynamic would be "accepted in the market" if it raised margins and the Schein employee responded in the affirmative. (*Id.* ¶¶ 97–98.) The Schein employee also instructed the Dynamic employee to seek margins "[n]orth of [thirty-two]," and stated that if Dynamic was going to offer a different price than that offered by Schein, the Schein employee would "know about it" and "shoot" that information "up to corporate." (*Id.* ¶¶ 98, 100.)

**ii. Allegations regarding buying groups**

Buying groups are groups of solo or small group practitioners that join together "to exert market power in buying dental supplies and equipment." (*Id.* ¶ 54.) Plaintiff alleges that Schein "historically" worked with buying groups. (*Id.* ¶ 60.) However, because Schein, Benco, and Patterson "feared that buying groups would drive down prices and threaten their profit margins," in or around July of 2012, Schein and Benco reached an agreement not to do business with buying groups, (*id.* ¶¶ 56, 60), and in or around February of 2013, Patterson joined the agreement, (*id.* ¶ 62). For example, in July of 2012, Smile Source, a buying group, contacted Benco to "establish a dental supply agreement." (*Id.* ¶ 61.) A managing director of Benco thought that "perhaps [Smile Source was] looking to [Benco] because Schein told them no," and indicated that he would send Smile Source's inquiry to Sullivan "with a note." (*Id.*) Shortly thereafter, Benco rejected Smile Source's offer to enter into a dental supply agreement. (*Id.*) Approximately seven months later, on February 8, 2013, a Benco managing director emailed Patterson's president to advise him that Benco "do[es] not recognize, work with, or offer discounts to buying groups." (*Id.* ¶ 62.) Patterson's president responded that Patterson "feel[s] the same way." (*Id.* ¶ 63.)

Plaintiff alleges that "[t]he agreement between Schein, Benco, and Patterson was . . . put into effect in the context of a customer called Atlantic Dental Care ('ADC')." (*Id.* ¶ 65.) In March of 2013, Sullivan and a Benco executive discussed whether ADC was a buying group and whether

Schein and Benco would bid for its business. (*Id.*) After Sullivan told the Benco employee that Schein would not do business with ADC, the Benco employee sent a text message to Sullivan advising him that ADC was not a buying group comprised of independent dentists, but instead a centrally-owned corporate dental practice, and that Benco would therefore bid for its business. (*Id.*) Both Schein and Benco subsequently bid for ADC's business, which Benco won. (*Id.* ¶¶ 65–66.) Shortly thereafter, Patterson's president asked a Benco executive to explain its business arrangement with ADC and whether Benco had changed its "position on buying groups." (*Id.* ¶ 66.) The Benco executive responded that ADC was a corporate dental practice, not a buying group, and that Benco's position on buying groups had not changed. (*Id.*)

Plaintiff alleges that Schein, Benco, and Patterson continued to receive business requests from buying groups in the subsequent months and years, and continued to reject them pursuant to the "agreement" between the three companies. (*Id.* ¶ 67.) For example, in August of 2013, in response to an email asking whether it was "worth it" to work with buying groups, a Patterson employee stated in an internal email that Schein, Benco, and Patterson agreed not to do business with buying groups, and that it was Patterson's "duty to uphold this and protect this great industry." (*Id.*) The following month, after Benco learned that a smaller distributor was doing business with buying groups, a Benco employee advised his colleague to contact Sullivan and Patterson's president and instruct them to "hold their positions as we are." (*Id.*) In addition, in May of 2014, a Benco employee commented in an internal email that the "best part" about rejecting buying groups is that he "already know[s] that Patterson and Schein [have also] said no." (*Id.* ¶ 68.)

**iii. Allegations regarding state dental associations**

Plaintiff alleges that Schein, Benco, and Patterson feared that the formation of buying groups and sales platforms by state dental associations would "cause [their] customers to leave them . . . or force them to bring down their margins." (*Id.* ¶¶ 72, 75.) Plaintiff alleges that the three

companies therefore worked together to "attack" the formation of buying groups and sales platforms by state dental associations by pressuring manufactures and distributors not to work with them and boycotting the trade shows they hosted. (*Id.*) For example, in October of 2013, the Texas Dental Association (the "TDA") launched a buying group and associated sales platform. (*Id.* ¶¶ 70–75.) Between October of 2013 and April of 2014, several manufacturers and distributors that worked with the buying group "pulled [their] product lines from it," citing "pressure applied by Schein" and/or its competitors. (*Id.* ¶¶ 73–74.)

At some point in 2013, employees of Schein, Benco, and Patterson began discussing withdrawing from the TDA's 2014 annual trade show. (*Id.* ¶ 76.) In October of 2013, a Benco employee told his counterparts at Schein and Patterson that Benco was "thinking about withdrawing" from the TDA's 2014 annual trade show, (*id.*), and on January 21, 2014, David Steck, an employee who reported directly to Sullivan, emailed his counterpart at Patterson indicating that he would call the Patterson employee "in the next few days" to advise him of whether Schein had decided to attend the trade show, (*id.* ¶ 77). All three companies ultimately did not attend the TDA's 2014 trade show. (*Id.* ¶ 79.)

Schein, Benco, and Patterson also "boycotted" a trade show hosted by the Arizona Dental Association (the "AZDA") after the AZDA "considered forming a buying group in 2014." (*Id.* ¶ 80.) On June 18, 2014, a Benco manager stated internally that he was "[p]laying phone tag" with a Schein employee to discuss the AZDA trade show and on July 21, 2014, a Benco employee asked his counterpart at Patterson whether Benco, Patterson, and Schein could send "the same message" to the AZDA that it sent to the TDA. (*Id.* ¶ 82.) The three companies ultimately withdrew from the AZDA trade show. (*Id.*)

### c. Defendants' alleged misstatements

Plaintiff alleges that Defendants made material misstatements and omissions during the Class Period about (1) competition, (2) cost containment and pricing, (3) Schein's value-added services, and (4) Schein's financial results and margins.

#### i. Defendants' alleged misstatements about competition

Plaintiff alleges that:

- In Schein's Form 10-K filed on February 13, 2013, it identified the following risk factor: "[t]he health care products distribution industry is highly competitive and we may not be able to compete successfully." (*Id.* ¶ 142.)

- During Schein's second-quarter 2016 earnings call on August 4, 2016, in response to an investor question about the "competitive environment," Bergman stated, "[e]verybody is fighting for that last dollar, so it is a competitive market." (*Id.* ¶ 152.)

- During Schein's fourth-quarter 2016 earnings call on February 21, 2017, in response to questions about the "competitive landscape," Bergman stated, "[t]he competition wants our business and we want our competitors' business. It's a fiercely competitive market." (*Id.* ¶ 35.)

- In each of its Form 10-Ks and several Form 10-Qs filed during the Class Period, Schein stated, "[o]ur distribution business is characterized by . . . intense competition." (*Id.* ¶ 134.)

- In each of its Form 10-Ks filed during the Class Period, Schein stated, "[t]he distribution and manufacture of health care supplies and equipment is highly competitive. . . . In North America, we compete with our distributors, as well as several manufacturers . . . on the basis of price, breadth of product line, customer service and value-added products and services. . . . [C]ompetitive pressures may materially adversely affect our operating results." (*Id.* ¶ 144.)

Plaintiff alleges that each of these statements was misleading because Schein did not operate in a "highly competitive," (*id.* ¶ 142), or "fiercely competitive," (*id.* ¶ 35), market as reflected in each of the statements. (*Id.* ¶ 135.) Instead, Schein "actively colluded" with its purported competitors to maintain high margins and block other distributors from entering the market. (*Id.* ¶¶ 135, 137.)

**ii. Defendants' alleged misstatements about cost containment and pricing**

Plaintiff alleges that:

- In Schein's Form 10-Ks and Form 10-Qs filed during the Class Period, it stated, "[i]n recent years, the health care industry has increasingly focused on cost containment. This trend has benefitted distributors capable of providing a broad array of products and services at lower prices. It has also accelerated the growth of . . . buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support." (*Id.* ¶ 132.)
- In Schein's Form 10-Ks and Form 10-Qs filed during the Class Period, it stated, "[w]ith respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies." (*Id.* ¶ 140.)

Plaintiff alleges that these statements were misleading because Defendants were engaged in an attempt to fight consumers' cost containment efforts including by squeezing out competition from low-cost distributors and preventing the formation of buying groups. (*Id.* ¶ 133.)

**iii. Defendants' alleged misstatements about Schein's value-added services**

Plaintiff alleges that:

- In its Form 10-Q filed on May 7, 2013, Schein stated, "[w]e have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs." (*Id.* ¶ 136.)
- During Schein's fourth-quarter 2016 earnings call on February 21, 2017, Bergman stated: "[w]e have, we believe, the most outstanding offering, with tremendous experience in that area. And yes, every now and again, a competitor will go in with a price that's below ours, and we will not match those prices. Because we believe our offering is of higher value, and we cannot and will not dilute the value that is ascribed to our offering." (*Id.* ¶ 36.)

- At the Goldman Sachs Global Healthcare Conference on June 13, 2017, Paladino stated, "we have unbelievably good service levels and a really strong offering of value-added products and services. And what we found is the market really wants more than just the lowest price. . . . I think people are voting with their wallet or their checkbook by really saying we really want all of these other services as well as competitive pricing." (*Id.* ¶ 162.)

Plaintiff alleges that these statements were misleading because "Schein's prices remained high not because the market wanted additional services Schein claimed to offer, but because Schein [was] engaging in an anticompetitive conspiracy with its purported competitors in order to maintain high prices by excluding lower-priced entrants to the market and preventing consumers from forming buying groups." (*Id.* ¶ 163.)

**iv. Defendants' alleged misstatements about Schein's financial results and margins**

During the Class Period, Schein's Securities and Exchange Commission ("SEC") filings reported its "gross margin" percentage numbers for the healthcare distribution segment. (*Id.* ¶ 138.) Plaintiff alleges that these numbers were false and misleading because they were inflated by Schein's collusion with its competitors to thwart the entry of lower-priced competitors and the creation of buying groups, "both of which would have reduced [Schein's] gross profit margin" for the healthcare distribution segment. (*Id.* ¶ 139.)

**d. The alleged corrective disclosures**

Plaintiff alleges that the market learned "the truth" through three corrective disclosures on August 8, 2017, November 6, 2017, and February 13, 2018.

**i. The August 8, 2017 press release**

On August 8, 2017, Schein issued a press release reporting its second-quarter 2017 financial results, and its share price declined by 5.3 percent. (*Id.* ¶¶ 107, 109.) Defendants attributed the disappointing financial results to the "extra holiday in the quarter and the loss of a customer," and "some movement towards lower-priced products." (*Id.* ¶ 107.)

Plaintiff alleges that the August 8, 2017 press release and other publicly available information at the time "partially revealed the truth concealed by Defendants' misstatements, as it revealed that Schein's poor results were a product of abandoning prior attempts to inflate sales volume and margins through anticompetitive collusion." (*Id.* ¶ 109.) The other publicly available information included a lawsuit filed on August 3, 2017 by the Attorney General of the State of Texas, alleging that Schein had engaged in anticompetitive activities. (*Id.* ¶ 43.) Schein "agreed to stipulate to an injunction prohibiting anticompetitive activity" on the day the lawsuit was filed. (*Id.*)

**ii. The November 6, 2017 press release**

On November 6, 2017, Schein issued a press release reporting its third-quarter 2017 financial results and disclosing "litigation asserting that Schein had been engaged in collusive and anti-competitive conduct." (*Id.* ¶¶ 111, 113.) The press release revealed for the first time that on August 1, 2017, Archer & White Sales, Inc. ("Archer") had filed an amended complaint against Schein, adding Patterson and Benco as defendants, alleging that the three companies "conspired to fix prices and refused to compete with each other for sales of dental equipment to dental professionals and agreed to enlist their common suppliers . . . to join a price-fixing conspiracy and boycott by reducing the distribution territory of, and eventually terminating, their price-cutting competing distributor Archer." (Nov. 6, 2017 Disclosure, annexed to Defs. Mot. as Ex. I, Docket Entry No. 45-11.)

