# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **IN RE HENRY SCHEIN, INC. SECURITIES LITIGATION** | **Master File No. 1:18-cv-01428-MKB-VMS**<br><br>**CLASS ACTION** |

**DECLARATION OF JAMES A. HARROD IN SUPPORT OF
(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S MOTION
FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................... 1

II.    PROSECUTION OF THE ACTION ........................................................................... 6

       A.    Background ............................................................................................................. 6

       B.    Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive
             Investigation and the Filing of the Complaint, and the Substantial Denial of
             Defendants' Motion to Dismiss ............................................................................ 7

             1.    Appointment of Miami GESE as Lead Plaintiff ............................................ 7

             2.    Lead Plaintiff's Preparation and Filing of the Complaint ............................. 8

             3.    Defendants File A Motion To Dismiss the Complaint, Which the Court
                   Partially Denies ........................................................................................... 10

             4.    Defendants' Reconsideration Motion and the FTC Trial Decision ............. 15

III.   MEDIATION ................................................................................................................ 17

IV.    SETTLEMENT AND DISCOVERY ......................................................................... 19

V.     RISKS OF CONTINUED LITIGATION ................................................................. 22

       A.    The Risks of Prosecuting Securities Actions In General ...................................... 22

       B.    Defendants' Reconsideration Motion .................................................................. 25

       C.    The Substantial Risks of Proving Defendants' Liability
             and Damages in This Case .................................................................................. 26

             1.    Risks of Proving Falsity, Materiality, and Reliance ..................................... 27

             2.    Risks of Proving Scienter ............................................................................ 31

             3.    Risks of Proving Loss Causation and Damages ........................................... 34

             4.    Risks After Trial .......................................................................................... 38

VI.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF
       THE POTENTIAL RECOVERY IN THE ACTION ................................................ 40

VII.   ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE CLASS ..................... 41

VIII.  PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ............ 43

IX.     THE FEE AND LITIGATION EXPENSE APPLICATION ........................................... 47

        A.    The Fee Application ................................................................................... 48

              1.    Lead Plaintiff Has Authorized and Supports the Fee Application ............... 48

              2.    The Time and Labor Devoted to the Action by Plaintiff's Counsel ............ 49

              3.    The Experience and Standing of Lead Counsel ............................................ 51

              4.    The Standing and Caliber of Defendants' Counsel ...................................... 51

              5.    The Risks of the Litigation and the Need to Ensure the Availability of
                    Competent Counsel in High-Risk Contingent Securities Cases .......................... 51

              6.    The Reaction of the Class to the Fee Application ........................................ 53

        B.    The Litigation Expense Application ...................................................... 54

X.      CONCLUSION .................................................................................................... 57

JAMES A. HARROD declares as follows:

## I.    INTRODUCTION

1.      I, James A. Harrod, am a member of the bars of the State of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the U.S. Courts of Appeals for the Second, Third, Sixth, and Seventh Circuits.  I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"), the Court-appointed Lead Counsel in the above-captioned action (the "Action").[1]  BLB&G represents the Court-appointed Lead Plaintiff, Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami GESE" or "Lead Plaintiff").  I have personal knowledge of the matters stated in this declaration based on my active supervision of and participation in the prosecution and settlement of the Action.

2.      I respectfully submit this declaration in support of Lead Plaintiff's motion, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action with Defendants Henry Schein, Inc. ("Schein") and Timothy J. Sullivan for $35 million in cash (the "Settlement").  The Court preliminarily approved the Settlement by its Order dated May 5, 2020 (the "Preliminary Approval Order").  ECF No. 74.

3.      I also respectfully submit this declaration in support of: (i) Lead Plaintiff's motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Class Members (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion, on behalf of all Plaintiff's Counsel,[2] for an award of attorneys' fees in the amount of 25% of the

---

[1] Unless otherwise defined in this declaration, all capitalized terms have the meanings defined in the Stipulation of Settlement dated April 30, 2020 (the "Settlement Agreement"), and previously filed with the Court.  *See* ECF No. 70-1.

[2] Plaintiff's Counsel are: Lead Counsel BLB&G and Klausner, Kaufman, Jensen & Levinson,

Settlement Fund; payment of litigation expenses incurred by Plaintiff's Counsel's in the amount of $102,840.56; and payment of $6,000.00 to Miami GESE in reimbursement of its costs and expenses directly related to its representation of the Class (the "Fee and Expense Application").[3]

4.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $35 million for the benefit of the Class.   This beneficial Settlement was achieved as a direct result of Lead Plaintiff's and Lead Counsel's efforts to diligently investigate, vigorously prosecute, and aggressively negotiate a settlement of this Action against highly skilled opposing counsel.   As discussed in more detail below, Lead Counsel's efforts in the Action, included, among other things:

- Conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, including consulting with experts and reviewing the voluminous public record;

- Drafting and filing the detailed, 81-page Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), filed with the Court on September 14, 2018 (ECF No. 28), which incorporated material from conference call transcripts, press releases, news articles, and other public statements issued by or concerning Defendants; financial analyst research reports concerning the Company and reports and other documents filed publicly by Schein with the U.S. Securities and Exchange Commission ("SEC"); court documents and materials from proceedings before the Federal Trade Commission ("FTC"); interviews with former Schein employees; and other publicly available information.

---

additional counsel for Lead Plaintiff Miami GESE.

[3] In conjunction with this declaration, Lead Plaintiff and Lead Counsel are also submitting the Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

- Successfully opposing (in significant part) Defendants' motion to dismiss the Complaint (ECF Nos. 45, 45-1, 48, 50, 53) consisting of over 2,300 pages of briefing and supporting materials, by researching and drafting a substantial opposition brief responding to Defendants' arguments, which Lead Plaintiff served on Defendants on January 23, 2019, and filed with the Court on February 22, 2019, as well as filing and responding to letters offering supplementary authority on the motion (ECF Nos. 46, 51, 52);

- Engaging in full briefing on Defendants' motion for partial reconsideration of the Court's order denying in part Defendants' motion to dismiss (ECF Nos. 57, 66) by researching and drafting a substantial opposition brief responding to Defendants' arguments, which Lead Plaintiff served on Defendants on October 25, 2019 and filed with the Court on November 1, 2019 (ECF No. 65);

- Consulting with experts regarding the significant loss causation and damages issues presented by this Action;

- Engaging in intensive, arm's-length negotiations with Defendants, including the submission of a detailed mediation statement concerning liability and damages, and participating in a two-day mediation session before the Hon. Daniel J. Weinstein (USDJ, Ret.), which ultimately culminated in the mediator's recommendation to settle the Action for $35 million in cash, which the parties accepted;

- Engaging in significant due diligence discovery, including reviewing and analyzing approximately 684,784 pages of documents produced by Defendants and interviewing Defendant Timothy J. Sullivan and Schein Executive Vice President, Chief Strategic Officer, and Director Mark Mlotek; and

- Drafting and negotiating the Settlement Agreement and related settlement documentation.

5.    The proposed Settlement represents an outstanding result for the Class, considering the significant risks in the Action and the amount of the potential recovery. The Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Class could recover nothing or substantially less than the Settlement

Amount after years of additional litigation and delay.  As discussed in more detail below, if this case continued to be litigated, there is no guarantee that Lead Plaintiff would have been able to establish Defendants' liability with respect to the fraud alleged in the Action, namely Schein's alleged misstatements and omissions concerning the competitive environment Schein faced and its financial results that were allegedly inflated by anticompetitive activity in the market for dental supplies.

6.     The Settlement was only reached after two full-day mediation sessions before Judge Daniel H. Weinstein, an experienced mediator of class actions and other complex litigation, and was reached pursuant to a mediator's recommendation.  Judge Weinstein has submitted a Declaration stating that he believes "that the settlement represents the highest settlement amount that the Class could have achieved at the time the settlement was reached," and that "based on [his] knowledge of this matter, all of the materials provided to [him], the extensive efforts of skillful advocacy and arm's-length bargaining of counsel, the litigation risks, and the benefits reached in the proposed settlement, . . . the settlement is fair, reasonable, and adequate," and he "respectfully recommend[s] that it be approved by this Court."  Declaration of the Hon. Daniel H. Weinstein (Ret.), attached as Exhibit 1, at ¶¶ 11-12.

7.     The close attention paid and oversight provided by the Lead Plaintiff, Miami GESE, throughout this case is another factor in favor of the reasonableness of the Settlement.  In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at *34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733.  Here,

Lead Plaintiff was actively involved in overseeing the litigation and settlement negotiations and has endorsed the Settlement as fair and reasonable. *See* Declaration of Ron Silver, General Counsel for Miami GESE, attached as Exhibit 2.

8.     Lead Plaintiff and Lead Counsel believe that the Settlement is in the best interests of the Class.  Due to their substantial efforts in the litigation to date, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a highly favorable outcome for the Class.

9.     In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation as fair and reasonable.  The Plan, which was developed in consultation with Lead Plaintiff's damages expert, provides for the distribution of the Net Settlement Amount on a *pro rata* basis to Class Members who submit Claim Forms that are approved for payment by the Court.  Each Claimant's share will be calculated based on his, her, or its losses attributable to the alleged fraud.

10.     Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis and incurred significant litigation expenses and thus bore all the risk of an unfavorable result.  For their considerable efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees for Plaintiff's Counsel of 25% of the Settlement Fund.  The 25% fee request is based on a retainer agreement entered into with Lead Plaintiff at the outset of the litigation and, as discussed in the Fee Memorandum, the 25% fee request is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries on a percentage basis.  Moreover, the requested fee represents a multiplier of approximately 1.9 on

Plaintiff's Counsel's total lodestar, which is well within the range of multipliers typically awarded in class actions with significant contingency risks such as this one, and thus, the lodestar cross-check also supports the reasonableness of the fee.

11.      Lead Counsel's Fee and Expense Application also seeks payment of litigation expenses incurred by Plaintiff's Counsel in connection with the institution, prosecution, and settlement of the Action totaling $102,840.56, plus reimbursement of $6,000.00 to Miami GESE for its costs and expenses directly related to its representation of the Class, as authorized by the PSLRA.