The November 6, 2017 disclosure also revealed that IQ Dental Supply, Inc. had filed an antitrust complaint against Schein, Benco, and Patterson, alleging that the three companies "conspired to suppress competition . . . for marketing, distribution and sale of dental supplies and equipment in the United States, and that defendants unlawfully agreed with one another to boycott dentists, manufacturers and state dental associations that deal with, or considered dealing with, plaintiff." (*Id.*)

Schein's share price declined by 9.8 percent on November 6, 2017. (CAC ¶ 113.) Plaintiff alleges that the November 6, 2017 disclosure "partially revealed the truth concealed by Defendants' misstatements, as they revealed that Schein's poor results were a product of Defendants' need to abandon prior attempts to inflate margins, increase sales and maintain market share through anticompetitive collusion." (*Id.*)

**iii. The February 13, 2018 press release**

On February 13, 2018, Schein issued a press release disclosing that the Federal Trade Commission ("FTC") had filed an antitrust lawsuit against Schein, Benco, and Patterson. (*Id.* ¶¶ 115, 117.) The FTC complaint alleged that the three companies "deprived independent dentists of the benefits of participating in buying groups that purchase dental supplies from national, full-service distributors," and "detail[ed] communications between executives of [Benco and Schein, including Sullivan] evidencing [an anticompetitive] agreement, as well as attempts to monitor and ensure compliance with the agreement." (*Id.* ¶ 117.) Defendants denied the allegations in the lawsuit. (*Id.*)

Plaintiff alleges that the February 13, 2018 disclosure and other publicly reported information corrected Defendants' prior misrepresentations and omissions concerning "the competitive environment Schein faced, the reasons for Schein's financial success, and [its] prospects going forward." (*Id.*)

**e. Separate allegations of Defendants' scienter**

In addition to the allegations set forth above, Plaintiff alleges that the following facts give rise to a strong inference of Defendants' wrongful state of mind.

First, Plaintiff alleges that Bergman was "likely directly informed of" Schein's "scheme to collude with Benco and Patterson." (*Id.* ¶ 126.) In support, Plaintiff alleges that Schein's regional general manager reported that Bergman "was in the room where strategies to deal with buying

groups, including directives not to engage with them, were discussed internally . . . during sales meetings dating back to prior to the beginning of the Class Period." (*Id.*)

Second, Plaintiff alleges that Bergman and Paladino made "suspicious stock sales" at "artificially inflated prices." (*Id.* ¶ 129.) During the Class Period, Bergman sold more than $37 million in Schein stock, compared to less than $26 million during the equivalent-length period immediately preceding the Class Period (the "Prior Period"), and Paladino sold more than $16 million in Schein stock during the Class Period. (*Id.*) In addition, Plaintiff alleges that Bergman's and Paladino's "repeated[] . . . detailed statements based on purported personal knowledge" about competition, margins, and profits, and "specific threats of competition" show their wrongful state of mind. (*Id.* ¶ 130.)

Third, Plaintiff alleges that Sullivan was "deeply and directly involved" in Schein's "scheme to collude with Benco and Patterson." (*Id.* ¶ 126.) For example, Sullivan spoke to Benco employees about "the boycott" of buying groups and the TDA trade show. (*Id.*)

Finally, Plaintiff alleges that each Defendant "had notice of the allegations of collusive conduct as a result of numerous prior lawsuits alleging similar conduct and related investigations, in which Defendants denied liability and refuted the allegations." (*Id.* ¶ 127.) In addition, Plaintiff alleges that the fact that Schein's dental distribution business was its "single most important line of business" during the Class Period "yields a strong inference of scienter." (*Id.* ¶ 128.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir.

2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

**b. Exchange Act claims**

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015); *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014); *Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 225 (2d Cir. 2012). The corresponding SEC regulation provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Liability under section 10(b) is referred to as "primary liability." *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (discussing the "requirements for primary liability under Rule 10b–5"); *see also Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 166 (2008) ("[T]he implied right of action in § 10(b) continues to cover secondary actors who commit primary violations."). "A primary violator is an entity that has committed a manipulative act and thereby has participated in a fraudulent scheme." *City of Providence, R.I. v. Bats Glob. Mkts., Inc.*, 878 F.3d 36, 51 (2d Cir. 2017) (alteration, citation, and internal quotation marks omitted); *see also Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 467 (2d Cir. 2013) (discussing district court finding that allegations were "sufficient to state a claim for primary liability under § 10(b)").

The Exchange Act also provides for secondary liability, or "controlling-person liability," through section 20(a), for "[e]very person who, directly or indirectly, controls any person directly liable under the Securities Exchange Act." *DeKalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 400 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir. 2014)); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 739 F. App'x 679, 687 (2d Cir. 2018) ("A § 20(a) claim seeks to hold the control person jointly and severally liable for the 'primary violation' of the securities laws by the controlled person, so long as the control person is a 'culpable participant' in the fraud." (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007))). "Controlling-person liability" may be pled as an alternative to primary liability. *See Weinstein v. Cardis Enters. Inter'l N.V.*, No. 16-CV-2661, 2017 WL 9485677, at *4 (E.D.N.Y. Aug. 3, 2017) ("A plaintiff asserting a Section 10(b) 'primary liability' claim may assert Section 20(a) control person liability against the same defendant as an alternative theory of liability, but a defendant cannot be held liable under both theories."); *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 368–69 (S.D.N.Y. 2013) ("While a party cannot be held liable for both a primary violation and

as a control person, alternative theories of liability are permissible at the pleading stage." (citing *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010))); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("'Controlling-person liability' is a separate inquiry from that of primary liability and provides an alternative basis of culpability." (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975))); S*uez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (same).

**i. Section 10(b) claims**

Plaintiff alleges claims pursuant to section 10(b) and Rule 10b–5 against Schein, Bergman, and Paladino. (CAC ¶ 179.)

To succeed on a section 10(b) or Rule 10b–5 claim, a plaintiff must show: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (alterations and citation omitted); *see also Schwab v. E*Trade Fin. Corp.*, 752 F. App'x 56, 58 (2d Cir. 2018) (same) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *GAMCO Inv., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (same). In addition, a plaintiff must make a threshold showing that the material misrepresentation was made by the defendant. *See* 17 C.F.R. § 240.10b–5 ("It shall be unlawful for any person, directly or indirectly . . . [t]o *make any untrue statement* of a material fact or to omit to state a material fact necessary." (emphasis added)); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit *making any material misstatement or omission* in connection with the purchase or sale of any security." (emphasis added)). "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity

can merely suggest what to say, not 'make' a statement in its own right." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

A claim of securities fraud under section 10(b) is "subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *Wyche v. Adv. Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)); *see also City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (same). Rule 9(b) of the Federal Rules of Civil Procedure provides that, when bringing a complaint "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015); *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *see also Schwab*, 752 F. App'x at 58; *Steginsky*, 741 F.3d at 368. In addition, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)(A); *see also Zech Cap. LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 583 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99); *Steginsky*, 741 F.3d at 368.

Defendants argue that the Court should dismiss Plaintiff's section 10(b) claims because Plaintiff has failed to show (1) a material misrepresentation or omission, (2) scienter, (3) loss causation, and (4) reliance. The Court considers each of these elements in turn below.

### 1. Material misrepresentation or omission

Defendants argue that Plaintiff has failed to adequately plead a misrepresentation or omission about (1) competition, (2) cost containment and pricing, (3) Schein's value-added services, and (4) Schein's financial results and margins. (Defs. Mem. 6.)

Rule 10b–5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5; *see also Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 209 (2d Cir. 2014) (same). A statement is considered materially misleading under section 10(b) when its "representations, viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81, 83 (2d Cir. 2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004)); *see also Singh*, 918 F.3d at 63 (explaining that allegedly misleading statements are "evaluated not only by literal truth, but by context and manner of presentation" (citation and internal quotation marks omitted)). "A statement or omission is material if a reasonable investor would have considered it significant in making investment decisions." *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018) (alteration and internal quotation marks omitted) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)); *see also Singh*, 918 F.3d at 63 ("An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010))); *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("A misstatement in a securities transaction is material so long as there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." (alterations, citation, and internal quotation marks omitted)).

Although section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information," where the misrepresentation in question is an omission, the plaintiff must allege either that the defendants had a duty to disclose or that "there [i]s a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Dalberth*, 766 F.3d at 183 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) (explaining that to state a section 10(b) violation based on omission, a plaintiff must show that the defendant "is subject to a duty to disclose the omitted facts" or that the defendant spoke in "half-truths," which are "statements that are misleading . . . by virtue of what they omit to disclose"); *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (explaining that an omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act" (citation omitted)); *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (explaining that a duty to disclose may arise "(1) expressly pursuant to an independent statute or regulation; or (2) as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts").

**A. Statements about competition**

Plaintiff alleges that the following statements were misleading: "[t]he health care products distribution industry is highly competitive and we may not be able to compete successfully," (CAC ¶ 142), "[e]verybody is fighting for that last dollar, so it is a competitive market," (*id.* ¶ 152), and "it's a fiercely competitive market," (*id.* ¶ 35).

Defendants argue that Plaintiff has not adequately pled a misrepresentation based on competition because it has not alleged that Defendants' statements about competition were false, *i.e.*, that the dental distribution business was *not* competitive. (Defs. Mem. 8.) In support,

Defendants argue that Plaintiff alleges collusive conduct as to buying groups, but does not assert that Schein's business with buying groups "constituted all, most, or even a significant part" of its dental distribution business, or that anticompetitive conduct existed in other areas of its business. (*Id.*)

Plaintiff has sufficiently pled that Defendants made material misrepresentations or omissions about competition by alleging facts showing that Schein colluded with its competitors to block new buyers from entering the market.

**(1) Plaintiff has pled a misstatement or omission**

Plaintiff pleads facts showing that Schein employees spoke to their counterparts at Benco and Patterson and that each company agreed that it would not deal with groups of solo or small group practitioners that joined together to concentrate market power and drive down prices. (*See* CAC ¶¶ 54–66; *see also id.* ¶ 77 (alleging that Schein and Benco employees texted about whether ADC was a buying group and whether each company would do business with it); *id.* ¶¶ 65–66 (alleging that both Schein and Benco ultimately bid for ADC's business); *id.* ¶ 67 (alleging that Benco employee advised his colleague to contact Sullivan to instruct him to "hold [Schein's] positions [on buying groups] as we are").) In addition, Plaintiff alleges that (1) several manufacturers and distributors working with a state dental association after it launched a buying group and sales platform "pulled [their] product lines" from the state dental association, citing "pressure applied by Schein" and/or its competitors, (*id.* ¶¶ 73–74), and (2) Schein agreed with Benco and Patterson to boycott trade shows hosted by state dental associations who were considering forming or had formed buying groups and associated sales platforms, (*id.* ¶¶ 76–80). (*See also id.* ¶ 76 (alleging that Benco employee told his counterpart at Schein that Benco was "thinking about withdrawing" from the TDA's 2014 annual trade show); *id.* ¶ 77 (alleging that Schein executive emailed his counterpart at Patterson explaining that he would call "in the next few

days" to advise Patterson of Schein's decision whether to attend the TDA's 2014 annual trade show); *id.* ¶ 79 (alleging that Schein, Benco, and Patterson did not attend the TDA's 2014 annual trade show).) Because they did not disclose these facts, Defendants' statements that Schein's dental distribution business was "highly competitive," (*id.* ¶ 142), and "characterized by . . . intense competition," (*id.* ¶ 134), would have misled a reasonable investor into believing that Schein did in fact operate in a competitive environment, when instead Schein was engaged in anticompetitive behavior pursuant to agreements with its competitors. *See Berger*, 563 F. App'x at 83 (explaining that a statement is materially misleading when "viewed as a whole," it "would have misled a reasonable investor" (citation omitted)); *see also In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at *7 (S.D.N.Y. Mar. 28, 2018) (concluding that if, as the plaintiffs alleged, the defendant "was engaged in a variety of anticompetitive practices — often in collusion with [its] competitors" — then the defendant's statement that it operated in a "very competitive" market was "misleading in the absence of a disclosure of that anticompetitive conduct"); *Fries v. N. Oil & Gas, Inc.*, 354 F. Supp. 3d 384, 392 (S.D.N.Y. 2018) ("A reasonable investor would interpret a company's statement that another company is a competitive threat to preclude a price-fixing agreement; after all, competitors enter into pricefixing agreements specifically to avoid competition.").