12.      For all of the reasons discussed in this declaration and in the accompanying memoranda and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e)(2). For similar reasons, and for the additional reasons discussed below, I respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.      PROSECUTION OF THE ACTION

### A.      Background

13.      As the Court is aware, Henry Schein, Inc. ("Schein") is the largest distributor of dental supplies and equipment in the United States.  This securities class action asserts claims on behalf of all persons and entities who, during the period from March 7, 2013 through February 12, 2018, inclusive (the "Class Period"), purchased or otherwise acquired Schein common stock, and who were damaged thereby (the "Class").

14.      Lead Plaintiff alleges that Defendants made false and misleading statements and material omissions about Schein's North American Dental business, including the competitive

environment for that business, the risks it faced, and the sources of its financial success. Specifically, the Complaint alleges that Schein repeatedly reported strong financial results, and assured investors—who were specifically concerned about margin pressure in the dental supply business—that, while the Company was involved in intense competition with its purported competitors, it was nonetheless able to maintain extraordinary margins on sales of commodity goods because of the quality of its value-added service offerings.  In addition, when Schein was accused of anticompetitive conduct in a raft of lawsuits filed before and during the Class Period, the Company issued strong denials, asserting that it would defend itself vigorously—and continued to deny allegations when it settled certain of the actions, claiming that any settlements were entered into merely to avoid the costs of prolonged litigation.  The Complaint further alleges that these misstatements inflated the price of Schein's common stock during the Class Period, and that the inflation was removed in three corrective disclosures, which revealed deteriorating financial results as a result of cessation of anticompetitive activities, additional antitrust lawsuits against the Company, and the filing of a Federal Trade Commission ("FTC") action.

### B.  Appointment of Lead Plaintiff and Lead Counsel, Lead Counsel's Extensive Investigation and the Filing of the Complaint, and the Substantial Denial of Defendants' Motion to Dismiss

#### 1.  Appointment of Miami GESE as Lead Plaintiff

15.  On March 7, 2018, an initial complaint was filed against Schein, Stanley Bergman, and Steven Paladino on behalf of plaintiff Joseph Salkowitz by counsel from The Rosen Law Firm, P.A. ("Rosen").  ECF No 1.  The complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

16.  On May 7, 2018, Miami GESE filed a motion for appointment as Lead Plaintiff, with BLB&G as Lead Counsel, along with supporting papers.  ECF Nos. 14-16.  That same day,

Salkowitz and Schein investor Stuart Neiss likewise filed a motion for appointment as lead plaintiff, with Rosen as lead counsel.  ECF Nos. 12-13.

17.     Miami GESE filed an opposition to Salkowitz and Neiss's motion on May 21, 2018, and then a reply in further support of Miami GESE's motion for appointment as Lead Plaintiff on May 29, 2018.  ECF Nos. 17-19.

18.     Recognizing Miami GESE's comparatively larger financial interest in the Action, Salkowitz and Neiss withdrew their motion for appointment by Notice filed with the Court on June 21, 2018.  ECF No. 21.  The following day, the Court appointed Miami GESE Lead Plaintiff, and BLB&G Lead Counsel.  ECF No. 22.

19.     The Court held a status conference on July 11, 2018.  That same day, the Court issued an order setting deadlines of September 14, 2018 for Lead Plaintiff to file an amended complaint, and of October 15, 2018 for Defendants to file a pre-motion conference letter concerning their anticipated motion to dismiss.  ECF No. 25.

## 2.     Lead Plaintiff's Preparation and Filing of the Complaint

20.     On September 14, 2018, Miami GESE filed the 82-page Consolidated Class Action Complaint (the "Complaint").  ECF No. 28.  The Complaint alleged claims under Section 10(b) of the Exchange Act against Schein, Bergman (Schein's Chief Executive Officer), and Paladino (Schein's Chief Financial Officer), and Section 20(a) claims Bergman, Paladino, and a new defendant, Timothy J. Sullivan ("Sullivan"), who served as Schein's head of North American Dental operations during the Class Period.  The Complaint alleged that defendants made materially false and misleading statements during the Class Period about: (i) the competitive environment of Schein's North American Dental business; (ii) Schein's dealings with dental buying groups; (iii) Schein's financial results; and (iv) the sources of Schein's financial success.  The Complaint also alleged that Schein failed to make disclosures required by

Item 303 of Regulation S-K (17 C.F.R. §229.303). The Complaint further alleged that the price of Schein's common stock was artificially inflated during the Class Period as a result of Defendants' alleged false and misleading statements and omissions, and declined when the truth was revealed in three partial corrective disclosures—on August 8, 2017, November 6, 2017, and on February 12-13, 2018.

21. Before the Complaint was filed, Lead Counsel conducted a comprehensive factual investigation and detailed analysis of the potential claims that could be asserted on behalf of investors in Schein securities. This investigation included, among other things, a detailed review and analysis of voluminous amounts of information relating to Schein, including allegations of anticompetitive activity against the Company and its competitors in lawsuits and regulatory actions, as well as available factual material concerning those allegations. Lead Counsel reviewed, among other things:

- Schein's SEC filings;

- Transcripts of Schein's investor conference calls, press releases, and publicly available presentations;

- Filings and decisions from related cases, including several private antitrust actions involving Schein and its competitors, as well as voluminous materials available from the FTC's website in connection with its case against Schein, Benco Dental Supply Company ("Benco"), and Patterson Companies, Inc. ("Patterson"); and

- Schein's historical stock price information, as well as similar information concerning Schein's competitors and the market as a whole; and

- An enormous volume of media, news, and analyst reports relating to Schein.

22. Lead Counsel also sought to obtain and review non-public documents obtained by the FTC in connection with its case against Schein, Benco, and Patterson. However, the FTC

declined to provide any documents beyond those that were publicly available on grounds that the investigation was ongoing as of the time of the filing of the Complaint.

23.     Lead Counsel and its in-house investigators also located and contacted several hundred former employees of Schein.  Lead Counsel and its investigators interviewed more than 100 such individuals believed to have information relevant to Lead Plaintiff's claims, some multiple times.  One of these individuals, a senior member of Schein's sales organization, provided important behind-the-scenes facts and documents that supported Lead Plaintiff's allegations, and information provided by this witness was included in the Complaint.

24.     In addition to undertaking an extensive review of documents, Lead Counsel engaged consulting experts to help analyze certain complicated issues in the case.  Lead Counsel worked with a financial economist on loss causation and damages issues, which was particularly important given that there were several different partial corrective disclosures in the case.

### 3.     Defendants File A Motion To Dismiss the Complaint, Which the Court Partially Denies

25.     On October 15, 2018, pursuant to the Court's Individual Practices § 3.A, Defendants filed a four-page pre-motion conference letter outlining the bases for their anticipated motion to dismiss, and seeking (i) leave to file it, and (ii) a briefing schedule.  ECF No. 37.  A week later, on October 22, 2018, Lead Plaintiff filed a three-page letter outlining its responses to Defendants' arguments.  ECF No. 38.

26.     On October 25, 2018, the Court issued an order directing the Parties to confer and submit a proposed briefing schedule for Defendants' anticipated motion to dismiss.  On October 29, 2018, the Parties filed a stipulation proposing a briefing schedule, which the Court so-ordered the same day.  ECF No. 39.  On November 27, 2018, Defendants sought leave to file a 35-page motion to dismiss, which the Court granted on November 28, 2018.  ECF No. 40.

27.     Pursuant to the briefing schedule ordered by the Court, on December 10, 2018, Defendants served their motion to dismiss and accompanying declaration, which attached 39 exhibits totaling nearly 2,300 pages, and which was filed with the Court on February 22, 2019. ECF No. 45.  In their Motion, Defendants attacked all parts of the Complaint as inadequate to plead securities fraud, including with respect to each type of false statement alleged, and as to each Defendant.

28.     In particular, Defendants argued (among other things) that:

- Lead Plaintiff failed to plead any material misrepresentations or omissions, including because (i) the Complaint failed to allege any facts showing that the overall dental distribution business was not competitive, and in any event Defendants' statements about competition in the market were non-actionable puffery or opinions, and (ii) the Complaint failed to plead facts showing that Defendants' statements explaining the reasons for Schein's success were false, and in any event those statements were also non-actionable puffery or opinions;

- Lead Plaintiff failed to plead a strong inference of scienter as to any Defendant, including because (i) the Complaint did not allege facts showing  knowledge on the parts of Defendants Bergman and Paladino, and their stock sales were not unusual, (ii) Defendant Sullivan's knowledge could not be imputed to Schein, because he was not a management-level employee, and the Complaint failed to plead facts showing a strong inference of his scienter in any event; and (iii) Lead Plaintiff could not rely on the "core operations" doctrine to establish scienter because Schein's North American dental business failed to meet the standard for that doctrine;

- Lead Plaintiff failed to adequately plead loss causation, including because (i) although Lead Plaintiff alleged Schein's financial results suffered when  anticompetitive activity was curtailed, it failed to plead necessary facts about that curtailment, such as when it occurred; (ii) allegations of anticompetitive activity against Schein had been public for years, long before the first corrective disclosure in the case; and (iii) in any event, no disclosure after the August 8, 2017 disclosure revealed anything new;

- Lead Plaintiff was precluded from pleading reliance or any actionable misstatement or omission after the first alleged corrective disclosure on August 8, 2017, given the volume of

information about Schein's alleged anticompetitive activities that was in the public domain during the Class Period and the connection to financial results allegedly revealed on that date, particularly in light of the Complaint's allegations that the market for Schein stock was efficient;  and

- The Complaint failed to adequately plead control-person liability as to the Bergman, Paladino, and Sullivan, including because it failed to plead a primary violation, establish Sullivan's control over Schein, or plead any individual's culpable participation in misconduct relating to financial reporting.

29.     Meanwhile, Lead Plaintiff prepared to oppose Defendants' motion.  In addition to reviewing and preparing responses to Defendants' legal arguments in the motion, Lead Plaintiff also conducted a lengthy review of documents made public by the FTC in connection with its case against Schein, Benco, and Patterson, including voluminous materials submitted in connection with pre-trial briefing in that case, which was made public following the filing of the Complaint in this Action.