Moreover, Plaintiff has pled a misrepresentation based on competition regardless of whether the dental distribution business was in fact competitive because a statement need not be actually false in order to be misleading. (*See* Defs. Mem. 8 (arguing that Plaintiff has not pled a misrepresentation based on competition because it has failed to allege facts showing that the dental distribution business was not competitive).) True statements can become, "through their context and manner of presentation, devices which mislead investors." *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (quoting *McMahan v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d

Cir. 1990)). Accordingly, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan*, 900 F.2d at 579; *see also Singh*, 918 F.3d at 63 (explaining that allegedly misleading statements are "evaluated not only by literal truth, but by context and manner of presentation" (citation and internal quotation marks omitted)); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 239–40 (explaining that a plaintiff can show a material misstatement or omission if the defendants spoke in "half-truths," which are "statements that are misleading . . . by virtue of what they omit to disclose"). Thus, because, as explained above, Plaintiff has plausibly alleged that Defendants' statements describing the dental distribution business as competitive would have misled a reasonable investor, it has stated a material misstatement or omission, and need not state facts showing that Defendants' statements were literally untrue. *See Speakes v. Taro Pharma. Indus., Ltd.*, No. 16-CV-08318, 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018) (rejecting argument that the plaintiff must plead "that there was *no* competition, as opposed to merely that there was an anti-competitive agreement"); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 444 (S.D.N.Y. Aug. 8, 2018) (finding statements materially misleading, even if true, because of omitted information); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 355 (S.D.N.Y. 2015) (explaining that a material misstatement or omission can arise "whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993))); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) ("[E]ven an entirely truthful statement may provide a basis for liability." (citation omitted)).

**(2) The statements or omissions were material**

Defendants argue that Plaintiff has not pled materiality as to Defendants' statements about competition because Plaintiff does not allege that Defendants' "allege[d] collusive conduct . . . constituted all, most, or even a significant part of Schein's dental distribution business." (Defs. Mem. 8.)

Plaintiff argues that Defendants' materiality argument is "too fact-specific an inquiry for resolution at this stage," and, in any event, Plaintiff has adequately alleged that "Defendants' collusion had a material effect on Schein's dental business." (Pl. Opp'n 13.)

The Court finds that Plaintiff has alleged materiality sufficient to withstand Defendants' motion. A misstatement or omission is material "so long as there is a substantial likelihood that a reasonable investor would find [it] important in making an investment decision." *Litvak*, 889 F.3d at 64 (alterations, citation, and internal quotation marks omitted). "[M]ateriality is a mixed question of law and fact" and, "in the context of a Rule 12(b)(6) motion, the complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (alterations, citation, and internal quotation marks omitted). Material facts include those that "affect the probable future of the company" or "affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 396 (S.D.N.Y. 2018) (same); *S.E.C. v. Wyly*, 33 F. Supp. 3d 290, 299–300 (S.D.N.Y. 2014) (same); *see also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) ("[W]ith respect to materiality," courts must balance "both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." (citation omitted)).

Defendants' purported communications with Schein's competitors about each company's decision not to do business with buying groups or attend trade shows of state dental associations would have been material to its investors. If, as Plaintiff alleges, Defendants' communications with its competitors were anticompetitive and/or illegal, they had the potential to spur litigation, sanctions, or other major changes to Schein's dental distribution business. Because Schein's dental distribution business accounts for approximately half of its total net sales, (CAC ¶ 17), the omitted information was therefore likely to affect the future of Schein's profitability and thus the desire of investors to buy, sell, or hold its stock. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181–82 (S.D.N.Y. 2010) ("[M]aterial misrepresentations include those concerning a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." (alteration, citation, and internal quotation marks omitted)); *id.* (finding statements material because they misled investors about "the fundamental nature of its most important business segment"); *Babaev v. Grossman*, No. 03-CV-5076, 2007 WL 633990, at *3 (E.D.N.Y. Feb. 26, 2007) (finding omission material because it concerned contracts that constituted a "large portion" of the defendant's business and "any potential termination of these exclusive agreements would affect the probable future of the company"); *Menkes v. Stol-Nielsen S.A.*, No. 03-CV-409, 2005 WL 3050970, at *6 (D. Conn. Nov. 10, 2005) (finding that a reasonable shareholder would consider information regarding price fixing important in part because of the "potential [that] sanctions . . . could significantly impact [the company's] future operations and earnings"). Accordingly, the Court cannot conclude that the misstatements and omissions are so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," *Indiana Pub. Ret. Sys.*, 818 F.3d at 96, and therefore finds that Plaintiff has adequately alleged materiality as to Defendants' statements about competition.

### (3) The material misstatements or omissions were not puffery

Defendants argue that their statements describing the dental distribution business as competitive were so vague and general that they constitute inactionable puffery. (Defs. Mem. 8–9.) Plaintiff argues that Defendants' statements do not constitute puffery because they were made to reassure investors and differentiate Schein from its competitors. (Pl. Opp'n 14.)

Puffery encompasses inactionable "'statements that are too general to cause a reasonable investor to rely upon them' and thus 'cannot have misled a reasonable investor.'" *In re Vivendi*, 838 F.3d at 245 (first quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); and then quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (alteration omitted)). "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'" particularly where "the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of Pontiac*, 752 F.3d at 183; *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017) ("The quintessential examples of . . . inactionable puffery are general statements about reputation, integrity, and compliance with ethical norms." (citation and internal quotation mark omitted)); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) ("While there is no canonical test for how vague a statement must be to qualify as puffery, courts in this Circuit frequently focus on the imprecision of the statements and whether such statements relate to future expectations."). Statements of "general corporate optimism" are considered puffery unless "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 389 (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)).

When viewed in context, Defendants' statements describing Schein's distribution market as "highly competitive," (CAC ¶ 142), and "characterized by . . . intense competition," (*id.* ¶ 134), cannot be considered puffery. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 647 (explaining that "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made" (citation omitted)); *In re BHP Billiton Ltd. Sec. Litig.*, 246 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (same). Plaintiff alleges, in response to investor questions about the "competitive environment," (CAC ¶ 35), or the "competitive market," (*id.* ¶ 152), Defendants stated that Schein's distribution business was "highly competitive," (*id.* ¶ 142), and "characterized by . . . intense competition," (*id.* ¶ 134). As explained above, these statements would have misled a reasonable investor if, as Plaintiff alleges, Schein did not actually operate in a competitive market and instead colluded with Schein's competitors to fix prices and block group purchasing organizations from entering the market. (*See, e.g.*, *id.* ¶ 3.)

Accordingly, although when viewed in isolation, Defendants' statements could be considered too vague or general to be actionable, *In re Vivendi*, 838 F.3d at 245 (explaining that puffery is "statements that are too general to cause a reasonable investor to rely upon them" (alteration and citation omitted)), when viewed in the context of Plaintiff's allegations that Schein was actively engaging in anticompetitive conduct, they cannot be considered puffery because they were made in response to investor questions about the competitive environment and, accepting Plaintiff's allegations as true, did not paint an accurate picture of that environment. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (rejecting puffery argument where the plaintiffs pled facts to show that the statement "that the inventory situation was 'in good shape' or 'under control'" was not true); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (finding that statements, although when "viewed in isolation, m[ight] be [considered] mere puffery," were actionable because they were "made repeatedly in an effort to reassure the investing public," and

thus "a reasonable investor could rely on them"); *Ark. Teachers Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation" where, "according to the complaint, . . . the company was writing off as worthless large portions of its inventory."); *see also In re Qualcomm Inc. Sec. Litig.*, No. 17-CV-00121, 2019 WL 1239301, at *8 (S.D. Cal. Mar. 18, 2019) (finding that the defendants' statements touting a "pro-competitive . . . model" did not constitute puffery where the plaintiffs alleged that the defendants were "engaged in policies that actually blocked competition"); *Roofer's Pension Fund v. Papa*, No. 16-CV-2805, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) (rejecting argument that statements about competitiveness were inactionable puffery in view of the plaintiffs' allegations "concerning collusive pricing").

**(4) Defendants' statements about competition are not inactionable opinions**

Defendants argue that their statements about competition are inactionable statements of opinion. (Defs. Mem. 8–9.) Plaintiff argues that even if certain of Defendants' statements could be considered opinions, they are actionable because the omission of certain material information rendered them misleading. (Pl. Opp'n 14.)

"A fact is a thing done or existing," whereas "[a]n opinion is a belief, a view, or a sentiment, which the mind forms of persons or things." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (alterations and internal quotation marks omitted). "Expressions of optimism and projections about the future are quintessential opinion statements." *Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d at 107); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) (noting that statements of opinion "include subjective statements that reflect judgments as to values that are not objectively determinable[,] . . . express expectations for the

future rather than presently existing, objective facts[,] [and] . . . statements using phrases classically indicative of opinion" (alteration, internal citations, and internal quotation marks omitted)); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018) (same). "[L]iability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1327). Liability for statements of opinion may also lie "if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.*; *see also Martin*, 732 F. App'x at 40 ("*Omnicare* identified three ways in which a statement of opinion can be false or misleading: (1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." (alterations and internal quotation marks omitted) (quoting *Tongue*, 816 F.3d at 211)). "[W]hether an omission makes an expression of opinion misleading always depends on context," *Omnicare*, 135 S. Ct. at 1329, and a court may not impose liability "merely because an issuer failed to disclose information that ran counter to an opinion expressed," *Tongue*, 816 F.3d at 212.

Defendants' statements about competition are not opinions and are therefore actionable. In Schein's SEC disclosures, it identified "[t]he health care products distribution industry [as] highly competitive" and explained that Schein "may not be able to compete successfully," (CAC ¶ 142), and in response to a question during an earnings call about the "competitive landscape," Bergman stated, "[i]t's a fiercely competitive market," (*id.* ¶ 35). These statements do not reflect the judgment of the speaker or the speaker's expectations for the future and were not qualified by phrases such as "I think" or "I believe," and thus do not constitute opinions. *See Gregory*, 297 F. Supp. 3d at 406 (explaining that opinions "include subjective statements that reflect judgments as to values that are not objectively determinable[,] . . . expectations for the future rather than presently

existing, objective facts," and "statements using phrases classically indicative of opinion"); *see also Okla. Firefighters Pension & Ret. Sys.*, 367 F. Supp. 3d at 32 (finding that the defendants' "characterization of the statements as mere opinions strains credulity" in part because "there was very little equivocation in [the defendants'] statements"); *cf. Martin*, 732 F. App'x at 42 (finding that defendant's statements were opinions because defendant "made manifest that its views were entirely its own"); *Querub v. Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016) (finding that reports "labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard"); *DoubleLine Cap. LP*, 323 F. Supp. 3d at 443 (finding that statements about "competitive strengths" were inactionable because they were "framed in [defendant's] financial disclosures as the company's opinion: 'We *believe* that we are able to make competitive bids'").