30.     On January 15, 2019, Lead Plaintiff filed a letter motion seeking leave for a 10-page extension for its opposition brief, which the Court granted the following day.  ECF No. 42.

31.     On January 23, 2019, Lead Plaintiff served its opposition to Defendants' motion to dismiss, which it filed with the Court on February 22, 2018.  ECF No. 46.  Lead Plaintiff also filed a declaration with exhibits, including exhibits uncovered when it reviewed the developing FTC factual record.  ECF No. 47.  In summary, Lead Plaintiff's opposition argued that:

- Defendants' misstatements and omissions relating to Schein's competitive environment, the reasons for its success, Schein's financial results, and known trends or uncertainties were materially false and/or misleading, and none were non-actionable opinions or puffery;

- The Complaint adequately alleged scienter as to Defendants Bergman and Paladino, adequately pleaded Defendant Sullivan's knowledge and facts showing that knowledge could be imputed to Schein, and adequately pleaded that Schein's North American Dental business was a core operation;

- Lead Plaintiff had adequately alleged loss causation under the notice-pleading standard applicable to that element, and in any event Defendants' arguments that the truth had been previously revealed were inappropriate for resolution on a motion to dismiss; and

- The Complaint adequately pleaded Bergman, Paladino, and Sullivan's control.

32.     On February 22, 2019, Defendants filed a reply in further support of their motion to dismiss the Complaint.  ECF No. 48.  Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiff's opposition brief.  In the months following the close of briefing on Defendants' motion, each Party submitted supplemental authorities for the Court's consideration, and responded to the other Party's submissions.  ECF Nos. 50-53.

33.     On September 27, 2019, the Court issued a thorough, 64-page Memorandum & Order ("Order") in which it partially granted and partially denied Defendants' motion to dismiss. ECF No. 54.  The Order dismissed Section 10(b) and 20(a) claims as to Defendants Bergman and Paladino, but sustained Section 10(b) claims as to Schein, and Section 20(a) claims as to Defendant Sullivan.

34.     In its Order, the Court sustained several of Lead Plaintiff's claims.  The Court held actionable Defendants' statements concerning the competitiveness in the dental distribution market, reasoning that such statements were adequately alleged to be at least misleading in light of the Complaint's well-pleaded allegations showing anticompetitive behavior in the market, including Schein's communications with Benco and Patterson about policies not to deal with buying groups and allegations that Schein pressured manufacturers to pull products from a competing online distributor's platform.  The Court rejected Defendants' argument that the Complaint failed to show that the dental distribution market was actually not competitive, noting

that Lead Plaintiff was not required to plead facts showing Defendants' statements were literally untrue, so long as it adequately pleaded that the statements would have misled a reasonable investor.   In addition, the Court rejected Defendants' argument that the statements about competition were immaterial, noting that the topics of the statements were frequent topics of investor concern, and also that the statements were not non-actionable opinions, as they were not phrased as such—and that, in any event, even if they were opinions, they were misleading for omitting disclosures necessary to make them not misleading.   The Court likewise sustained statements based on Schein's attribution of its success to legitimate factors and its risk factors. However, the Court dismissed claims based on statements reporting Schein's financial results and margins.

35.     With respect to scienter, the Court dismissed claims against Defendants Bergman and Paladino, finding that the Complaint failed to plead sufficient particularized facts to show their knowledge.   However, the Court found that Defendant Sullivan's knowledge was adequately pleaded, and could be imputed to Schein by virtue of Sullivan's management role.

36.     The Court found the Complaint failed to adequately plead loss causation related to the disclosures of poor financial results on August 8, 2017 and November 6, 2017, reasoning that the Complaint lacked sufficient allegations tying those disclosure to the alleged fraud.   However, the Court found loss causation adequately pleaded as the November 6, 2017 disclosure of additional antitrust lawsuits against the Company, as well as the February 12, 2018 disclosure of the FTC Complaint.   In so holding, the Court rejected Defendants' arguments that the truth had previously been known, crediting Lead Plaintiff's arguments that the prior disclosures did not apprise the market of all relevant facts and that Defendants' denials of misconduct undermined the contention that the prior disclosures rendered the alleged misstatements immaterial.

37.     The Court also rejected the Complaint's allegations that control had been adequately pleaded as to Defendants Bergman and Paladino, but found it adequately alleged Defendant Sullivan's control, on account of his oversight of Schein's day-to-day operations.

### 4.     Defendants' Reconsideration Motion and the FTC Trial Decision

38.     Shortly after the Court issued the Order, on October 1, 2019, Defendants sought an extension of time to answer the Complaint, which the Court granted the following day.  ECF No. 55.

39.     Then, on October 11, 2019, Defendants served a motion seeking reconsideration of the Court's Order (the "Reconsideration Motion").   In the Reconsideration Motion, Defendants asked the Court to reconsider its findings in the Order that (i) Defendant Sullivan's knowledge could be imputed to Schein, and (ii) that the Complaint adequately pleaded Defendant Sullivan's control.  Defendants urged that controlling Second Circuit precedent—*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008)—requires that an employee whose knowledge is imputed to a corporate defendant have some connection to the issuance of false and misleading statements, not just to underlying misconduct, and that Defendant Sullivan's alleged knowledge could not, therefore, be imputed to Schein because he was not alleged to have had any responsibility of the alleged false and misleading statements in the Complaint.  Similarly, Defendants argued that control allegations as to Defendant Sullivan were deficient, because he was not alleged to have had control over Schein's financial reporting and disclosures.  Defendants noted correctly that the imputation issue was dispositive of the case, as a decision finding that imputation was improper would necessarily mean that Schein would have to be dismissed as a Section 10(b) Defendant, for lack of scienter, and accordingly that Section 20(a) claims would also have to be dismissed for failure to adequately plead a predicate violation.

40.     As the Parties had done in connection with the other motion papers in the Action, the same day Defendants served their Reconsideration Motion on Lead Plaintiff, they filed via ECF the associated transmittal letter.  ECF No. 56.  The Court ordered Defendants to file their Reconsideration Motion via ECF that same day, and Defendants filed it on the docket on October 12, 2019.  ECF Nos. 57-58.

41.     Then, on October 15, 2019, following a lengthy trial on the merits involving 65 witnesses and more than 5,000 exhibits, FTC Administrative Law Judge D. Michael Chappell issued an initial decision in the FTC's case alleging antitrust law violations against Schein, Benco, and Patterson, as well as numerous findings of fact (the "FTC Trial Order"), which Defendants submitted to the Court the following day.  ECF No. 59.  In the FTC Trial Order, ALJ Chappell dismissed the antitrust claims against Schein, finding, among other things:

- There was substantial evidence suggesting Schein did not have a blanket policy to categorically refuse to do business with buying groups, and the totality of the evidence weighed against a finding that Schein acted in parallel, conspired, or exchanged assurances with Benco and Patterson regarding a refusal to deal with buying groups, with no dispositive evidence to the contrary;

- The documentary record showed that Schein continued doing business with existing buying group customers during the alleged conspiracy period, and indeed accepted some new relationships with buying group customers during that time; and

- Defendant Sullivan was never the sole decision-maker and was not necessarily the final decision-maker with respect to the question of whether Schein would do business with buying groups.

However, ALJ Chappell found Benco and Patterson liable for violations of the FTC Act on grounds that they conspired to refuse to offer discounts to buying groups.

42.     Meanwhile, Lead Plaintiff sought to vigorously prosecute the Action. Accordingly, on October 18, 2019, Lead Plaintiff filed a Letter Motion requesting that the Court schedule a Rule 16 conference on or after November 18, 2019, to afford the Parties time to

confer and submit a Rule 26(f) report.  ECF No. 60.  Defendants responded three days later, on October 21, 2019, requesting that the Court defer any Rule 16 conference during the pendency of the Reconsideration Motion.  ECF No. 61.  Lead Plaintiff responded that same day in a letter to the Court, opposing Defendants' request for a deferral of the Rule 16 conference.  ECF No. 62.

43.  On October 25, 2019, Lead Plaintiff served its response in opposition to the Reconsideration Motion, which it filed with the Court on November 1, 2019.  ECF Nos. 63, 65. Among other things, Lead Plaintiff argued that the Court had considered and rejected Defendants' arguments concerning *Dynex* and its progeny in the Order, that Defendants had failed to meet the stringent standards for reconsideration, and that, in any event, Defendants' substantive arguments were without merit.  On November 1, 2019, Defendants filed a reply brief in further support of the Reconsideration Motion, which reiterated the arguments in the Reconsideration Motion and responded to Plaintiffs' contrary arguments.

## III.    MEDIATION

44.  While the Reconsideration Motion was being briefed, the Parties agreed to attempt to resolve the Action through mediation.  Accordingly, on November 1, 2019, following the filing of Defendants' reply brief, the Parties filed a joint letter requesting that the Court defer ruling on the Reconsideration Motion while the Parties explored mediation prospects, proposing that the Parties would report to the Court by February 21, 2020 concerning the status of those negotiations.  ECF No. 67.  The Court granted the request that same day, terminating the Reconsideration Motion but providing for its reinstatement in the event the Action did not settle, and directing the Parties to file a status report by February 21, 2020.  On November 25, 2019, the Court likewise terminated Lead Plaintiff's letter motion requesting that a Rule 16 conference be scheduled.

45.     Prior to the mediation Lead Plaintiff obtained and conducted an exhaustive review of thousands of pages of materials that were made public in connection with the FTC action and trial, including numerous materials that had been made public after Lead Plaintiff's review performed in connection with the motion-to-dismiss briefing.   This included voluminous briefing, reports, and evidence, including both transcripts of testimony and documents.