Moreover, even if Defendants' statements about competition could be considered opinions, because the statements did not include disclosure of Defendants' allegedly anticompetitive behavior, they are actionable. *See Tongue*, 816 F.3d at 210 (explaining that liability for opinions may lie "if the speaker omits information [which] . . . makes the statement misleading"). As explained above, if true, the fact that Schein colluded with its purported competitors to block buying groups and other distributors from entering the market, would conflict with what a reasonable investor would conclude from Defendants' statements that the dental distribution business was "highly competitive," (CAC ¶ 142), and "characterized by . . . intense competition," (*id.* ¶ 134). *See Lopez v. Ctpartners Executive Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) ("The core inquiry . . . is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself." (citation and internal quotation marks omitted)). Defendants' statements about competition are therefore actionable even if considered opinions. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279–80 (S.D.N.Y. 2012) (explaining that a defendant cannot

"pass off [as statements of opinion] its repeated assertions" that, assuming the truth of the plaintiff's allegations, involved "misrepresentations of existing facts").[1]

### B. Statements about cost containment and pricing

Plaintiff alleges that Defendants' statement that the cost containment "trend" has (1) "benefitted distributors capable of providing a broad array of products and services at lower prices" and (2) "accelerated the growth of . . . buying groups" which "emphasi[ze] . . . competitive prices" and "tend to favor distributors capable of providing specialized management information support," (CAC ¶ 132), was materially misleading "for failing to disclose facts about Schein's collusive scheme related to those very issues," (Pl. Opp'n 15).

Defendants argue that their statements about cost containment and pricing were not misleading because Plaintiff has not alleged that these statements were false. (Defs. Mem. 9–10.)

Plaintiff has adequately alleged a material misstatement or omission about cost containment and pricing.

Although a defendant may not have a duty to speak about a particular topic, if it does, it has a duty to speak accurately and completely on that topic. "Disclosure is required . . . when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (alteration and citation omitted). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing duty to disclose information on the issue or topic." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 258 (alterations, citation, and internal quotation marks omitted).

---

[1] Defendants also argue that "some of the challenged statements were not assertions of fact or opinion, but were risk warnings," *e.g.*, Schein's statement that "price reductions by our competitors could result in a similar reduction in our prices" and that "competitive pressures may materially affect [Schein's] operating results." (Defs. Mem. 9.) However, Defendants cite no case law for the proposition that a risk warning is inactionable under section 10(b). Moreover, Plaintiff does not rely on these statements to allege a misrepresentation or omission about competition.

In their statements about the focus of buying groups on cost containment and pricing, Defendants failed to disclose the whole truth by omitting a key fact — Schein colluded with its competitors to block buying groups from entering the market and demanding lower prices and cost containment. Because they failed to disclose this fact, Defendants' statements that buying groups "emphasi[ze] . . . competitive prices" and that buying groups favored distributors capable of providing certain services and lower prices, (CAC ¶ 132), would have misled a reasonable investor into believing that Schein was doing business or seeking to do business with buying groups and offering or considering offering them certain services and lower prices. Accordingly, Plaintiff has adequately alleged material misstatements or omissions about cost containment and pricing. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (finding statement that the defendant responded to document requests "[f]rom time to time" not "accurate and complete" because although true, "a reasonable investor could have read" the statements "to mean that [defendant] was not already in receipt of . . . a request for information," which was untrue); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011) (finding that statement was misleading where company chose to speak on topic but omitted a relevant fact that was necessary to "provide a truthful and complete" picture).

**C. Statements about Schein's value-added services**

Plaintiff alleges the following statements were misleading: (1) Schein "established strategically located distribution centers," which, "together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables [Schein] to be a single source of supply for [its] customers' needs," (CAC ¶ 136), (2) Schein would "not match [lower prices] . . . [b]ecause we believe our offering is of higher value, and we cannot and will not dilute the value that is ascribed to [its] offering," (*id.* ¶ 36), and (3) Schein "compete[s] with [its] distributors, as well as several manufacturers, . . . on the basis of price, breadth of product line,

customer service and value-added products and services," (*id.* ¶ 144). Plaintiff argues that these statements cannot be considered inactionable opinions because they were "simply not expressed as beliefs or opinions," and "even if some could be construed as opinions, they are actionable because they were misleading based on omitted facts." (Pl. Opp'n 17.) In addition, Plaintiff argues that Defendants' statements were not puffery because Defendants "held [value-added services] out as central to Schein's business model." (*Id.*)

Defendants argue that Plaintiff has failed to allege a material misstatement or omission about value-added services because Defendants' statements were "expressions of opinion about customers' perceptions of the value of Schein's services" and does not allege that Defendants did "*not* believe that Schein's success was due to the value-added services that [it] provided." (Defs. Mem. 10.) In addition, Defendants argue that their statements about value-added services were inactionable puffery. (*Id.*)

Although some of Defendants' statements about value-added services are framed as opinions, they omitted relevant information which made the statements materially misleading, and therefore actionable. In speaking about the sources of Schein's success, Defendants left out a material basis for the company's achievements — Schein's alleged collusion with its competitors to maintain high prices by, *inter alia*, agreeing with its competitors to fix prices and margins. *See Tongue*, 816 F.3d at 210 (explaining that opinions are "actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor" (citing *Omnicare*, 135 S. Ct. at 1327)); *see also Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 251 (S.D.N.Y. 2019) (explaining that statements are actionable "when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices" and "when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief" (quoting *In re Virtus Inv. Partners, Inc. Sec.*

*Litig.*, 195 F. Supp. 3d at 536)); *Fries*, 354 F. Supp. 3d at 391 (same); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 653 (same); *see also Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 768 (S.D.N.Y. 2019) (failure to "disclose the true (and improper) nature" of a source of success "properly plead[s] an actionable half-truth" once defendant "puts the topic of the cause of its financial success at issue"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d at 537 (finding statement that "portfolio managers [were] . . . a key driver of . . . high levels of sales and net flows" misleading where sales "driven largely by" improper and undisclosed source); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding statement that "trading volumes and price volatility determine our opportunities to trade" put "sources of [defendant's] revenue at issue," and thus was actionable because the defendants failed to disclose that the "true source" of revenue was illicit trading).[2]

In addition, Defendants' statements about value-added services are not inactionable puffery for several reasons. *See In re Vivendi*, 838 F.3d at 245 (explaining that "statements that are too general to cause a reasonable investor to rely upon them" constitute inactionable puffery (citation omitted)). First, Defendants' statements that Schein's "strategically located distribution centers[,] . . . broad product and service offerings at competitive prices, and a strong commitment to customer service," enabled it to be a "single source of supply for . . . customers' needs," (CAC ¶ 136), were not vague or general, but instead identified specific sources of success. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d at 537 ("While there is no canonical test for how vague a statement must be to qualify as puffery, courts in this Circuit frequently focus on the imprecision of

[2] Defendants also argue that Plaintiff has failed to allege a material misstatement about value-added services because it does not allege that Defendants did "*not* believe that Schein's success was due to the value-added services that [it] provided." (Defs. Mem. 10.) However, as explained above, there are three separate ways to plead an actionable opinion: facts showing that (1) "the speaker did not hold the belief she professed," (2) "the supporting facts she supplied were untrue," or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue*, 816 F.3d at 210.

the statements and whether such statements relate to future expectations."); *cf. In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012) ("Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it."). Second, this statement did not predict Schein's future, but instead identified current, then-existing, sources of success. *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 268 (S.D.N.Y. 2016) ("Decisions in this Circuit concluding that statements were mere puffery have often focused on factors such as the imprecision of the statements and whether they related to future expectations."); *Freudenberg*, 712 F. Supp. 2d at 189 (explaining that statements are not puffery where they are alleged to be "misrepresentations of existing facts"); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.'" (quoting *Novak*, 216 F.3d at 315)). Third, the statement about value-added services reassured investors about Schein's ability to compete based on value and differentiated Schein from its competitors. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 660 (finding that statements were not puffery where made to "reassure . . . investors"); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017) (same); *In re BHP Biliton Ltd. Sec. Litig.*, 276 F. Supp. 3d at 79 (explaining that when statements are made to reassure the public "about matters particularly important to the company and investors, those statements may become material to investors," and thus cannot constitute puffery). Accordingly, Plaintiff has adequately alleged a material misrepresentation or omission about value-added services.

**D. Statements about Schein's financial results and margins**

Plaintiff argues that Schein's SEC filings reporting its "gross margin" percentage numbers for the healthcare distribution segment constitute materially misleading statements because Schein's numbers were inflated by Defendants' collusive conduct. (Pl. Opp'n 18.) Defendants argue that

their statements about financial results and margins were based on accurate historical data and therefore cannot form the basis of a securities violation. (Defs. Mem. 11.)

"Accurately reported financial statements . . . cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance." *Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018); *see also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings."); *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws."); *Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16-CV-6277, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2019) ("[A] violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016)); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) ("[T]he isolated statement of actual revenues allegedly generated by improper activities does not create Section 10(b) liability.").

Because Plaintiff concedes that the gross margin percentage reported in Schein's SEC filings was accurate historical data, (*see generally* Pl. Opp'n 17–18), Plaintiff has failed to state a claim based on the disclosure of Schein's financial data. *See Fogel*, 759 F. App'x at 24 (explaining that "[a]ccurately reported financial statements . . . cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance").

*In re Van der Moolen Holdings N.V. Securities Litigation*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), does not support a contrary result. Plaintiff argues that, based on *Van der Moolen*, its "[a]llegations that reported financial metrics were inflated by illicit activity suffice to plead falsity." (Pl. Opp'n 18.) In *Van der Moolen*, the court held that the defendant's statements explaining the sources of its revenue were actionable because the defendant "put[] the topic at issue[;]" the court did *not* hold that accurate financial data was actionable. 405 F. Supp. 2d at 400–01. Plaintiff cites the *Van der Moolen* appendix, which includes a reprint of the "alleged false and misleading statements made during the class period," including disclosure of historical financial data, to support its argument that it can state a claim based on the disclosure of accurate financial data. (Pl. Opp'n 18.) However, there is nothing in the court's opinion in *Van der Moolen* to suggest that it held that each of the statements in the appendix, labeled "*alleged* false and misleading statements," was actionable. *See Van der Moolen*, 405 F. Supp. 2d at 413 (emphasis added). The Court agrees with those courts that have considered and rejected Plaintiff's reading of *Van der Moolen* and have limited actionable misstatements to a company's misstatements or omissions explaining financial data, and not the accurate financial data itself. *See In re VEON Ltd. Sec. Litig.*, No. 15-CV-8672, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("[T]he [c]ourt agrees with the district courts that have read *Van der Moolen* . . . narrowly" — "a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading." (citation omitted)); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6 (concluding that statements "explain[ing] the source and causes of [defendant's] financial success" were actionable, "[u]nlike [its] statements of income on Forms 10-K and 10-Q"); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d at 470 ("The [c]ourt is of the opinion that a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves."); *In re FRB*

*Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) ("Accurate statements of past earnings figures are not themselves actionable under Section 10(b)."). Accordingly, Plaintiff has failed to allege a material misstatement or omission regarding Schein's financial results and margins.