46.     After retaining Judge Weinstein, the Parties scheduled two full-day mediation sessions in New York on February 4 and 5, 2020, to also be attended by Schein's insurers and the plaintiffs in the related derivative litigation on behalf of Schein.   In advance of the mediation sessions, the parties exchanged detailed mediation submissions—including, in Lead Plaintiff's case, numerous mediation exhibits consisting of the best evidence gleaned from its comprehensive review of the record from the FTC action—concerning both the liability and damages issues in this case.   In advance of the mediation Lead Plaintiff consulted extensively with, and received written materials from, its consulting expert on damages and loss causation. In addition, Lead Plaintiff consulted with an economics and competition expert regarding the market for dental supplies and the possible effects on Schein's business of collusion by its two main competitors, Patterson and Benco.

47.     Through the Parties' mediation briefing, and during the first day of mediation, it was clear that the disagreements between the Parties were many and complex.   For example, the Parties presented to each other analyses pertinent to liability and damages issues in the Action, which revealed that the Parties were far apart in terms of their views of the strength of the liability case and the potential damages at issue.   In spite of these disagreements, the Parties were able to begin a productive dialogue about potentially narrowing areas of dispute.

48.    The Parties conducted a second day of mediation on February 5, 2020.  After an intensive, full-day session of intensive negotiations, Judge Weinstein issued a mediator's recommendation to resolve the case for $35 million in cash, which the Parties accepted and memorialized in a Term Sheet signed that same day.

49.    The Term Sheet set forth the Parties' agreement to settle and release all claims against Defendants in return for a cash payment of $35 million to be paid or caused to be paid by Schein on behalf of all Defendants for the benefit of the Class.[4]  The Term Sheet expressly stated that the Settlement was subject to the completion of certain discovery by Lead Plaintiff (including both document discovery and witness interviews) for the purpose of assessing the reasonableness and adequacy of the settlement, as well as other terms and conditions, including the execution of a formal stipulation and agreement of settlement and related papers.

IV.    **SETTLEMENT AND DISCOVERY**

50.    The Parties informed the Court on February 21, 2020 that they had reached an agreement in principle to settle the Action, and proposed to report to the Court by April 30, 2020 concerning the process of finalizing the settlement.  ECF No. 69.

---

[4] The parties have stipulated, for purposes of the Settlement, to a Class consisting of all persons and entities who, during the Class Period, purchased or otherwise acquired Schein Common Stock, and who were damaged thereby.  *See* Settlement Agreement § I.A.13.  Excluded from the Class are: (a) any such persons or entities who submit valid and timely requests for exclusion from the Class; (b) such persons or entities who, while represented by counsel, settled an actual or threatened lawsuit or other proceeding against one or more of the Releasees arising out of or related to the Released Class Claims; and (c) Schein and (i) all officers and directors of Schein currently and during the Class Period (including Stanley Bergman, Steven Paladino, and Timothy J. Sullivan), (ii) Schein's Affiliates, subsidiaries, successors, and predecessors, (iii) any entity in which Schein or any individual identified in (i) has or had during the Class Period a Controlling Interest, and (iv) for the individuals identified in (i), (ii), and/or (iii), their Family Members, legal representatives, heirs, successors, and assigns.

51.     After the Parties reached their agreement in principle to settle on February 5, 2020, they negotiated the final terms of the Settlement and drafted the Settlement Agreement and related settlement papers.   On April 30, 2020, the Parties executed the Settlement Agreement, as well as a Supplemental Agreement concerning Defendants' right to terminate the Settlement if a certain threshold number of opt-outs is reached.

52.     On April 30, 2020, Lead Plaintiff filed its Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement (ECF Nos. 70-72), which included a copy of the Settlement Agreement (ECF 70-1) and a memorandum in support (ECF No. 71).  On May 1, 2020, Defendants filed their own memorandum in support of that motion. ECF No. 73.

53.     On May 5, 2020, the Court entered its Order Preliminarily Approving Proposed Settlement ("Preliminary Approval Order"), which preliminarily approved the Settlement, preliminarily certified the Class for settlement purposes, approved the proposed procedure to provide notice of the Settlement to Class Members, and set September 16, 2020 as the date for the final approval hearing.  ECF No. 74.  On or about June 2, 2020, the $35 million Settlement Amount was deposited into an escrow account.

54.     In connection with the agreement in principle to settle the action, the Parties negotiated and agreed on the scope of due diligence discovery that Defendants would provide to Lead Plaintiff.  In late February and early March 2020, prior to the execution of the Settlement Agreement, Defendants produced 684,764 pages of documents to Lead Plaintiff, including documents that had been previously produced in connection with various antitrust litigations and investigations, most of which had never been made publicly available in any form, as well as numerous unredacted versions of materials that had been publicly available only in redacted

form (for example, those filed publicly in connection with the FTC trial).  The Parties also agreed to conduct witness interviews in connection with due diligence of the settlement.  Lead Plaintiff immediately set out to thoroughly review this voluminous discovery record.

55.     In Lead Counsel's professional judgment, the discovery review was particularly necessary here.  Although Lead Plaintiff had conducted an extensive investigation into its claims prior to filing the Complaint and beyond, the publicly available record from the FTC case was heavily redacted, and did not include the majority of materials produced in that case. Accordingly, Lead Plaintiff demanded the right to additional discovery as part of the terms of the proposed Settlement in order to ensure an informed view of the material, and to test its assumptions regarding the weaknesses and strengths of the case, before seeking final approval of the settlement.  For these reasons, the additional discovery was critical to evaluating the reasonableness of the proposed Settlement from a merits perspective.

56.     Indeed, through the discovery process, Lead Plaintiff analyzed in great detail the strengths and weaknesses of Lead Plaintiff's claims to assure the reasonableness of the proposed Settlement.

57.     Throughout the process, Lead Counsel prioritized conducting thorough, comprehensive and effective discovery as efficiently and economically as possible.  As discussed below, to do so, Lead Counsel assigned a team of attorneys to undertake the time-sensitive and critical tasks of reviewing, analyzing, and digesting the large volume of complex documents that Schein produced.  Lead Plaintiff made use of industry-standard technological tools as appropriate to expedite the review.

58.     In Lead Counsel's view, the discovery effort confirmed that the Class would face significant obstacles to a recovery in excess of the Settlement.  Having considered the risks of

continued litigation, and based on all proceedings and discovery performed in the Action, it is the informed judgment of Lead Plaintiff and Lead Counsel that the proposed Settlement is fair, reasonable, and adequate and in the best interest of the Class.  Specifically, the discovery review identified documents that would have provided some support for Lead Plaintiff's case but also demonstrated the significant risks that Lead Plaintiff would have faced litigating the case through class certification, summary judgment, at trial, and through any appeals.  Those risks are summarized in more detail below.

## V.   RISKS OF CONTINUED LITIGATION

59.    The Settlement provides an immediate and certain benefit to the Class in the form of a $35 million cash payment, which represents a significant portion of the likely recoverable damages in the Action as determined by Lead Plaintiff's damages expert, particularly after considering Defendants' substantial arguments with respect to liability and damages.  These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiff and the Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

### A.    The Risks of Prosecuting Securities Actions In General

60.    In recent years, securities class actions have become riskier and more difficult to prove, given changes in the law, including numerous United States Supreme Court decisions. For example, data from Cornerstone Research show that, in each year between 2010 and 2017, approximately half of all securities class actions filed were dismissed, and the percentage of dismissals was as high as 57% in 2013. *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS 2019 YEAR IN REVIEW (2020), attached hereto as Exhibit 6, at 16.  In fact, well-known economic consulting firm NERA found that "[a] record 205 cases were dismissed in 2017, which marked the second consecutive year (and second year since the PSLRA became

law) in which more cases were dismissed than settled." *See* Stefan Boettrich and Svetlana Starykh, NERA Economic Consulting, Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review (2018), attached hereto as Exhibit 7, at 22.

61.     Even when they have survived motions to dismiss, securities class actions can be defeated in connection with *Daubert* motions or at summary judgment. For example, multiple securities class actions also recently have been dismissed at the summary judgment stage. *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, No. 09-01989, (S.D.N.Y.) (summary judgment granted on September 13, 2017 after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1211 (S.D. Cal. 2010).  And even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions.  *See, e.g.*, *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

62.     Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, and have gone to trial, there are still very real risks that there will be no recovery or substantially less recovery for class members.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010.  2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011).  In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims.  *Id*. at *38.  In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation.  *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

63.     There is also the increasing risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended.  The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010).  As a result, many cases have been lost after thousands of hours have been invested in briefing and discovery.  For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs finding Vivendi acted recklessly with respect to 57 statements, the district court granted judgment for defendants following a change in the law announced in *Morrison*.  *See* 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).

64.     In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation.

**B.     Defendants' Reconsideration Motion**

65.     As discussed above, Defendants' Reconsideration Motion was pending when the Parties reached their agreement in principle to settle the Action. That motion sought reconsideration of the Court's holdings that Schein's scienter could be established by Defendant Sullivan's alleged knowledge of anticompetitive activities in the dental supplies market, and that Sullivan had sufficient control over Schein to be held liable as a controlling person for Schein's alleged primary securities-law violations. In the Reconsideration Motion, Defendants contended (among other things) that Lead Plaintiff had failed to plead facts showing that Sullivan had participated in or controlled Schein's allegedly false and misleading statements and omissions.

66.     Lead Plaintiff opposed the Reconsideration Motion and believes it lacked merit, but acknowledges that it presented a significant risk to successfully prosecuting the Action.  As noted above, there was a meaningful risk that the Court could accept Defendants' arguments in the Reconsideration Motion and determine that Defendant Sullivan's knowledge, if any, could not in any event be imputed to Schein.

67.     In addition, even if the Court denied the Reconsideration Motion, there was a significant risk that Defendants could have successfully appealed the denial to the Second Circuit pursuant to 28 U.S.C. §1292(b).

68.     Had Defendants prevailed on their *Dynex* argument either before the Court or, in the event they lost, before the Second Circuit, it necessarily would have led to a full dismissal of the case, and eliminated entirely any recovery for the Class.