**2. Scienter**

Plaintiff argues that it has adequately pled scienter as to Bergman and Paladino through (1) each individual's direct involvement in the alleged scheme, (2) the volume and profit of stock sales they made during the Class Period, and (3) other allegations of scienter, including Defendants' "detailed representations" about competition and buying groups, the lawsuits and investigations detailed in the CAC, and the fact that Schein's dental distribution business was its "single largest source of revenue." (Pl. Opp'n 25–31.) As to Schein, Plaintiff argues that Sullivan was "directly and personally" involved in the purported fraud and that his knowledge can be imputed to Schein because he oversaw Schein's dental operations "for years." (*Id.* at 25, 27.)

Defendants argue that Plaintiff's allegations regarding (1) Bergman's and Paladino's direct involvement in the alleged fraud, (2) Bergman's and Paladino's stock sales, and (3) Defendants' statements about competition and buying groups, the other lawsuits described in the CAC, and the core operations doctrine,[3] do not show scienter. (Defs. Mem. 16–22, 24–27.) As to Schein, Defendants argue that (1) Plaintiff does not allege that Sullivan made any misstatements or omissions or "kn[e]w or h[ad] anything to do with" the alleged misstatements or omissions, and (2) even if the Court finds that Sullivan had the requisite level of scienter, his knowledge cannot be attributed to Schein. (*Id.* at 22–23.)

[3] Under this doctrine, "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of business, such as events affecting a significant source of revenue." *Okla. Firefighters Pension & Ret. Sys.*, 367 F. Supp. 3d at 37 (citation omitted).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)); *see also Dekalb Cty. Pension Fund*, 817 F.3d at 406 ("For purposes of the securities laws, . . . [scienter is] a mental state embracing intent to deceive, manipulate, or defraud." (internal quotation marks omitted) (quoting *Hochfelder*, 425 U.S. at 193 & n.12)). Because of the heightened pleading standard, a plaintiff asserting a securities fraud claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4; *see also United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017); *Steginsky*, 741 F.3d at 368. "The inference of scienter must be cogent and at least as compelling as any opposing inference one could draft from the facts alleged." *Stratte-McClure*, 776 F.3d at 106 (alteration omitted) (quoting *Tellabs*, 551 U.S. at 324).

The scienter "requirement can be satisfied by 'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* at 106 (quoting *ATSI Commc'ns*, 493 F.3d at 99). When a plaintiff seeks to establish scienter through evidence of recklessness, she may do so "through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *S.E.C. v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)); *see also City of Pontiac*, 752 F.3d at 184 (noting that, in this context, recklessness is defined as "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (quoting *Novak*, 216 F.3d at 308, 312)).

Circumstances comprising evidence of recklessness include allegations that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov. of the Virgin Islands v. Bankford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 199); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76 ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business.").

**A. Bergman and Paladino**

The Court finds that Plaintiff has failed to allege scienter as to Bergman and Paladino because (1) the alleged direct involvement lacks the particularity required to plead scienter, (2) the stock sales were not unusual or suspicious, and (3) the additional allegations of scienter are insufficient, standing alone, to satisfy the pleading standard.

**(1) Direct involvement in the alleged fraud**

Plaintiff argues that it has pled scienter as to Bergman and Paladino through their "direct involvement" in the alleged fraud. (Pl. Opp'n 25.) In support of its allegations as to Bergman, Plaintiff cites a former regional general manager's statement that Bergman was "present when directives not to engage with buying groups . . . were discussed internally," which would have "run directly contrary to Schein's business interests in the absence of an agreement" with Schein's competitors. (*Id.*) In support of its allegations as to Bergman and Paladino, Plaintiff cites a Schein regional executive's statement that "when he pressured manufacturers to force out Schein's lower-priced competitors, he did so with the blessing of senior 'corporate' leaders." (*Id.*)

Defendants argue that Plaintiff's allegations of Bergman's and Paladino's "direct involvement" in the fraud do not evidence scienter because even if Bergman was "in the room" where strategy discussions about buying groups occurred, these conversations show knowledge only of *unilateral* conduct, not collusion. (Defs. Mem. 17.) In addition, Defendants argue that Plaintiff "does not even attempt to plead a single fact showing . . . Paladino's purported knowledge of anticompetitive activity." (*Id.*)

Plaintiff's allegation that Bergman was "in the room" where strategy discussions occurred is too vague to support an inference of scienter, as Plaintiff fails to identify when the alleged meetings occurred, how often they occurred, what was said in the meetings, who said what, and whether Bergman heard what was said. *See Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763, 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018) (finding allegations "insufficient to allege scienter under the PSLRA" where the plaintiff alleged "in a rather conclusory manner," that defendants were "present — with few details about who was present and no details about when they were present or what was actually said"); *id.* (finding argument that attendance of unnamed "senior executives" at sales conference where improper conduct occurred gave rise to an inference of scienter "weak at best" because the plaintiff did not identify exactly *who* attended or any details about *when* they were present); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 374 (E.D.N.Y. 2013) (concluding that, "[e]ven assuming that [the defendant] read th[e] email" revealing the purported fraud, "it does not constitute or significantly contribute to the strong circumstantial evidence necessary" to establish scienter because it did not "identif[y] specific events, individuals, or points in time"); *In re Alstom SA*, 406 F. Supp. 2d 433, 472 (S.D.N.Y. 2005) (finding that allegations of scienter were "too vague" because they failed to allege "the extent of the conversation" allegedly communicating information contradicting the defendant's public statements and who communicated this information).

Plaintiff concedes that the allegation that Bergman was present for discussions about buying groups shows only that he was "*likely* directly informed of" the fraud, (CAC ¶ 126 (emphasis added)); this is insufficient to satisfy the heightened pleading standard. *See Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) (finding that the plaintiff failed to adequately allege scienter based on what the defendant "must have known"); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665, 2014 WL 4832321, at *20 (S.D.N.Y. Sept. 29, 2014) (rejecting scienter allegations based on statement that defendants "should have been aware" of fraud "because of their supervisory positions"); *In re Alstom SA*, 406 F. Supp. 2d at 472 (explaining that negligence is not enough to "support a finding of liability under Section 10(b)").

In addition, even if Bergman was aware of directives not to engage with buying groups, Plaintiff does not specify how knowledge of that fact specifically contradicted any contemporaneous public statement made by Bergman. *See Okla. Firefighters Pension & Ret. Sys.*, 367 F. Supp.3d at 37 (explaining that to show an inference of scienter through knowledge of contradictory information, the plaintiff must allege "(1) *specific* contradictory information that was available to the defendant[] (2) *at the same time* [he or she] made the[e] misleading statements"); *see also Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (same); *Youngers v. Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 499, 516 (S.D.N.Y. 2016) (same).

The Court also finds that a Schein regional executive's statement that "when he pressured manufactures to force out Schein's lower-priced competitors, he did so with the blessing of senior 'corporate' leaders," (Pl. Opp'n 25), fails to establish Bergman's or Paladino's scienter because it does not identify *which* "corporate" employees gave their "blessing" or what the "corporate" employees did to convey their "blessing." *See Sullivan-Mestecky v. Verizon Commc'ns Inc.*, No. 14-CV-1835, 2016 WL 3676434, at *3 n.5 (E.D.N.Y. July 7, 2016) ("When a claim is brought against multiple defendants, Rule 9(b) requires that a plaintiff differentiate his allegations as to each

defendant."); *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 517 (W.D.N.Y. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant." (alterations, citation, and internal quotation marks omitted)). Accordingly, because this allegation does not include any reference to Bergman or Paladino, it cannot create an inference that either acted with the requisite state of mind. Plaintiff has therefore failed to allege Bergman's or Paladino's scienter based on direct involvement.

**(2) Stock sales**

Plaintiff argues that the "sheer magnitude" of Bergman's and Paladino's stock sales during the Class Period show scienter. (Pl. Opp'n 29.) In support, Plaintiff alleges that Bergman sold "more than $37 million in Schein stock" during the Class Period "as compared to less than $26 million in the [Prior Period]," and that Paladino sold "more than $16 million worth of stock during the Class Period."[4] (CAC ¶ 129.)

Defendants argue that Bergman's and Paladino's stock sales do not show scienter because (1) the amount earned on these sales "must be discounted because of the unusually long duration" of the Class Period, (2) the stock sales were consistent with Bergman's and Paladino's trading patterns before the Class Period, (3) these Defendants "sold more shares during the Prior Period than the Class Period," (4) the timing of the sales is not suspicious because they took place "long before" the "truth" was revealed, (5) Bergman and Paladino did not sell their stock at the peak price, (6) they held "significant amounts" of stock after the "truth" was revealed, and (7) Bergman's stock holdings did not "decrease significantly" during the Class Period. (Defs. Mem. 17–22.)

[4] Plaintiff does not state the amount of stock sold by Paladino in the Prior Period. (*See generally* CAC ¶ 129.)

Stock sales that are "unusual or suspicious" can support an inference of scienter. *Gagnon*, 368 F. Supp. 3d at 772; *see also Dempsey v. Vieau*, 130 F. Supp. 3d 809, 816 (S.D.N.Y. 2015) ("In order to establish scienter based on stock sales, plaintiffs must plead facts establishing that the sales were unusual or suspicious in amount or timing."); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-CV-975, 2012 WL 1646888, at *23 (S.D.N.Y. May 12, 2012) ("Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount."). A trade is suspicious if it is "made a short time before a negative public announcement." *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *23. "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74–75; *In re Eaton Corp. Sec. Litig.*, No. 16-CV-5894, 2017 WL 4217146, at *11 (S.D.N.Y. Sept. 20, 2017) (same); *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 318 (D. Conn. 2017) (same); *see also Gagnon*, 368 F. Supp. 3d at 772–73 (In determining whether stock sales are unusual or suspicious, courts consider "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." (quoting *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018)); *Nguyen*, 297 F. Supp. 3d at 493 (considering stock sales "in context," including "whether they comprised a significant proportion of [the defendants'] total holdings . . . whether they were timed to occur prior to the announcement of bad news or after certain misstatements were made," and "whether they occurred in the regular course under a non-discretionary trading plan," and viewing the sales "against pre- and post-[c]lass [p]eriod sales").

Plaintiff's allegations that Bergman sold "more than $37 million in Schein stock" during the Class Period "as compared to less than $26 million in the [Prior Period]," and that Paladino sold "more than $16 million worth of stock during the Class Period, (CAC ¶ 129), are insufficient to show scienter as to either Defendant. Although these allegations show large profits and, with respect to Bergman, a larger profit during the Class Period than the Prior Period, standing alone, they do not suggest fraudulent intent. *See Reilly v. U.S. Physical Therapy, Inc.*, No. 17-CV-2347, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (explaining that "without more, the amount of stock sold cannot be determinative," and that "courts routinely find that raw sales numbers alone are insufficient to establish scienter"); *Singh*, 277 F. Supp. 3d at 319 ("The selling of even considerable shares is not sufficient, standing alone, to infer scienter.").

Further, the portion of holdings sold by Bergman and Paladino does not support an inference of scienter. According to Schein's 2013 Proxy Statement, Bergman held 1,317,910 shares and Paladino held 125,509 shares as of March 15, 2013, eight days after the Class Period began. (Defs. Mem. 21; Schein Apr. 2013 Proxy Statement, annexed to Defs. Mot. as Ex. A, Docket Entry No. 45-3.) By April 2, 2018, approximately two months after the Class Period ended, Bergman held 1,045,526 shares and Paladino held 119,675 shares. (Defs. Mem. 21–22; Schein Apr. 2018 Proxy Statement, annexed to Defs. Mot. as Ex. K, Docket Entry No. 45-13.) This decline of approximately twenty percent and five percent, respectively, in the volume of shares held is insufficient by itself to show scienter. *See Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000) ("[L]arge volume trades may be suspicious but where a corporate insider sells only a small fraction of his or her shares in the corporation, the inference of scienter is weakened." (quoting *In re Oxford*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999)); *In re Travelzoo Inc. Sec. Litig.*, No. 11-CV-5531, 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013) (finding no inference of scienter where defendant reaped "exceedingly large profit" but retained seventy-eight percent of his total stockholdings).