C.     **The Substantial Risks of Proving Defendants' Liability and Damages in This Case**

69.     Even though Lead Plaintiff prevailed at the motion to dismiss stage on several of their claims asserted against Defendants, Lead Plaintiff continued to face substantial risks that: (a) the Court would find that they failed to establish liability, loss causation or damages as a matter of law at summary judgment; (b) if the Court were to permit the claims to proceed to trial, that a jury (or appeals court) would find against Plaintiffs; and, (c) even if Lead Plaintiff prevailed at trial, the verdict would be overturned by an appellate court or reduced through other post-trial proceedings on reliance.  While Lead Plaintiff and Lead Counsel believe they had advanced strong claims on the merits, Defendants vigorously contested their liability with respect to nearly every element of Lead Plaintiff's claims.

70.     From a "big picture" perspective, such risks were heightened here because this case lacked certain obvious badges of fraud that can provide tailwinds for the plaintiff's discovery efforts and overall case.  For example, there was no financial restatement or parallel SEC action against Schein that Lead Plaintiff could use to support its case or guide its discovery efforts.

71.     Further, as is set forth in more detail below, some of the litigation risks Lead Plaintiff faced were particularly acute in light of ALJ Chappell's FTC Trial Order, which was a highly significant development that amplified the risk to the Class's recovery at every stage of the Action going forward.  As noted above, ALJ Chappell dismissed all claims against Schein in the related FTC case (the filing of which was the main remaining corrective disclosure in the case).  This was highly significant because, in addition to severely undermining the Complaint's allegations that Schein purposely engaged in anticompetitive activities, rendering its statements knowingly or recklessly false, that development also would have called into question the

Complaint's loss causation allegations, as well as the amount of recoverable damages for the Class.

### 1.   Risks of Proving Falsity, Materiality, and Reliance

72.     Defendants would have vigorously contested that any of their allegedly false and misleading statements were material to investors.  As detailed above, the core remaining allegations in this case were that Defendants made materially false and misleading statements during the Class Period about: (i) the competitive environment of Schein's North American Dental business; (ii) the sources of Schein's financial success; and (iii) the business risks Schein faced, including from the emergence of buying groups.  The Complaint also alleged that Schein failed to make disclosures required by Item 303 of Regulation S-K (17 C.F.R. §229.303).

73.     Defendants likely would have argued that each of the categories of allegedly false and misleading affirmative statements above was factually true, and that Schein's disclosures satisfied Item 303's requirements.  Defendants presumably would have further argued that the truthfulness and material accuracy of their disclosures was confirmed by Schein's exoneration before ALJ Chappell following consideration of an extensive factual record developed in the FTC's case.  While Lead Plaintiff believes it had meaningful arguments in response—including that the Complaint's allegations did not require Schein to have technically violated antitrust law to be liable in the Action, and the fact that Schein need not have engaged in anticompetitive activities itself to have faced (and benefitted from) a non-competitive marketplace environment—it is evident that the FTC Trial Order significantly amplified risks to the viability of these statements.  For example, ALJ Chappell's determinations that Schein did, in fact, do business with buying groups during the alleged conspiracy period could have eliminated from the case allegations that Schein's statements concerning buying groups were materially false and misleading, and significantly undermined the remaining alleged false and misleading statements

and omissions described above.  While Lead Plaintiff believes it had meaningful responses to such contentions, the arguments presented a significant risk that some or all of the alleged false and misleading statements and omissions in the case could have been eliminated during summary judgment or at trial.

74.     Due diligence discovery confirmed these risks. Among other things, the documentary record suggested that, consistent with ALJ Chappell's findings in the FTC Trial Order, Schein did, in fact, do business with certain buying groups during the alleged conspiracy period, and the evidence did not strongly support the notion that Schein operated under a blanket policy not to do business with buying groups, as had been alleged by the FTC.  Moreover, in Lead Counsel's judgment, Defendant Sullivan's testimony on these facts could be considered credible by a jury, confirming that there was a meaningful risk a factfinder could reach a determination in Defendants' favor.

75.     Defendants also were likely to continue arguing that the alleged false and misleading statements in the Complaint were largely (if not entirely) statements of opinion or immaterial "puffery."  In that regard, Defendants likely would have proffered economic and statistical analysis demonstrating that Schein's stock price did not necessarily react to such disclosures made during the Class Period.  While Lead Plaintiff defeated such arguments at the pleading stage, there was a significant risk that Defendants could have prevailed on them at a later stage of the case.

76.     In addition, Defendants were likely to argue that alleged misstatements and omissions were not false or misleading in light of the fact that buying groups represented only a small portion of the Company's overall addressable market, another factual proposition largely confirmed in due diligence discovery.  In essence, Defendants could argue that, even if Lead

Plaintiff were able to establish that Schein engaged in or knew about efforts to block buying groups, they represented too small of a portion of the market to render generalized statements about market-wide competition, the sources of Schein's revenues, or the risks Schein faced materially false or misleading.   While Lead Plaintiff had meaningful responses to such arguments, including that buying groups likely would have proliferated in the absence of a scheme to thwart them—and therefore that their actual prevalence dramatically understated the true "but-for" prevalence that would have occurred in the absence of anticompetitive misconduct—there was a meaningful risk that Defendants could have persuaded the Court or a jury otherwise at summary judgment or trial.

77.     Further, Defendants were likely to continue to raise materiality arguments based on the fact that allegations of anticompetitive conduct, both against Schein specifically and against several of its key competitors, were widely publicized before and during the Class Period.   Defendants were likely to argue that, in light of such widespread, specific allegations, Defendants' statements (which largely addressed more general issues of competition, business risk, and the reasons for Schein's positive results) simply could not have reasonably misled the market, and that reasonable investors could not have relied on them.   In further support of this argument, Defendants likely would have pointed to the fact that much of the evidence cited in the Complaint—including highly specific factual allegations concerning anticompetitive activities by Schein and others—was drawn from allegations that were concededly publicly available during the Class Period, and that were, in fact, reported on in the press.   While Lead Plaintiff prevailed on this "truth-on-the-market" argument in connection with Defendants' motion to dismiss, it largely did so by arguing that such questions were inappropriately raised at the pleading stage.   There was a very significant risk that Defendants could have successfully resurrected these

arguments at summary judgment or trial, or on appeal, and thereby potentially secured elimination of some or all of the alleged misstatements in the case.

78. In addition, developments in class certification case law in recent years have only heightened the risks associated with Defendants' materiality and reliance challenges. Following the Supreme Court's *Halliburton II* decision, which afforded defendants in securities class actions an opportunity to rebut the fraud-on-the-market presumption of reliance (which Lead Plaintiff relied on in the Complaint, and would have relied on at class certification in this Action), Defendants often challenge the propriety of class certification on grounds that an absence of price impact from misstatements—including because of their immateriality—successfully rebuts the fraud-on-the-market presumption. While Lead Plaintiff believes it could have overcome such challenges at the class certification stage, the available materiality and reliance arguments here would have heightened the risk that the class would not be certified.

79. Finally, while the Court dismissed claims concerning the falsity of Defendants' financial results in its Order, it did so because the Complaint lacked sufficient allegations tying those results to alleged anticompetitive misconduct. During due diligence discovery, Lead Plaintiff carefully scrutinized the financial information Defendants produced, including by assigning a team to investigate and report on any patterns in margins or other financial results that suggested such results were ostensibly improved for reasons related to the misconduct alleged in this case, against the possibility that such statements could be brought back into the case via amendment. Due diligence discovery did not uncover clear evidence supporting the argument that Schein's financial results were inflated by anticompetitive misconduct. Lead Plaintiff also interviewed Mr. Mlotek concerning this issue, and, in Lead Counsel's judgment, he offered testimony that Schein's poor financial performance on the first two corrective disclosure

dates alleged in the Complaint was not related to any cessation of anticompetitive conduct that a factfinder could have found credible.

80.    Lead Plaintiff continues to believe its falsity, materiality, and reliance allegations have merit.  Nonetheless, and particularly in light of ALJ Chappell's decision in the related FTC case and the facts revealed (and not revealed) in the course of due diligence discovery, there remained a significant risk that Defendants could have prevailed on all or some of these arguments at class certification, summary judgment, trial, or on appeal—thereby reducing or eliminating any recovery for the Class.

## 2.    Risks of Proving Scienter

81.    Even if Lead Plaintiff were able to establish the falsity and materiality of Defendants' alleged misrepresentations, it faced significant hurdles in proving scienter. As the Court is aware, the Complaint alleged several false and misleading statements made by Schein and Defendants Bergman and Paladino, but the Court dismissed Defendants Bergman and Paladino from the case on scienter grounds in its Order.  However, the Court found scienter adequately pleaded as to Schein because Lead Plaintiff adequately pleaded (i) Defendant Sullivan's knowledge, and (ii) that his knowledge could be imputed to Schein, even though Defendant Sullivan was a non-speaker, by virtue of his senior role in managing the Company's day-to-day operations.

82.    As set forth above, the question of imputing Defendant Sullivan's knowledge to Schein was the subject of Defendants' Reconsideration Motion.  Although Lead Plaintiff believes it would have prevailed on that motion, the briefing on that motion largely concerned pleading standards and standards for reconsideration.  Even if Lead Plaintiff defeated the Reconsideration Motion, Defendants could (and likely would) have raised again, at a later stage of the case, their substantive arguments that Lead Plaintiff was required to establish Defendant Sullivan's

participation in or responsibility for Schein's financial reporting and investor disclosures in order for his knowledge to be imputed to Schein—and that, in any event, Lead Plaintiff would have had to establish Sullivan's knowledge of anticompetitive activities in the first instance.

83.     Due diligence discovery confirmed the risks presented by these arguments. Specifically, due diligence discovery did not uncover evidence showing conclusively that Defendant Sullivan was aware of anticompetitive activities concerning buying groups, whether conducted by Schein or others.  Lead Plaintiff specifically investigated these issues, assigning teams of staff attorneys to search for, review, and report on the documentary evidence concerning Schein's approach to buying groups and Defendant Sullivan's knowledge of the same.  As set forth above and consistent with ALJ Chappell's findings in the FTC Trial Order, the documentary evidence reviewed did not uncover conclusive evidence undermining Defendants' likely argument that Defendant Sullivan and Schein's senior executives took a case-by-case approach to evaluating buying group opportunities, with a focus on determining whether such relationships would make business sense for the Company, and in fact elected to work with several during the Class Period.  Due diligence discovery also failed to uncover facts demonstrating conclusively that Defendant Sullivan was aware of any conspiracy between Benco and Patterson to refuse to do business with buying groups.  In addition, also consistent with ALJ Chappell's FTC Trial Order, the documentary evidence failed to clearly establish that Schein conspired with Benco and Patterson to boycott the Texas Dental Association's ("TDA") trade show, and some evidence suggested that Schein made an independent decision not to attend the trade show, including because it considered the TDA to be establishing a competitor to Schein, and that Schein considered working with the TDA to establish a buying group.