In addition, the timing of Defendants' stock sales does not support an inference of scienter. Bergman's last sale during the Class Period was in November of 2016 and Paladino's was in February of 2017, several months prior to the market learning the "truth." (Defs. Mem. 20.) This delay of approximately nine and six months between Defendants' last sale during the Class Period and the date of the first purported corrective disclosure on August 8, 2017 is too long to support an inference of scienter. *See Reilly*, 2018 WL 3559089, at *14 ("[C]ourts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure."); *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 336 (E.D.N.Y. 2013) (finding that the "inference [of scienter was] further weakened by the fact that the [sales] . . . occurred more than six months before" the corrective disclosure); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. Apr. 16, 2008) (finding that "[t]he lapsing of . . . approximately four months between the[] substantial sales and the revelation of the alleged falsity[] inescapably attenuates any inference of scienter"); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344–45 (W.D.N.Y. 2008) (finding that the fact that "the stock sales at issue took place, for the most part, over two months prior to the release of the negative disclosures" did "not suggest that [the defendants] meant to realize profits immediately prior to the expected and dramatic fall in the stock's price"). Accordingly, Defendants' stock sales do not evidence scienter.

**(3) Other allegations of scienter**

Plaintiff argues that other evidence shows Bergman's and Paladino's wrongful state of mind: (1) Defendants' "repeated[]" and "detailed" statements about competition shows that they must have educated themselves on this topic, and thus would have discovered the purported fraud, (2) the lawsuits and the FTC investigation detailed in the CAC put Bergman and Paladino "on notice" of Schein's anticompetitive activities, and (3) the core operations doctrine supports an inference of scienter. (Pl. Opp'n 28–31.)

Defendants argue that Plaintiff's additional allegations of scienter are insufficient because (1) Bergman's and Paladino's statements about competition do not themselves suggest knowledge that the statements were false, (Defs. Mem. 26–27), (2) Defendants denied the allegations in the lawsuits detailed in the CAC, and therefore the lawsuits do not show that Defendants knew that Schein engaged in the conduct alleged, (*id.* at 26), and (3) courts have expressed skepticism about the viability of the core operations doctrine after the enactment of the PSLRA, and, even if the doctrine remains viable, Plaintiff has not alleged a core operation to invoke it, (*id.* at 24).

**(A) Statements about competition**

The Court is unpersuaded by Plaintiff's theory that Bergman's and Paladino's statements about competition suggests that they would have educated themselves about these topics, and thus would have uncovered the purported fraud, and therefore known that their statements on these topics were false. This argument amounts to an assertion that Bergman and Paladino "must have" known that their statements were false, and therefore lacks the particularity required to plead scienter. *See Sinay*, 554 F. App'x at 42 (allegation that the defendant "must have known" that its statements were false is insufficient to plead scienter); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (allegation that "information was the sort of [data]" that "would have been reviewed by the [defendants] is too speculative to give rise to a strong inference of scienter"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 407–08 (S.D.N.Y. 2006) (finding no scienter where the plaintiff had not pled specific data showing that the defendant's statements were false or recklessly made).

The cases cited by Plaintiff in support of its argument do not support a contrary conclusion. (*See* Pl. Opp'n 28 (citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012)).) In *New Orleans*

*Employees Retirement Systems*, the plaintiff pled scienter by alleging facts showing that witnesses provided information about the fraud to the defendants directly or participated in meetings where the defendants were informed by others about the fraud. 455 F. App'x at 13. The court also found that the fact that the fraud concerned a key area of the corporate defendant's business reinforced the inference of scienter. *Id.* at 14. Similarly, in *Fresno County Employees' Retirement Association*, the court found that the plaintiff had adequately pled a material misstatement in connection with the defendants' revenue recognition, and that the plaintiff had adequately pled scienter through the corporate defendant's admission in its SEC filings that it had internal control issues, the timing and circumstances of employee resignations, and the amount of the improperly recognized revenue. 268 F. Supp. 3d at 551–54. The court also found that the fact that the subject of the fraud was key to the corporate defendant's financial performance reinforced the inference of scienter. *Id.* at 553. In *In re General Electric Company Securities Litigation*, the defendant made detailed statements about the corporate defendant's financial portfolio, including the size of its debt, loans, and loan reserves, and the location of its borrowers. 857 F. Supp. 2d at 395. Based on the details in the defendant's statements, the court found that he must have educated himself about the corporate defendant's financial health — which was the subject of the purported fraud — to speak so knowledgeably about it. *Id.* at 395–96. The court therefore drew an inference of scienter. *Id.*

Unlike in *New Orleans Employees Retirement System* and *Fresno County*, where the defendants' statements on the subject of the fraud reinforced an already established inference of scienter, Plaintiff has not established an inference of scienter. As a result, Defendants' statements about competition — the subject of the purported fraud — cannot be used to reinforce any inference because there was no prior inference. Likewise, unlike the detailed, specific, and technical statements made by the defendant in *General Electric*, Bergman's and Paladino's statements

describing Schein's "unbelievably good service levels" and describing "[t]he health care products distribution industry" as "highly competitive," (CAC ¶ 142), were far less detailed and specific and were not technical and therefore do not evidence scienter.

**(B) Lawsuits, the FTC investigation, and the core operations doctrine**

In addition, while lawsuits, government investigations, and the core operations doctrine can bolster an inference of scienter, they cannot create one where none exists. *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, --- F. Supp. 3d --- , --- , No. 18-CV-2352, 2019 WL 3066487, at *13 (S.D.N.Y. July 12, 2019) (finding that "[d]efendants' knowledge of the litigation does not contribute to an inference of scienter"); *Schaffer*, 2018 WL 481883, at *13 (explaining that "government investigations cannot bolster allegations of scienter that do not exist" (citation omitted)); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 164 (S.D.N.Y. 2015) (explaining that "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter" (citation omitted)); *Das*, 332 F. Supp. 3d at 816 (explaining that, post-PSLRA, "several courts in this Circuit have expressed doubts" as to the viability of the core operations doctrine, and that "at most," the doctrine can provide "supplemental support for alleging scienter but does not independently establish scienter" (citation and internal quotation marks omitted)); *Lipow*, 131 F. Supp. 3d at 163 (explaining that the core operations doctrine "at most constitutes supplemental support for alleging scienter" (citation and internal quotation marks omitted)). Accordingly, Plaintiff's additional allegations do not establish scienter.

Because Plaintiff has failed to plead scienter as to Bergman and Paladino, the Court grants Defendants' motion to dismiss the section 10(b) claims against these Defendants.

### B. Schein

Plaintiff argues that it has adequately pled scienter as to Schein, through Sullivan, because Sullivan knew about and directly participated in the fraudulent scheme. (Pl. Opp'n 26.) In support, Plaintiff argues that Sullivan's knowledge can be imputed to Schein because, as President of Schein's North American Dental Group, Sullivan oversaw Schein's United States dental operations. (*Id.* at 26–27.)

Defendants argue that Plaintiff has not pled scienter as to Schein because Plaintiff does not "assert that . . . Sullivan made any misstatements or omissions, or knew of or had anything to do with those allegedly made by [Bergman and Paladino] or anyone else." (Defs. Mem. 22.) In addition, Defendants argue that even if the Court finds that Sullivan had the requisite level of scienter, his knowledge cannot be imputed to Schein because Sullivan was not a management-level employee or involved in drafting Schein's internal controls or public disclosures. (*Id.* at 22–23.)

Where the defendant is a corporation, a plaintiff can "plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3. Ltd.*, 797 F.3d at 177 (internal quotation marks omitted) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008)); *see also Jackson v. Halyard Health, Inc.*, No. 16-CV-5093, 2018 WL 1621539, at *7 (S.D.N.Y. Mar. 30, 2018) (same); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 667 (same); *Schwab v. E*Trade Fin. Corp.*, 258 F. Supp. 3d 418, 432 (S.D.N.Y. 2017) (same). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d at

90–91 (citation omitted); *Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) (explaining that "courts in this [d]istrict have held that 'management level' employees can serve as proxies for the corporation in suits filed under the Exchange Act"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 667 (imputing knowledge of "senior officers" to corporate defendant); *In re Vale S.A. Sec. Litig.*, No. 15-CV-9539, 2017 WL 1102666, at *34 (S.D.N.Y. Mar. 23, 2017) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority." (citation omitted)).

Plaintiff has adequately alleged scienter as to Sullivan based on his involvement in the alleged fraud. Plaintiff alleges that in his role as President of Schein's North American Dental Group, Sullivan regularly communicated with his counterparts at Benco and Patterson to discuss the three companies' purported conspiracy. For example, in March of 2013, Sullivan and a Benco executive discussed whether ADC was a buying group and whether Schein and Benco would bid for its business. (CAC ¶ 65.) After Sullivan informed the Benco employee that Schein would not do business with ADC, the Benco employee sent Sullivan a text message stating that ADC was not a buying group comprised of independent dentists, but instead a centrally-owned corporate dental practice, and that Benco would therefore bid for its business. (*Id.*) Both Schein and Benco subsequently bid for ADC's business. (*Id.* ¶¶ 65–66.) In addition, in July of 2012, after a buying group contacted Benco to "establish a dental supply agreement," a Benco managing director indicated that he would send the buying group's inquiry to Sullivan "with a note," (*id.* ¶ 61), and in September of 2013, after Benco learned that a smaller distributor was doing business with buying groups, a Benco employee advised his colleague to contact Sullivan and instruct Sullivan to "hold [Schein's] position[] as we are," (*id.* ¶ 67). These allegations show that Sullivan directly participated in the alleged fraudulent scheme by communicating with Schein's competitors about buying groups and agreeing not to do business with them and are sufficient to demonstrate scienter.

*See Ark. Teacher Ret. Sys.*, 18 F. Supp. 3d at 486 (finding corporate scienter where employee was "personally involved in directing [the alleged fraud]"); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 316–17 (S.D.N.Y. 2011) ("The fact that, on multiple occasions, employees . . . are alleged to have performed their professional duties in a consciously wrongful or reckless manner establishes a strong inference of corporate scienter." (internal quotation marks omitted)); *Plymouth Cty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 281 (E.D.N.Y. 2008) (finding scienter where the defendants engaged in backdating, which formed part of the allegedly fraudulent scheme); *U.S. S.E.C. v. Dunn*, 587 F. Supp. 2d 486, 508 (S.D.N.Y. 2008) (finding scienter where the defendant "personally conveyed the substance of the [purportedly illicit] plan").[5]

The Court also finds that Sullivan's knowledge can be imputed to Schein. Sullivan is the President of Schein's North American Dental Group. (CAC ¶ 19.) In this role, Sullivan "oversee[s]" Schein's United States dental operations, which account for approximately fifty percent of Schein's total net sales. (*Id.* ¶¶ 17, 19.) Sullivan also manages employees, including Schein's Vice President of Sales, David Steck, (*id.* ¶ 77), and frequently communicated with a

---

[5] Defendants argue that Plaintiff has not shown Sullivan's scienter because he did not make any misstatements or omissions or know about those misstatements or omissions made by others. (Defs. Mem. 22.) However, in the corporate scienter context, the individual whose knowledge is imputed to the company need not be the individual who made the alleged misstatements or omissions. *See Gagnon*, 368 F. Supp. 3d at 787 (explaining that courts "do not require the same individual who has made an alleged misstatement on behalf of the corporation to be the same individual whose intent may be imputed to the corporation"); *Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 409–10 (S.D.N.Y. 2018) (same); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d at 90–91 (same); *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038, 2016 WL 1629325, at *15 n.38 (S.D.N.Y. Apr. 21, 2016) ("[T]he person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue."); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d at 481 (explaining that "there is no requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter" and explaining that a different framework would "foreclose[] liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement" (citation and internal quotation marks omitted)).