84.     Moreover, when interviewed, Defendant Sullivan provided robust explanations regarding Schein's approach to buying groups and its reasons for taking that approach, and he disclaimed that Schein conspired with Benco and Patterson to boycott the TDA trade show.  In Lead Counsel's judgment, Defendant Sullivan presented as a reasonable and credible witness, thereby heightening the risk that a factfinder could credit his explanations.

85.     In addition, Lead Plaintiff carefully investigated issues concerning the potential imputation of Defendant Sullivan's knowledge, if any, to Schein.  Lead Plaintiff's team of attorneys closely scrutinized the documents produced in due diligence discovery for evidence that Defendant Sullivan had responsibility over Schein's public disclosures, either by having responsibility over the information contained in those disclosures, or by virtue of reviewing them.  On balance, the documentary evidence did not clearly support the conclusion that Defendant Sullivan was substantially responsible for Schein's public disclosures or financial results.  Moreover, the documentary evidence produced did not clearly support the contention that Defendant Sullivan reviewed or commented on any public disclosures, and he credibly testified to that effect as well.

86.     Further, due diligence discovery uncovered certain evidence that could have supported Defendants' arguments as to scienter.  For example, due diligence discovery confirmed that Schein had in place policies prohibiting anticompetitive activities, including certain types of communications with competitors, and that Schein employees purported to follow such policies and were ostensibly reminded to do so by their superiors.  Defendants likely would have pointed to such policies to argue that, even if isolated individuals engaged in anticompetitive conduct, Schein and its senior management reasonably believed that policies prohibiting such conduct were in-place and effective.

87.     As with falsity and materiality, Lead Plaintiff continues to believe its scienter allegations have merit.  However, due diligence discovery confirmed that there were serious risks that the Action could be ended at the summary judgment stage or at trial on scienter grounds, entirely eliminating any recovery for the Class.

### 3.     Risks of Proving Loss Causation and Damages

88.     Even assuming that Lead Plaintiff overcame each of the above-described risks and successfully established falsity, materiality and scienter, it faced very serious risks in proving loss causation and damages.   Indeed, a major consideration driving the calculation of a reasonable settlement amount was the fact that Defendants were likely to advance substantial challenges to each of the corrective disclosures.  After the Parties presented those arguments through financial expert analysis, if the Court accepted any of Defendants' arguments—in whole or in part, at class certification, summary judgment, or trial—it would have eliminated or, at a minimum, drastically limited Class Members' recovery.

89.     Following the Court's motion to dismiss order, this case involved two partial corrective disclosure events.  First, on November 6, 2017, Schein filed its Form 10-Q for the third quarter of fiscal year 2017, in which it announced for the first time the existence of two antitrust complaints that had been filed against the Company.  Second, on February 12, 2018, after market close, the FTC announced that it had filed a complaint alleging that Schein, Benco, and Patterson conspired to thwart the formation of buying groups in violation of the FTC Act.

90.     Lead Plaintiff bears the burden of establishing loss causation, and Defendants would have contested each of the corrective disclosures above based on the nature of the information revealed and the timing of the stock price reaction in response to the specific information disclosed.  Each disclosure event is discussed in more detail below.

91.    ***November 6, 2017***.  On November 6, 2017, at approximately 2 p.m., Schein filed its form 10-Q for the third quarter of fiscal-year 2017.   In the Form 10-Q, Schein publicly disclosed, for the first time, antitrust actions filed against the Company by Archer & White Sales, Inc. ("A&W") and IQ Dental Supply, Inc. ("IQ Dental").   The Complaint alleges that, on November 6, 2017, Schein's stock declined 9.8%, closing at $70.04 per share.  This represented a drop of $7.60 per share from their November 3, 2017 closing price of $77.64, and was associated with extremely high trading volume of 7.7 million shares.

92.    Defendants would have raised several significant arguments concerning loss causation and damages for the November 6, 2017 disclosure.  Most significantly, Defendants would have argued that intraday trading data shows that Schein's stock price did not react to the disclosure of the lawsuits, but rather to other information released the same day—specifically, the Company's poor financial results, which the Complaint alleged were driven by a curtailment of anticompetitive activities by Schein, but which the Court specifically rejected as a corrective disclosure in its Order on grounds that such curtailment had not been adequately established. Defendants also would have cited analyst reaction from the Complaint, which focused on the financial results and, in fact, downplayed another antitrust complaint filed against the Company that was discussed in the Form 10-Q.   While Lead Plaintiff would have responded to such arguments, they presented a significant risk that the Court or a factfinder could determine that loss causation could not be established for the November 6, 2017 disclosure, and accordingly that there were no recoverable damages associated with it.[5]

---

[5] The Court's Order dismissed claims based on Schein's disclosure of poor financial results on August 8, 2017 and November 6, 2017, on grounds that Lead Plaintiff had failed to adequately connect those poor results to the anticompetitive activity alleged in the Complaint. As discussed above, in connection with due diligence discovery, Lead Plaintiff investigated whether evidence

93.     In addition, as discussed above, Defendants likely would have argued that Schein's disclosure of two new antitrust lawsuits could not, as a matter of law or fact, constitute new information that caused the stock price decline on November 6, 2017.  Specifically, as they argued in their motion to dismiss, Defendants would have argued that the A&W lawsuit (which was filed in 2012) was well-publicized prior to and during that Class Period, and that, moreover, the A&W and IQ Dental lawsuits arose from the same course of conduct as the SourceOne Dental complaint action, which had previously been disclosed.  Defendants would have cited such facts in arguing that the disclosure of these lawsuits in Schein's Form 10-Q did not reveal new, material information to the market.  Had the Court or the factfinder credited such arguments, the Class might not have been able to recover some or any of the declines associated with the November 6, 2017 disclosure.

94.     ***February 12-13, 2018***.  On February 12, 2018, after the close of trading, the FTC announced that, following a lengthy investigation, it had filed an antitrust complaint against Schein, Benco, and Patterson alleging that the three had conspired to block the formation of buying groups in violation of the FTC Act.  The press release also noted that the FTC's complaint detailed communications between Schein and Benco executives allegedly demonstrating the agreement and attempts to monitor and enforce it.  The Complaint alleges that, in response to the revelation of Schein's anticompetitive scheme, on February 13, 2018, Schein

---

supported the contention that Schein's poor results on those two days were related to any curtailment of anticompetitive activities, whether by Schein or its competitors, including by assigning a team of attorneys to specifically review the financial information (and related communications) that were produced by Defendants.  Due diligence discovery reflected that Lead Plaintiff would have had significant difficulty establishing that the cessation of anticompetitive activity prior to those earnings dates was clearly associated with poor performance, and in fact Schein's witness, Mr. Mlotek, provided credible testimony that any poor results were due to causes unrelated to cessation of anticompetitive activity.

shares declined by 6.64%, closing at $67.39 per share, a drop of $4.79 per share from their February 12, 2018 closing price of $72.18, on extraordinarily high trading volume of 12.35 million shares.

95.     Defendants likely would have had strong arguments against loss causation and damages with respect to the February 12, 2018 disclosure.  First and foremost, Defendants would argue that Schein's exoneration before the FTC after trial eviscerates any allegation that the filing of the FTC complaint revealed any relevant "truth" to the market.  Lead Plaintiff would have had arguments to make in response, including that the FTC Trial Order did find that Benco and Patterson conspired, and that Schein was exonerated largely for technical reasons related to antitrust law that do not show that the Company's statements to the market concerning market-wide competition were truthful.  But it is manifest that ALJ Chappell's dismissal of antitrust claims against Schein—which followed a lengthy trial, and which result the FTC did not appeal—presented a very substantial risk that the Court or a factfinder could determine that the filing of the FTC's complaint did not reveal any facts to the market.  Even if the Court or a factfinder permitted claims to proceed on the narrowed basis that Defendants' statements might not have been truthful even it Schein itself was not guilty of conspiring with Benco and Patterson, Defendants likely would have argued that any damages sought in connection with the February 12, 2018 disclosure would have to parse out the effect of subsequently-disproven allegations that Schein was a co-conspirator—which could have significantly reduced or eliminated damages.

96.     In addition, Defendants would have argued that loss causation could not be pleaded based on the disclosure of factual matter in the FTC's complaint.  While the FTC issued its press release on February 12, 2018, the actual complaint itself was not made public until

several days later, for reasons relating to the need to redact confidential information contained in it.  Had Defendants successfully made this argument, Lead Plaintiff would not have been able to support its loss causation allegations by reference to the evidentiary matter specifically cited and discussed in the FTC's complaint, and would instead have had to establish loss causation based solely on the far more skeletal contents of the FTC's press release.

97.    Finally, Defendants likely would have raised similar "truth-on-the-market" arguments with respect to the February 12, 2018 disclosure as were discussed in the context of the November 6, 2017 disclosure.   While Lead Plaintiff believes it would have had strong arguments in response—including that the market would have interpreted a complaint filed by a Federal regulator following a lengthy investigation differently than a complaint filed by a customer or competitor, and that Defendants had issued strong denials of misconduct each time they were accused of it—these arguments, if successful, could have independently reduced or eliminated damages associated with the February 12, 2018 disclosure.

### 4.    Risks After Trial

98.    Even had Lead Plaintiff prevailed at summary judgment and at trial, Defendants would likely have appealed the judgment—leading to many additional months, if not years, of further litigation.  On appeal, Defendants would have renewed their host of arguments as to why Lead Plaintiff had failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiff to the risk of having any favorable judgment reversed or reduced below the Settlement Amount after years of litigation.