Benco managing director about buying groups and whether Schein and Benco would do business with them, (*id.* ¶¶ 60–61, 65, 76). These responsibilities and actions demonstrate that Sullivan was sufficiently senior to be considered a "management level" employee, and to impute his knowledge to Schein. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 667 (imputing knowledge of "senior officers"); *Patel v. L-3 Commc's Holdings Inc.*, No. 14-CV-6038, 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016) (finding chief financial officer of one of the defendant's four business segments, which comprised thirty-six percent of defendant's "total business," was "sufficiently senior" to impute his knowledge to the corporate defendant); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) (imputing knowledge of vice president and assistant vice president).

### 3. Loss causation

Plaintiff argues that it has adequately pled loss causation because "the truth about Schein's anticompetitive scheme was revealed to the market through three partial corrective disclosures" on August 8, 2017, November 6, 2017, and February 13, 2018, and the market reacted negatively to these disclosures. (Pl. Opp'n 32.) Plaintiff concedes that it does not allege that Schein ceased collusive activities at any point, but argues that it "pleads that Schein was being investigated by the FTC, settled the SourceOne and Texas Attorney General [a]ctions, and stipulated to discontinue its collusion immediately prior to the August 7 and November 6 disclosures," which "easily meets Rule 8's notice pleading standard." (*Id.* at 32–33.)

Defendants argue that Plaintiff has failed to plead loss causation because although Plaintiff claims that after August 8, 2017, Schein's stock price began to fall because the market realized that it had abandoned its collusive activities, (CAC ¶ 109), Plaintiff fails to plead any facts alleging how and when this shift began or occurred. (Defs. Mem. 27–28.) In addition, Defendants argue that if the August 8, 2017 disclosure revealed Schein's "abandonment" of its anticompetitive conduct, the

November 6, 2017 and February 13, 2018 disclosures do not show loss causation because they did not reveal anything new to the market. (*Id.* at 28.)

"Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 260 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)); *see also Charney v. Wilkov*, 734 F. App'x 7, 10 (2d Cir. 2018) (same). "To plead loss causation, [a plaintiff] must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014) (quoting *Suez Equity Inv'rs, L.P.*, 250 F.3d at 95). To do so, a plaintiff can allege either (1) "the existence of a cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud" or (2) "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Id.* (internal quotation marks omitted) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)). To plead loss causation through a corrective disclosure, a plaintiff "must plausibly allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected, and that the market reacted negatively to the corrective disclosure." *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 233–34 (alteration and internal quotation marks omitted) (quoting *In re Omnicom*, 597 F.3d at 511; *Lentell*, 396 F.3d at 174); *see also id.* at 233 ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for the decline in stock price.").

The parties dispute the pleading standard applicable to loss causation. Defendants contend that a party alleging loss causation must satisfy Rule 9(b)'s pleading requirements, while Plaintiff contends that compliance with Rule 8(a)'s pleading requirements is sufficient. (*Compare* Defs. Mem. 27 ("Loss causation must be pled with the particularity required by Rule 9(b)." (citing

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 432 n.9 (S.D.N.Y. 2010))) *with* Pl. Opp'n 31 ("Loss causation is subject only to Rule 8(a)'s notice pleading requirements." (citing *Dura Pharm.*, 544 U.S. at 346–47; *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008))).)

Since the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), holding that a securities fraud plaintiff must prove that a defendant's fraud caused economic loss, several courts of appeals have disagreed as to whether loss causation is subject to the pleading requirements of Rule 9(b) or Rule 8(a). *See, e.g.*, *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) ("The Fourth Circuit has held that heightened pleading requirements of Rule 9(b) apply to the element of loss causation. . . . The Fifth Circuit, in contrast, has held that only the requirements of Rule 8(a)(2) apply."); *see also Oregon Pub. Emp. Ret. Fund*, 774 F.3d at 605 (holding that "Rule 9(b) applies to all elements of a securities fraud action, including loss causation"). The Second Circuit has "yet to weigh in on this debate." *Speakes*, 2018 WL 4572987, at *10; *see also Loreley Fin. (Jersey) No. 3. Ltd.*, 797 F.3d at 182–83 (explaining that the "question[] . . . as to the level of *particularity*" necessary to plead loss causation "is an open one in our Circuit"); *Nguyen v. New Link Genetics Corp.*, No. 16-CV-3545, 2019 WL 591556, at *2 (S.D.N.Y. Feb. 13, 2019) (noting that the "Second Circuit has not resolved which pleading standard applies to the issue of loss causation" (citation omitted)). However, the majority of district courts in this Circuit have applied Rule 8's pleading requirements instead of the heightened pleading standard of Rule 9(b). *See Nguyen*, 297 F. Supp. 3d at 500 ("Of course, allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA." (citation and internal quotation marks omitted)); *In re Frontier Comm'ns, Corp. Stockholders Litig.*, No. 17-CV-1617, 2019 WL 1099075, at *12 (D. Conn. Mar. 8, 2019) ("On the loss causation element of securities fraud claims, . . . [p]laintiffs must meet only Rule 8 pleading requirements."); *Nguyen*, 2019 WL

591556, at *2 ("[T]he vast majority of courts in [the Southern District of New York] have required that loss causation only meet the notice requirement of Rule 8." (citation omitted)); *Tobia v. United Grp. of Cos., Inc.*, No. 15-CV-1208, 2016 WL 5417824, at *14 (N.D.N.Y. Sept. 22, 2016) ("District courts in this Circuit have generally not applied the heightened pleading standards to loss causation allegations."); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015) ("[C]ourts in [the Southern District of New York] have historically evaluated loss causation under the notice pleading standard of Rule 8."); *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 233 (E.D.N.Y. 2014) ("A short, plain statement that provides defendants with notice of the loss and some notion of the causal connection to the alleged misconduct is sufficient."); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 93 (2d Cir. 2018) ("Although the burden on a securities plaintiff to plead loss causation is not a heavy one, the complaint must still give some indication of a plausible causal link between the loss and the alleged fraud." (alteration and internal quotation marks omitted) (quoting *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 187)). Because under either standard, Plaintiff adequately pleads loss causation as to the November 6, 2017 and February 13, 2018 disclosures but not as to the August 8, 2017 disclosure, the Court declines to decide whether the Rule 8 or Rule 9 pleading standard applies to loss causation.

**A. The August 8, 2017 disclosure**

Plaintiff has failed to plead loss causation as to the August 8, 2017 disclosure because (1) it was not a corrective disclosure and (2) Plaintiff fails to allege facts showing that the stock drop on that day was caused by the materialization of any risk concealed by Defendants' fraudulent statements.

The August 8, 2017 disclosure is not a corrective disclosure because, although it revealed disappointing financial results, it did not disclose that Defendants were engaging in anticompetitive conduct or any other facts relevant to the purported fraud. Instead, Defendants attributed the

disappointing financial results to the "extra holiday in the quarter and the loss of a customer," and "some movement towards lower-priced products." (CAC ¶ 107.) Because Plaintiff has failed to show that "public information regarding the company's financial condition was corrected," Plaintiff has not alleged loss causation as to the August 8, 2017 disclosure because it was not a corrective disclosure. *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 233–34 (alteration and internal quotation marks omitted); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 389 (finding that earnings announcements did not show loss causation because they did not contain "any disclosure of the alleged fraud" and explaining that "[s]peculation will not suffice to link the explanations actually given in the disclosures" and the alleged fraudulent scheme); *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (finding that where declining margins were attributed to sources other than the purported fraud, they could not qualify as corrective disclosures and could not establish loss causation)*; Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 617 (S.D.N.Y. 2008) (finding no loss causation where the defendant attributed poor financial performance to causes other than the alleged fraud).

Moreover, Plaintiff does not connect the disappointing financial results revealed in the August 8, 2017 disclosure to the materialization of any risk concealed by Defendants' allegedly fraudulent statements and has therefore failed to allege loss causation through materialization of an undisclosed risk. *See Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 233–34 (explaining that a plaintiff can show loss causation by alleging "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement"). Plaintiff's theory is that several lawsuits caused Defendants to change their anticompetitive behavior, which drove down profits, and subsequently, Schein's stock price. (*See* CAC ¶ 109; Pl. Opp'n 32–33.) However, Plaintiff does not allege or argue that Defendants actually abandoned their anticompetitive conduct prior to the August 8, 2017 disclosure. Absent this allegation, Plaintiff has failed to allege any facts

showing that the risk concealed by Defendants' statements — *i.e.*, the risk that Defendants would stop their anticompetitive and collusive behavior — materialized, and thus has failed to allege loss causation. *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015) (finding no loss causation because there were "no facts alleged . . . that tie the . . . [p]laintiff's theory of fraud to the share price drop on which it relies to allege loss); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 209 (D. Conn. 2014) (finding no loss causation where there were "no factual allegations . . . to support the inference that the [financial] results reported . . . were caused by the materialization of an alleged concealed risk"). Plaintiff has therefore failed to plead loss causation as to the August 8, 2017 disclosure.

**B. The November 6, 2017 disclosure**

For the same reasons stated above with regard to the August 8, 2017 disclosure, Plaintiff has failed to plead loss causation as to the November 6, 2017 press release based on the disclosure of disappointing financial results, but has adequately pled loss causation as to the November 6, 2017 press release based on the disclosure of certain litigation.

Plaintiff alleges that the November 6, 2017 press release revealed to the market two new lawsuits. The first lawsuit was filed by a distributor and alleged that Schein, Benco, and Patterson "conspired to fix prices and refused to compete with each other for sales of dental equipment," and "enlist[ed] their common suppliers . . . to join a price-fixing conspiracy and boycott by reducing the distribution territory of, and eventually terminating, their price-cutting competition distributor." (CAC ¶¶ 111, 113; *see also* Nov. 6, 2017 Disclosure.) The second lawsuit was an antitrust case filed by a supplier, alleging that Schein, Benco, and Patterson "conspired to suppress competition . . . for marketing, distribution and sale of dental supplies and equipment" and "unlawfully agreed with one another to boycott dentists, manufactures, and state dental associations that deal with, or considered dealing with, plaintiff." (CAC ¶¶ 111, 113; *see also* Nov. 6, 2017 Disclosure.)

Although several lawsuits alleging that Schein, Benco, and Patterson had conspired to prevent the formation of buying groups and to inflate margins had been filed prior to the November 6, 2017 disclosure, (*see* Defs. Mem. 30–31), because Plaintiff is not required to show that all of the alleged losses were caused by Defendants' misstatements or omissions and because the November 6, 2017 disclosure revealed additional potential liability, Plaintiff has adequately alleged loss causation as to the November 6, 2017 disclosure. *See DoubleLine Cap.*, 323 F. Supp. 3d at 456 (explaining that "[p]laintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for the decline in stock price" (citation omitted)); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *18 (concluding that the plaintiffs adequately alleged loss causation where disclosure of suspected price-fixing scheme caused stock drop on two different dates and concluding that the defendants' arguments went to "the robustness of [the p]laintiff's selection of corrective disclosures" and were better resolved at a "later stage of litigation, after the aid of discovery"); *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *27 (finding that disclosure announced "the potential degree of [the defendant's] liability" and "changed the available public information" and was therefore a corrective disclosure); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d at 734 (explaining that "at the pleading stage a [p]laintiff need not demonstrate that defendants' misstatements or omissions caused *all* of plaintiffs' losses. Rather, plaintiffs need only allege facts that would allow a factfinder to ascribe *some rough proportion* of the whole loss to [the defendant's alleged] misstatements." (internal citation and quotation marks omitted)); *Richman*, 868 F. Supp. 2d at 282–83 (finding that series of lawsuits and investigations were sufficient at motion to dismiss stage to show that misstatements caused, or at least contributed to, the plaintiffs' losses); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 290 (finding second stock drop sufficiently showed loss causation because the first disclosure did "not necessarily constitute complete disclosure of the relevant truth," and "[i]t is plausible at [the motion to dismiss] stage . . . to infer that the [second

disclosure] conveyed information to the investing public concerning the extent and likelihood of [the alleged scheme] which was not present in the [first disclosure]").