99.    The risk that even a successful trial verdict could be overturned by a later appeal is very real in securities fraud class actions.  There are numerous instances across the country where jury verdicts for plaintiffs in securities class actions were overturned after appeal.  *See, e.g., Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and

remanding jury verdict of $2.46 billion after 13 years of litigation); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 16, 2009), *aff'd*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) (granting summary judgment to defendants after eight years of litigation); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after 19-day trial and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Apple Comp. Sec. Litig.*, No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

100.    Moreover, even if a judgment in Lead Plaintiff's favor was affirmed on appeal, Defendants could then have challenged reliance and damages as to each class member, including Lead Plaintiff, in an extended series of individual proceedings.  That process could have taken multiple additional years, and could have severely reduced any recovery to the Class as Defendants "picked off" class members.  For example, in *In re Vivendi Universal SA Securities Litigation*, 765 F. Supp. 2d 520 (S.D.N.Y. 2011), the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members." 765 F. Supp. 2d at 583-584.  Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

101.    Thus, even if Lead Plaintiff and the Class were to have prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely limited, or even eliminated, any recovery – and, at minimum, could have added several years of further delay.

*      *      *      *      *

102.    Based on all the factors summarized above, Lead Plaintiff and Lead Counsel respectfully submit that it was in the best interest of the Class to accept the immediate and substantial benefit conferred by the $35 million Settlement, instead of incurring the significant risk that the Class would recover a lesser amount, or nothing at all, after several additional years of arduous litigation.  Indeed, the Parties were deeply divided on several key fact issues central to the litigation, and there were serious risks that Lead Plaintiff would not prevail on these issues at class certification, summary judgment, or trial.  If Defendants had succeeded on any of these substantial defenses, Lead Plaintiff and the Class would have recovered nothing at all or, at best, would likely have recovered far less than the Settlement Amount.

## VI.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

103.    The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiff prevailed at trial, which was far from certain for all the reasons noted above.  Lead Plaintiff's expert estimates, after giving effect to certain of Defendants' loss-causation and damages arguments, that the maximum potential damages that could be realistically established at trial were approximately $268 million.  Accordingly, the $35,000,000 Settlement represents approximately 13% of the realistic *maximum* recoverable damages for the Class.  This percentage recovery significantly exceeds the norm in securities class action cases and is an outstanding result for Class Members given the risks of the litigation.  Moreover, proving that level of damages assumes that Lead Plaintiff would have prevailed on its merits arguments about falsity, materiality, and scienter, which was far from certain.  In addition, the calculation of loss causation and damages would be subject to substantial risk at trial, as they would be subject to a "battle of the experts."  Even if Lead

Plaintiff prevailed at trial the amount of damages could have been substantially reduced based on arguments about both the substance of the disclosures that purportedly dissipated the artificial inflation in the price of Schein shares and the extent to which the regression analysis Lead Plaintiff's expert would present accurately captured the amount of dissipation in Schein's share price on each alleged date that it declined in connection with the truth being revealed.

104.    For all these reasons, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation.

## VII.    ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE CLASS

105.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Class.   The Preliminary Approval Order also set an August 26, 2020 deadline for Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Class, and set a final approval hearing date of September 16, 2020.

106.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd. ("A.B. Data"), the Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation and Class

Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Class.  The Notice also informs Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, for payment of expenses paid or incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $200,000, and for payment of the reasonable costs and expenses incurred directly by Lead Plaintiff related to its representation of the Class in an amount not to exceed $25,000.   To disseminate the Notice, A.B. Data obtained information from Schein through Lead Counsel and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members.  *See* Declaration of  Eric J. Miller Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Miller Decl."), attached hereto as Exhibit 3, at ¶¶ 2-7.

107.    A.B. Data began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Class Members and nominee owners on May 29, 2020.  *See* Miller Decl. ¶¶ 3-6.  As of August 11, 2020 A.B. Data had disseminated a total of 179,750 Notice Packets to potential Class Members and nominees.  *Id.* ¶ 8.

108.    In addition, A.B. Data caused the Summary Notice to be published in the *Wall Street Journal* and *Investor's Business Daily* on June 8, 2020 and to be transmitted over the *PR Newswire* on July 14, 2020.  *See id.* ¶¶ 9.[6]

---

[6] As discussed in a letter that Lead Plaintiff submitted to the Court on July 15, 2020 (ECF No. 75), due to an oversight by A.B. Data, the Summary Notice was not published over the *PR Newswire* until July 14, 2020, although the deadline for such publication under the Preliminary Approval Order was July 7, 2020.  The other two publications were timely and, as noted in the

109.    Lead Counsel also caused A.B. Data to establish a dedicated settlement website, www.HSICSecuritiesLitigation.com, to provide potential Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Settlement Agreement and Preliminary Approval Order. *See id.* ¶ 10. That website became operational on May 29, 2020. Lead Counsel has also made copies of the Notice and Claim Form available on its own website, www.blbglaw.com, since May 29, 2020.

110.    As set forth above, the deadline for Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Class is August 26, 2020. To date, one objection, directed only to Lead Counsel's motion for attorneys' fees and expenses, has been received. The objection is attached hereto as Exhibit 5.[7]   In addition, to date, two requests for exclusion have been received. *See* Miller Decl. ¶ 12. Lead Counsel will file reply papers on September 9, 2020, after the deadline for submitting requests for exclusion and objections has passed, which will address all objections and requests for exclusion that may be received.

## VIII.   PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

111.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who want to participate in the distribution of the Net Settlement Amount (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Expenses, and (c) the Attorneys' Fees and Expenses Award and the PSLRA Award) must submit a valid Claim Form

---

July 15, 2020 letter, the Parties have agreed that if any late objections or late requests for exclusion are received within seven days after the August 26, 2020 deadline (reflecting the delay in publication of the *PR Newswire* notice) they will not object to consideration of these objections or acceptance of these opt-outs on ground of lateness.

[7] In the interest of privacy, the objector's street address, email, and telephone number in his

with all required information postmarked no later than September 2, 2020.  As set forth in the Notice, the Net Settlement Amount will be distributed among Class Members according to the plan of allocation approved by the Court.

112.   Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed plan of allocation (the "Plan of Allocation").  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Amount among Class Members.

113.   The Plan of Allocation is set forth at pages 12 to 15 of the Notice.  *See* Miller Decl. Ex. A at pp. 12-15.  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Notice ¶ 51.  Instead, the calculations under the plan are only a method to weigh the claims of Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Amount.  *Id*.

114.   In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the price of Schein common stock allegedly caused by Defendants' allegedly false and misleading statements and material omissions.  In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiff's damages expert considered price changes in the stock in reaction to the public disclosures allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on

---

objection have been redacted.

that day that were attributable to market or industry forces.  Notice ¶ 53.  The Plan of Allocation

does not consider price changes following the August 2017 disclosures alleged in the

Complaint, because the Court dismissed claims relating to that date.  *Id*.  In addition, the amount

of artificial inflation considered to have been removed from the price of Schein common stock

on November 6, 2017 has been reduced by 90% as a result of the Court's partial dismissal of the

loss-causation allegations related to that alleged corrective disclosure and to account for other

difficulties that the Class would face in establishing that the alleged misstatements were

responsible for the abnormal price decline on that date (*i.e.*, Defendants' argument that the

disclosure of two lawsuits on that date did not occur until after the stock price had already

dropped following Schein's issuance of its earnings release).  *Id*.

115.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated

for each purchase of Schein common stock during the Class Period that is listed in the Claim

Form and for which adequate documentation is provided.  The calculation of Recognized Loss

Amounts will depend upon several factors, including (a) when the Schein common stock was

purchased or otherwise acquired, and at what price; and (b) whether the Schein common stock

was sold or held through the end of the Class Period, and if the stock was sold, when and for

what amounts.  In general, the Recognized Loss Amount calculated will be the difference

between the estimated artificial inflation on the date of purchase and the estimated artificial

inflation on the date of sale, or the difference between the actual purchase price and sales price

of the stock, whichever is less.  Notice ¶¶ 54, 56-57.

116.    Claimants who purchased and sold all their Schein common stock before the first

corrective disclosure on November 6, 2017, or who purchased and sold all their Schein common

stock between the first disclosure on November 6, 2017 and the second disclosure on February

12, 2018 (that is, they did not hold the shares over a date when artificial inflation was allegedly removed from the stock price), will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same on the date of purchase and sale, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action.

117.    In accordance with the PSLRA, Recognized Loss Amounts for shares purchased during the Class Period and sold from February 13, 2018 through May 11, 2018 (known as the "90-Day Look-Back Period"), are further limited to the difference between the purchase price and the average closing price of the stock from February 13, 2018 to the date of sale.  Notice ¶¶ 56(c), 57(b).  For shares purchased during the Class Period that are still held as of the close of trading on May 11, 2018, the Recognized Loss Amount is the lesser of: (i) the amount of artificial inflation on the date of purchase; or (ii) the purchase price minus $69.28 (the average closing price during the 90-Day Look-Back Period).  Notice ¶¶ 56(d), 57(c).

118.    The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Schein common stock during the Class Period is the Claimant's "Recognized Claim."  Notice ¶ 60.   The Plan of Allocation also limits Claimants based on whether they had an overall market loss in their transactions in Schein common stock during the Class Period.  A Claimant's Recognized Claim will be limited to his, her, or its market loss in Schein common stock during the Class Period.  Notice ¶¶ 66-67.  The Net Settlement Amount will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Notice ¶ 67.

119.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Amount among Class Members based on the losses they suffered

on transactions in Schein common stock that were attributable to the alleged misconduct. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

120.    As noted above, as of August 11, 2020, more than 179,000 copies of the Notice, which contains the Plan of Allocation, and advises Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Class Members and nominees.  S*ee* Miller Decl. ¶ 8.  To date, no objections to the proposed Plan of Allocation have been received.

## IX.    THE FEE AND LITIGATION EXPENSE APPLICATION

121.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court on behalf of Plaintiffs' Counsel for an award of attorneys' fees of 25% of the Settlement Fund, including any interest earned (the "Fee Application").[8] Lead Counsel also requests payment for expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $102,840.56 and reimbursement to Lead Plaintiff of $6,000.00 in costs and expenses that Miami GESE incurred directly related to its representation of the Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

122.    The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Memorandum.  The primary factual bases for the requested fee and expenses are summarized below.