**C. The February 13, 2018 disclosure**

Plaintiff has also pled loss causation as to the February 13, 2018 disclosure revealing the FTC's lawsuit against Schein, Benco, and Patterson. (*See* CAC ¶¶ 115–19.)

The FTC lawsuit revealed "detail[ed] communications" between executives of Schein and Benco evidencing an anticompetitive agreement, attempts to monitor and ensure compliance with the agreement, and details concerning Sullivan's role in the alleged agreement. (*Id.* ¶¶ 115–16.) These allegations sufficiently show that new information was revealed to the market, *e.g.*, information showing Sullivan's communications with his counterparts at Benco and Patterson. The February 13, 2018 disclosure therefore shows loss causation through corrective disclosure. *See Speakes*, 2018 WL 4572987, at *10 (finding that disclosures revealed the extent of a specific defendant's involvement in the alleged fraud and thus revealed something new to the market); *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *27 (finding disclosure that revealed "the potential degree of [the defendant's] liability" was a corrective disclosure); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 290 ("It is plausible at [the motion to dismiss] stage . . . to infer that the [second disclosure] conveyed information to the investing public concerning the extent and likelihood of [the alleged scheme] which was not present in the [first disclosure]").

**4. Reliance**

Defendants invoke the "truth on the market" defense — under which a misrepresentation is not material if the information is already known to the market — to argue that because no new information entered the market after August 8, 2017, Plaintiff has not pled reliance as to any transaction occurring after that date. (Defs. Mem. 33–34.)

Plaintiff argues that the "truth on the market" defense is inappropriate for resolution at this stage and, in any event, is not applicable to this case. (Pl. Opp'n 34.)

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Stoneridge Inv. Partners, LLC*, 552 U.S. at 159). While "[t]he traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation," *id.* at 810, "a plaintiff may also seek to take advantage of two presumptions of reliance established by the Supreme Court," *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). These presumptions were established in (1) *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and (2) *Basic v. Levinson*, 485 U.S. 224 (1988). The presumption established in *Affiliated Ute Citizens of Utah* allows a presumption of reliance "if there is an omission of material fact by one with a duty to disclose." *Schwab*, 752 F. App'x at 58 (quoting *Stoneridge Inv. Partners*, 552 U.S. at 159); *see also Levitt*, 710 F.3d at 465 (same); *Stoneridge Inv. Partners*, 552 U.S. at 159 ("[I]f there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."). The presumption established in *Basic*, referred to as the "fraud-on-the-market" theory, allows a presumption of reliance where "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Waggoner*, 875 F.3d at 93 n.25 (quoting *Basic*, 485 U.S. at 243–44); *see also Halliburton*, 573 U.S. at 268 (same); *Stoneridge Inv. Partners*, 552 U.S. at 159 ("[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement."). The "truth-on-

the-market" defense provides that a "misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino*, 228 F.3d at 167. However, the "corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.* (citation and internal quotation marks omitted).

At this stage, the Court cannot conclude that Defendants are entitled to the truth-on-the-market defense. As explained above, as of August 8, 2017, the market was not aware of all of the relevant information. For example, the market was unaware of the FTC complaint and the allegations detailing conversations between Schein executives and their counterparts at Benco and Patterson. (CAC ¶¶ 115–16.) In addition, because Defendants denied the allegations in each of the lawsuits filed before August 8, 2017, the alleged "truth" was not conveyed to the public in a manner to sufficiently undermine the allegedly misleading statements. *See Ganino*, 228 F.3d at 167; *see also In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act. (ERISA) Litig.*, 757 F. Supp. 2d at 302 ("I am unable to say at the Rule 12(b)(6) stage, without further context, whether the cited articles speak to the [purported fraud] with a degree of intensity and credibility that effectively counterbalances language in the [defendant's disclosures]." (citation and internal quotation marks omitted)); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 288 (S.D.N.Y. 2006) (finding that publicity did not establish truth-on-the-market when counteracted by "authoritative statements from defendants"). In light of this, and the fact that the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint," *Ganino*, 228 F.3d at 167, the Court finds that the "truth-on-the-market" defense is unavailable to Defendants at this stage. Because this defense is Defendants' only challenge to reliance, the Court finds that Plaintiff has adequately pled reliance.

For the reasons stated above, the Court grants Defendants' motion to dismiss Plaintiff's section 10(b) claims against Bergman and Paladino. The Court also grants Defendants' motion to dismiss Plaintiff's section 10(b) claim against Schein to the extent that it relies on Schein's financial results and margins to allege a material misstatement or omission and to the extent that it relies on the August 8, 2017 disclosure to allege loss causation. The Court otherwise denies Defendants' motion to dismiss Plaintiff's section 10(b) claim against Schein.

**ii. Section 20(a) claim**

In addition to its section 10(b) claims, Plaintiff alleges claims pursuant to section 20(a) against Bergman, Paladino, and Sullivan. (CAC ¶ 189.) Plaintiff argues that it has adequately pled a primary violation pursuant to section 10(b). (Pl. Opp'n 35.) In addition, Plaintiff argues that Bergman and Paladino do not contest that they were "control persons" and that Plaintiff's scienter allegations against them show their culpable participation in the purported fraud. (*Id.* at 35 & n.24.) Plaintiff also argues that Sullivan had control over Schein because he was "the senior-most executive responsible for the operations of the division where all of the collusion at issue occurred." (*Id.* at 35.)

Defendants argue that Plaintiff has failed to plead control-person liability because it has failed to establish a primary violation by Schein. (Defs. Mem. 34.) In addition, Defendants argue that even if the Court finds a primary violation, Plaintiff has not established that Sullivan had control over Schein or that any Defendant was a "culpable participant" in the purported fraud for the same reasons that it has failed to show each Defendant's scienter under section 10(b). (*Id.* at 34–36.) Defendants appear to concede that Bergman and Paladino are control persons. (*See id.*)

"To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." *Carpenters Pension Tr. Fund of St. Louis*, 750 F.3d at 236 (internal quotation marks omitted) (quoting *ATSI Commc'ns*, 493 F.3d at 107). SEC regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.505; *see also In re Bernard L. Madoff Inv. Sec. LLC*, 739 F. App'x at 685 (quoting same).

Because, as explained above, Plaintiff has adequately pled a violation of section 10(b) against Schein, it has adequately pled the first element of a section 20(a) claim — a primary violation of section 10(b).

Defendants concede that Plaintiff has established the second element of a section 20(a) claim — control of the primary violator — as to Bergman and Paladino. (*See generally* Defs. Mem. 34–36.) In addition, the Court finds that Plaintiff has adequately pled control as to Sullivan. Plaintiff alleges that Sullivan is President of Schein's North American Dental Group and "oversee[s]" Schein's United States dental operations. (CAC ¶¶ 17, 19.) Sullivan also manages employees, including Schein's Vice President of Sales, David Steck, who allegedly communicated with a Patterson employee about boycotting the TDA trade show. (*Id.* ¶ 77.) Sullivan also frequently communicated with a Benco managing director about buying groups and whether Schein and Benco would do business with them. (*Id.* ¶¶ 60–61, 65, 76.) These responsibilities and actions demonstrate that Sullivan sufficiently controlled Schein's dental distribution business, especially because determining whether an individual is a control-person is a fact-intensive inquiry often inappropriate for resolution on a motion to dismiss. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15-CV-6369, 2018 WL 1449206, at *7 (S.D.N.Y. Mar. 23, 2018) ("Determining whether an individual defendant is a 'controlling person' is 'a fact-intensive inquiry that generally should not be resolved on a motion to dismiss.'" (quoting *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d at 669));

*Audet v. Frasner*, No. 16-CV-940, 2017 WL 4542386, at *6 (D. Conn. Oct. 11, 2017) (same); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d at 542 (same); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (same); *see also In re Barrick Gold Sec. Litig.*, No. 13-CV-3851, 2015 WL 1514597, at *16 (S.D.N.Y. Apr. 1, 2015) (finding control where the defendants occupied "high-level positions" and were involved in the alleged fraudulent scheme); *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 214 (S.D.N.Y. 2011) (explaining that allegation that a defendant was "deeply involved in [the corporate defendant's] day-to-day operations" sufficiently pled control). Accordingly, the Court finds that Plaintiff has adequately alleged control of the primary violator by Sullivan.

Plaintiff has failed to adequately allege the third element — culpable participation — as to Bergman and Paladino, but has adequately pled this element as to Sullivan. As discussed above, Plaintiff has failed to allege scienter as to Bergman and Paladino, and has therefore failed to allege that they are culpable participants. *See Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B. Commc'ns Ltd.*, No. 17-CV-4937, 2019 WL 1407453, at *11 (S.D.N.Y. Mar. 28, 2019) ("[J]ust as the [c]ourt has concluded that [p]laintiffs have failed to allege scienter for purposes of Section 10(b) and Rule 10b–5, the [c]ourt likewise concludes that [p]laintiffs have not sufficiently alleged culpability for purposes of Section 20(a)."); *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918, 2014 WL 3928606, at *11 (S.D.N.Y. Aug. 12, 2014) ("Because the [c]omplaint fails to plead even recklessness with the particularity required by the PSLRA as to [the d]efendants . . . in the § 10(b) context, it also necessarily fails to do the same in the § 20(a) context."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 308 (finding that because plaintiffs had failed to demonstrate scienter as to one set of defendants under section 10(b), they had necessarily failed to show culpable participation by those defendants under section 20(a)); *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d at 494–95 (dismissing section 20(a) claims against defendants where plaintiffs had

insufficiently plead scienter under section 10(b)); *In re Sotheby's Holdings, Inc.*, No. 00-CV-1041, 2000 WL 1234601, at *8 (S.D.N.Y. 2000) (holding that where the complaint failed to adequately allege section 10(b) scienter, "[f]or this same reason, the Section 20(a) claim against [defendants] must be dismissed"). However, as explained above, Sullivan regularly communicated with his counterparts at Benco and Patterson to discuss the three companies' purported conspiracy, which demonstrates his scienter and his culpable participation. *See In re Glob. Brokerage, Inc.*, No. 17-CV-916, 2019 WL 1428395, at *18 (S.D.N.Y. Mar. 28, 2019) (finding culpable participation under section 20(a) based on finding of scienter under section 10(b)); *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018) (explaining that culpable participation "is established by alleging scienter on the part of a controlling person to the extent that it would satisfy § 10(b) and Rule 10b–5").

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's section 20(a) claims against Bergman and Paladino and denies the motion as to Sullivan.

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The Court dismisses Plaintiff's section 10(b) and 20(a) claims against Bergman and Paladino and Plaintiff's section 10(b) claim against Schein to the extent that it relies on Schein's financial results and margins to allege a material misstatement or omission and the August 8, 2017 disclosure to allege loss causation. The Court otherwise denies Defendants' motion to dismiss.

Dated: September 27, 2019
Brooklyn, New York

SO ORDERED:

s/ MKB
MARGO K. BRODIE
United States District Judge