---

[8] As noted above, Plaintiff's Counsel are Lead Counsel BLB&G and Klausner, Kaufman, Jensen & Levinson, additional counsel for Lead Plaintiff.

A.       The Fee Application

123.     For the efforts of Plaintiffs' Counsel on behalf of the Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the U.S. Supreme Court and the Second Circuit Court of Appeals for cases of this nature.

124.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, particularly given the facts and circumstances of this case, as well as within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

1.       Lead Plaintiff Has Authorized and Supports the Fee Application

125.     Lead Plaintiff Miami GESE is a sophisticated institutional investor that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Declaration of Ron Silver ("Silver Decl."), attached hereto as Exhibit 2, at ¶¶ 2-6.  Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested.  *Id.* ¶ 8.  Lead Plaintiff has reviewed and approved the proposed fee and believes it is fair and reasonable in light of the result obtained for the Class, the substantial risks in the litigation, and the work performed by Plaintiffs' Counsel.  *Id.*  Lead Plaintiff's endorsement of Lead Counsel's fee

request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

## 2.    The Time and Labor Devoted to the Action by Plaintiff's Counsel

126.    Plaintiff's Counsel devoted substantial time to the prosecution of the Action.  As described above in greater detail, the work that Plaintiff's Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly available documents such as SEC filings, analyst reports, conference call transcripts, press releases, company presentations, and media reports, and interviews with over 100 people, including former employees of Schein and other individuals believed to be knowledgeable about the facts alleged in the Complaint; (ii) drafting a detailed consolidated complaint based on this investigation; (iii) successfully defeating Defendants' motion to dismiss, in part and fully briefing Defendants' motion for reconsideration; (iv) undertaking substantial due diligence discovery, which included obtaining and analyzing more than 680,000 pages of documents produced by Defendants and conducting interviews with two senior Schein executives; (vi) consulting extensively throughout the litigation with experts in financial economics; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement.

127.    Throughout the litigation, Plaintiff's Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.  As the lead partner on the case, I personally monitored and maintained control of the work performed by other lawyers at BLB&G and the other Plaintiff's Counsel throughout the litigation.  Other experienced attorneys at Plaintiff's Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations.  More junior attorneys and

paralegals worked on matters appropriate to their skill and experience level.

128.   Attached hereto as Exhibits 4A and 4B, respectively, are my declaration on behalf of BLB&G and the declaration of Robert D. Klausner on behalf of Klausner, Kaufman, Jensen & Levinson in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations").   Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates.   These Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.   In addition, Exhibit 4A-2 sets forth summary descriptions of the principal tasks performed by each attorney at Lead Counsel who was involved in the Action.   The first page of Exhibit 4 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiff's Counsel's firm, and gives totals for the numbers provided

129.   As set forth in Exhibit 4, Plaintiffs' Counsel collectively expended a total of 9,963.6 hours in the investigation and prosecution of the Action from its inception through July 15, 2020.   The resulting lodestar is $4,499.931.25.   The vast majority of the total lodestar—99.7%—was incurred by Lead Counsel.

130.   The requested fee of 25% of the Settlement Fund is $8,750,000, plus interest accrued at the same rate as the Settlement Fund, and therefore represents a multiplier of approximately 1.9 of Plaintiffs' Counsel's lodestar.   As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is within the range of fee multipliers

typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3.    The Experience and Standing of Lead Counsel

131.    As demonstrated by the firm resume included as Exhibit 4A-4 hereto, Lead Counsel BLB&G is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country.  Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.  I believe this willingness and ability added valuable leverage during the settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

132.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by experienced and extremely able counsel Proskauer Rose LLP, which vigorously represented its clients.  In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are very favorable to the Class.

### 5.    The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

133.    This prosecution was undertaken by Lead Counsel entirely on a contingent basis. The risks assumed by Lead Counsel in prosecuting these claims to a successful conclusion are described above.  Those risks are also relevant to an award of attorneys' fees.

134.    From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for

the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel and the other Plaintiffs' Counsel received no compensation during the course of the Action and have collectively incurred over $102,000 in litigation expenses in prosecuting the Action for the benefit of the Class.

135.    Lead Counsel also bore the risk that no recovery would be achieved.  As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

136.    Lead Counsel knows from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

137.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the

interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

138.    Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.  In circumstances such as these, and in consideration of the hard work and the excellent result achieved, I believe the requested fee is reasonable and should be approved.

### 6.    The Reaction of the Class to the Fee Application

139.    As stated above, as of August 11, 2020, 179,750 Notice Packets had been mailed to potential Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund.  *See* Miller Decl. ¶ 8.  In addition, the Court-approved Summary Notice was published in the *Wall Street Journal* and *Investor's Business Daily* and transmitted over the *PR Newswire*.  *Id.* ¶ 9.  To date, one objection to the attorneys' fees request has been received by Lead Counsel.  *See* Objection of D. Michael Connellan (Exhibit 5).  All objections received will be addressed in Lead Counsel's reply papers to be filed on September 9, 2020, after the deadline for submitting objections has passed.

140.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 25%, resulting in a multiplier of 1.9 is fair and reasonable, and is supported by the fee awards that courts have granted in other comparable cases.

### B.    The Litigation Expense Application

141.    Lead Counsel also seeks payment from the Settlement Fund of $102,840.56 in litigation expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

142.    From the outset of the Action, counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved.   Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.   Accordingly, Lead Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

143.    Lead Counsel has incurred a total of $102,840.56 in litigation expenses in connection with the prosecution of the Action.   The expenses are summarized in Exhibit 4A-3, which identifies each category of expense, *e.g.*, expert fees, mediation costs, and on-line research, and the amount incurred for each category.   These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs' Counsel's hourly rates.

144.    The largest expense was for the mediation fees of Judge Weinstein and Mr. Melnick of JAMS, in the amount of $39,804.00, or 39% of the total litigation expenses. Another $20,835.00, or approximately 20%, was expended for the retention of experts.   As noted above, Lead Counsel consulted with experts in the fields of financial economics, loss causation, and damages during its investigation and the preparation of the Complaint, and in connection with the development of the proposed Plan of Allocation.

145.     Another large component of the litigation expenses was for online legal and factual research, which was necessary to conduct the factual investigation and identify potential witnesses, prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss, and prepare Lead Plaintiff's mediation submissions.  The charges for on-line research amounted to $30,870.47 or 30% of the total amount of expenses.

146.     The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, and postage and delivery expenses.

147.     All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiff. *See* Silver Decl. ¶ 9.

148.     The Notice informed potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $200,000.  The total amount requested, $102,840.56, is significantly below the $200,000 that Class Members were advised could be sought.

149.     In addition, Lead Plaintiff Miami GESE seeks reimbursement of the reasonable costs and expenses that it incurred directly in connection with its representation of the Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 21-22.  Lead Plaintiff seeks reimbursement of $6,000 for the time expended in connection with the Action by its General Counsel, Ron Silver, who spent a substantial amount of time communicating with Lead Counsel and reviewing pleadings and motion papers, and as well as time dedicated to the Action by other Miami personnel.  *See*

Silver Decl. ¶¶ 5-6, 10-11.

150.   The Notice informed potential Class Members that Lead Plaintiff might be requesting expense awards for its time and expenses devoted to the supervision and prosecution of the Action in an amount not to exceed $20,000.

151.   In sum, the expenses incurred by Plaintiffs' Counsel and Lead Plaintiff were reasonable and necessary to represent the Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the application for payment of these expenses should be approved.

152.   Attached hereto are true and correct copies of the following documents previously cited in this Declaration:

Exhibit 1:   Declaration of the Hon. Daniel H. Weinstein (Ret.)

Exhibit 2:   Declaration of Ron Silver, General Counsel of the City of Miami General Employees' & Sanitation Employees' Retirement Trust, in Support of: (A) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

Exhibit 3:   Declaration of Eric J. Miller Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

Exhibit 4:   Summary of Plaintiffs' Counsel's Lodestar and Expenses

Exhibit 4A:   Declaration of James A. Harrod in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP

Exhibit 4B:   Declaration of Robert D. Klausner in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses Filed on Behalf of Klausner, Kaufman, Jensen & Levinson

Exhibit 5:   Objection of D. Michael Connellan [redacted]

Exhibit 6:   CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS 2019 YEAR IN REVIEW (2020)

Exhibit 7:      STEFAN BOETTRICH AND SVETLANA STARYKH, NERA ECONOMIC CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2017 FULL-YEAR REVIEW (2018)

Also attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 8:      *In re OSG Sec. Litig.,* No. 12-cv-07948-SAS (S.D.N.Y. Dec. 2, 2015), ECF No. 261

Exhibit 9:      *In re Celestica Inc. Sec. Litig.*, No. 07-cv-00312-GBD (S.D.N.Y. July 28, 2015), ECF No. 267

Exhibit 10:      *Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 1:08-cv-03612-RJS (S.D.N.Y. Apr. 5, 2013), ECF No. 127

Exhibit 11:      *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, No. 1:09-cv-08633-JFK (S.D.N.Y. Mar. 14, 2013), ECF No. 23

Exhibit 12:      *In re Xerox Corp. ERISA Litig.*, No. 02-CV-1138 (AWT) (D. Conn. Apr. 14, 2009), ECF No. 354

Exhibit 13:      *Freudenberg v. E\*Trade Fin. Corp.*, No. 07 Civ. 8538 (JPO) (MHD) (S.D.N.Y. Oct. 20, 2012), ECF No. 154

Exhibit 14:      JANEEN MCINTOSH & SVETLANA STARYKH, NERA ECONOMIC CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION: 2019 FULL-YEAR REVIEW (2020)

## X.    CONCLUSION

153.    For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate. Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $102,840.56 and Lead Plaintiff's costs and expenses, in the amount of $6,000.00 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: August 12, 2020                         Respectfully submitted,


                                        _____ */s/ James A. Harrod* _____
                                              James A. Harrod